# **EXHIBIT C**

# Deposition Transcript of William J. Vigilante, Jr., Ph.D., CPE (08.18.16)

| PAGE:LINE(S) CITED IN MEMORANDUM OF LAW |
|---|
| 74:10-13 |
| 96:13-17 |
| 96:18-21 |
| 98:11-17 |
| 99:10-12 |
| 99:17-20 |
| 105:16-106:10 |
| 107:8-108:10 |
| 108:24-109:6 |
| 146:1-11 |
| 147:3-9 |
| 98:11-99:5 |
| 99:2-9 |

Page 1

1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF CONNECTICUT
2    _____
                               )
3    RACHEL DENNERT,           )
                               )
4            Plaintiff,        )
                               )
5        -vs-                  )
                               )
6    MEDTRONIC, INC.;          )   Civil Action No.
     MEDTRONIC MINIMED,        )   3:11-CV-01229 (SRU)
7    INC., d/b/a MEDTRONIC     )
     DIABETES, a Division of   )
8    MEDTRONIC, INC.           )
     (improperly named as      )
9    MEDTRONIC DIABETES);      )
     UNOMEDICAL DEVICES SA     )
10   de CV and UNOMEDICAL      )
     A/S,                      )
11                             )
             Defendants.       )
12   _____

13
              WILLIAMS CUKER BEREZOFSKY
14        1515 MARKET STREET - SUITE 1300
          PHILADELPHIA, PENNSYLVANIA 19102
15              AUGUST 18, 2016
                  10:07 A.M.
16

17

18        VIDEOTAPED DEPOSITION OF
     WILLIAM J. VIGILANTE, JR., Ph.D., CPE
19

20

21

22

23

24   REPORTED BY: DEBRA SAPIO LYONS, RDR, CRR, CRC, CCR, CPE

25   JOB NO: 111357

Page 2

```
1
2
3
4
5              August 18, 2016
6          Videotaped deposition of
7    William J. Vigilante, Jr., Ph.D., CPE, held at
8    the offices of Williams Cuker Berezofsky, 1515
9    Market Street, Suite 1300, Philadelphia,
10   Pennsylvania 19102, before Debra Sapio Lyons, a
11   Registered Diplomat Reporter, a Certified
12   Realtime Reporter, a Certified Realtime
13   Captioner, a Certified LiveNote Reporter, an
14   Approved Reporter of the United States District
15   Court for the Eastern District of Pennsylvania, a
16   Certified Court Reporter of the State of New
17   Jersey, a Notary Public of the States of New
18   Jersey, New York and the Commonwealth of
19   Pennsylvania.
20
21
22
23
24
25
```

Page 3

```
1   APPEARANCES:
2       WILLIAMS CUKER BEREZOFSKY
        BY:  KEVIN HAVERTY, ESQUIRE
3          SARAH HANSEL, ESQUIRE
        210 Lake Drive East
4       Corporate Center
        Cherry Hill, NJ 08002
5       Attorneys for Plaintiff Rachel Dennert
6
7
8       MASLON
        BY:  DAVID SCHULTZ, ESQUIRE
9       3300 Wells Fargo Center
        90 South Seventh Street
10      Minneapolis, MN 55402
        Attorneys for Defendant Medtronic, Inc.;
11      MEDTRONIC MINIMED, INC., d/b/a MEDTRONIC
        DIABETES, a Division of MEDTRONIC, INC.
12      (improperly named as MEDTRONIC DIABETES)
13
14
15      THOMPSON HINE
        BY:  Z. ILEANA MARTINEZ, ESQUIRE
16      3560 Lenox Road Northeast
        Atlanta, GA 30326
17      Attorneys for Defendant Unomedical
        Devices SA de CV and Unomedical A/S
18
19
20  ALSO PRESENT:
21      GERARD ALFE, LEGAL VIDEO SPECIALIST
        TSG REPORTING
22
23
24
25
```

Page 4

```
1           W. VIGILANTE
2        (The following is not recorded on
3    the videotaped record.)
4        MR. HAVERTY:  Dave.
5        MR. SCHULTZ:  Sure.  Mr. Vigilante,
6    you've tendered to us a fee agreement that
7    you've asked my law firm and, I believe,
8    Ms. Martinez's law firm to execute; and
9    I've indicated to you that I do not intend
10   to execute it for the reason that I am
11   obligated under the rules, the Federal
12   Rules of Civil Procedure to pay you in
13   accordance with those rules, and I, of
14   course, will honor that obligation, but
15   what I won't do is sign a fee agreement for
16   an expert I have not retained which may or
17   may not purport to obligate I or my law
18   firm beyond the rules.  So you've asked
19   that I execute it.  I have indicated that I
20   will abide by the Rules Of Civil Procedure
21   and I will compensate you as required by
22   the rules, but I will not sign that fee
23   agreement.
24       MS. MARTINEZ:  And I join
25   Medtronic's position on this issue.
```

Page 5

```
1           W. VIGILANTE
2        MR. HAVERTY:  And just so -- just so
3    we're clear, we want to put this on the
4    record so that we make sure that everybody
5    is covered in the event there's any type of
6    a dispute later on down the road.
7        MR. SCHULTZ:  Fair enough.
8        THE VIDEOGRAPHER:  Is everyone
9    ready?  Okay.  And could you put your mic
10   on?
11       (Discussion is held off the record.)
12       (The following is recorded on the
13   video record.)
14       THE VIDEOGRAPHER:  This deposition
15   is now beginning.  The date August 18th,
16   2016.  The time 10:10.  This is the
17   deposition of William J. Vigilante taken in
18   the matter of Rachel Dennert versus
19   Medtronic, Inc., et al. in the
20   United States District Court, District of
21   Connecticut, Civil Action Number
22   3-11-cv-01229(SRU).
23       Counsel will now introduce
24   themselves.
25       MR. HAVERTY:  Good morning.  Kevin
```

Page 6

```
 1              W. VIGILANTE
 2    Haverty, Williams Cuker Berezofsky for the
 3    Plaintiff.
 4         MS. HANSEL:  Sarah Hansel, Williams
 5    Cuker Berezofsky also for the Plaintiff.
 6         MS. MARTINEZ:  Ileana Martinez from
 7    Thompson Hine for the Unomedical
 8    Defendants.
 9         MR. SCHULTZ:  Good morning.  David
10    Schultz, Maslon LLP on behalf of the
11    Medtronic Defendants.
12              - - -
13         William J. Vigilante, Jr., PhD, CPE,
14    having been first duly sworn, was examined
15    and testified as follows:
16              - - -
17    EXAMINATION
18    BY MR. SCHULTZ:
19         Q.  Good morning, Mr. Vigilante.
20         A.  Morning.
21         Q.  In your 13-year career as an
22    expert witness, how many times have you been
23    deposed?
24         A.  Somewhere over a hundred.
25         Q.  And in addition to that, how many
```

Page 7

```
 1              W. VIGILANTE
 2    times have you testified in a Court of Law?
 3         A.  Maybe 36.
 4         Q.  Okay.  So the rules of this
 5    proceeding are well-known to you; correct?
 6         A.  I think I have a general
 7    understanding.
 8         Q.  Okay.  You understand that I ask
 9    you questions, you got to provide me answers,
10    correct, unless --
11         A.  Sure.
12         Q.  -- instructed to do otherwise;
13    right?
14         A.  Sure.
15         Q.  Okay.  And if you don't understand
16    a question, you -- will you let me know that?
17         A.  I will do my best.
18         Q.  Okay.  Well, if you don't indicate
19    any misunderstanding or unclarity about the
20    question, I'm going to assume that you've
21    understood it.
22              Is that a fair way to proceed?
23         A.  Sure.
24         Q.  All right.  Is there any reason
25    why today you are unable to give complete and
```

Page 8

```
 1              W. VIGILANTE
 2    accurate testimony?
 3         A.  I don't believe so.
 4         Q.  Who do you consider your client in
 5    this matter, Mr. Vigilante?
 6         A.  Mr. Haverty.
 7         Q.  How much have you earned in your
 8    13-year career as an expert witness?
 9         A.  I have no idea.
10         Q.  Do you know how much you make a
11    year?
12         A.  I knew what my salary was with my
13    prior employer.
14         Q.  Okay.  What was it?
15         A.  It's not for the record.
16         Q.  I'm sorry?
17         A.  It's not for the record.
18         Q.  Are you declining to answer that
19    question?
20         A.  In the way it's asked, yes, I am.
21         Q.  Why?
22         A.  Because it's not for the record.
23    It's --
24         Q.  What --
25         A.  -- it's a --
```

Page 9

```
 1              W. VIGILANTE
 2         Q.  -- what do you mean "it's not for
 3    the record"?
 4         A.  I'm not going to provide an answer
 5    to the question.
 6         Q.  Well, Mr. Vigilante, I think
 7    you're required to do that, and I'd ask that
 8    you do that.  If your counsel decides he wants
 9    to mark it confidential, he's free to do that.
10         A.  Yeah, my salary with my prior
11    employer was confidential information.  I'm
12    not going to provide it on the record whether
13    you mark it confidential or not.  I can -- be
14    happy to answer other questions related to how
15    I'm compensated, but I'm not going to provide
16    an answer to that question.
17         MR. HAVERTY:  Why don't we -- why
18    don't we move on.  We'll contact the Judge
19    later about this.  Is that all right,
20    David?
21         Q.  Mr. Vigilante, how long have you
22    been -- well, how long have you had Vigilante
23    Forensics?
24         A.  I opened up for business on
25    October 1st, 2015.
```

3 (Pages 6 to 9)

Page 10

W. VIGILANTE

1
2      Q.   Since opening Vigilante Forensics
3   up for business on October 15 -- or October
4   1st of 2015, how much money have you earned as
5   an expert witness?
6      A.   I don't know.
7      Q.   How much money -- you have no idea
8   how much you've earned as an expert witness?
9      A.   My taxes haven't been done for the
10  year.  I don't know.
11     Q.   Well, I understand your taxes
12  haven't been done, but you're just -- you're
13  telling me that you just have no idea how much
14  income you've brought home from your expert
15  witness's services?
16     A.   Again, I can tell you that as of
17  October 1st, 2015 all of my income that I
18  generate is through my company, Vigilante
19  Forensic.
20     Q.   Yeah, not my question.  My
21  question was how much money -- if you want me
22  to rephrase it as Vigilante Forensics, how
23  much money has Vigilante Forensics earned
24  through your provision of expert witness
25  services?

Page 11

W. VIGILANTE

1
2      A.   Again, I -- I haven't done my
3   taxes for the year, so I don't know or could
4   give an answer for you other than that.
5      Q.   I'm not looking for a precise
6   dollar amount.  Are you able to give a
7   reasonable approximation?
8      A.   My approximation is, is that all
9   the money I've generated or the company has
10  generated has been related to forensic work
11  since I opened up for business on October 1st.
12     Q.   Right.  And so the question is:
13  In dollars what's your best estimate as to how
14  much that is?
15     A.   It -- I don't know.  I haven't
16  done the taxes.  I haven't been through to
17  find out what the revenue is for the year.
18     Q.   Can you state what the gross
19  income is of Vigilante Forensics?
20     A.   Again, I haven't calculated it.
21  The best I can offer you is maybe the fourth
22  quarter of 2015 was the last time that the
23  taxes were done.
24     Q.   Yeah.  So you pay estimated taxes;
25  right?

Page 12

W. VIGILANTE

1
2      A.   I do pay estimated taxes.
3      Q.   Okay.  And you paid estimated
4   taxes on fourth quarter of 2015; correct?
5      A.   No, I did not.
6      Q.   Okay.  Did you pay estimated taxes
7   on first quarter of 2016?
8      A.   Yes.
9      Q.   And estimated taxes on second
10  quarter of 2016?
11     A.   Yes.
12     Q.   And the estimated taxes are based
13  upon your best projection of the amount of
14  revenues that Vigilante Forensics would
15  generate; correct?
16     A.   It's based upon what my tax
17  accountant does with the information that I
18  provide him.  He has access to my books.  He
19  looks through the money that's been collected.
20  He looks at my tax liabilities.  He looks at
21  the other issues related to the taxes, and he
22  tells me how much he's going to pull from the
23  bank account.
24     Q.   And one piece of that information
25  that your accountant looks at is how much

Page 13

W. VIGILANTE

1
2   revenue your company, Vigilante Forensics, is
3   generating; correct?
4      A.   How much it's collected in, I
5   would imagine, up to that point in time.
6      Q.   All right.  And despite your --
7   and you paid those taxes; right?
8      A.   Yes.
9      Q.   All right.  And despite having
10  paid those taxes, you're unable to give any
11  reasonable approximation of how much revenue
12  your company has generated through your
13  services as an expert witness?
14     A.   I can tell you what my taxes were.
15  I -- again, you're --
16     Q.   Okay.
17     A.   -- asking me to give you a guess,
18  and it's my understanding as a rule for
19  depositions is not to guess or speculate.
20  So --
21     Q.   Actually --
22     A.   -- you're asking me to -- to guess
23  at numbers I don't have and I don't have
24  access to at the moment.
25     Q.   I'm actually not asking you to

4 (Pages 10 to 13)

Page 14

W. VIGILANTE

1  guess, and your counsel hasn't objected on
2  that grounds, Mr. Vigilante.  I've asked if
3  you have a reasonable estimate, which is
4  something different, and if you're saying you
5  can't give me a reasonable estimate because it
6  would be just a wild guess, I'll accept that
7  testimony.
8        A.  Well, good.  It would be a --
9        Q.  Is that what your testimony is?
10       A.  It -- I don't have a reasonable
11  estimate to give to you at the moment.
12       Q.  Okay.  Are you full time as an
13  expert witness?
14       A.  I don't know what you mean by
15  "full time."  I run a -- a company that does
16  forensic consulting.
17       Q.  Do you work 40 hours a week?
18  How -- how much do you work?
19       A.  I wish I worked 40 hours a week.
20  Sometimes it's 60.  Sometimes it's 70.
21       Q.  Okay.  And do you generate income
22  through your company at the hourly rates that
23  you have quoted to us in your fee agreement?
24       A.  Yeah, I have an hourly rate that I

Page 15

W. VIGILANTE

1  have a agreement for with clients, and they
2  pay the hourly late -- hopefully they pay the
3  hourly rate when I invoice them.
4        Q.  And the hourly rate --
5        A.  Sometimes I have problems
6  collecting.  Sometimes I have clients that
7  aren't -- that want to negotiate the final
8  invoice.  It just -- it's -- it's variable.
9        Q.  Your hourly rate is what?
10       A.  Currently it's $350.00 an hour for
11  all case-related work except for videotaped
12  testimony which is 435 an hour.
13       Q.  Now, why do you charge more for
14  videotaped testimony?
15       A.  Because it's a more stressful
16  event.  It's harder to -- to testify under
17  video and it takes more effort during the
18  deposition or the trial testimony or what have
19  you.
20       Q.  Okay.  So you find -- you -- are
21  you saying that you find this videotaped
22  deposition to be stressful?
23       A.  Yeah.  I wasn't trained as an
24  anchor or newscaster.  I'm not used to sitting

Page 16

W. VIGILANTE

1  in front of a camera having to talk to a
2  camera for hours at end.  So it's a unusual
3  and more stressful situation than a regular
4  deposition or trial testimony that's not
5  videotaped.
6        Q.  Would it be less stressful if you
7  looked me in the eye instead of looking solely
8  at the camera?
9        A.  I think that I'm supposed to be
10  looking at the camera because I'm being
11  videotaped.  Why would I be looking at you if
12  I'm going to be videotaping to the camera --
13       Q.  That's your understanding --
14       A.  -- or being videotaped by the
15  camera.
16       Q.  That's your understanding of what
17  a rule is in this deposition for your conduct?
18       A.  I don't think there is any rules
19  for videotaped testimony, but, again, you're
20  videotaping me.  I'm going to be looking at
21  the camera.
22       Q.  Okay.  Well, if there's anything
23  that causes you to want to look me in the eye,
24  feel free to do that, okay, so that you're not

Page 17

W. VIGILANTE

1  feeling as if you have to look at the camera
2  at all times, Mr. Vigilante.
3        Why don't you tell me about your
4  educational background if you would.
5        A.  What would you like to know?
6        Q.  Well, let's do it this way.
7        MR. HAVERTY:  Can we just go off the
8  record real quickly?
9        THE VIDEOGRAPHER:  One moment.  We
10  are now going off the video record.  The
11  time, 10:20.
12       (A recess is held from 10:20 a.m. to
13  10:22 a.m.)
14       (Exhibit Vigilante-1, multipage
15  document entitled William J. Vigilante Jr.,
16  PhD, CPE, Human Factors/Ergonomics Expert,
17  is marked for identification.)
18       THE VIDEOGRAPHER:  Back on, 10:22.
19       MR. SCHULTZ:  Go ahead and hand that
20  to the witness.
21       THE WITNESS:  Thank you.
22  BY MR. SCHULTZ:
23       Q.  Mr. Vigilante, the court reporter
24  has handed you what's been marked as Exhibit 1

5 (Pages 14 to 17)

W. VIGILANTE

1
2  which is a copy of the CV you have provided in
3  conjunction with this case.
4         Do you recognize that document as
5  I've described it?
6      A.  Yes.
7      Q.  And is that a complete statement
8  of your credentials and qualifications as you
9  understand them?
10     A.  It is.  There's been an update to
11 it.  So that would be the only caveat.
12     Q.  What's the update?
13     A.  There's a newer version of it.
14     Q.  Okay.  What's the difference
15 between the new version and the version that
16 was provided?  Just more testimony or --
17     A.  I believe the -- the difference is
18 some edits I made in the grammar and some
19 spelling errors --
20     Q.  Okay.
21     A.  -- but I -- my current CV has a
22 different date on it.  That's how I know that
23 it's different.
24     Q.  Okay.  But in terms of relating
25 the training and experience that you rely upon

W. VIGILANTE

1
2  in this case for your opinions, that version
3  of the CV accurately and completely conveys
4  that training and experience; correct?
5      A.  Yeah, I'd say it was adequate for
6  that reason.
7      Q.  Okay.
8      A.  The --
9      Q.  Is there any --
10     A.  Just the -- my updated CV has a
11 date of July 2016 --
12     Q.  Okay.
13     A.  -- and I can -- happy to provide
14 you with a copy of that.
15     Q.  Have you received any additional
16 degrees or certifications since that are
17 reflected in your updated CV?
18     A.  No.
19     Q.  All right.  And is there any
20 experience or training that you are relying on
21 in rendering your opinions in this case that
22 isn't reflected on the CV that's been marked
23 as Exhibit 1?
24     A.  No.
25     Q.  And I take it there is nothing

W. VIGILANTE

1
2  that you would describe as inaccurate or
3  misleading on your CV; correct?
4      A.  There's nothing misleading.  There
5  was some inaccuracies, that's why I had to go
6  and edit it, but nothing misleading.
7      Q.  Okay.  Your CV says that you have
8  a Ph.D. -- among other things, it says you
9  have a Ph.D. in psychology/ergonomics.  Does
10 your -- did you actually receive a degree in
11 ergonomics or are you simply conveying that
12 that was your area within psychology that you
13 studied?
14     A.  Yeah, technically it's a Doctorate
15 of Philosophy, but my department that the
16 degree was earned in was in the Psychology
17 Department, and the area in which I studied in
18 that department was the ergonomics area.
19     Q.  Okay.  And I guess what I'm asking
20 is:  The institution from which you got your
21 degree does not say you have a doctorate in
22 ergonomics; correct?  That's not the way they
23 describe it.
24     A.  I don't know.  I can tell you that
25 the diploma says doctor of -- Doctorate of

W. VIGILANTE

1
2  Philosophy.  I don't know how NC State
3  would -- would present it.
4      Q.  Okay.  Well, and your doctorate
5  was earned through the Psychology Department;
6  correct?
7      A.  Yes, I was a student in the
8  Psychology Department.
9      Q.  Okay.  And is there a Department
10 of Ergonomics at North Carolina State
11 University?
12     A.  No.
13     Q.  All right.  What is ergonomics?
14     A.  Ergonomics or human factors are
15 synonyms, is basically the science that
16 studies how people interact with or use all
17 different types of products, machines, and
18 systems; and what we focus on are the people
19 that are going to be using the systems, the
20 products, and so forth.  We're interested in
21 how people capture information through their
22 senses, through their ear -- their hearing,
23 their -- their visual senses and so forth, how
24 they make sense of that information, how they
25 make decisions, how they learn, how they're

Page 22

W. VIGILANTE

able to -- how memory is affected by the information they get and how memory affects the information -- how they interpret the information they collect. We look at also things such as physical strength, coordination, and so forth.

The goal of human factors is to take the information we learn about the user and apply it to the design of products, machines, systems so that products are easy to use, they're comfortable for the users that have to use them, and that they're safe for use by the multiple users that are likely to use them.

Q. Is it your view that ergonomics and human factors -- did you say they're synonymous?

A. Yes.

Q. All right. You said earlier that you formed Vigilante Forensics on October 1st of 2015; correct?

A. That's the day I started business.

Q. Okay. When did you form it?

A. The LLC is technically

Page 23

W. VIGILANTE

Vigilante Consulting, and it was sometime prior to October 1st.

Q. And why did you decide to form Vigilante Forensics or Vigilante Consulting?

A. Yeah, I wanted to do -- I wanted to have my own company, so I was, I guess, advised to open an LLC. So I opened an LLC to do business as Vigilante Consulting.

I offer both forensic consulting and traditional consulting, so I didn't want to call the LLC Vigilante Forensic. So I applied for a doing business as Vigilante Forensic so that I can still do traditional consulting work under Vigilante Consulting, LLC. I know it's a little confusing, but that's kind of the reason for it.

Q. Are there two separate organizations?

A. No.

Q. Okay. Do you do what you call "traditional consulting" under Vigilante Forensic?

A. No, I would send the -- if a

Page 24

W. VIGILANTE

client calls and wants me to do traditional consulting work, I would send them a -- an agreement, much like the agreement I sent to Mr. Haverty for my involvement in his case, and it would be titled under Vigilante Consulting, LLC.

Q. Okay. And when you're engaged in litigation or legal-related work, you issue your invoices and your agreements under the name "Vigilante Forensic"; correct?

A. Actually, the invoices are sent under Vigilante Consulting, LLC doing business as Vigilante Forensic.

Q. Okay. So there's not two separate LLCs?

A. No, there's only one LLC.

Q. All right. Do you -- when you say -- well, let me ask it this way. Since forming Vigilante Consulting, LLC, have you done any traditional consulting?

A. I've had a few proposals out, but I haven't generated any income through Vigilante Consulting, LLC doing traditional consulting work.

Page 25

W. VIGILANTE

Q. Have you -- and I take it you are not under any current engagements to do any traditional consulting?

A. Correct.

Q. What do you mean by "traditional consulting"?

A. Non-litigation related. So a manufacturer may come to me and ask me to help them with their product design, usability testing, warning assessment, things of that nature.

Q. So to date, which is about ten months operating Vigilante Consulting dba Vigilante Forensic, all of your engagements have been forensic work; correct?

A. All revenue I've generated since opening the company has been forensic or litigation related.

Q. Okay. Why the qualification?

A. 'Cause I really didn't understand your question fully and I wanted to make sure I was clear.

Q. Okay. Have you done other work under Vigilante Consulting that hasn't

Page 26

W. VIGILANTE

1
2  generated revenues?
3       A.  Like I said, I submitted a few
4  proposals for traditional consulting work --
5       Q.  Okay.
6       A.  -- for clients that were
7  interested.
8       Q.  All right.  But that's it; right?
9          In other words, you're not
10 providing some services for which you're not
11 getting revenues under Vigilante Consulting?
12      A.  No.  Like I said, the -- only
13 thing I've done other -- that's not litigation
14 related is I have submitted a few proposals on
15 the request of clients that were
16 non-litigation related, were non-lawyers that
17 were looking for work to be done.  So I spoke
18 with them, generated the proposal, sent them
19 off, and that's where they stand.
20      Q.  Have you heard that any of those
21 proposals have expired, meaning that it's not
22 that they're open, but a decision has been
23 made and they've gone in a different
24 direction?
25      A.  I have not heard either way.

Page 27

W. VIGILANTE

1
2       Q.  Okay.  Have any of those proposals
3  been made to medical device manufacturers?
4       A.  No.
5       Q.  Pharmaceutical companies?
6       A.  No.
7       Q.  In terms of the nomenclature, when
8  you say "forensic work," you're using
9  "forensic" in the sense of legal related;
10 correct?
11      A.  Well, typically it's legal
12 created -- or typically it's legal related for
13 the work that I do, but technically forensic
14 is just the investigation of an incident to
15 determine root cause and other variables that
16 may have been involved.
17      Q.  Okay.  Well, I just want to make
18 sure I understand how you're using the word
19 "forensic" in your dba.  So is that what
20 you're intending to communicate, that you're
21 engaged in forensic work?
22      A.  Yeah, I chose the name to have a
23 connotation that I do forensic-related work.
24      Q.  Okay.  And by that you mean what?
25      A.  I don't understand.  That I do

Page 28

W. VIGILANTE

1
2  forensic-related work.
3       Q.  What do you mean by
4  "forensic-related work"?
5          MR. HAVERTY:  He just -- he just
6  said what.
7       A.  Yeah, so technically it's for
8  anything that involves incident investigation
9  to determine root causes and -- and the roles
10 and responsibility of the people involved and
11 what could have been done to prevent it.  Most
12 of my work is done in the litigation arena.
13      Q.  Well, since forming
14 Vigilante Consulting dba Vigilante Forensic,
15 have you done any forensic work that was not
16 litigation related?
17      A.  I don't believe so.
18      Q.  How many employees does Vigilante
19 Consulting have?
20      A.  I don't have any employees.
21      Q.  Okay.  So the company -- you and
22 the company are synonymous in terms of --
23 well, strike that.  That's a bad question.
24          You're the owner of the company;
25 right?

Page 29

W. VIGILANTE

1
2       A.  Yes.
3       Q.  And you have no employees other
4  than yourself if you call yourself an
5  employee?
6       A.  Yeah, I don't have any other
7  employees.
8       Q.  Okay.  Where is your office?
9       A.  I work out of my home office.
10      Q.  And where is that?
11      A.  Do you want the street address or
12 do you want the location?
13      Q.  Street address would be good.
14 Thanks.
15      A.  200 Pembrooke Circle,
16 Phoenixville, PA 19460.
17      Q.  Okay.  And do you have any
18 certifications?
19      A.  Yes.
20      Q.  What do -- what certifications do
21 you hold?
22      A.  I'm board certified by the -- I'm
23 a board certified professional ergonomist.
24      Q.  Okay.  What's the certification
25 procedure for that organization?

Page 30

W. VIGILANTE

1
2        A.  There is an application that you
3    have to complete.  You have to have, I think,
4    some prerequisites related to the amount of
5    years that you've been doing work in the field
6    of ergonomics/human factors.  Once you submit
7    the application, if you have the
8    prerequisites, they request you to submit a
9    portfolio of work that you've done over the
10   years.  The portfolio of work is apparently
11   given to a panel of reviewers for
12   determination of whether or not it's adequate,
13   appropriate, et cetera, meets the standards of
14   the Certification Board.
15       If they're happy with that, you
16   have to sit for an exam.  The exam covers the
17   different areas of human factors ergonomic --
18   ergonomics.  You have to have a certain score
19   on the exam, a passing score on the exam.  If
20   you pass the exam, they give you a board
21   certification; and then to keep the
22   certification, you have to meet certain
23   continuing education requirements.
24       Q.  Anything else you have to do in
25   order to maintain certification other than

Page 31

W. VIGILANTE

1
2    continuing education?
3        A.  Technically you have to -- I guess
4    there's like a form.  I haven't gotten there
5    yet.  I think it's every three years you have
6    to submit a form to the Certification Board
7    with the list of the continuing education and
8    then the proof that you attended the
9    continuing education.  And there are so many
10   points of different types of education, and as
11   long as the points meet their criteria,
12   they'll continue to allow you to be listed on
13   their registry.  I assume that if you don't
14   meet their requirements, there may be some
15   time period in which to meet them.  I -- I
16   don't know yet.
17       Q.  All right.  When -- when did you
18   become first certified?
19       A.  I believe it's been either the
20   spring of '15 or the spring of '14, but within
21   the last two years.
22       Q.  And when you say you had to submit
23   some information about your work, can you give
24   me an idea of what -- what was the nature of
25   the information you submitted?

Page 32

W. VIGILANTE

1
2        A.  I think I submitted some of the
3    peer-reviewed scientific research that I've
4    conducted.  I believe I submitted a report
5    that I had done for a -- a litigation-related
6    case.  I don't know -- I don't remember what
7    else I did.
8        Q.  Have you held any other
9    certifications in your professional areas of
10   endeavor?
11       A.  Yes, so the -- I think the -- the
12   answer is yes -- or, excuse me, the answer is,
13   no, I don't hold any other certifications
14   related to my field.  I do hold some other
15   certifications that are related to the type of
16   work that I get involved with, but I wouldn't
17   call them -- they're professional
18   organizations, but I wouldn't call them like a
19   academic professional organization like human
20   factors or ergonomics or that thing.
21       Q.  What other certifications do you
22   hold?
23       A.  Like, for example, I have -- I'm
24   certified for -- I'm a certified forklift
25   operator.  I'm -- I've received certification

Page 33

W. VIGILANTE

1
2    from the Motorcycle Safety Foundation through
3    different courses, the NRA through different
4    courses as an instructor.  I think there's
5    a -- maybe a few more of them that are listed.
6    In the past I've had like Fall Protection
7    Certification, Confined Space Certification.
8    So kind of things of that nature.
9        Q.  Who issues these certifications
10   you're referring to now?
11       A.  There's multiple different
12   parties.
13       So, for example, the motorcycle
14   stuff is -- is done through the Motorcycle
15   Safety Foundation.
16       Raymond offered the certification
17   for -- for forklift operation.
18       The confined space and the fall
19   protection were done by a -- they were done
20   through -- through OSHA, but they were not
21   done by OSHA.  It was a -- it was a -- kind of
22   an OSHA consultant that came in and gave the
23   training that issued the certification based
24   on OSHA's requirements.
25       Q.  And the NRA you referenced

9 (Pages 30 to 33)

Page 34

```
 1                W. VIGILANTE
 2    earlier, that's the National Rifle
 3    Association?
 4         A.   Yes.
 5         Q.   Have you ever had a certification
 6    withdrawn or disciplined in any way?
 7         A.   No.
 8         Q.   The certifying board --
 9         A.   Oh, I take that back.  I think my
10    Confined Space Certification has lapsed and
11    it's possible my Fall Protection Certification
12    has lapsed.  They require training every so
13    many years.  Like you have to sit through a
14    class every so many years, so I think they may
15    have lapsed over time.
16         Q.   You -- and I assume you let them
17    lapse; right, you didn't seek recertification?
18         A.   I did not seek recertification.
19         Q.   All right.  What's Confined Space
20    Certification?  What does that deal with?
21         A.   Technically from a workplace
22    safety standpoint, OSHA standpoint, you can't
23    have people go into confined spaces without
24    being certified to -- to go into them because
25    of the potential danger associated with
```

Page 35

```
 1                W. VIGILANTE
 2    confined spaces and essentially asphyx --
 3    asphyxicating [sic] due to lack of oxygen or
 4    other gases that may be present.
 5         Q.   And the Fall Protection
 6    Certification, what is that?
 7         A.   That's -- again, it's a
 8    certification offered by OSHA for ensuring
 9    that you are -- are familiar with and know the
10    requirements and -- the safety requirements
11    for working at height.  So I think -- I don't
12    remember how -- what the minimum heighth is,
13    but if you're going to be up 20, 30, 40 feet
14    working, you need to be tied in at all times
15    and there's different ways to do it.  There's
16    different equipment to do it.  So the
17    certification ensures you have the training to
18    know what the requirements are and what that
19    equipment is and how the equipment's used.
20         Q.   All right.  So is it a fair
21    summary to say that certifications like fall
22    protection and confined spaces, those that are
23    not the Board of Professional Ergonomics,
24    those are essentially testing to see whether
25    you're familiar with the various applicable
```

Page 36

```
 1                W. VIGILANTE
 2    regulations such as OSHA?
 3         A.   The way I would phrase it is that
 4    it's all part of a training package, and at
 5    the end of the training you're provided the
 6    certification.  The certification lets the
 7    people know that need to know that you've been
 8    through the training, you've had the training
 9    and that you've exercise -- or are able to
10    demonstrate the knowledge from that training
11    so that they know that you're -- you're
12    trained and appropriate for whatever the task
13    may be.
14         Q.   Over the last 13 year -- well,
15    prior to being at Vigilante Consulting dba
16    Vigilante Forensics, you were with ROBE-SON
17    Forensics or ROB-SON?  How is it pronounced?
18         A.   ROB-SON.
19         Q.   Okay.  And in that role you also
20    did litigation-related work; correct?
21         A.   Yes.
22         Q.   Over -- and you were there for how
23    long?
24         A.   Since July of 2003, so a little
25    over 12 years.
```

Page 37

```
 1                W. VIGILANTE
 2         Q.   Okay.  During that -- so then
 3    looking back from 2003 to the present, you've
 4    been involved in litigation-related
 5    consulting; correct?
 6         A.   Sure.
 7         Q.   What percentage of your time was
 8    litigation-related consulting or expert work
 9    as opposed to what you've called "traditional
10    consulting"?
11         A.   When I was with Robson Forensic,
12    my billable hours percentage wise for
13    litigation versus non-litigation was probably
14    on the order of 90, 95 percent litigation, 5,
15    10 percent traditional consulting.
16         Q.   All right.  And so far, as we've
17    established under Vigilante Consulting, in
18    terms of revenue-generating activities, it's
19    been a hundred percent litigation?
20         A.   Yes.
21         Q.   Have you -- and within that
22    litigation experience, what percentage has
23    been on behalf of plaintiffs seeking damages
24    against a defendant as opposed to a defendant
25    in a case?
```

10 (Pages 34 to 37)

Page 38

1            W. VIGILANTE
2        A.  For civil litigation it's probably
3    about 60/40 over -- over time.
4        Q.  And, you know, you've mentioned
5    that do you some -- or have done some
6    criminal-related work; is that correct?
7        A.  I -- I have done -- I have been a
8    consultant in criminal-related work.
9        Q.  How many times?
10       A.  I don't -- I don't know.  I can't
11   give you a number.
12       Q.  Do you think it's more than ten?
13       A.  I would say more than ten.
14       Q.  And in those circumstances, are
15   you typically engaged on behalf of the
16   criminal defendant or the prosecutor's office?
17       A.  I would think the majority of
18   criminal cases I've been hired on behalf of
19   the defendant.  The majority of the time.
20       Q.  Okay.  Have you ever been hired by
21   the prosecuting office?
22       A.  I believe so.
23       Q.  How many times?
24       A.  I don't recall.
25       Q.  Is that something that you keep

Page 39

1            W. VIGILANTE
2    track of?  Is that information available to
3    you in some form?
4        A.  I don't keep track of it.
5        Q.  Have you -- in your civil
6    experience, have you ever had your opinion or
7    testimony excluded?
8        A.  There's been times where a judge
9    has ruled that I wouldn't be allowed to
10   testify.
11       Q.  So the answer is yes?
12            MR. HAVERTY:  No, objection.  That's
13   not -- the answer is what it is.
14       A.  Yeah, I mean, I -- I -- the -- the
15   way you've asked the question, I -- I don't
16   know the exact rulings and how it relates to
17   your question, so I'm trying to answer it the
18   best way I can.
19       Q.  So a judge -- your -- you've
20   offered opinion testimony, a judge has ruled
21   that your opinion testimony will not be
22   admitted?
23       A.  Sure.
24       Q.  How many times has that happened?
25       A.  There's been three cases where the

Page 40

1            W. VIGILANTE
2    judge has ruled that my -- I wouldn't be
3    allowed to testify.  Technically it's four
4    cases.
5        Q.  Have you had, in addition to those
6    four cases where you haven't been allowed to
7    testify, had your -- the scope of your
8    opinions or the scope of your testimony
9    limited by a judge?
10       A.  Yeah, I believe there's been cases
11   where I've been allowed to testify, but I may
12   not be allowed to testify about certain
13   opinions that I had planned to give; whereas
14   other opinions I was allowed to give or would
15   be allowed to give depending upon the state of
16   the case.
17       Q.  How many times has your opinion
18   been limited in that fashion, your opinion
19   testimony been limited in that fashion?
20       A.  I don't know.  Maybe a couple.
21       Q.  Do you know why your opinion
22   testimony has been ruled inadmissible in the
23   four cases that you described?
24            MR. HAVERTY:  Objection.  It wasn't
25   ruled inadmissible.  Object to the form of

Page 41

1            W. VIGILANTE
2    the question, but that's fine.
3            MR. SCHULTZ:  Fine.  I -- I can
4    rephrase it.
5            MR. HAVERTY:  Yeah, please.
6            MR. SCHULTZ:  But let's be -- let --
7    let me use your phrase.
8        Q.  Of the four occasions in which a
9    judge has said that he will not allow you to
10   testify in his or her courtroom, do you know
11   why the judge said that?
12            MR. HAVERTY:  Better question.
13       A.  Yes, I -- I think I understand
14   why.
15       Q.  What is your understanding?
16       A.  One case was in civil court in
17   Florida in a trip and fall and the judge ruled
18   that it was a veracity issue between the
19   plaintiff and defendant, and he wasn't going
20   to have any expert testify in court.  So when
21   plaintiff's ex -- or plaintiff's counsel
22   presented my testimony, the judge ruled that
23   he wasn't going to allow any expert to
24   testify, so I didn't get a chance to testify.
25            A case in Federal Court in either

Page 42

W. VIGILANTE

1
2 New York or Connecticut back in maybe the 2004
3 time frame a judge found that my opinions were
4 not beyond the province of the jury, that the
5 field of psychology was nothing more than
6 common sense; therefore, he wouldn't let me
7 testify in the case.
8        I had a case in Federal Court in
9 Virginia where the judge found that the hazard
10 was an act of God, act of nature; and,
11 therefore, my assessment would not be allowed
12 to -- and the case would not be allowed to go
13 forward.
14        Another case in Virginia was
15 civil -- State Court where the judge -- it was
16 a trip and fall case. A judge ruled that the
17 State of Virginia doesn't recognize the field
18 or science of human factors; therefore, she
19 wouldn't let me testify. The ruling was
20 appealed on appeal. The judge's -- trial
21 judge's decision was overturned. The
22 Appellate Court's decision was appealed to the
23 State Supreme Court. The Virginia State
24 Supreme Court said that it was in the trial
25 judge's discretion; therefore, they let the

Page 43

W. VIGILANTE

1
2 ruling stand without making a comment as to
3 whether or not the State of Virginia
4 recognized the field of human factors.
5        Q.  So just so that we're clear on the
6 record, in this last case you were describing,
7 ultimately the highest court in the State of
8 Virginia said the Trial Court properly
9 disallowed your testimony?
10        MR. HAVERTY:  Objection.
11        A.  That --
12        MR. HAVERTY:  They ruled that they
13     didn't abuse its discretion.
14        A.  Yeah, it's my -- I'm sorry.
15        MR. HAVERTY:  Go ahead.
16        A.  Yeah, my understanding of the
17     ruling was the State Supreme Court said it was
18     in -- within the Trial Judge's discretion.
19        Q.  And, therefore, the judge was
20 proper in its ruling?
21        MR. HAVERTY:  Objection, Dave.  You
22     know that's not what that means.
23        A.  I don't know what other than what
24 I've been told.  I'm --
25        Q.  Okay.

Page 44

W. VIGILANTE

1
2        A.  So I can't agree with you or not
3 agree with you.  I just know that that's what
4 the ruling was.
5        Q.  Have you read the opinions in
6 those cases?
7        A.  I don't know that I ever seen an
8 opinion in the -- in that, the Virginia State
9 Court either at the Appellate level or the
10 State Supreme Court level.
11        Q.  How about the other ones, the
12 other three?
13        A.  I don't think there was anything
14 written in the -- the case down in Florida.
15 It was a decision at trial, time of trial.
16 The one -- the Daubert challenge in Virginia
17 I've -- I've never seen the -- I don't think
18 I've seen the -- the ruling, a written ruling.
19 And I'm pretty sure at one time I did see that
20 a written ruling -- I -- I take that back.
21 I'm pretty sure that the case in 2004 in
22 Federal Court, I saw the transcript from the
23 hearing, the Daubert hearing.  I wasn't
24 present for it.  So I do remember reading the
25 transcript at some point in time.

Page 45

W. VIGILANTE

1
2        Q.  Okay.  The Florida case was in
3 what court?
4        A.  It was in State Court somewhere
5 near Venice, Florida, which is the west side
6 of Florida.  I don't know if it was actually
7 Venice or -- or -- or maybe Naples.  I don't
8 -- I don't recall.
9        Q.  What was the name of the case?
10        A.  I don't recall the plaintiff, and
11 the -- the defendant was something like You Do
12 It Aluminum or something like -- of that -- of
13 that nature.
14        Q.  Do you know who the lawyer was on
15 the other side of that case?
16        A.  I do not.
17        Q.  You were testifying or hoping to
18 testify on behalf of the plaintiff in that
19 case; correct?
20        A.  I was retained on behalf of the
21 plaintiff in that case.
22        Q.  Okay.  In the second case you said
23 it was determined that your testimony would
24 not be helpful to the jury.  Where was that
25 case venued?

12 (Pages 42 to 45)

Page 46

W. VIGILANTE

1
2     A.  Yeah, what I testified to was the
3  judge said the field of psychology was nothing
4  more than common sense, and my opinions were
5  not beyond the province of a jury.  That case
6  was venued in either Connecticut or New York.
7     Q.  You don't know which?
8     A.  I don't recall.
9     Q.  Federal or State?
10     A.  Federal.
11     Q.  Do you know the name of the case?
12     A.  It's Wald versus Costco.
13        (Sneeze.)
14     A.  God bless you.
15     Q.  In any event -- and you don't
16  understand that ruling to be that the judge
17  found that your testimony would not be helpful
18  to the jury?  You don't understand it that
19  way.
20     A.  I've already told you my
21  understanding.  The judge in the trial -- in
22  the hearing, I should say, commented that the
23  field of psychology was nothing more than
24  common sense; and the other comment he made
25  was that my opinions would not be beyond the

Page 47

W. VIGILANTE

1
2  province of the jury, so he wasn't going to
3  let me testify.  That's the extent of my -- of
4  my knowledge.
5     Q.  Okay.  So you don't understand it
6  beyond what you've just said?
7     A.  That's correct.
8     Q.  Okay.  And in the case in which
9  the judge said the incident in question was
10  the act of God, I take it you were opining
11  that it was not an act of God; correct?
12     A.  No, there was a -- I was working
13  on behalf of the -- of the -- of the
14  plaintiffs.  There was another expert in the
15  case also working on behalf of the plaintiff,
16  an engineer, and what our opinions were was
17  that the -- the hazard that ended up injuring
18  the plaintiff was foreseeable to the
19  defendants.
20     Q.  And so why did the judge exclude
21  your opinion?
22     A.  Yeah, he felt that the opinion --
23  that the hazard was an act of God, therefore,
24  our analyses and opinions related to them were
25  inadmissible because it was a -- it was an act

Page 48

W. VIGILANTE

1
2  of God.
3     Q.  Okay.  Were you taking a position
4  that the incident was or wasn't an act of God?
5     A.  I -- I don't believe I ever took
6  that position.
7     Q.  Okay.  What was the hazard
8  involved in that case?
9     A.  The hazard was a -- case
10  involved a pole vault mat used for track and
11  field.  It was used outdoors where it was
12  marketed for on an outdoor track.  The school,
13  I believe it was a high school, had left the
14  pole vault mat out.  It was on a -- a --
15  what's the best way to describe it?  A
16  platform, a small -- a short platform to keep
17  it out of the mud and the -- the dirt and
18  everything to help prevent deterioration of
19  the mat.
20        The mat was left out during a --
21  another event.  I think -- I don't remember if
22  it was a baseball game or a football game or
23  whatever, but a storm came in, a pretty
24  powerful storm came in, a thunderstorm came
25  in.  The crowd was asked to take shelter in

Page 49

W. VIGILANTE

1
2  their cars.  As the crowd was making their way
3  through the adjacent track and field area, a
4  gust of wind came in and picked the pole vault
5  mat up and tumbled it down the track and it
6  struck multiple people; and one of those
7  people were hurt badly, I guess, and that was
8  the -- the gist of the case.
9     Q.  And what was the opinion that you
10  gave in that case?
11     A.  The opinion, I believe, was that
12  the manufacturer of the pole vault mat knew or
13  should have known that the pole vault mat
14  could be lifted and become a projectile under
15  heavy winds and foreseeable conditions and
16  potentially injure someone.
17     Q.  And, therefore, should have done
18  what?
19     A.  Provided warning and instruction
20  and/or the ability to strap the mat down,
21  anchor the mat down, to inform their customers
22  or users of the potential hazard and how to
23  safeguard against it.
24     Q.  And where was that case venued?
25     A.  Virginia.

13 (Pages 46 to 49)

Page 50

W. VIGILANTE
1
2     Q.  Federal Court?
3     A.  Yes.
4     Q.  What was the name of the case?
5     A.  I don't recall the plaintiff's
6  name and I don't recall the defendant's name,
7  but there's not that many manufacturers of
8  pole vaults -- pole vault mats.
9     Q.  In the fourth case in which the
10 Trial Court said that Virginia did not
11 recognize the science of human factors, where
12 was that case venued --
13    A.  This is in --
14    Q.  -- State or Federal Court?
15    A.  State Court.
16    Q.  And what district?
17    A.  I don't recall.  It was in, I
18 believe, like the Fairfax area, but I'm not a
19 hundred percent sure.
20    Q.  Do you remember the name of the
21 parties in that case?
22    A.  The plaintiff was a man by the
23 name of Hovermill, and I'd have to guess at
24 how to spell that, other than trying to do it
25 through pronunciation.  The defendant was Best

Page 51

W. VIGILANTE
1
2  Buy.
3     Q.  In the pole vault mat case, how
4  large was the mat?
5     A.  It was a standard size pole vault
6  mat, so I don't know offhand exactly, but I'm
7  going to hazard a guess that it was something
8  like eight-feet wide by maybe nine-feet deep.
9     Q.  And how thick?
10    A.  I would say over a foot.
11    Q.  Okay.  Any idea how heavy it was?
12    A.  I don't -- I don't know.  I mean,
13 it's probably over a hundred pounds easy.
14 Exactly how much it weighed, I don't know.
15    Q.  Okay.  Was there any reason why
16 the school in that case could not have brought
17 the mat indoors?
18    A.  Had they known of the potential
19 hazard, they could have.
20    Q.  And your --
21    A.  It's --
22    Q.  Your opinion was they didn't know
23 of the potential hazard?
24    A.  Yeah, they -- they weren't aware
25 of the potential hazard.

Page 52

W. VIGILANTE
1
2     Q.  In the other cases where your
3  opinion was not -- you were not prohibited
4  from testifying about your opinion but rather
5  the scope of your opinions were limited, tell
6  me about those cases.
7     A.  I know a case I testified in
8  Federal Court in -- over the course of the
9  summer where I had opinions related to the --
10 the operator manual for a product related to
11 the -- the manufacturer's reliance upon it
12 solely to provide information.  The judge felt
13 that since the plaintiff testified that he had
14 read the manual, that that opinion wouldn't
15 come in.
16    Q.  Where was that case venued?
17    A.  Philadelphia.
18    Q.  Federal Court?
19    A.  Yes.
20    Q.  What were the name of the parties
21 in that case?
22    A.  Yazdani was the plaintiff and BMW
23 North America was the defendant.
24    Q.  What was the product involved?
25    A.  It was a BMW motorcycle.

Page 53

W. VIGILANTE
1
2     Q.  Okay.  Tell me about the other
3  cases in which your opinion testimony has been
4  limited.
5     A.  I know there was a case in Montana
6  where there was some overlap between my
7  opinions and another expert's opinions, and
8  the judge said that I could not provide the
9  overlap opinions.
10    Q.  Do you know why?
11    A.  Redundancy.
12    Q.  Okay.  Was that in Montana Federal
13 or State Court?
14    A.  I believe that was Federal Court.
15    Q.  Do you know which district in
16 Montana or which town in Montana?
17       MR. HAVERTY:  It's probably the same
18 thing.
19       MR. SCHULTZ:  It's not.
20    A.  I -- I don't know.
21    Q.  Okay.  Was it Butte?
22    A.  I can't say whether it was or not.
23    Q.  Okay.  What were the name of the
24 parties in that case?
25    A.  I don't remember the -- the

14 (Pages 50 to 53)

Page 54

W. VIGILANTE

1  plaintiff's name, but the defendant was the
2  company that owned Big Sky Ski Resort.
3      Q.  And what was the opinion that you
4  were going to provide but were not allowed to?
5      A.  I don't recall.  Generally my
6  opinions were -- were with respect to the
7  ability of the plaintiff to discern and react
8  to, when she was able to discern a -- a change
9  in the run of the ski slope given her position
10 on the slope; and then the failure of the ski
11 mountain to provide adequate uphill warning to
12 the skiers as to the sudden and drastic change
13 in the direction of the slope of the -- of the
14 run.
15     Q.  Any other cases in which your
16 anticipated testimony was limited?
17     A.  They're the only ones I can think
18 of.
19     Q.  All right.  Have you ever
20 testified that an instruction or warning
21 provided by a manufacturer was adequate?
22     A.  I don't know if I've ever
23 testified to that or not.
24     Q.  Have you ever rendered a formal

Page 55

W. VIGILANTE

1  opinion to that effect?
2      A.  I've been hired by manufacturers
3  to assess the adequacy of their warning.  I
4  have had favorable opinions for the defendant
5  in some of those cases; and in some of those
6  cases I have not been able to render a
7  favorable opinion.
8      Q.  Have you -- have you rendered a
9  formal opinion?  In other words, one that was
10 disclosed to the opposing party in which you
11 opined that the instruction or warning
12 provided by the manufacturer was adequate?
13     A.  Yes, and I think I did testify in
14 deposition in at least two cases with that
15 fact pattern that I -- that I remember the
16 specifics of.
17     Q.  And what did those cases involve?
18 What products?
19     A.  One was a -- a -- a movable gate
20 used -- used to create a pen to keep horses or
21 livestock in.  The second involved a -- I -- I
22 don't remember if it was a boiler or a heater
23 installed in a -- I don't remember if it was a
24 residence or a commercial -- commercial

Page 56

W. VIGILANTE

1  building.
2      Q.  Okay.  Where was the first case,
3  the movable gate to keep horses in, where was
4  that case venued?
5      A.  I don't recall.  I don't recall.
6      Q.  Do you remember the lawyer or law
7  firm who retained you?
8      A.  Not offhand.
9          Oh, I do remember another one.
10     Q.  Which is?
11     A.  I just -- well, technically the --
12 the report hasn't been disclosed yet.  The
13 report was written for a disclosure deadline
14 beginning of July and something happened with
15 the -- on the -- the more legal side of the
16 case that has everything moved out for an
17 indeterminant amount of time.  So technically
18 it doesn't meet the criteria of your question,
19 but I do re -- I do recall it.  I don't know
20 why I forgot it.
21     Q.  Is it -- is it currently pending?
22     A.  Yes.
23     Q.  Okay.  Do you feel you can
24 disclose anything about the name of the

Page 57

W. VIGILANTE

1  parties in that case?
2          MR. HAVERTY:  I don't think you --
3      A.  Yeah, I don't know.
4          MR. HAVERTY:  He shouldn't do
5  that --
6      A.  Yeah.
7          MR. HAVERTY:  -- until it's been
8  disclosed.
9      A.  Yeah, I think that's --
10     Q.  Has your identity as an expert
11 witness been disclosed in that case?
12     A.  I don't know.
13     Q.  Okay.  Other than those three
14 cases, can you think of any others in which
15 you have rendered an opinion that a
16 manufacturer's warning or instruction was
17 adequate?
18     A.  I do remember another case that I
19 gave a videotaped trial testimony in
20 involving -- I think it was a skid loader; and
21 there was an issue over the sufficiency of the
22 information in the manual provided with the --
23 with the product.
24     Q.  And what was your opinion?

Page 58

W. VIGILANTE

1
2     A.   That the plaintiff had sufficient
3  information based upon the information
4  provided by the manufacturer to know what he
5  was doing was improper and could be hazardous.
6     Q.   Where was that case venued?
7     A.   That was in Pennsylvania.  It's --
8  it was in southeast Pennsylvania.  I don't
9  know that I can -- I don't know that -- that I
10 know if it was Federal or State Court, and I
11 don't know if I can get it pinned down to a
12 particular county.
13    Q.   Who were the parties?
14    A.   I don't recall.
15    Q.   Who were the lawyers?
16    A.   The -- I know the attorney's first
17 name is -- is Bill or William because it's the
18 same as mine; and I don't recall what his last
19 name was other than it started with an M.
20    Q.   And how long ago was that case?
21    A.   That was before I moved to -- that
22 was when I was living in Lancaster.  So I
23 moved to the Philadelphia area in 2010, so
24 sometime before 2010.
25    Q.   Okay.  It was when you were at

Page 59

W. VIGILANTE

1  Robson Forensics?
2
3     A.   Yes.
4     Q.   Okay.  How about the case
5  involving the movable gate, when was that?
6     A.   I believe that was when I was
7  living in Lancaster as well.
8     Q.   So when you were at
9  Robson Forensics?
10    A.   Yes.
11    Q.   And the case involving a boiler or
12 heater, where was that venued?
13    A.   I don't recall.
14    Q.   When was the case?
15    A.   I was still at Robson, and I don't
16 recall if I was living in Philadelphia or
17 Lancaster.
18    Q.   Who were the parties?
19    A.   I don't recall.
20    Q.   Who were the lawyers?
21    A.   I don't recall.
22    Q.   Do you keep lists of these
23 engagements?
24    A.   I do not.
25    Q.   Why not?

Page 60

W. VIGILANTE

1
2     A.   I have never found a need to.
3     Q.   You've been asked about these
4  things before in depositions; right?
5     A.   I've been asked similar questions,
6  sure.
7     Q.   Right.  And -- but you didn't find
8  a need to have that information available to
9  the attorneys questioning you?
10    A.   The only thing I find a need to do
11 is to -- for Federal cases is to disclose a
12 four-year testimony history.  Other than that
13 I don't -- I don't -- I don't think I'm
14 required to do anything beyond that.  So when
15 I prepare for a deposition, I actually prepare
16 for the facts of the case that I'm involved
17 in, not what I've done in the -- in the past.
18    Q.   Have you ever disclosed this
19 information to a potential client who is
20 seeking to retain you?
21    A.   Which information?
22    Q.   Information about prior
23 engagements in which you've testified that a
24 manufacturer's warning was adequate.
25    A.   I think the -- the best way to

Page 61

W. VIGILANTE

1
2  answer that is I'm sure that when a client
3  calls me and they ask me -- I'll give you an
4  example.
5         I got contacted Saturday by a
6  client in -- out in the Pittsburgh area that
7  asked me if I had any prior cases relative to
8  what his case was about, and it was a -- kind
9  of a specific area.  And I guess part of his
10 decision making was going to be whether he
11 could find a -- an expert that had worked on
12 similar cases in the past, and I hadn't.  So I
13 told him I hadn't done that.
14    Q.   Okay.  But other than those kind
15 of general responses, you've not been asked to
16 provide specific information, for example,
17 copy of your report in the movable gate case
18 to a lawyer or company seeking to retain you?
19    A.   That's a yes and no, and I don't
20 mean to be difficult.  I don't remember
21 personally doing that where a client has said,
22 "Can I have a copy of that report?"  But when
23 I worked for Robson Forensic, they had a -- a
24 Marketing Team, and part of their Marketing
25 Team was they decided a good idea was to put

16 (Pages 58 to 61)

Page 62

W. VIGILANTE

1  old reports up on the website or offer them in
2  what they call "the white book" which is
3  essentially a three-ring binder with older
4  reports on it; and I don't recall if they were
5  redacted or if they were full reports. Again,
6  I imagine they were redacted. So they would
7  have been available to potential clients.
8  That's, you know, that's kind of a roundabout
9  way of answering your question to make sure I
10 did it completely.
11 Q. Have you ever turned down a
12 litigation engagement on behalf of a plaintiff
13 because you felt that the warning or
14 instruction provided by the manufacturer was,
15 in fact, adequate?
16 A. I've had cases where I had to tell
17 a client after they retained me that based
18 upon my analysis, I -- I couldn't find that
19 the warning was inadequate.
20 Q. How often has that happened?
21 A. Every now and again.
22 Q. Usually in the majority of cases
23 you find that the warning or instruction was
24 not adequate when asked to opine on that topic

Page 63

W. VIGILANTE

1  for a plaintiff?
2  A. If for the majority of -- of
3  plaintiff cases that I'm retained in to assess
4  the adequacy of the warning, I would say the
5  majority I've been able to find that the
6  warning -- or I did find the warning was not
7  adequate.
8  Q. You -- you were at
9  Robson Forensics from 2003 until 2015; is that
10 right?
11 A. Correct.
12 Q. And your title there was
13 "associate"; is that right?
14 A. Yes.
15 Q. And in that 12 years that you were
16 there, you never made principal?
17 A. Yeah, I never made principal.
18 There was only -- when I arrived there, there
19 was only the major partner, the founder of the
20 firm, Lance Robson, and then two part -- two
21 partners that were the area managers in
22 Lancaster and Cedar Knolls that each owned 15
23 percent of the -- of the company. The
24 owner -- the -- the founder owned the bulk

Page 64

W. VIGILANTE

1  majority of it and then there was money or
2  shares set aside for ESOP, Employee Stock
3  Option Program.
4  The owner eventually bought those
5  two partners out, brought in a CEO or promoted
6  a CEO, and when he promoted the CEO, he gave
7  that CEO 5 percent of the company. And then
8  that was the way the company was owned until
9  the founder sold the company to the CEO and
10 his wife. And so currently I believe the only
11 two shareholders are the CEO and his wife and
12 then the ESOP, Employee Stock Option Program.
13 Q. Were you in the ESOP?
14 A. Yes.
15 Q. Did anybody become a principal
16 during the time you were there?
17 A. Yeah, so if principal you mean
18 shareholder, it would have been the CEO and
19 his wife.
20 Q. Okay. Do you have an
21 understanding -- 'cause that -- that phrase is
22 used on Robson's website, "principal."
23 Do you have an understanding of
24 what they mean by that phrase?

Page 65

W. VIGILANTE

1  A. Well, I think that Bart Eckhardt
2  is the owner of the company now. He bought
3  the company. Him and his wife bought the
4  shares from Lance Robson a number of years
5  ago, maybe two or three, and at that point I
6  think he changed his name from CEO/President
7  to Principal.
8  Q. In your current employment with or
9  work with Vigilante Consulting dba Vigilante
10 Forensic, other than this one case you
11 mentioned, have you ever rendered an opinion
12 that a manufacturer's instructions or warnings
13 were adequate?
14 A. I'm sorry, 'cause you kind of lost
15 me in the question.
16 Q. Sure. I think you said that since
17 the time you formed Vigilante Consulting
18 you've rendered one opinion, it hasn't been
19 disclosed yet, that a manufacturer's warning
20 or instruction was adequate; correct?
21 A. I think that's -- I've only been
22 retained by one manufacturer defendant since
23 August in a product warnings case. I think
24 that's accurate.

17 (Pages 62 to 65)

Page 66

W. VIGILANTE

1
2     Q.  Okay.  Have you been retained --
3  other than that one manufacturer, have you
4  been retained on behalf of any other
5  manufacturers during the time that you've had
6  Vigilante Consulting dba Vigilante Forensic?
7     A.  I don't know.  I'm going so say if
8  I had, it's been a relatively few times, but
9  nothing else is coming to mind.
10    Q.  Okay.  How many engagements do you
11 currently have?
12    A.  I think I assigned something on
13 the order of 50 case numbers in 2016.  Not all
14 those cases have started.  Not all those cases
15 are active.
16    Q.  Okay.  And to the best of your
17 recollection, as you sit here, of those 50
18 cases only one is for a defendant
19 manufacturer?
20    A.  I can tell you that there's only
21 one that I know for sure.  It -- yeah, I
22 don't...
23       (Exhibit Vigilante-2, multipage
24    document entitled The Experts Robson
25    Forensic, The Robson Forensic Difference,

Page 67

W. VIGILANTE

1
2  is marked for identification.)
3     MR. SCHULTZ:  I'm going to mark
4  several of them.
5     (Pause.)
6     MR. HAVERTY:  Is that 2?
7     (Exhibit Vigilante-3, multipage
8  document entitled The Experts Robson
9  Forensic, Human Factors &, is marked for
10 identification.)
11    (Exhibit Vigilante-4, multipage
12 document entitled The Experts Robson
13 Forensic, Medical Device, is marked for
14 identification.)
15    MR. SCHULTZ:  Go ahead and hand them
16 all over.
17    MR. HAVERTY:  2, 3, 4; right?
18    THE WITNESS:  Thank you.
19 BY MR. SCHULTZ:
20    Q.  Mr. Vigilante, the court reporter
21 has handed you exhibits marked 2, 3, and 4.
22 All of them are various printouts from Robson
23 Forensics' website.
24       I just want to know if you
25 recognize -- would you agree with me that

Page 68

W. VIGILANTE

1
2  that's the Robson Forensics that you worked
3  for when you were there from 2002 to 2015?
4     A.  Yes, it appears to be.  They've --
5  they've changed their logo it appears to be,
6  but this is Robson Forensic.
7     Q.  Okay.  And with respect to -- for
8  example, you're looking right now at Exhibit 2
9  which has a picture of --
10    A.  Do you want me to hold it up?
11    Q.  Sure.  Please.  That has a picture
12 of the current owner of the company; right?
13    A.  Yes.
14    Q.  And you recognize him because you
15 worked for him; right?
16    A.  Yes.
17    Q.  Okay.  Earlier in this deposition
18 you talked about peer-reviewed research.  We
19 have, I think, on your CV a list of your
20 articles and publications.
21       Can you tell me which ones of
22 those were peer reviewed?
23    A.  Everything from Page 5 through
24 Page 10.
25    Q.  Okay.  Without exception?

Page 69

W. VIGILANTE

1
2     A.  Well, the top of Page 5 has my
3  professional membersips -- memberships and
4  affiliations, but from --
5     Q.  Right.  I'm just asking about the
6  actual articles, though, or the article -- or
7  publications.
8     A.  Yeah, these are all peer-reviewed
9  publications and peer-reviewed technical
10 reports.
11    Q.  When you say "peer-reviewed
12 technical reports," what do you mean?
13    A.  Well, "peer review" has different
14 meanings to different circumstances.  So, for
15 example, the publications and presentations on
16 Pages 5 through 8 was the traditional academic
17 peer review where the article -- the research
18 is submitted to a journal or conference.  The
19 editor of the journal or conference submits it
20 to blind peer reviewers who don't know who the
21 author is or are not supposed to know who the
22 author is and then give feedback to the editor
23 as to acceptance, rejection, acceptance with
24 qualifications.  So that's the typical way
25 it's done in academia for scientific journals

18 (Pages 66 to 69)

Page 70

W. VIGILANTE

1    and so forth.
2           The technical reports that are
3    listed on Pages 8 through 10 were IBM internal
4    technical reports, and that peer-review
5    process was a little bit different.  They were
6    given to other professionals in the -- the
7    department who knew where the technical
8    reports would come from.  They were approved
9    by management and so forth before they were
10   released for publication as a technical report
11   in IBM.
12          Q.  Okay.  So those were all peer
13   reviewed internally at IBM?
14          A.  Yes.
15          Q.  Okay.  I don't have a copy with
16   me, but I suspect you have a copy accessible
17   to you which is the portion of your report
18   that deals with your expert testimony by
19   deposition or trial.
20          Do you have that available to you?
21          A.  I'm sorry.  What --
22          Q.  Do you have that with you?
23          MR. HAVERTY:  List of testimony.
24          Q.  Your list of testimony.

Page 71

W. VIGILANTE

1           A.  Oh, yes, I do, yeah.
2           Q.  By my count you have testified 46
3    times at least as listed in the last four
4    years.
5           Does that sound right to you?
6           A.  I'd have to count them, but I mean
7    that's probably -- probably in that ballpark.
8           Q.  Which you would roughly plan --
9           A.  I -- I have to --
10          Q.  Oh.  Go ahead.
11          A.  Just a clarification.  I don't
12   know that I have the four-year testimony
13   history that was submitted with the report.  I
14   have the updated one, so I'm happy to produce
15   that too.  When I was preparing for the
16   deposition, I change them as I go through
17   depositions and so forth, so they're updated;
18   and I don't know that -- this report was
19   submitted in April and my current date on my
20   list is August, so there's probably some
21   change.
22          Q.  Okay.  Well, why don't you, as
23   you're looking at your current testimony, what
24   testimony do you have since April of 2016?

Page 72

W. VIGILANTE

1           A.  There was a Denise Pender versus
2    Florida East Coast Railway in April.
3           Joseph and Ursy Vitale versus
4    Electrolux Home Products in April.
5           Anita Malone versus K&G Mens
6    Company.
7           Q.  Hold on.  Yeah.  I'm sorry.  You
8    just got to go a little bit slower.
9           A.  Sure.
10          Q.  Yeah, why don't we -- why don't
11   we -- I'll tell you what, why don't we do
12   this?  Why don't we, if you're willing to,
13   just mark a copy of that at a break.
14          A.  Sure, absolutely.
15          Q.  Okay.  In general, though, you
16   would agree that by these numbers you are on
17   average testifying at a deposition or a trial
18   about once a month; correct?
19          A.  Yeah, I mean, I do about 12
20   depositions a year.  I -- I -- maybe sometimes
21   a little more, sometimes a little bit less.
22   That's probably about right.
23          Q.  Do you hold -- other than a
24   driver's license, do you hold any licenses of

Page 73

W. VIGILANTE

1    any kind in ergonomics or human factors?
2           A.  I'm not aware of any licenses.
3    I'm aware of the certification through the
4    Board of Certification For --
5           Q.  Right.
6           A.  -- Professional Ergonomics.
7           Q.  All right.  Have you ever been
8    terminated from a position as a human factors
9    professional or an ergonomics professional?
10          A.  No.
11          Q.  Have you ever been relieved of an
12   engagement as an expert witness by your
13   client?
14          A.  I think I know what you mean, so
15   any time the case is over, I'm released.  But
16   I've been involved in cases where I can't give
17   a favorable opinion that I'm asked by the
18   client not to do any more work, so I submit a
19   final bill and -- and that's it.  I typically
20   close the case.  So that happens.
21          Q.  Other than those two circumstances
22   when you are unable to give a helpful opinion
23   or the case ends, have you ever been -- I
24   mean, let me put it in sort of common

W. VIGILANTE
1
2   parlance.  Have you ever been fired by a
3   client?
4           A.  Not -- no.
5           Q.  Let's talk about your medical
6   device experience in particular.
7               You -- you've never been employed
8   by a medical device manufacturer; correct?
9           A.  No.  I'm sorry.  Correct.
10          Q.  Correct.  Okay.  And you've never
11  been hired by the Food and Drug Administration
12  to consult on any medical devices?
13          A.  Not on any medical devices.
14          Q.  Okay.  Are you -- have you been
15  retained by the Food and Drug Administration
16  to consult regarding pharmaceuticals?
17          A.  I've never been hired, but I have
18  worked in consultation with the FDA on
19  research related to pharmaceuticals.
20          Q.  How many times?
21          A.  I did two large projects that I
22  cooperated with the FDA on.  One was on
23  formatting features and factors for
24  over-the-counter medication labeling.
25          Q.  Formatting what?  I'm sorry.

W. VIGILANTE
1
2           A.  Features, design features,
3   presentation of information on
4   over-the-counter medication labeling.  That
5   was in the mid to the late '90s.
6               And then I worked on a -- well, my
7   dissertation was on the presentation of risk
8   and benefit information on direct-to-consumer
9   advertisements of prescription medications on
10  the web, and I was -- that was for my
11  dissertation.
12          Q.  Okay.  Did the FDA have some
13  involvement in your dissertation?
14          A.  Yes.  After -- the lab I worked in
15  at North Carolina State University, the
16  Cognitive Ergonomics Lab, we did a lot of
17  research in warnings and risk perception; and
18  one area was that a significant area of work
19  done by the lab was related to medication
20  labeling and presentation of information for
21  over-the-counter prescription medications.
22              So in the '90s we were working
23  with the FDA on areas in which they wanted
24  research done.  So it was a way to come up
25  with research projects that would be useful,

W. VIGILANTE
1
2   you know, in the real world.  So we did a
3   number of studies related to the formatting
4   features of over-the-counter medication
5   labeling and the ordering of information
6   presented on over -- over-the-counter
7   medication labeling.  The results of that
8   information was fed back to the FDA and used
9   in their regulatory process to come up with
10  requirements for the presentation of
11  information on over-the-counter medication
12  labeling which, I believe, they put forth in
13  1999.
14              After doing the OTC stuff, we were
15  looking for other projects; and our contacts
16  at the FDA, in consultation with them, asked
17  them if -- asked us if we can do work related
18  to direct-to-consumer advertisements because
19  in the late '90s that was becoming -- I think
20  there was a change in the regulation or the
21  law allowing pharmaceutical companies to
22  advertise directly to consumers, and there was
23  a question over how they were doing that and
24  how they were presenting risk and hazard
25  information and compared to the benefits

W. VIGILANTE
1
2   because there was some loose interpretation of
3   the equal time clause in the -- in the new
4   regulations.  So as a lab we looked at
5   direct-to-consumer ads on the web which was
6   the hunk of research that I was running, but
7   also in print ads and also on television ads.
8               So colleagues of mine at NC State
9   led the -- a different person lead the
10  television advertisements and a third led the
11  research done on the print ads.  And then
12  when -- as we were finding our -- coming to
13  our findings, we were feeding that back in to
14  our contacts at the FDA for use in their
15  regulatory process.
16          Q.  Okay.  Let me drill down on those
17  for a second.
18              First of all, you've identified
19  two projects, right, one with formatting
20  features on the labels attached to
21  over-the-counter medications themselves;
22  right?
23          A.  Well, I would say there was two
24  areas of work that we did.  One was DT -- DTC,
25  direct-to-consumer advertisement, and the

Page 78

```
1              W. VIGILANTE
2    other was over-the-counter medication
3    labeling.
4         Q.  Okay.
5         A.  They -- they both had multiple
6    projects within those two areas.
7         Q.  Both of those projects or both of
8    those areas were in the 1990s; correct?
9         A.  The OTC stuff was mid '90s to late
10   '90s.  The DTC stuff was late '90s, early
11   2000s.  I think my dissertation was published
12   in 2001 if I'm not mistaken.
13        Q.  Okay.  And since that time --
14        A.  And then --
15        Q.  -- since the pub --
16        A.  -- the -- the other -- I mentioned
17   the other colleagues.  They finished their
18   research and their dissertation and their
19   degrees after I did, so I don't know if it was
20   2002, 2003, 2004.
21        Q.  But after your dissertation, you
22   did not continue with the projects, did you?
23        A.  I think I have a publication
24   related to the medications, it was after my
25   dissertation.  Give me a second.  I can look
```

Page 79

```
1              W. VIGILANTE
2    that up if you don't mind.
3              I did a -- I published an article,
4    a research paper in 2003, two years -- a year
5    and a half, two years after completing my
6    Ph.D. and publishing the dissertation on "The
7    effects of label format on knowledge
8    acquisition and perceived readability by
9    younger and older adults."
10        Q.  For over-the-counter medications?
11        A.  That would have been for
12   over-the-counter.
13        Q.  And that -- that particular
14   article was based upon the research you had
15   done as part of your graduate work for a
16   dissertation; correct?
17        A.  No, 'cause the work I did my
18   dissertation was on direct-to-consumer
19   advertising.
20        Q.  It was based on work that you did
21   as a graduate student?
22        A.  I was a graduate student at the
23   time.  The -- I did present and publish
24   another paper in 2005 related to
25   direct-to-consumer medication advertisement,
```

Page 80

```
1              W. VIGILANTE
2    and my guess is, is that was probably based
3    upon work I was doing for my dissertation.
4    Sometimes there's a lag between finishing the
5    work, getting the dissertation done, the
6    technical reports done and then getting it
7    published.  It's harder to get it published in
8    a peer-reviewed journal, so it sometimes takes
9    longer and there's a lag.
10             Then I did a project with -- in
11   2007 on direct-to-consumer prescription drug
12   advertisement on television and online
13   purchases of medications.  That was not
14   related to my dissertation.
15        Q.  Was the FDA involved in that
16   project?
17        A.  I don't know.
18        Q.  Okay.  Going back to the
19   formatting labels on over-the-counter
20   medication that was done in 1990s, mid to late
21   '90s, first of all, that was when you were a
22   graduate student; right?
23        A.  I was going to say there was
24   another post-dissertation research publication
25   in 2005.  That one was, again, related to DTC
```

Page 81

```
1              W. VIGILANTE
2    information on websites.
3         Q.  Direct to consumer?
4         A.  Correct.  But a -- a student that
5    was helping me with the project, a junior
6    student at the time continued that work, and I
7    believe that I helped him with his
8    continuation of work after, you know,
9    graduating and moving on and what have you;
10   and that's -- my part in that was published in
11   2005, I believe.
12        Q.  So going back -- let's -- let's
13   break this down.  Going back to the work you
14   did with respect to over-the-counter labeling
15   in the mid to late 1990s, that was work you
16   did as a graduate student?
17        A.  Yes.
18        Q.  So you were doing it under the
19   supervision of a faculty member at North
20   Carolina State?
21        A.  Sure.  I had an academic advisor.
22        Q.  Okay.  Did you have a contract
23   with the FDA?
24        A.  No.
25        Q.  Did the institution have a
```

21 (Pages 78 to 81)

Page 82

```
 1              W. VIGILANTE
 2  contract with the FDA?
 3        A.  I don't believe so.
 4        Q.  Did the FDA sponsor that research?
 5        A.  They did not sponsor it in that
 6  they provided monetary value for it.  Again,
 7  we were in consultation with them.  I believe
 8  that the Drug Information Association funded
 9  the projects for the OTC stuff and then
10  provided some funding for the -- the
11  direct-to-consumer advertisement research that
12  we did after the OTC stuff --
13        Q.  And what's --
14        A.  -- or at the end of the OTC stuff.
15        Q.  What's the Drug Information
16  Association?
17        A.  My understanding it was a
18  consortium of manufacturers in the
19  pharmaceutical industry.
20        Q.  Okay.  So if I understand this
21  right, the Drug Information Association had
22  research performed, I assume, probably not
23  just at North Carolina State, correct --
24        A.  I -- I --
25        Q.  -- as far as you know?
```

Page 83

```
 1              W. VIGILANTE
 2        A.  Yeah, I don't know.
 3        Q.  Okay.
 4        A.  But they were -- I believe we
 5  submitted a request for grant money --
 6        Q.  From the DIA?
 7        A.  -- to the DIA.
 8        Q.  Yep.
 9        A.  And then we had received monies
10  for the OTC stuff and the direct-to-consumer
11  advertisement stuff, and that's -- that's all
12  I could recall.
13        Q.  Okay.  And so the studies were
14  done -- funded by the DIA, and not requested
15  by the FDA; correct?
16        A.  No.  Well, two things.  The DIA
17  money was not enough to fully fund all the
18  projects.  It was used to help purchase some
19  equipment that was used in the multiple
20  studies, but it wasn't -- typically like if
21  you get a grant researching a specific topic,
22  you can apply to a -- a grant organization,
23  maybe the Federal government, and they can
24  provide you with enough money to fund the
25  project fully where they're -- they're paying
```

Page 84

```
 1              W. VIGILANTE
 2  for the research work, the researchers.
 3  They're paying for the -- the lead
 4  investigator to maybe not take some classes,
 5  not teach some classes.  They pay for the --
 6  the participants.  They pay for all the
 7  equipment.  They may pay for travel to present
 8  the data and the information.  So that's kind
 9  of a fully funded grant, a fully funded
10  project under a grant.
11        The DIA did not provide us fully
12  funded grant money.  They provided us grant
13  money to help run the projects.  So there was
14  multiple projects going on.  So I just wanted
15  to make that clear.
16        Second part is, is that the work
17  was done in conjunction with our contacts at
18  the FDA asking them what type of issues do
19  they -- do they see, what type of research is
20  needed, what are ideas for research projects.
21  So that was the extent of our collaboration
22  with the FDA; and then, of course, feeding
23  that data back to the FDA, our contacts at the
24  FDA for their use in whatever they were doing.
25        Q.  The FDA did not solicit the
```

Page 85

```
 1              W. VIGILANTE
 2  research; correct?
 3        A.  I can tell you -- I don't know.  I
 4  can tell you that for my direct-to-consumer
 5  project --
 6        Q.  Right now we're not talking about
 7  direct-to-consumer.  Okay?  Right now my
 8  questions are related to the over-the-counter
 9  labeling.  Okay?
10        A.  Yeah.  I'm -- I'm sorry.  So at --
11  at that -- the over-the-counter labeling, I
12  don't -- I don't recall.  I can tell you how
13  the DTC stuff got started.
14        Q.  We'll get to that.
15        A.  Yeah.
16        Q.  Okay.  As far as you know, the FDA
17  did not solicit the research; correct?
18        A.  I don't know.
19        Q.  Okay.  And you don't know because
20  the research was overseen by and requested by
21  the DIA; correct?
22        MR. HAVERTY:  Objection.
23        A.  No.  That's not correct.
24        Q.  It was not requested by the DIA?
25        A.  Yeah, no, what I just explained is
```

22 (Pages 82 to 85)

Page 86

W. VIGILANTE

1   W. VIGILANTE
2   that we put in a grant request to the DIA for
3   the research topics that we had come up with
4   it and they provided us money to partially
5   fund the projects.  The topics came up in
6   conjunction with discussions with the FDA and
7   the contacts we had at the FDA.  So that's --
8   I think that's the, you know, the overall
9   history of it.
10      Q.  When you say the context we --
11  "contacts we had at the FDA," who's the "we"
12  in that sentence, North Carolina State
13  University?
14      A.  Well, I would have been through
15  contacts with it through my advisor, Mike
16  Wogalter at the time; and then I had two
17  contacts in -- I was trying to explain -- with
18  the DTC.  When I was looking for a
19  dissertation subject I contacted them.  I
20  said, "Hey, it's Bill Vigilante, you know, I'm
21  looking to put together a dissertation.  Do
22  you have areas of study that you think would
23  be of interest and use to the FDA," and that's
24  where they -- they pointed -- pointed us into
25  the DTC stuff.

Page 87

W. VIGILANTE

1   W. VIGILANTE
2      Q.  I'll get to the DTC stuff in a
3   second.  I'm still focussing on the
4   over-the-counter labeling.  Okay?
5      A.  Sure.
6      Q.  Okay.  That research was not
7   directed by FDA.
8      A.  Yeah, there was no directive that
9   said "You must do this."  Again, it was in
10  collaboration, discussions with the FDA as to
11  what research and what things they were doing
12  and research they could use; and that's how we
13  decided on research projects.
14      Q.  Well, and when you say
15  "collaboration," that collaboration was
16  initiated not by FDA but by North Carolina
17  State University; right?
18      A.  Yeah, I said three times I don't
19  know.
20      Q.  Okay.  It was not -- and that
21  collaboration -- well, did you deal directly
22  with the FDA?
23      A.  For the OTC stuff, at the latter
24  part of the project, I did, but not at the
25  start of the project.

Page 88

W. VIGILANTE

1   W. VIGILANTE
2      Q.  What was the nature of your direct
3   dealings with FDA at the latter part of the
4   OTC project?
5      A.  Well, one of the things that I did
6   was send them my research; and then back in
7   2003, I think the fall of 2003 my contact
8   asked me to come and give a -- a presentation
9   to the FDA and the committee that was sitting
10  for the OTC stuff.  So I put together a
11  presentation.  I sent it down to them and
12  unfortunately I -- I came down with a stomach
13  bug, so my -- a colleague of mine who was down
14  there giving another presentation gave my --
15  gave my presentation as well.
16      Q.  Okay.  And that presentation
17  involved whatever the outcome of your research
18  was?
19      A.  Yes, in the -- whatever the
20  findings from the research was, and I -- I
21  don't recall at the time if that was DTC or
22  OTC.  I just don't recall.
23      Q.  Okay.  And you don't know what FDA
24  did internally with your research?
25      A.  For the DTC stuff, I don't.  For

Page 89

W. VIGILANTE

1   W. VIGILANTE
2   the OTC stuff I know that it was directly
3   implemented in their regulations for the
4   labeling.  For example, I know that there's a
5   requirement for a minimum of 8 point font.
6   That came directly out of our research.  That
7   was one of our recommendations.  There was
8   a -- an order of the -- of the information, an
9   ordering of the information to be presented on
10  the labels; and I do know that it was followed
11  directly on the result of my research except
12  for the presentation of active ingredients,
13  that they got pushback from the pharmacists
14  and the doctors.  They wanted that higher in
15  the list.  And I know of no other research in
16  the country that was done on the -- the
17  ordering of information for
18  direct-to-consumer -- or over-the-counter
19  medication labeling.
20      There is recommendations for white
21  space that came out of the research that was
22  put into the regulations.  There was the
23  recommendation for foldout labels to present
24  or have larger real estate to present the
25  information in a more and better format using

Page 90

W. VIGILANTE

1
2  bullet lists, using extra white space, using
3  relatively larger fonts, et cetera; and,
4  again, that was something that wasn't directly
5  from our recommendations that were -- were put
6  forth by the FDA and is used now.
7        Q.   Did you say "directly from your
8  research" or "not directly from your
9  research"?
10       A.   It --
11       Q.   I just didn't hear you.
12       A.   At what point?
13       Q.   Just now you said and that -- that
14  the FDA took that directly from your research
15  or not directly from your research.  I just
16  didn't hear you.
17       A.   Yeah, the rec -- the
18  recommendation was directly from our
19  research --
20       Q.   Okay.
21       A.   -- with regard to those topics.
22       Q.   Do you know if it was exclusively
23  from your research?
24       A.   I don't know of any other research
25  that was published related to those topics

Page 91

W. VIGILANTE

1
2  other than what we were doing --
3        Q.   Well, whether published --
4        A.   -- and that I was doing at the
5  time.
6        Q.   -- or not, do you know whether it
7  came exclusively from your research?
8        A.   Yeah, I can't say that a --
9  another organization somewhere had results
10  that they didn't publish to the public that
11  were submitted to the -- to the FDA, but I'm
12  not aware of it.
13       Q.   Okay.  There's no reason why you
14  would be aware of them, is there, if
15  information was given to the FDA?
16       A.   If it was non-public information
17  that was given to the FDA, I can't say that
18  I'm sure they would send it over to us.  Maybe
19  it was confidential if it existed.  I would
20  think that if it was presented to the FDA and
21  it wasn't confidential, they would send it up
22  to us to at least take a look at to let us
23  know what other people were doing.  Typically
24  that's how research works.  You want to be
25  able to collaborate between different groups

Page 92

W. VIGILANTE

1
2  and parties so that you're not stepping on
3  each other's toes, you get an idea of what's
4  being done, pitfalls that may be out there
5  that may need to be addressed and so forth.
6        Q.   Typically that's how FDA research
7  is done, is that your testimony?
8        A.   No, that's typically how research
9  is done.
10       Q.   Right.  But you don't know how,
11  typically, FDA research is done?
12       A.   I don't know how it was -- for the
13  work that we were doing on the OTC and DTC
14  stuff, I don't know how the FDA was getting
15  information from other parties and if there
16  was information from other parties that
17  related -- related to the topics that we were
18  working on.
19       Q.   And in any event, the
20  recommendations that were in your research
21  related to the font size, the order of
22  present -- and I'm talking again about the OTC
23  project -- the font size, the order of
24  presentation and the amount of white space --
25       MR. HAVERTY:  Objection.

Page 93

W. VIGILANTE

1
2        Q.   -- correct?
3        MR. HAVERTY:  There's more.
4        A.   Yeah, so we looked at the font
5  size.  We looked at the white spacing.  We
6  looked at using bulleted list versus paragraph
7  prose.  We looked at extended label designs.
8  We looked at even leading between the --
9  between the lines which is related to -- to
10  white space and the ordering of information.
11       Q.   Okay.  On the direct-to-consumer
12  marketing materials, your part of the research
13  was related to TV advertisements?
14       A.   I did help in the TV
15  advertisements, but my major project was on
16  website advertisements.
17       Q.   Oh, okay.  And was that research
18  requested by FDA?
19       A.   Yeah, so what happened was is that
20  I contacted the FDA, my contacts at the FDA,
21  and asked them, you know, what areas --
22  because we had done the OTC stuff, that was
23  behind us, what areas they saw and had need of
24  in the future and they requested that I focus
25  on the DTC stuff, the direct-to-consumer

24  (Pages 90 to 93)

Page 94

W. VIGILANTE

1  advertisement stuff and we -- in particularly
2  the -- the websites for the project I was
3  doing.
4      Q.  You initiated the contact with
5  FDA.  They didn't initiate it with you.
6      A.  I know that I -- I initiated that
7  contact, yes.
8      Q.  Okay.  And was that research on
9  direct-to-consumer advertising on websites
10 sponsored in any way by FDA?
11     A.  Yeah, I don't know.  I don't think
12 it was sponsored quote-unquote by the FDA.
13     Q.  Okay.  What did you do with your
14 research with respect to providing it to FDA?
15     A.  When I collected the data,
16 analyzed the data, I sent them copies of the
17 reports, talked to them about it and -- and
18 then published the data in peer-reviewed
19 journals over a number of years I guess.
20     Q.  Do you know what use they made of
21 your research that you sent to them?
22     A.  Not specifically.  I did -- I do
23 know that the requirements for the TV ads
24 because I -- I don't typically -- as a --

Page 95

W. VIGILANTE

1  after graduate school and after doing my work,
2  I don't typically surf direct-to-consumer
3  advertisement websites for prescription
4  medications, but I do see the advertisements
5  on the TV and I know they -- they -- the way
6  in which the risks and benefits are presented
7  on the TV ad have changed based upon updated
8  regulations from the FDA.
9      Q.  You didn't do the TV research.
10     A.  I helped in the TV research, but I
11 wasn't the -- the major or principal
12 researcher on it.
13     Q.  What was specifically your role
14 with respect to the TV research for
15 direct-to-consumer advertising --
16     A.  Yeah, I would --
17     Q.  -- of pharmaceuticals?
18     A.  -- have been -- yeah, I'm sorry.
19 I would have been working with the -- the
20 other principals, the other -- I want to call
21 them older grad students that were responsible
22 for the projects and coming up with
23 methodologies, coming up and reviewing
24 questionnaire questions, their surveys, how

Page 96

W. VIGILANTE

1  they're going to go about doing the research,
2  helping them with the data analysis, and then
3  helping them with -- with writing it up.
4      Q.  Were those direct-to-consumer --
5  well, strike that.
6          Let's move on to your experience
7  back to medical devices.
8          You've never been retained by FDA
9  or consulted by FDA with respect to medical
10 devices; correct?
11     A.  That's correct.
12     Q.  Okay.  In your traditional
13 consulting role at Robson Forensics, were you
14 ever retained by a medical device
15 manufacturer?
16     A.  No.
17     Q.  Did you ever participate in design
18 validation of a medical device under the Code
19 of Federal Regulations, 21 CFR Section 820.30?
20     A.  No.
21     Q.  Did you ever --
22     A.  Excuse me.
23     Q.  No, I'm sorry.  You've answered my
24 question --

Page 97

W. VIGILANTE

1      MR. HAVERTY:  No, no.
2      Q.  -- Mr. Vigilante.
3      MR. HAVERTY:  Go ahead.
4      A.  Yeah, so I just want --
5      MR. SCHULTZ:  No, no, no, no.  It's
6  my deposition.
7      MR. HAVERTY:  Dave.  Excuse me,
8  Dave.  He -- he's talk --
9      MR. SCHULTZ:  He's answered.  It was
10 a yes-or-no question.
11     MR. HAVERTY:  Dave, he said no and
12 now he realized that that was not a correct
13 answer.  He's entitled to finish.
14     Q.  Oh, is that not a correct answer?
15     A.  Well, what I was going to say --
16 it's a correct answer.  What I was going to --
17     Q.  Okay.
18     A.  -- is I need a break.  So whether
19 you want to do it right now or you want to do
20 it after the next question, either way I'm
21 happy to oblige you, but I need a break.
22     MR. SCHULTZ:  You need a break,
23 that's fine.
24     THE VIDEOGRAPHER:  We are now going

Page 98

```
 1              W. VIGILANTE
 2   off the video record.  That concludes DVD
 3   Number 1.  The time is 11:49.
 4        (A recess is held from 11:49 a.m. to
 5   12:02 p.m.)
 6        THE VIDEOGRAPHER:  We are now back
 7   on the video record.  This commences DVD
 8   Number 2, August 18th, 2016.  The time,
 9   12:02.
10   BY MR. SCHULTZ:
11        Q.  Mr. Vigilante, before the break we
12   were talking about the design validation
13   regulations in the Code of Federal Regulations
14   for medical devices.  And with respect to
15   those regulations, have you ever performed a
16   risk analysis pursuant to those regulations?
17        A.  I have not.
18        Q.  Have you ever submitted labeling
19   of a medical device to FDA pursuant to
20   21 CFR 801?
21        A.  No.
22        Q.  Ever been involved in the process
23   of submitting a 510(k) application for
24   clearance of a medical device to FDA?
25        A.  No.
```

Page 99

```
 1              W. VIGILANTE
 2        Q.  How about involved in the process
 3   of submitting a pre-market approval
 4   application to FDA for a medical device?
 5        A.  I have not.
 6        Q.  Have you ever drafted a warning or
 7   label or instruction for a medical device
 8   manufacturer?
 9        A.  I have not.
10        Q.  Have you ever been involved in a
11   CAPA process?
12        A.  No.
13        Q.  Ever been involved in a
14   post-market surveillance program for a medical
15   device?
16        A.  I have not.
17        Q.  Or developed a post-market
18   surveillance plan under the Federal
19   regulations?
20        A.  I have not.
21        Q.  Have you had any consulting,
22   traditional consulting role with respect to
23   medical devices?
24        A.  Are you asking me if I've ever
25   been retained by a manufacturer in a
```

Page 100

```
 1              W. VIGILANTE
 2   consulting role for a medical device?
 3        Q.  Yes.
 4        A.  I have not.
 5        Q.  Okay.  Or just to be clear and
 6   complete, work on a project for someone who
 7   was retained by a medical device manufacturer.
 8        A.  That one gets a little bit more
 9   fuzzy.
10        Q.  Okay.  Why don't you explain that
11   to me?
12        A.  I had a -- a colleague at Robson
13   that was doing some medical device submission
14   work, testing work, submission work, and she
15   used to get overloaded in her work and she
16   would ask colleagues to help her go through
17   data or whatever, and I've -- I've helped her
18   on those parts, but I can't really get into
19   exactly what it was that I was reviewing or
20   doing for her at the time.  I just don't
21   recall.
22        Q.  It was a number of years ago?
23        A.  Yes.
24        Q.  And it was reviewing data?
25        A.  I don't recall all the tasks.
```

Page 101

```
 1              W. VIGILANTE
 2        Q.  Okay.  But it was a project that
 3   was -- someone else at Robson was retained to
 4   do for the medical device manufacturer?
 5        A.  Yes.
 6        Q.  All right.  In your litigation
 7   work, whether at Robson or at Vigilante
 8   Forensics, have you ever been hired by a
 9   medical device manufacturer?
10        A.  None are coming to mind.
11        Q.  Okay.  Other than this case, have
12   you ever been retained on behalf of a
13   plaintiff suing a medical device manufacturer?
14        A.  None are coming to mind, but I
15   have a -- a feeling that I did at least
16   consult on one case involving a medical
17   product, but it's very, very fuzzy, and I
18   don't have a specific memory of it.
19        Q.  Okay.  So it's not -- it's not
20   certainty whether you have or you haven't?
21        A.  Correct.
22        Q.  All right.  Are you familiar with
23   the Guidance For Industry and FDA Pre-Market
24   and Post-Market Review Staff With Respect to
25   Incorporating Human Factors and Risk
```

TSG Reporting - Worldwide - 877-702-9580

W. VIGILANTE
Management, the 2000 guidance?
A. Am I familiar with their staff?
Q. No. Are you -- the document is called Guidance For Industry and FDA Pre-Market and Post-Market Review Staff on Incorporating Human Factors and Risk Management. Are you familiar with that guidance document from 2000?
A. I -- I'm familiar with the 2016. I don't think I've read the 2000.
Q. Okay.
A. Was it 2001? No, it was July 18, 2000.
Q. You haven't read that guidance?
A. I have not.
Q. Okay. The 2016 guidance, you're familiar with that?
A. Yes.
Q. Is this case the first time during which you've had occasion to read that 2016 guidance?
A. Yes.
Q. Do you recognize that in that guidance FDA, first of all, does not require

W. VIGILANTE
use of human factors?
A. Yeah, I'm not sure that they require it. I think it's a -- a guideline recommendation.
Q. Okay. And in that guideline recommendation, they -- they do not -- FDA does not specify the mode of human factors analysis that medical device manufacturers should incorporate; correct?
A. One more time.
Q. Sure. Let me see if I can rephrase it to be a little bit more clear.
That guidance document, the 2016 guidance document, suggests that when appropriate manufacturers should incorporate human factors into their design and labeling analysis; correct?
A. It's my understanding it's a guidance, so I don't think it's a requirement.
Q. Right. What I'm saying is: The FDA in that guidance document is suggesting to manufacturers that they consider incorporating human factors analyses when that's appropriate; correct?

W. VIGILANTE
A. What they say is, and I'll read it, the guidance -- "This guidance recommends that manufacturers follow human factors or usability engineering processes during the development of new medical devices"; et cetera.
So my understanding it's a -- the document is a guidance and that the FDA recommends it. It's not a requirement.
Q. And in recommending the incorporation of human factors analyses, it does not specify what human factors processes or analyses the manufacturer is recommended to follow; correct?
A. No, it does provide a list of different usability tools that the manufacturer should follow --
Q. It does not specify --
A. -- from -- from beginning --
Q. -- which --
A. -- to end.
Q. -- one of those tools they should utilize if any.
A. They do specify them. They're --

W. VIGILANTE
they're -- they're laid out in the document of -- as to what human factors tools and evaluation should be done and at what parts of the design process they should be done.
Q. Right. So it is your understanding that FDA is saying manufacturers should follow these processes?
A. Yes, it's a recommended guidance.
Q. All right. Issued in 2016?
A. Issued in 2016. There was a -- my understanding is that the -- this 2016 version supersedes the 2000 version.
Q. Which you have not read?
A. I have not read that.
Q. All right. Do you know what a device history file is?
A. I do not know the technical definition of a device history file.
Q. Do you know what a design history file is?
A. Not as it's applied to medical devices.
Q. Do you know what regulations govern the design history file?

Page 106

W. VIGILANTE

1
2     A.  I do not.
3         Q.  I take it you've never maintained,
4     created, or reviewed a design history file?
5         A.  I have.  Not for medical products,
6     but for other consumer/commercial products.
7         Q.  Right.  But not for a medical
8     device as specified under the Federal
9     regulations?
10        A.  Yes.
11        Q.  Yes, you have; or, yes, that's
12    correct?
13        A.  I'm sorry.  I was agreeing with
14    you.
15        Q.  Yeah.  Okay.  Have you read the
16    Federal statutes governing medical devices?
17        A.  I have not read all the statutes
18    governing medical devices.  The only one that
19    I read was the -- the notice in the Federal
20    register in -- from July 18, 2000.
21        Q.  Which is what?
22        A.  It is -- the volume -- it's
23    Volume 65, Number 138.  The topic is Guidance
24    For Industry and FDA Reviewers on Medical
25    Device Use--Safety:  Incorporating Human

Page 107

W. VIGILANTE

1
2     Factors Engineering Into Risk Management
3     Availability.
4         Q.  Okay.  And what you reviewed there
5     was the statement in the Code of Federal
6     Regulations; right?
7         A.  Yes.
8         Q.  All right.  Have you read the
9     Federal regulations that govern the design,
10    labeling, and approval of medical devices?
11        A.  I have not.
12        Q.  Do you know what MDD 93/42/EEC
13    refers to?
14        A.  I'm sorry.  I'm not familiar with
15    it.
16        Q.  Do you know what --
17        A.  I'm sorry.  I'm not familiar with
18    the statute number.  Whether or not I've seen
19    the statute, I don't know.
20        Q.  Okay.  Do you know what EN 1441
21    Annex C refers to?
22        A.  EN is a European standard
23    typically, but I have not reviewed that
24    standard at least for this case that I know
25    of.

Page 108

W. VIGILANTE

1
2         Q.  Do you know what O.D.E. Guidance
3     is?
4         A.  Yeah, not offhand.
5         Q.  Okay.  Do you -- are you familiar
6     with ISO 14971:2007?
7         A.  What's the name of the standard?
8         Q.  Medical Devices, Application of
9     Risk Management to Medical Devices.
10        A.  I'm not familiar with it.
11        Q.  Okay.  Are you familiar with
12    IEC 60601-1-6:2010, Collateral Standard on
13    Usability?
14        A.  I'm not familiar with it.
15        Q.  Are you familiar with
16    IEC 62366:2007, Medical Devices, Application
17    of Usability Engineering in Medical Devices?
18        A.  I don't believe I read it.
19        Q.  Are you familiar with ANSI,
20    A-N-S-I, slash, Aami He752009, Human Factors
21    Engineering, Design of Medical Devices?
22        A.  I don't recall if I read that or
23    not.
24        Q.  Have you ever performed a formal
25    risk analysis?

Page 109

W. VIGILANTE

1
2         A.  For a medical product or any
3     product?
4         Q.  Well, let's start with a medical
5     product.
6         A.  I have not for a medical product.
7         Q.  Okay.  Have you performed a formal
8     risk analysis for some other product?
9         A.  For consumer and commercial
10    products I have.
11        Q.  Okay.  Consumer and commercial
12    products, you're distinguishing those from
13    medical devices; correct?
14        A.  Sure.
15        Q.  Okay.  What process or methodology
16    have you used to perform a formal risk
17    analysis?
18        A.  The risk analysis I've been
19    involved with were during my time at IBM in
20    product development.  It was integrated into
21    the product development cycle and in --
22    different parties that were different members
23    of the Product Development Team fed into the
24    risk analysis.  It was run and overseen by
25    the -- the Product Development Manager.

TSG Reporting - Worldwide - 877-702-9580

Page 110

W. VIGILANTE

1
2      For my part, the product, both the
3 concept and then once the concept was put into
4 more physical form, was assessed for potential
5 errors, potential hazards, potential problems.
6 That was fed back into the risk assessment
7 based upon the user's standpoint, the -- the
8 product user's standpoint.
9      The Engineering Teams, the Testing
10 Teams all fed back into the -- the risk
11 assessment based upon their disciplines and
12 their types of testing and -- and data that
13 they collect.
14      Q.  Those risk analyses that you were
15 involved in were during your time at IBM I
16 think you said?
17      A.  Yes.
18      Q.  So they involved computer
19 software?
20      A.  I don't think I've done one for
21 computer software.  It was mostly for
22 hardware.
23      Q.  Computer hardware?
24      A.  Yes.
25      Q.  Such as?  Give me an example.

Page 111

W. VIGILANTE

1
2      A.  I had a -- I've worked on the
3 design development of laptops, desktops,
4 monitors, input devices such as keyboards,
5 mice, scanners, printers.  I've worked on
6 wireless devices, whether 802.11, Bluetooth.
7 I worked on storage, tape storage, desktop
8 tape storage, commercial storage, tape
9 libraries, tape library pickers.  Even worked
10 on cameras at one point.  So I think that's
11 a -- kind of a good cross-reference of the
12 different types of products I've worked on.
13      Q.  What was your role with respect to
14 those -- well, actually, let me back up.
15      How many such risk analyses did
16 you participate in at your -- in your time at
17 IBM?
18      A.  I don't have a number for you.
19 Generally it would be done during the product
20 design function.  So if there were existing
21 products that we're making cosmetic or minor
22 changes to, we wouldn't go through a full risk
23 analysis.  It would only be products that
24 we're developing either a new platform or a
25 brand new product, like bringing a brand new

Page 112

W. VIGILANTE

1
2 product to market where it would be done.  So
3 I've worked on maybe over two dozen to three
4 dozen products that fit that category.
5      Q.  Okay.  And was your role -- let me
6 see if I can come at it a different way.
7      Were you looking at these products
8 from the standpoint of primarily being
9 concerned with repetitive stress injuries or
10 what were you looking at?
11      A.  My role in the Product Development
12 Team was the User Centered Design Team Lead.
13 So I was responsible for the human factors,
14 the ergonomics, the usability.  So I had an
15 assigned role on the teams, and my job was to
16 represent the user.  So I worked for the
17 Design Team representing the user through all
18 stages of -- of the design process from
19 initial requirements gathering, the concept
20 development, to initial prototypes, to the
21 testing concepts, testing prototypes, getting
22 physical products working, testing those with
23 users and different usability techniques to
24 validation and competitive benchmarking for
25 the products; and then watching warranty and

Page 113

W. VIGILANTE

1
2 working with warranty and service to identify
3 post-release problems that, you know, were not
4 foreseen.
5      So that's my role in the
6 Development Teams.
7      Q.  Well, what I was trying to get at
8 is with respect to those products at IBM, were
9 you attempting to analyze the potential for
10 injury?
11      A.  On some of the products potential
12 for injury was a focus.  Most -- all of the
13 products usability and user error and
14 potential damage to the machine was my focus.
15      Q.  What kind of injuries did you
16 evaluate?
17      A.  For the smaller products, the
18 biggest problem I had to worry about was sharp
19 edges, and that's usually picked up by the
20 manufacturing folks, but when I get into
21 testing if it was -- if there was an issue, I
22 would identify it, mark it, and have it get
23 fixed.
24      For the bigger products, like the
25 tape library -- not the -- the tape libraries.

29 (Pages 110 to 113)

Page 114

W. VIGILANTE

1
2   The tape libraries with the pickers we had
3   issues with the fact that we have large moving
4   robotic arms on tracks that can crush and
5   injure people.  So there was issues related to
6   crush hazards with the tape libraries; and the
7   large tape storage or the large storage units
8   our biggest issue was with the electric --
9   electric shock and electrocution.  So we had
10  to identify potential is risks associated with
11  the fact that they were high-voltage machines
12  that both the typical user and the servicer
13  and the installer had to access, and at
14  different points in time at different parts of
15  that access they may be exposed -- or the --
16  the job was to prevent them from being exposed
17  to the high-voltage areas of the machine.
18       Q.  Okay.  Did -- in the -- in the
19  risk analyses processes that you were involved
20  in, was there a particular methodology of risk
21  analysis that was utilized?
22       A.  Well, there was.  Like for the --
23  more of the engineering side the FMEAs were
24  practiced, the failure modes effect analysis
25  were done.  Fault trees were done.  My

Page 115

W. VIGILANTE

1
2   responsibility was doing it through usability
3   testing, identifying issues that came up
4   during task analysis, issues during the -- the
5   assessment of the prototypes, issues that were
6   identified during the -- the user testing.
7   That -- that's where my focus was.
8       Q.  Okay.  So -- and your focus, to
9   the extent it was on usability testing, would
10  involve both task analysis and then the
11  usability side of it; correct?
12       A.  Well, there were multiple tools
13  that I utilized working for IBM doing these,
14  the product assessment; and it would be my
15  responsibility as -- as opposed to that --
16  that it be done and -- and done correctly as
17  opposed to be the sole person doing it.  But
18  usability testing, focus groups, the cognitive
19  walk-throughs, the -- the hallway testing, the
20  task analysis, you know, these were all
21  different tools that were -- that I utilized
22  depending upon what pay -- what stage of the
23  development process the product was in, what
24  stage of the development process the
25  assessment was done in, the time and the

Page 116

W. VIGILANTE

1
2   resources available.
3       Q.  Are you familiar with the phrase
4   "use error"?
5       A.  I'm more familiar with the term
6   "user error."
7       Q.  Okay.  Are you able to define the
8   phrase "use error"?
9       A.  You're going to have to give me a
10  context.
11       Q.  In the medical device context are
12  you familiar with that phrase?
13       A.  I'm not sure how they're defining
14  it.
15       Q.  Okay.  Let's talk about what you
16  did to -- well, actually, let me -- before I
17  get to that...
18            (Exhibit Vigilante-5, multipage
19       document entitled William Vigilante Human
20       Factors ExpertVigilante Forensic, is marked
21       for identification.)
22            MR. SCHULTZ:  Is that Number 5?
23            COURT REPORTER:  Yes.
24       Q.  Mr. Vigilante, the court reporter
25  has handed you Exhibit Number 5 which -- well,

Page 117

W. VIGILANTE

1
2   do you recognize this document?
3       A.  Looks to be a poor printout of my
4   home page and then looks like there's a
5   printout of my about page.
6       Q.  Okay.  Did you say "a poor
7   printout"?
8       A.  Yeah, I mean this isn't what it
9   looks like on my website, so it's a poor
10  printout of the website.
11       Q.  Okay.  Are you able to read it?
12       A.  There's a bunch of text that's
13  obscured by the graphic.
14       Q.  That's on the front page, the
15  landing page of the website; correct?
16       A.  The home page?
17       Q.  Right.  The home page, landing
18  page, right, where the language is obscured.
19       A.  Yeah, you're using a loose term.
20  Landing page may not be the home page.  It --
21  so it depends on how you're using it, but this
22  is my home page.
23       Q.  Right.  And the term I used was I
24  don't think loose.  It was the home page's
25  landing page.

TSG Reporting - Worldwide - 877-702-9580

Page 118

W. VIGILANTE

1
2     A.  There's no such thing as a home
3  page landing page.  You can have a landing
4  page and you can have a home page.  They may
5  be the same page.  They may be different
6  pages.  So this is my home page.
7     Q.  Okay.  Where you land if you are
8  on the home page; right?
9     A.  No.  The way they use the term
10 "landing page" is that it's a page within the
11 website that you're going to send the user to
12 from another place.  So, for example, if you
13 have a pdf document related to, you know, I
14 don't know, usability testing for medical
15 products, and you have a link out to a
16 website, that landing page from that document
17 may not be the same as the home page for that
18 website.  So the landing page has a, you know,
19 a specific use and meaning.
20    Q.  May I get you to turn to the
21 second page of Exhibit 5.
22    A.  Sure.
23    Q.  This is the about page; right?
24    A.  I'm sorry.  It's Page 3?
25    Q.  Page 3.  I'm sorry.

Page 119

W. VIGILANTE

1
2     A.  Yes.
3     Q.  The about page from your website;
4  correct?
5     A.  Yes.
6     Q.  Did you draft this content?
7     A.  Yes.
8     Q.  Is it true and complete?
9     A.  To the best of my knowledge.
10    Q.  Okay.
11       MR. SCHULTZ:  Can you mark this one?
12       (Exhibit Vigilante-6, multipage
13    document entitled Human Factors Expert
14    Services Vigilante Forensic, is marked for
15    identification.)
16    A.  I've seen a couple typos.
17    Q.  Mr. Vigilante, the court reporter
18 has handed you Exhibit Number 6.  Do you
19 recognize Exhibit Number 6 as a true and
20 correct copy of the portion of your website
21 indicating "Practice Areas"?
22    A.  Vigilante-6 is a poor copy of my
23 services page.
24    Q.  Okay.  Forgive me.  Your services
25 page.

Page 120

W. VIGILANTE

1
2     Does it -- is that an exhibit --
3  or is that content that you drafted?
4     A.  Yes.
5     Q.  Okay.  Is it true and accurate?
6     A.  Well, as I noticed on the last
7  about page, there's some grammatical errors,
8  so I don't know how accurate it is, but for
9  the most part, it's meant to be accurate.
10    Q.  Right.  Grammatical errors or
11 typos aside, it's accurate?
12    A.  It was my intent, yes.
13    Q.  Yeah.
14       (Exhibit Vigilante-7, multipage
15    document entitled Bill Vigilante LinkedIn,
16    is marked for identification.)
17    Q.  Do you recognize Vigilante Exhibit
18 Number 7?
19    A.  It looks like a printout from my
20 LinkedIn page.
21    Q.  And did you draft that content?
22    A.  The content under "Summary" and
23 "Experience," yes.
24    Q.  Okay.
25    A.  And the -- yeah, yes.

Page 121

W. VIGILANTE

1
2     Q.  Okay.  Did you -- is it true and
3  accurate?
4     A.  To the best of -- well, I can't
5  say to the best of my ability, but that was my
6  intent.
7       (Exhibit Vigilante-8, multipage
8    document entitled William J. Vigilante,
9    PhD, CPE - SEAK, Inc. Expert Witness
10   Directory, is marked for identification.)
11    Q.  Do you recognize Vigilant-8?
12    A.  I know what it is.  I don't know
13 that I've ever physically went to the website
14 and looked myself up.
15    Q.  It's a printout of the information
16 that you provided to an expert witness service
17 called SEAK; correct?
18    A.  Yes.
19    Q.  And the information that is
20 included in that expert witness profile is
21 information you provided, is it not?
22    A.  That is -- that would be my
23 belief, yes.
24    Q.  And can you tell or do you recall
25 when you provided this information to the SEAK

31 (Pages 118 to 121)

Page 122

1          W. VIGILANTE
2    Expert Witness Directory?
3         A.  I don't know that I have a
4    specific date, but I can tell you it's
5    sometime between October 1st, 2015 and today.
6         Q.  Because it's after you formed
7    Vigilante Consulting; correct?
8         A.  That's correct.
9         Q.  All right.  And in the front page
10   of this expert witness directory it says,
11   "Number Of Times Deposed/Testified in the Last
12   4 Years."  You've written "50 plus."
13        Do you see that?
14        A.  Yes.
15        Well, wait, wait, wait.  It -- so
16   one of the things I want to clarify is that
17   for the SEAK Expert Witness Directory, which
18   is a website page from, I had to go -- I don't
19   remember if it was online or they sent me a
20   paper application, and they were -- like under
21   "General Specialties" I didn't write myself
22   "Human factors, warnings and labels."  Like
23   there were selections I had to choose from.
24   Like I had to select, you know, one or two
25   from the -- from the below list; and the same

Page 123

1          W. VIGILANTE
2    thing with "Specialty Focus."  I think
3    "Education" was a free form.  "Years in
4    Practice" was free form.  And I don't remember
5    "Number Of Times Deposed/Testified in the Last
6    4 Years" if there was a selection or if that
7    was free form.  So I -- I can't testify that
8    that's what I wrote.  That might have been my
9    only selection.
10        Q.  I gotcha.  But if it was a
11   selection, you selected more than 50 times;
12   correct?
13        A.  Yes.
14        Q.  All right.  And that's true and
15   accurate when you made that selection; right?
16        A.  Yes.
17        Q.  And the "Additional Information"
18   that's provided on Pages 2 and 3 of this
19   particular exhibit, that's free-form
20   information?  In other words, you wrote it;
21   right?
22        A.  I'm going to -- the safest way to
23   answer that is to say that I wrote the
24   information and put it into the system.  I
25   don't know if -- if SEAK went in and edited it

Page 124

1          W. VIGILANTE
2    for -- to shorten it because it couldn't be so
3    long.  That's possible without going back to
4    see what I submitted.  I don't recall.  But I
5    would have provided them the initial content,
6    and if they edited it, they edited it.  If
7    not, then it's exactly what I provided.
8         Q.  You're not aware of any edits that
9    they made, are you?
10        A.  Like I said, I don't know if they
11   do or not.  I -- I don't -- I don't recall.
12        Q.  Well, why don't you take a moment
13   to read the "Additional Information" and tell
14   me if you view it to be edited or incomplete
15   or inaccurate.
16        A.  I can read it and give you an
17   assessment of the third request, but the first
18   two I would have to go back and see what I
19   initially submitted.
20        Q.  Well, why don't you read it and
21   I'll ask you some follow-up questions.
22        A.  Sure.  Okay.
23        (Reviewing document.)
24        Okay.
25        Q.  You've had an opportunity to read

Page 125

1          W. VIGILANTE
2    the "Additional Information" on Exhibit 8?
3         A.  Yes.
4         Q.  Is it truthful?
5         A.  Yes.
6         Q.  Is it incomplete?
7         A.  I'm sorry?  Is it incomplete?
8         Q.  Yes, sir.
9         A.  Incomplete of what?
10        Q.  Incomplete for what you're
11   describing in there.
12        Well, what are you attempting to
13   describe in the "Additional Information"?
14        A.  Just the general background of
15   the -- my experiences and the type of work I
16   do.  I mean, it -- for, you know, what it's
17   meant to be, it seems to be complete.  If it
18   was meant for something else, it might not be
19   complete.
20        Q.  But for what it was meant to be,
21   it's a complete description?
22        A.  For what it's supposed to be, it
23   seems to be right.
24        Q.  And what's it supposed to be?
25        A.  The additional information

32 (Pages 122 to 125)

```
 1              W. VIGILANTE
 2   describing my background and the type of work
 3   I do that would fit in the field and area that
 4   was offered.
 5        Q.   What field and area was it offered
 6   in?
 7        A.   It's a website.  There's --
 8   there's a form.  They're typically limited
 9   for -- for text and characters.  So if it was
10   limited for text and characters that's where I
11   had to fit it into; and like I said, if I had
12   given them information and they needed to cut
13   it down, they may have edited it.  I just
14   don't know at this point.
15        Q.   Are there significant areas of
16   your qualifications as an expert in the fields
17   of human factors and ergonomics that are
18   missing from that description?
19        A.   Well, I have a whole CV that's --
20   that's, what, ten pages long and this is just
21   one form on a website.  So, yeah, I mean, I --
22   I couldn't fit everything in there.
23        Q.   Okay.  So your -- your CV is the
24   most complete statement of your experience;
25   correct?
```

```
 1              W. VIGILANTE
 2        A.   Yes.
 3             MR. SCHULTZ:  All right.  Why don't
 4   you mark that.
 5             (Exhibit Vigilante-9, multipage
 6   document entitled William J. Vigilante,
 7   Jr.:: Real Estate - Human Factors::
 8   JurisPro Expert Witness Directory, is
 9   marked for identification.)
10        Q.   Do you recognize Vigilante-9?
11        A.   Yes.
12        Q.   What is it?
13        A.   It's my listing in the JurisPro
14   Expert Witness Directory.
15        Q.   That's also something that you
16   created, correct, or inputted if you will?
17        A.   Yes, I -- I -- there were forms
18   that I input into.
19        Q.   Okay.  And much of this document
20   is in the form of questions and answers;
21   correct?
22        A.   Yes.
23        Q.   And the questions were questions
24   provided by JurisPro Expert Witness Directory
25   and the answers are what you typed in;
```

```
 1              W. VIGILANTE
 2   correct?
 3        A.   Yes.
 4             Yeah, so it looks like some of
 5   this information is outdated.
 6        Q.   What information is outdated?
 7        A.   Without going through all of it,
 8   for example, it says, "When was the last time
 9   you had your deposition taken," and I put
10   October 2015.  Obviously that's incorrect.  I
11   think this is the information that I had at
12   the time I filled the form out in probably
13   October of 2015.  My rate has changed too.  So
14   I know that's different.  And then how many
15   years I've worked in the legal industry as
16   a -- as an expert, that should be 14 plus, not
17   13 plus because it's the next year.
18        Q.   So in other words --
19        A.   I've got a -- "How many occasions
20   have you been qualified by a court to give
21   expert testimony?"  Well, I guess that's
22   right, 35 plus, that still fits.
23             Number -- "On how many occasions
24   you have testified as an expert in court or
25   before an arbitrator" the answer is 32, it's
```

```
 1              W. VIGILANTE
 2   actually 36 at this point.
 3             Everything else seems to be
 4   reasonably accurate.
 5        Q.   Okay.  Have you worked with
 6   Mr. Haverty on litigation matters before?
 7        A.   I have not.
 8        Q.   Have you worked with members of
 9   his firm, Williams Cuker & Berezofsky, before
10   this case?
11        A.   It's possible, but I don't know.
12   The name of the firm is not familiar to me.
13        Q.   Is everything that you reviewed in
14   arriving at your opinions listed in your
15   report -- or reports?
16        A.   Everything I plan on relying upon,
17   yes.
18        Q.   Did you review materials that
19   you're not relying on?
20        A.   It's possible that I looked up
21   websites.  Like when I pulled down the -- the
22   FDA CFR document, I would have done a web
23   search on human factors in design of medical
24   devices, and I can't say that there was other
25   websites that I looked at that I didn't rely
```

Page 130

W. VIGILANTE

1    W. VIGILANTE
2    upon or -- download and rely upon.  So
3    certainly there's potential I looked at other
4    information, but the things I'm relying upon
5    are listed in my report or provided with me
6    here today.
7        Q.  Okay.  Were you provided
8    information or documents that you did not rely
9    upon?
10       A.  Certainly in all of the documents
11   I got, some were more relevant to what I was
12   doing than others.  So I think that's the best
13   way to put it.
14       Q.  Are any of the documents that you
15   were provided not listed in your report?
16       A.  Reports.  If it's reports --
17       Q.  Reports.  Sorry.
18       A.  Yes, I did receive the deposition
19   of Dr. Klimowicz, and that's not listed in any
20   of my reports.
21       Q.  Okay.  Other than Mr. Klimowicz's
22   report, anything that's not listed in your
23   reports?
24       A.  The only thing that's not listed
25   in the report was the 2006 FDA document

Page 131

W. VIGILANTE

1    W. VIGILANTE
2    "Applying Human Factors and Usability
3    Engineering to Medical Devices, Guidance For
4    Industry and Food and Drug Administration
5    Staff."
6        Q.  Did you say 2006 or 2016?
7        A.  2016.
8        Q.  Okay.  All right.  Now --
9        A.  I may have said 2006.  If I did, I
10   apologize.
11       Q.  You -- you meant 2016 if you did.
12       All right.  Did you conduct any
13   interviews as part of your opinion
14   formulation?
15       A.  The only thing that I would --
16   fall into that category is my discussion
17   with -- telephone discussion with
18   Dr. Kilowicz --
19       Q.  Okay.
20       A.  -- Klimowicz.
21       Q.  When did --
22       A.  Sorry.
23       Q.  -- that occur?
24       A.  April 13, 2016.
25       Q.  And what was your purpose for

Page 132

W. VIGILANTE

1    W. VIGILANTE
2    speaking with Mr. Klimowicz?
3        A.  I think that was the beginning of
4    my report writing.  So I wanted to go over
5    with Dr. Klimowicz his opinions, his findings,
6    and make sure that I have a -- a correct
7    understanding of -- of the things I was
8    talking about.
9        Q.  Okay.  We'll come back to that.
10       But in general, am I correct in
11   understanding that you were talking to
12   Dr. Klimowicz or Mr. Klimowicz so that you
13   could understand what he was opining was the
14   failure mechanism at issue in this case; is
15   that a fair summary?
16       A.  Yeah, so I have notes from the
17   teleconference and I can tell you the things
18   we talked about, and certainly one of the
19   things that I wanted to get from the dep -- or
20   from the teleconference was what mis -- or
21   Dr. Klimowicz's findings, opinions were --
22   were going to be, you know, what -- what was
23   his findings through his investigation.
24       Q.  Okay.  And you -- you have notes
25   of that telephone conference?

Page 133

W. VIGILANTE

1    W. VIGILANTE
2        A.  Yes.
3        Q.  Was anybody else on the call?
4        A.  Mr. Haverty.
5        Q.  Okay.  Were you relying upon
6    Mr. Klimowicz's facts or opinions in drafting
7    your report?
8        A.  As the subject matter expert I was
9    relying upon him in part, yes.
10       Q.  Okay.  Did you -- did
11   Mr. Klimowicz tell you anything of a factual
12   nature that you did not include in your
13   reports?
14       A.  I don't know.
15       Q.  That's something that would be
16   discernable from your notes perhaps?
17       A.  Yes.
18       Q.  Tell me what your -- just, in
19   general, tell me your process, the process you
20   went through to formulate your opinions in
21   this case.
22       A.  Yeah, so I rely upon the
23   scientific method when I do a investigation,
24   particularly for assessment of -- of warnings
25   for a product.  I start with a -- typically it

34 (Pages 130 to 133)

Page 134

W. VIGILANTE

1    starts with a call from a client and I get
2    general question areas that I'm asked to -- to
3    look at.
4         I start doing some research,
5    whether it's, you know, online research
6    looking at the product, looking at maybe
7    information that's out there related to the
8    product, looking at things that are related to
9    the product.
10        Then I start drafting hypotheses
11   based upon my review of the initial -- my
12   initial review of the information.  I then
13   continue with the -- the -- and it could be,
14   depending upon the time frame, it could be
15   condensed into a few weeks, it could be
16   dragged out over a few months.  But as the
17   discovery information starts coming in, I
18   start gathering the facts of what happened,
19   how it happened, who was involved, when it
20   happened, and so forth.
21        So I look at what was done from
22   the manufacturer's standpoint, when it was
23   done, how it was done, what they did with
24   warnings, with -- what -- what was the end

Page 135

W. VIGILANTE

1    result, who was involved, what type of
2    assessments we're doing.  Same thing with the
3    risk assessment and identifying foreseeable
4    hazards associated with the product.
5         I then -- once I'm done with the
6    discovery material, I look at what is the
7    standard of care for product developers,
8    warning -- warning designers and developers
9    and look to see whether or not the -- in this
10   case whether or not the manufacturer --
11   manufacturers met the standard of care.  And
12   then I also look at whether or not their --
13   their warnings, instructions, in this case the
14   IFUs, met the standard of care for the
15   presentation of instructional and warnings
16   information.
17        And then I come to my conclusions
18   based upon my assessment of whether or not
19   they met the standard of care; and then I
20   formalize and memorialize my opinions in my
21   reports.
22        Q.  Okay.
23        A.  If it's a -- that's what I did for
24   this case.  Some -- some courts, they don't

Page 136

W. VIGILANTE

1    require reports, so it may be done in an
2    affidavit or disclosure, some other method,
3    but for this case it's memorialized in a
4    report.
5         Q.  Right.  You said at the beginning
6    of this that you follow the scientific method.
7    Would you define for me what you mean by "the
8    scientific method"?
9         A.  Sure.  You know, the scientific
10   method you start with questions.  You develop
11   hypotheses from your initial research.  You
12   collect data.  You put together a way to
13   collect that data, a way to test that data.
14   You do the -- you do the -- the assessment,
15   the testing of the data you collected; and
16   then you analyze that data and you determine
17   whether or not your hypotheses were supported
18   or not.  And then, of course, part of it is --
19   is memorializing it.
20        Q.  Did you, as part of your opinion
21   formulation process in this case, did you ask
22   for or review the design history file for the
23   P-cap or what others refer to as the
24   proprietary connecter?

Page 137

W. VIGILANTE

1         A.  I did not ask for it.
2         Q.  Did you receive it?
3         A.  I don't -- I don't know if it was
4    in the discovery material that I have.  That's
5    the -- I don't know if it was received in the
6    discovery material.
7         Q.  Okay.  Do you -- were there --
8    were any fact provided to you by any person
9    that you relied upon in formulating your
10   opinion?
11        In other words -- and let -- let
12   me just be clear.  I'm asking you for factual
13   information as distinct for -- from
14   conversations that you may have had with, for
15   example, Mr. Haverty about matters of a
16   non-factual nature.
17        A.  Yeah, so all the facts that I used
18   to -- to support my analysis and opinions are
19   laid out in the report; and they're identified
20   specifically by the party and if it's a
21   deposition, the page number on which the party
22   testified to that particular fact.
23        Q.  Okay.  Let -- let me rephrase the
24   question a little bit.

35 (Pages 134 to 137)

Page 138

W. VIGILANTE

1
2      What I was trying to get at was
3  whether you were provided facts by any person
4  where the facts were not either contained in
5  deposition testimony or in documents produced
6  in discovery.
7      A.  I don't know how to answer that
8  'cause I'm not really sure what you're asking
9  about.
10      So the case-specific facts I
11  received through the discovery documents and
12  my conversation with Dr. Klimowicz.  I didn't
13  have another source for case-specific facts.
14      Q.  Yeah.  I can ask it a different
15  way.  I -- I -- I think I know your answer,
16  but I just need to be clear.
17      Did Mr. Haverty or Mr. Klimowicz
18  or any other person verbally provide you
19  factual information that you relied upon those
20  statements in formulating your opinions?
21      A.  Not from Mr. Haverty, but from
22  Dr. Klimowicz.  Again, we had a teleconference
23  to go over his opinions and findings because
24  he was -- you know, he's reporting -- he's
25  writing his report while I'm writing my

Page 139

W. VIGILANTE

1
2  report.  He couldn't very well give me it at
3  start of my report writing, so I would have
4  relied upon that conversation in part for some
5  of my work --
6      Q.  Okay.
7      A.  -- understanding different aspects
8  of what he was doing and so forth.
9      Q.  Right.  And -- and those -- that
10  information revolved around the alleged
11  failure mechanism of the temporary blocked
12  vent; correct?
13      A.  Oh, I've got a whole sheet of
14  notes, so -- as to what the conversations were
15  about.  So part of the notes are certainly the
16  defects that he identified with the -- with
17  the product, with the P-cap and the --
18  Paradigm Reservoir and the infusion set.
19      We talked about the -- the Lot 8
20  problems.  We talked about the -- how the
21  infusion device goes through the 501(k) [sic]
22  device process.  So certainly I'm not an
23  expert in that process.  I would leave
24  testimony to that process to Dr. Klimowicz.
25      You know, we -- we talked about

Page 140

W. VIGILANTE

1
2  how the different components of the system and
3  what are -- where -- where they fall within
4  the regulatory process.
5      You know, we went through the
6  infusion set.  I had some questions about what
7  the -- I have the -- I had a -- a sample of
8  the infusion set and the reservoir.  I just
9  wanted to make sure I was correct in my
10  understanding of what was included in -- in
11  each part of it.
12      We talked about how they were sold
13  and what came with them.  We talked about
14  the -- the pump being an approved medical
15  device and some of the submission process for
16  that.  You know, we talked about the fact that
17  the infusion set and the reservoir were not
18  considered a medical device like the pump,
19  that there was no thorough assessment and
20  approval of the product and instructions by
21  the FDA.
22      We kind of went over the history a
23  little bit of -- of -- of the Paradigm -- of
24  the Paradigm pump and the initial -- one of
25  the initial requirements that it be

Page 141

W. VIGILANTE

1
2  waterproof, and how that requirement
3  eventually got dropped, but they didn't change
4  the design of the vent cap -- of the vents in
5  the cap.
6      You know, Dr. Klimowicz described
7  to me that it only happens during priming, it
8  doesn't happen if -- if you do a bolus later
9  on.  He talked to me a little bit about the
10  glucose monitor sensor and how it transmits
11  data.  He went over the manual prime procedure
12  a little bit.  He, you know, went over the
13  fact that there was no evidence that the
14  infusion tube was connected to the cannula
15  before she primed the tube.
16      Yeah, we talked about the fact and
17  re -- reiterated the fact that you can't have
18  any -- any liquids or contaminants on the
19  reservoir before attaching the P-cap and that
20  it should be wiped down in -- with an alcohol
21  swab; and that the -- we discussed that the
22  warning should have included -- the warnings
23  for -- the IFU should have included a warning
24  to that effect.
25      Q.  A warning to what effect?

W. VIGILANTE

1
2      A.  That it needs to be -- do not
3  allow liquids, et cetera, from contacting the
4  top of the reservoir, to wipe it down, et
5  cetera, and that can cause problems if you
6  don't, or if there is, and you don't.
7          And we talked about the -- the
8  need to refill or change the reservoir and set
9  every three days and that -- you know, we also
10  talked about that it's foreseeable you can
11  miss the step of turning the vial back over.
12  Even if you know it or are taught it, you may
13  have forgotten, you may have misunderstand it,
14  distracted, hurrying.  So there's a -- a -- a
15  list of different things that can occur that
16  just makes it a bad -- a bad design in -- in
17  making that requirement for the litany of
18  reasons why people inadvertently do things
19  because they're, in fact, human and they're
20  expressing human tendencies such as
21  inattention, distraction, forgetting,
22  hurrying, so forth.
23      Q.  And those facts that you've just
24  relayed here or related here came from you --
25  came to you from Mr. Klimowicz; right?

W. VIGILANTE

1
2      A.  No, I don't know that I would
3  describe them as facts.  I would describe them
4  as discussion.  Some of them are facts and
5  some of it's discussion.  Some of it's
6  Dr. Klimowicz explaining things to me better,
7  reinforcing what I've already known or me
8  talking with him about what my take on the
9  issue is.
10      Q.  And you incorporated some of that
11  information into your report; right?
12      A.  Yes.
13      Q.  Okay.  You said a moment -- well,
14  first of all, you have a reservoir and an
15  infusion set you were provided; is that
16  correct?
17      A.  Yes.
18      Q.  Where did you get that?
19      A.  Mr. Haverty's office.
20      Q.  Okay.  Do you know where
21  Mr. Haverty obtained them or do you have an
22  understanding?
23      A.  Yeah, I'm not sure if he obtained
24  them upon initiation of his involvement in
25  this suit or if these were actually left over

W. VIGILANTE

1
2  from what the plaintiff and her mother
3  recovered after the incident.
4      Q.  Okay.  You said earlier when you
5  were describing or reading from your notes of
6  your conversation with Mr. Klimowicz that the
7  infusion set and reservoir were not a medical
8  device the way the pump was.  Do you recall
9  saying that?
10      A.  I don't know if I used those words
11  exactly, but I recall that topic coming up
12  in --
13      Q.  What --
14      A.  -- the conversation.
15      Q.  What do you mean by that?
16      A.  It's my understanding that the --
17  the pump has to go -- is a medical device
18  that's approved by the FDA, that the IF -- IFU
19  is approved by the FDA and that it goes
20  through a different regulatory process than
21  the infusion set and the reservoir.  So that
22  there's a -- there's a different process and
23  different regulations that apply to the -- the
24  two sets of products.
25      Q.  As to how those review processes

W. VIGILANTE

1
2  work, you're not familiar with them; correct?
3      A.  Yeah, that's not my area of
4  expertise.
5      Q.  Okay.  In fact, you said a moment
6  ago that one of them was the 501(k) process.
7  You meant 510(k); right?
8      A.  If I said 501, I meant 510(k)
9  'cause I've got 510(k) written in my notes.
10      Q.  Okay.  And the 510(k) process, is
11  it your understanding that that does not
12  involve -- I think you used the phrase that
13  the FDA does not fully consider the device in
14  that process?
15      A.  It's my understanding that the IFU
16  for the pump is considered a label and it's
17  submitted with the application for approval,
18  but it's not the case that the FDA reviews and
19  signs off on the IFU for the reservoir and the
20  infusion set.
21      Q.  Okay.  And that's information or
22  an understanding provided to you by
23  Mr. Klimowicz?
24      A.  That would have been one of the
25  topics that Dr. Klimowicz went over with me.

Page 146

```
 1            W. VIGILANTE
 2       Q.  Okay.  Are you aware that by
 3  clearing a medical device through the 510(k)
 4  process, the FDA has determined that to its
 5  satisfaction the device is reasonably safe and
 6  effective for use by the public?
 7            MR. HAVERTY:  Objection.  If you
 8  know.  Do you know anything about the
 9  510(k) process?
10       A.  Yeah, I would leave that, those
11  questions to Dr. Klimowicz.
12       Q.  Well, if you leave those questions
13  to Dr. Klimowicz and you can't say that the
14  510(k) process results in an FDA determination
15  of reasonable safety and effectiveness, why
16  are you then relying on the portion of
17  Mr. Klimowicz's discussion with you that says
18  the FDA hasn't fully considered the product?
19            MR. HAVERTY:  Well, Dave, first of
20  all --
21       Q.  I mean --
22            MR. HAVERTY:  -- this is a legal
23  issue as you well know.  He is not familiar
24  with the 510(k) process.  He's just
25  reciting what Mr. Klimowicz told him.
```

Page 147

```
 1            W. VIGILANTE
 2       Q.  Go ahead.
 3       A.  I never testified that I was
 4  relying upon that for my opinions.  It was
 5  something that we talked about in the
 6  teleconference.  Any questions that relate to
 7  the process, 5 -- 510(k) process I will leave
 8  to Dr. Klimowicz, but, you know, knowledge of
 9  that process wasn't necessary for my analysis.
10       Q.  Okay.  You're not suggesting that
11  somehow the FDA didn't fully and appropriately
12  consider the safety and efficacy of the
13  infusion set and reservoir when it cleared
14  those devices, are you?
15            MR. HAVERTY:  Wait.  Whoa.
16  Objection.
17       Dave, you know that's not the
18  standard.  The 510(k) is a different legal
19  standard and you're asking him the
20  question.  It -- it's too murky and it's
21  beyond his expertise anyway.
22            MR. SCHULTZ:  Well, he can say, no,
23  he's not if that's the answer.
24            MR. HAVERTY:  Or he can say he
25  doesn't know one way or the other.
```

Page 148

```
 1            W. VIGILANTE
 2       A.  Yeah, my -- my answer is --
 3            MR. SCHULTZ:  Yeah, we should
 4  probably --
 5            THE WITNESS:  I'm sorry.
 6            MR. SCHULTZ:  -- let him testify.
 7       Why don't you read my question back?
 8       (The following portion of the record
 9  is read by the court reporter:
10       QUESTION:  Okay.  You're not
11  suggesting that somehow the FDA didn't
12  fully and appropriately consider the safety
13  and efficacy of the infusion set and
14  reservoir when it cleared those devices,
15  are you?")
16            MR. HAVERTY:  Note my objection.
17       A.  Yeah, so my answer is I -- I don't
18  know what the process is, so I don't know what
19  the FDA did with -- with respect to the
20  process, so I don't know.  Again, I leave
21  questions like that to Dr. Klimowicz.
22       The other thing I want to just
23  point real quick out, you know, I don't care
24  on the record, off the record, but I need to
25  take a lunch break.  So if you got another
```

Page 149

```
 1            W. VIGILANTE
 2  question or two, I'm happy to oblige, but I
 3  need to take a lunch break.
 4       Q.  We can take a break.
 5       A.  Okay.  Thank you.
 6            THE VIDEOGRAPHER:  We are now going
 7  off the video record.  That concludes DVD
 8  Number 2.  This time is 12:58.
 9       (A luncheon recess is held from
10  12:58 p.m. to 1:37 p.m.)
11            THE VIDEOGRAPHER:  We are now back
12  on the video record.  This commences DVD
13  Number 3, August 18, 2016.  The time 13:37.
14  BY MR. SCHULTZ:
15       Q.  Good afternoon, Mr. Vigilante.
16       How much have you billed on this
17  case?
18       A.  I had an invoice for $11,021.50.
19       Q.  Through what period of time?
20       A.  That was through the report.
21       Q.  First or second or both?
22       A.  I'm going to say first report.
23       Q.  All right.  Do you know how much
24  you've -- the work value of your time since
25  then?
```

Page 150

W. VIGILANTE

1
2    A.  I have got maybe another five to
3    ten hours --
4    Q.  Okay.  So --
5    A.  -- through today.
6    Q.  So another couple thousand?
7    A.  Yeah.
8    Q.  Thereabouts.  Okay.
9         Would you agree with me,
10   Mr. Vigilante, that as an expert you have an
11   obligation to gather and consider all relevant
12   information in formulating your opinions?
13        A.  If it's available, sure.
14        Q.  Okay.  And in the case of what
15   you're opining on, information regarding human
16   factors evaluations performed by Medtronics is
17   certainly relevant; correct?
18        A.  Sure.
19        Q.  And it's your job as an expert to
20   obtain and review and consider that
21   information; right?
22        A.  If I know it's available and I can
23   obtain it, sure.
24        Q.  Right.  And there was information
25   that was available, but you didn't consider it

Page 151

W. VIGILANTE

1
2    in your first report, correct, of that nature?
3        A.  Yeah, well, I think what you're
4    referring to is that there was information I
5    wasn't aware that was available when I wrote
6    my first report.
7        Q.  Did you ask for all human factors
8    evaluations performed by Medtronic during the
9    design of the P-cap?
10       A.  I don't recall exactly what I
11   asked for.  I asked for relevant information.
12       Q.  Would you expect that that would
13   be provided to you?
14       A.  Yeah.  At the time I wrote my
15   report, I thought I had relevant information
16   that was available.
17       Q.  And you didn't; right?
18       A.  Well, if you're referring to the
19   deposition of Mrs. --
20       Q.  Susan McConnell.
21       A.  -- Susan McConnell and the
22   exhibits that went with it, I did not have
23   them when I wrote my first report.
24       Q.  Right.  And that's information
25   that you would have liked to have had when you

Page 152

W. VIGILANTE

1
2    formulated your initial opinions in this case;
3    correct?
4        A.  If I knew it was available, I
5    would have liked to have had it.
6        Q.  Well, whether or not you knew it
7    was available, you would have liked to have
8    had it; right?
9        A.  I'm sorry.  I don't mean to argue
10   with you, but if I didn't know it was
11   available, I wouldn't know whether I would
12   like it or not.
13       Q.  In -- you wouldn't know if you
14   would like it or not?
15       A.  If I don't know it's available.  I
16   mean, we're getting into a Dick Cheney thing
17   here where you can't know what you don't know.
18       Q.  Well, I understand that you didn't
19   know it was available.  You know it's
20   available now; right?
21       A.  Yes, I do.
22       Q.  All right.  And from having
23   reviewed that information, you wouldn't argue
24   with me that it's relevant to your opinions;
25   correct?

Page 153

W. VIGILANTE

1
2        A.  To parts of them, yes.
3        Q.  Right.  And so in retrospect, you
4    would have wished that it had been provided to
5    you before you formulated your opinions in
6    this case?
7        A.  As I said a little bit ago, if I
8    knew it was available, I would have liked to
9    have had it.
10       Q.  Right.  You're not a design
11   engineer; correct?
12       A.  I am not an engineer.
13       Q.  All right.  You're not offering
14   opinions on the design of the P-cap; correct?
15       A.  As it relates to the overall
16   product design and where warnings fit in, I
17   am.  With respect to the specific design, I'm
18   not.
19       Q.  Well, let me put it a different
20   way.
21            You're not offering opinions on
22   the physical design of the P-cap itself as
23   distinct from how the instructions or warnings
24   should have been written in your opinion?
25       A.  I'm not sure what you're asking

39 (Pages 150 to 153)

Page 154

W. VIGILANTE

1  me.
2      Q.  Okay.  I'll rephrase it.
3          You're not offering an opinion
4  that it was somehow an inappropriate design
5  from an engineering perspective to include a
6  venting mechanism in the P-cap; correct?
7      A.  Oh, yeah, I'm not offering
8  opinions with respect to specific design
9  features of it.
10     Q.  Right.
11     A.  I would iss -- I would deal with
12 design issues as they fall into the overall
13 safety hierarchy when dealing with product
14 design.  So the term "design" has a lot of
15 connotations.  I just want to make sure that
16 we're on the same page with them.
17     Q.  No, I understand.  Taking the
18 design of -- or the design features of the
19 P-cap itself, you were then looking at it from
20 the perspective of whether the instructions
21 and the warnings were adequate; correct?
22     A.  Yeah, given the design of the
23 product, I'm looking at whether the
24 instructions and warnings were adequate.

Page 155

W. VIGILANTE

1      Q.  And you're not offering an opinion
2  on how the event that is the subject of this
3  lawsuit occurred, are you?
4      A.  Oh, no.  I'm leaving that to
5  Dr. Klimowicz and others.  I'm not rendering
6  an opinion as to the -- the ability for air to
7  travel between the membrane that was used and
8  the types of materials that were used for that
9  membrane when it's contaminated with insulin
10 or other contaminants.
11     Q.  So you're taking it as a given in
12 formulating your opinions that Rachel Dennert
13 suffered hypoglycemia as a result of something
14 known as temporary blocked vent or prime/fill
15 anomaly, you're just assuming that as a given;
16 correct?
17         MR. HAVERTY:  Objection, if you're
18     making any assumptions at all.
19     A.  Yeah, it's my understanding that
20 that's what happened.
21     Q.  Well, what's -- your understanding
22 that that, in fact, happened or are you taking
23 as an assumption that that's what others
24 believe happened?

Page 156

W. VIGILANTE

1      A.  That's what my understanding is
2  others have concluded.
3      Q.  Okay.  And you're not quarreling
4  with that and you're not taking a side with
5  that.  You're taking that as a -- as a
6  starting point for your opinions about
7  instructions and warnings; correct?
8          MR. HAVERTY:  Objection.
9      A.  No.  What I'm taking as a starting
10 point is the fact that Medtronic identified
11 the prime/fill anomaly; and, in fact, it was
12 foreseeable when they were designing and
13 developing it back in the late '90s, early
14 2000s before Ms. Dennert was ever prescribed
15 the -- the products.
16     Q.  Well, are you or are you not
17 assuming that Rachel Dennert's hypoglycemia on
18 August 8 of 2009 resulted from a condition
19 known as temporary blocked vents?
20     A.  Yeah, my understanding is that at
21 some point on the night prior to the being
22 found, that the vents were blocked consistent
23 with the prime/fill anomaly that Medtronic had
24 identified, and that because of that she was

Page 157

W. VIGILANTE

1  administered an overdose of insulin or
2  excessive amount of insulin and that related
3  to whatever medical problems that she
4  suffered.
5      Q.  And you would concede that you are
6  not qualified to offer an opinion on whether,
7  in fact, she had blocked vent membrane in her
8  P-cap?
9          MR. HAVERTY:  And he won't offer any
10     such opinion.
11     A.  Yeah, so two things.  I don't know
12 that I'm qualified or not, but I haven't been
13 asked to do that and I wasn't planning on
14 doing it.
15     Q.  Do you think you're qualified to
16 render that opinion?
17     A.  I'd have to look at what the
18 analysis was to -- to get involved with it and
19 determine whether or not I am, but I haven't
20 been asked to it, so it hasn't been anything
21 that's been come up -- that has -- that has
22 come up.
23     Q.  Would you agree that if, in fact,
24 Rachel Dennert's hypoglycemia were not caused

W. VIGILANTE

1  by a venting membrane blockage, then your
2  opinions about instructions and warnings are
3  not causally related to her event?
4      A.  Well --
5          MR. HAVERTY:  He's not --
6      A.  I'm sorry.
7          MR. HAVERTY:  Before you get -- he's
8  not offering any causation opinions.  He's
9  offering opinions about warnings.
10         MR. SCHULTZ:  Have you read his
11  report?
12         MS. MARTINEZ:  He is offering it.
13         MR. SCHULTZ:  He's offering several
14  causation opinions.
15         MR. HAVERTY:  No.  He's offer --
16         MR. SCHULTZ:  It's right there in
17  his --
18         MR. HAVERTY:  He's offering --
19         MR. SCHULTZ:  Right there in his
20  report, Kevin.
21         MR. HAVERTY:  Dave, his opinions are
22  on the adequacy of the instructions for
23  use, the warnings; and if you want to ask
24  him if he's got opinions on causation,

W. VIGILANTE

1  point -- point them to me.
2          MR. SCHULTZ:  Well, yeah, in point
3  of fact, it doesn't matter what you think
4  his opinions are.  It's a proper question
5  and I want an answer to it.  But his report
6  does, in fact, say that the failure to
7  provide what he deems adequate instructions
8  caused her event.
9          MR. HAVERTY:  Okay.
10         MR. SCHULTZ:  So go ahead and read
11  my question back, please.
12         (The following portion of the record
13  is read by the Court Reporter:
14         "QUESTION:  Would you agree that if,
15  in fact, Rachel Dennert's hypoglycemia were
16  not caused by a venting membrane blockage,
17  then your opinions about instructions and
18  warnings are not causally related to her
19  event?")
20     A.  Can I answer it?
21     Q.  Yeah.
22     A.  Okay.  Yeah, so if she experienced
23  some other condition unrelated to the
24  prime/fill anomaly, then my opinions wouldn't

W. VIGILANTE

1  be related, causally related, but they would
2  still be valid with respect to the adequacy of
3  the warnings, instructions provided by the
4  defendants.
5      Q.  But they wouldn't be causally
6  related to the issues in this case?
7          MR. HAVERTY:  He just said that.
8      A.  That's what I just said.
9          MR. SCHULTZ:  Well, but he also
10  muddled his answer by saying they'd still
11  be valid which is not what I asked.
12         MR. HAVERTY:  Well --
13     Q.  So I want a clear answer on the
14  record.  They wouldn't be causally related to
15  the event at -- at issue in this lawsuit?
16         MR. HAVERTY:  Objection, asked and
17  answered.
18     A.  Yeah, so if Rachel Dennert
19  experienced some other problem or malfunction
20  with the -- with the pump that wasn't related
21  to the prime/fill anomaly, my opinions with
22  respect to causation wouldn't apply, but my
23  other opinions regarding the adequacy of the
24  warnings and instructions provided with the

W. VIGILANTE

1  IFU from the defendants would be -- would be
2  applicable and would be valid.
3          MR. SCHULTZ:  Move to strike
4  everything after "but."
5      Q.  And, of course, if Rachel
6  Dennert's hypoglycemia was the result of some
7  idiosyncrasy of her diabetes or idiopathic --
8  idiopathically caused and not related to any
9  alleged malfunction of the pump, again, your
10  opinions would not be causally related to the
11  events at issue in this lawsuit; correct?
12         MR. HAVERTY:  That's the same
13  question you just asked, Dave.
14         MR. SCHULTZ:  No -- yeah, but he --
15         MR. HAVERTY:  Go ahead.
16         MR. SCHULTZ:  -- he also assumed
17  that the only alternative was it was either
18  a temporary blocked vent or some other
19  malfunction.
20     Q.  And my point is:  If it's no
21  malfunction at all and merely a hypoglycemic
22  event, then, again, your opinions about
23  warnings and instructions would not be
24  causally related to her injury?

```
 1          W. VIGILANTE
 2      MR. HAVERTY:  Objection, form.
 3      A.  So I -- I think I understand what
 4  you're asking me.  So if her injury was the
 5  result of not a failure or malfunction of the
 6  pump due to the prime/fill anomaly, my
 7  opinions with respect to causation would not
 8  apply, but my opinions with respect to the
 9  adequacy of the instructions and warnings
10  provided by Medtronic and Unomedical would
11  still apply.
12      Q.  Well, do you think they'd be
13  admissible?
14      MR. HAVERTY:  Whoa.  No, don't
15  answer.
16      MR. SCHULTZ:  Well, he's -- he's
17  offering -- hey, he's -- he's deciding he's
18  going to speculate --
19      MR. HAVERTY:  Dave.
20      MR. SCHULTZ:  -- on the legal
21  sufficiency --
22      MR. HAVERTY:  What?
23      MR. SCHULTZ:  -- of his opinion --
24      MR. HAVERTY:  No.
25      MR. SCHULTZ:  -- so I'm going to
```

```
 1          W. VIGILANTE
 2  follow up.
 3      MR. HAVERTY:  No.  He's saying that
 4  to him as an expert, his opinions would
 5  still apply as to the adequacy of the
 6  warning.  It's not a question of
 7  admissibility, Dave.  You just asked him a
 8  legal question.
 9      MR. SCHULTZ:  No, he just gave a
10  legal answer.
11      Q.  Go ahead and answer my question.
12      A.  Yeah, so from my analysis and my
13  standpoint whether or not Rachel Dennert ever
14  existed or used the pump is irrelevant to my
15  assessment of the adequacy of the warnings and
16  instructions provided by the defendants with
17  the Paradigm Reservoir infusion set.  Whether
18  or not they're accessible, if somehow or
19  another her incident was caused by some other
20  method or some other malfunction or some other
21  problem, you know, I'll leave the judge to
22  decide that.  I -- but my opinions are still
23  valid.
24      Q.  Do you have an understanding based
25  on any of your information gathering or
```

```
 1          W. VIGILANTE
 2  conversations with Mr. Klimowicz as to which
 3  infusion set is at issue of the two that were
 4  used on the night of August 8th, 2009?
 5      A.  It's understanding that
 6  Dr. Klimowicz has concluded that the
 7  contamination of the P-cap occurred in the
 8  second change-out refilling of the night at
 9  around ten o'clock, eleven o'clock, whatever
10  the time is; and that's when the contamination
11  and blockage of the vent -- vents occurred.
12      Q.  All right.  So just -- I just want
13  to make sure that it's clear.  Your
14  understanding of how the event occurred comes
15  from Mr. Klimowicz; correct?
16      A.  And the testimony of Rachel's
17  mother.
18      Q.  Okay.  As opposed to based upon
19  some original investigation by yourself?
20      A.  Yeah.  I did not do an
21  investigation by myself to determine at which
22  point in time the contamination and the
23  blockage of the vents occur.
24      Q.  All right.  In rendering your
25  opinions in this case -- first of all, you
```

```
 1          W. VIGILANTE
 2  produced two reports; correct?
 3      A.  Yes.
 4      Q.  An initial report dated, I
 5  believe, April 19th of 2016 and then a
 6  supplemental report; right?
 7      A.  That's correct.
 8      Q.  All right.
 9      (Exhibit Vigilante-10, Report of
10  William J. Vigilante, Jr., PhD, CPE dated
11  April 19, 2016, is marked for
12  identification.)
13      THE WITNESS:  Thank you.
14      (Exhibit Vigilante-11, letter dated
15  June 16, 2016 addressed to Kevin Haverty,
16  Esq., is marked for identification.)
17      THE WITNESS:  Thank you.
18      Q.  Mr. Vigilante, the court reporter
19  has marked Exhibit Number 10 which is your
20  April 19th initial report and Exhibit
21  Number 11 which is your supplemental report;
22  correct?
23      A.  That's what they appear to be.
24      Q.  Okay.  Now, the second report, the
25  supplemental report rendered two months later,
```

Page 166

W. VIGILANTE

1  that was the one that you generated as a
2  result of being provided with the deposition
3  and exhibits for the deposition of Susan
4  McConnell; right?
5       (Reporter clarification.)
6       Q.  Susan McConnell; right?
7       A.  I'm sorry.  I missed your
8  question.
9       Q.  Sure.  You generated the
10 supplemental report two months after your
11 original report because in the interim you'd
12 been given the deposition of Susan McConnell;
13 right?
14      A.  Yeah.  So after I wrote my first
15 report, I was provided with the deposition of
16 Susan McConnell Monta -- Montell -- Mont --
17 how about we just do Susan McConnell -- and
18 the exhibits that went along with that
19 deposition.
20      Q.  And prior to -- well, at the time
21 you wrote your initial report, Exhibit 10, you
22 weren't aware of Susan McConnell or her
23 deposition; right?
24      A.  That's correct.

Page 167

W. VIGILANTE

1       Q.  Who is she?
2       A.  She was a MiniMed and later a
3  Medtronic employee, and I don't have the exact
4  job description, but I can look it up if you
5  would prefer.
6       Q.  Well, do you have an understanding
7  of generally what her job was at the time of
8  the development of the P-cap?
9       A.  I did at the time I wrote the
10 report.  I'd have to look up my notes to see
11 what her job description was.
12      Q.  Well, regardless of her job
13 description, would you agree that she was
14 involved in the risk analysis and human
15 factors assessment related to the P-cap during
16 its development?
17      A.  It -- it seems that she was
18 involved in the human factors testing that was
19 done in the early 2000s.
20      Q.  You would agree that that
21 information is relevant to the subject matter
22 on which you've been asked to opine in this
23 case?
24      A.  Sure.

Page 168

W. VIGILANTE

1       Q.  You didn't consider it at the time
2  because you didn't have it at the time of your
3  initial report?
4       A.  I didn't consider it because I
5  didn't know it existed at the time of my
6  initial report.
7       Q.  And when exactly did you learn of
8  its existence?  When were you provided that
9  deposition?
10      A.  Sometime between April 19, 2016
11 and June 16th, 2016.
12      Q.  Can you be more specific?
13      A.  I'm sorry.  I can't at this point.
14      Q.  How long after receiving that
15 report or that deposition did you write your
16 supplemental report?
17      A.  Well, my supplemental report's
18 dated June 16th, 2016.
19      Q.  Right.  But how quickly after
20 receiving the deposition did you write the
21 report?
22      A.  I'm sorry.  I don't know.
23      Q.  In essence, you write in your
24 supplemental report -- well, in your first

Page 169

W. VIGILANTE

1  report you issued the opinion that Medtronic
2  did not perform an adequate human factors
3  evaluation of the P-cap; correct?
4       A.  Okay.
5       Q.  Is that true?
6       A.  Sure.
7       Q.  And then unbeknownst to you, there
8  had been a human factors evaluation during the
9  development of the P-cap, and you received
10 that information in the form of the deposition
11 testimony of Susan McConnell and the related
12 exhibits; correct?
13      A.  Yes, so my understanding when I
14 wrote the initial report, all the other
15 Medtronic, MiniMed employees and Unomedical
16 employees testified that there was no human
17 factors assessment done on the products that
18 they were aware of.  So at the time I wrote
19 the report, I wasn't aware that any, any human
20 factors was done or any risk analysis was done
21 according to the guy who designed the P-cap
22 system, Mr. Adair.
23      Q.  Well, to be --
24      A.  So when I wrote my report, that

Page 170

W. VIGILANTE

1
2 was my understanding. I have since -- since
3 writing that report I learned that Susan
4 McConnell had been deposed and she testified
5 that there was a human factors study, two
6 studies done in the early 2000s; and those --
7 reports from those studies were produced as
8 exhibits -- or as an exhibit.
9     Q.  And to be precise, I mean, you did
10 read the deposition of Randy Adair, did you
11 not?
12     A.  Yes.
13     Q.  And to be precise, he testified
14 that he was not involved in any human factors
15 studies; correct?
16     A.  Hold on a minute.  I'll tell you
17 what his testimony is.
18         (Reviewing document.)
19         He testified he did not do any
20 human factors testing in the design of the
21 P-cap on Page 71.  He testified he does not
22 know if any human factors testing was done on
23 the P-cap on Page 71.  He does not know if
24 MiniMed did any safety testing on the P-cap on
25 71.

Page 171

W. VIGILANTE

1
2         He was not involved in any risk
3 analysis for the infusion sets used in the 511
4 system, Page 92.
5         He was not responsible for
6 identifying potential risk associated with his
7 design of the P-cap, Pages 122 to 123.  He had
8 never had any discussions with anyone who was
9 responsible for identifying potential risk
10 associated with his design of the P-cap, Page
11 122.
12         So there -- that's my summary of
13 his deposition testimony.
14     Q.  So Mr. Adair testified that he was
15 not involved in any human factors analysis and
16 he didn't know whether one was done or not?
17     A.  That's not correct.
18     Q.  How is that incorrect?
19     A.  He does not know if any human
20 factors testing was done and he did not do any
21 human factors testing --
22     Q.  Right.  And --
23     A.  -- on the design of the P-cap.
24     Q.  And based on that, you criticize
25 Medtronic in your first report saying that

Page 172

W. VIGILANTE

1
2 they hadn't done any human factors testing,
3 didn't you?
4     A.  I'm sorry.  There was other
5 testimony from other employees of Medtronic
6 and Unomedical.
7     Q.  Answer my question, please.
8         You -- you criticized Medtronic
9 saying that they had not done any human
10 factors analysis in the development of the
11 P-cap; true?
12     A.  One more time 'cause I was waiting
13 for another part to your question.
14     Q.  In your initial report you
15 criticized Medtronic for failing to do any
16 human factors analysis during the development
17 of the P-cap --
18     A.  Yes --
19     Q.  -- true?
20     A.  -- during my initial report, it
21 was my belief and understanding that they had
22 not done any human factors testing, but it was
23 not based solely on Randy Adair's testimony.
24 It was based upon his testimony and other
25 employees' testimony.

Page 173

W. VIGILANTE

1
2     Q.  And you criticized Medtronic
3 saying that they didn't do any; correct?
4     A.  Sure.
5     Q.  And you were wrong, they did,
6 didn't they?
7     A.  After writing my report, I had
8 learned that there was two human factors tests
9 done on the IFU for the Paradigm pump --
10 excuse me, Paradigm Reservoir infusion set.
11     Q.  So that was a false criticism on
12 your part.
13     A.  I think it --
14     Q.  It was an inaccurate one.
15     A.  Sure.  Inaccurate is probably a
16 good word.
17     Q.  Okay.  And it was unfair, wasn't
18 it?
19         MR. HAVERTY:  Objection.  Dave, save
20 that for the jury, Dave.
21         MR. SCHULTZ:  No, no, it's --
22         MR. HAVERTY:  That's argument.
23         MR. SCHULTZ:  -- it's a question.
24         MR. HAVERTY:  That's argument.
25     Q.  Do you think it was unfair?

44 (Pages 170 to 173)

Page 174

W. VIGILANTE

1
2    A.  I --
3          MR. HAVERTY:  That's a different
4    question.
5    A.  Yeah, I don't think it's unfair
6    because I wasn't aware of it.  If I was aware
7    of it and I didn't use it, then it would be
8    unfair.  My report is based, as stated in my
9    report, based upon the information I had
10   available at the time.  Should additional
11   information become available, I'm happy to
12   redo my analysis, relook at it, and determine
13   whether or not my opinions still apply or not.
14         Q.  And -- and to be precise about it,
15   the information was always available, it just
16   wasn't given to you?
17         A.  I don't know that either, so I --
18   I don't --
19         Q.  You know the date of
20   Ms. McConnell's deposition, don't you?
21         A.  I know that I didn't have it.
22   Whether or not it was available to Mr. Haverty
23   or someone else prior to that, I -- I don't
24   know.  I wasn't privy to that information.
25         Q.  Have you read Ms. McConnell's

Page 175

W. VIGILANTE

1
2    deposition?
3          A.  Yes.
4          Q.  Are you aware that Mr. Haverty was
5    present during the deposition?
6          A.  I -- you know what?  I don't
7    recall, but I can look.
8          First of all, it's my
9    understanding that that deposition was taken
10   in the John Kubiak and Karen Kubiak matter on
11   behalf of Carolyn Kubiak.
12         Q.  Are you unaware that it was
13   cross-noticed in this case, the Dennert case?
14         A.  I wasn't done.  So that's first
15   thing I wanted to point out.
16         And the second was whether or not
17   Mr. Haverty was there, and apparently he was
18   there --
19         Q.  Are you aware --
20         A.  -- but the --
21         Q.  -- that it was cross-noticed in
22   the Dennert case?
23         A.  Yeah, I don't know what
24   "cross-noticed" means.
25         Q.  Are you aware that it was taken in

Page 176

W. VIGILANTE

1
2    the year 2015?
3          A.  It was taken on June 23rd, 2015.
4          Q.  So well in advance of your first
5    report?
6          A.  Yeah, it was done -- what's
7    that -- ten months before my first report.
8          Q.  Okay.  And having -- when you
9    finally received it after your first report
10   criticizing Medtronic for not having engaged
11   in any human factors analysis, you then
12   concluded that despite having conducted human
13   factors analysis, didn't change your opinion,
14   Medtronic was still deficient; is that
15   correct?
16         A.  Yeah, my opinions haven't changed
17   based upon that information.  The IFU for the
18   reservoir and the infusion set are still
19   deficient.
20         Q.  Well, no, what I'm talking about
21   is your first opinion which is Medtronic
22   failed to conduct an adequate human factors
23   evaluation; and initially your opinion was
24   they didn't do it at all and then when you
25   were proven wrong, that they did do it, you

Page 177

W. VIGILANTE

1
2    said, yeah, but it was still inadequate;
3    right?
4          A.  Well, so you've misstated a few
5    things.  One is that wasn't my first
6    opinion, but it is my second opinion; and two,
7    after looking at the human factors usability
8    testing report, the testing it did was still
9    inadequate.  So, yes, after looking at what
10   they did, what they did was inadequate.
11   Having not done it was inadequate, but what
12   they did was inadequate as well, so my
13   opinions still hold.
14         Q.  That what was done was inadequate
15   even though you didn't understand that, in
16   fact, you were initially wrong about whether
17   one had been done or not?
18         A.  Yeah, so whether or not I knew it
19   had been done or not doesn't change the fact
20   that it was an inadequate usability study
21   done; and, you know, there's -- I'm happy to
22   give you the reasons why it's inadequate.
23   It's not like I just made it up.  If it had
24   been a -- a thorough usability study, my
25   belief is that they would have caught this

45 (Pages 174 to 177)

Page 178

1           W. VIGILANTE
2   problem and they would have addressed it back
3   in the early 2000s, not waiting until 2012,
4   2013.
5       Q.  Well, let's -- I -- I want to come
6   back to that, but let me ask you this:  Have
7   you reviewed Exhibits 8, 9 and 10 of Susan
8   McConnell's deposition?
9       A.  Hold on a minute.
10          (Reviewing computer.)
11          Yes.
12      Q.  All right.  All right.  So why
13  don't we turn to -- why don't you tell me what
14  in your opinion was deficient about the human
15  factors evaluation that was performed by
16  Medtronic during the development of the P-cap.
17      A.  So in the report that was
18  disclosed as McConnell-8, they discuss a task
19  analysis that was done on the reservoir to
20  infusion set connection, IFUs, and the
21  process; and they identify two usability
22  studies that were performed.
23          So with regard to the task
24  analysis, they identified ten tasks, but
25  they -- there's no indication in the report

Page 179

1           W. VIGILANTE
2   that they broke those tasks down to identify
3   the sub-step -- sub-steps that were required
4   for each -- to complete each tasks.  There's
5   no indication of what information on behalf --
6   that's needed by the user to complete each of
7   the sub -- sub -- sub-steps.
8           There's no indication that they
9   identify what actions were needed to complete
10  each of the sub-steps.  There's no indication
11  of whether each sub-step action is consistent
12  with conventional norms, behavioral tendencies
13  or user expectancies.  There's no assessment
14  of ease of use, comfort, stress, or efficiency
15  for each task and sub-task.  There's no
16  assessment of the errors or mistakes that can
17  be made for each sub -- each sub-step.
18  There's no assessment of the consequence of
19  said errors, for example, hazards such as the
20  P-cap being blocked and over- or
21  under-administration of insulin.
22          For the solution for Task Number 7
23  through the task analysis, which Task 7 was
24  remove transfer guard from reservoir, it
25  states, "The instructions describe how the

Page 180

1           W. VIGILANTE
2   transfer guard must be removed."  However,
3   that solution identified in the task analysis
4   was never implemented in the IFU for the
5   reservoir that was provided to Ms. Dennert.
6   So those are the problems I identified with
7   their task analysis.
8           For their usability studies the
9   big thing is that they didn't use a
10  representative population of users.  They went
11  in -- into Mini -- into MiniMed and selected
12  employees.  If you want to do usability
13  testing to validate whether it can be used by
14  your potential users, you don't go and pull
15  the people that have experience with -- with
16  these types of products.  And I think there's
17  a list of in -- in here of their demographics
18  that first -- the first usability study all
19  ten -- all ten subjects were employees of
20  MiniMed in their Clinical Services Department,
21  all possessed a thorough understanding of
22  insulin infusion pump use, all had high
23  experience with filling syringes, insulin
24  pumps, and infusion sets, 60 percent were
25  college degrees, 40 percent had some college.

Page 181

1           W. VIGILANTE
2           Ms. Dennert had never used a pump
3   before, and I'm sure there are many pump users
4   and infusion set users that had never used
5   this type of product before, but yet they
6   weren't represented in their usability
7   studies.
8       Q.  Can you point to me -- can you --
9       A.  I'm not done.
10      Q.  Well, but you're --
11      A.  Well, I'm not done.
12      Q.  Well, but --
13      A.  You asked me a question.
14          MR. HAVERTY:  Let him answer the
15  question.
16      Q.  No, you're -- you're being
17  narrative.
18          MR. HAVERTY:  No, he's tell --
19      Q.  Okay.  So I'm going to break it
20  down.
21          MR. HAVERTY:  You asked a question.
22  You asked a question.
23          MR. SCHULTZ:  Well, and I'm --
24          MR. HAVERTY:  He's telling you --
25          MR. SCHULTZ:  -- entitled to follow

Page 182

```
1              W. VIGILANTE
2    up.
3         MR. HAVERTY:  No, he's --
4         MR. SCHULTZ:  Okay.
5         MR. HAVERTY:  -- entitled to finish
6    his answer.  You asked a question.  You're
7    getting your answer.  Go ahead, Bill.
8         MR. SCHULTZ:  No, go -- no.
9         MR. HAVERTY:  Bill.
10        MR. SCHULTZ:  I'm going to ask a
11   question.
12        Q.  Mr. Vigilante, can you point me
13   where in your report, either report, you
14   criticize Medtronic for utilizing what you are
15   now saying are an unrepresentative sample in
16   the usability study?  Can you show me where
17   that is?
18        A.  So the second major problem that I
19   identified --
20        Q.  Can you answer my question,
21   please?
22        A.  -- in the usability studies --
23        Q.  In the report, please, show me
24   where that opinion is disclosed, please.
25        A.  I'm sorry.  I was trying to finish
```

Page 183

```
1              W. VIGILANTE
2    my answer to the last question.
3         Q.  Mr. Vigilante, answer the question
4    that is posed, please.
5         MR. HAVERTY:  He's still answering
6    the question.
7         MR. SCHULTZ:  No.
8         MR. HAVERTY:  He didn't finish his
9    answer.
10        MR. SCHULTZ:  Well --
11        MR. HAVERTY:  He's going to finish
12   his answer.
13        MR. SCHULTZ:  I'm asking a new
14   question.
15        MR. HAVERTY:  You can ask a new
16   question when he's finished his answer.
17        MR. SCHULTZ:  Kevin --
18        MR. HAVERTY:  Dave --
19        MR. SCHULTZ:  -- it is not your
20   deposition.
21        MR. HAVERTY:  Hey.
22        MR. SCHULTZ:  And I am tired of the
23   speaking objections.
24        MR. HAVERTY:  Let's get the judge on
25   the phone right now.
```

Page 184

```
1              W. VIGILANTE
2         MR. SCHULTZ:  He is not
3    responsive --
4         MR. HAVERTY:  Let's get the judge --
5         MR. SCHULTZ:  -- and I'm sick -- go
6    ahead.
7         MR. HAVERTY:  Get the judge on the
8    phone right now because you're not
9    letting --
10        MR. SCHULTZ:  I want an answer to
11   the question.
12        MR. HAVERTY:  You -- you -- you
13   didn't let him finish the answer to your
14   first question, Dave.
15        MR. SCHULTZ:  Because he started to
16   read the entire report into the record --
17        MR. HAVERTY:  He -- you asked --
18        MR. SCHULTZ:  -- which is not
19   responsive.
20        MR. HAVERTY:  -- what the criticisms
21   were.
22        MR. SCHULTZ:  Fine.  Now --
23        MR. HAVERTY:  Yeah, please --
24        MR. SCHULTZ:  -- answer -- no.
25   Q.  Answer my question, Mr. Vigilante.
```

Page 185

```
1              W. VIGILANTE
2         MR. HAVERTY:  And as soon as you
3    finish answering his question, Bill, go
4    back and an -- and finish your answer to
5    his first question.
6         A.  So --
7         Q.  Where in your report have you
8    criticized Medtronic for failing to use what
9    you've determined is a representative sample
10   of users in the usability study?
11        A.  Well, in the first report I wasn't
12   aware that any human factors or usability
13   study was done, so I wouldn't have been able
14   to assess it, evaluate it, and point out the
15   deficiencies in it.
16        The second, I don't believe that I
17   went into great detail of it other than the
18   point I was trying to make, that the second
19   major issue I had with it was that it didn't
20   assess the IFU that was shipped with
21   Mrs. Dennert's infusion set and reservoir.  In
22   fact, when they did their usability study,
23   they made change -- they had an IFU they
24   started with, they made changes to it -- they
25   don't tell us what those changes were -- based
```

W. VIGILANTE

1
2    upon some of the usability study; and then
3    when they got done, they made additional
4    changes and didn't tell us what those changes
5    were and they never went back to validate
6    whether or not the changes they made, whether
7    they were effective or not.
8            So if you're going to change
9    something because you're having problems, you
10   just don't throw it out there and hope for the
11   best. You got to validate what -- what you've
12   done works. So that was the -- the second
13   major issue that I had with the usability
14   studies.
15       Q.   Are you done?
16       A.   Yes, sir.
17       Q.   Good. Now, can you point me to
18   anywhere in your supplemental report that you
19   wrote after learning that Medtronic had, in
20   fact, done a human factors evaluation where
21   you assert that the usability study didn't use
22   a proper study population?
23       A.   I don't believe I discussed
24   that --
25       Q.   Okay.

W. VIGILANTE

1
2       A.   -- in the --
3       Q.   I don't think you did either.
4       A.   -- supplemental report.
5       Q.   Okay. Would you turn to your
6    initial report, please?
7       A.   Sure.
8       Q.   In your segment on hazard
9    evaluation you discuss that -- or your opinion
10   is that Medtronic did not identify the hazard;
11   correct?
12       A.   Well, I think that you're
13   misstating a few things, so maybe we can
14   clarify that and then we can figure out what
15   my opinion was.
16           So I have a section in my report
17   entitled "Hazard Identification," and the
18   opinion with that -- for that section is that
19   the unintended delivery of insulin resulting
20   from the blockage of the P-cap connecter vents
21   created a hazard to users of the Paradigm
22   infusion set and reservoir.
23       Q.   What I'm trying to understand is
24   what is the hazard that you are saying
25   Medtronic failed to identify?

W. VIGILANTE

1
2       A.   Well, the hazard is the under- or
3    over-delivery of insulin unintended --
4       Q.   As -- as a result --
5       A.   -- and unknown.
6       Q.   -- of?
7       A.   As a result -- well, it's a result
8    of the blocked vented -- excuse me --
9       Q.   Okay.
10      A.   -- blocked vents.
11      Q.   So you would agree -- well,
12   your -- your position is Medtronic failed to
13   identify that hazard; right?
14      A.   Well, that's part of it. My other
15   part of it is that it was foreseeable.
16      Q.   I know that's not your entire
17   opinion.
18           My question is: Are you saying
19   that Medtronic failed to identify that hazard
20   as you've defined the hazard? Are you saying
21   that?
22      A.   Well, two things. One is that
23   Medtronic defined the hazard. I'm agreeing
24   with them and using that as my understanding
25   of what the hazard is; and, two, my criticism

W. VIGILANTE

1
2    is, is that it was identifiable prior to 2012
3    and prior to 2009 and it was identifiable
4    during -- should have been identifiable during
5    the design process back in the early 2000s and
6    late 1990s.
7       Q.   Mr. Vigilante, I would appreciate
8    an answer to my question. So listen carefully
9    to my question.
10      A.   Sorry.
11      Q.   Your criticism is that in 2 --
12   among others, and we'll talk about all the
13   others, in the year 2000, during the
14   development of the P-cap, Medtronic failed to
15   identify the hazard which is the unintended
16   over- or under-delivery of insulin resulting
17   from a temporary blocked vent condition;
18   correct?
19           Have I stated that correctly?
20      A.   I think my opinions are listed in
21   my report. So you're trying to paraphrase and
22   combine them and condense them and change
23   them --
24      Q.   Is it inaccurate?
25      A.   -- but they -- the way you -- I --

Page 190

```
 1              W. VIGILANTE
 2   again, the -- the opinions are in my report.
 3   The opinions are, is that their failure to do
 4   an adequate risk and haz -- human factors
 5   analysis -- I'm sorry -- their
 6   failure to do an adequate risk and human
 7   factors analysis resulted in them failing to
 8   identify the hazard at the time of
 9   development --
10        Q.  Okay.
11        A.  -- and that had they --
12        Q.  So --
13        A.  -- done that, you know, they --
14   they should have identified it and they should
15   have dealt with it; and that their failure to
16   do the -- a proper, adequate human factors
17   analysis was unreasonably dangerous and
18   created an unreasonably dangerous condition
19   that caused or contributed to Mrs. Dennert's
20   injuries.
21        Q.  Mr. Vigilante, I'm not trying to
22   trick you here.  Okay?  And this deposition is
23   going to take an awfully long time if every
24   time I ask you one question, you regurgitate
25   your entire opinion.  Okay?  So let me try it
```

Page 191

```
 1              W. VIGILANTE
 2   again and be specific and let's see if I can
 3   get an answer to my question.
 4        Among everything else you say in
 5   your report, you are asserting that Medtronic
 6   during the development of the P-cap failed to
 7   identify the hazard; correct?
 8        A.  They did.
 9        Q.  Okay.  You would agree with me,
10   would you not, that a manufacturer cannot warn
11   of a hazard that they don't know about?
12        A.  Sure.
13        Q.  Okay.  And your point is that they
14   should have identified that hazard, broadly
15   speaking, during the development; correct?
16        Generally speaking, that's a
17   correct statement; right?
18        A.  Yes, had they done an adequate
19   human factors and risk analysis, they should
20   have identified it.
21        Q.  Okay.  But you would also agree
22   that if, in fact, someone concludes that an
23   adequate human factors evaluation was done,
24   and that adequate human factors evaluation did
25   not identify the hazard, then the failure to
```

Page 192

```
 1              W. VIGILANTE
 2   warn of that hazard is understandable; right?
 3   You'd agree with that?
 4        A.  I would not because there's no
 5   reasonable person that can look at the
 6   usability testing that was done and consider
 7   it adequate.
 8        Q.  There is no reasonable person who
 9   can look at the usability studies and the
10   human factors analysis that were done and
11   conclude that they were adequate?
12        A.  That's correct.
13        Q.  So if a -- if an expert testifying
14   for Medtronic and employees testifying for
15   Medtronic say that the human factors analysis
16   and the usability testing that was done is
17   adequate, they're unreasonable and wrong?
18        A.  That would be correct.
19        Q.  Okay.  What standard that existed
20   at the time of the development of the P-cap
21   are you utilizing for this opinion?
22        A.  The standard of care for product
23   design and development.
24        Q.  Well, what -- I mean, is there a
25   published standard you're referring to?
```

Page 193

```
 1              W. VIGILANTE
 2        A.  You can look at the -- the ANSI
 3   standards that talk about symbol and pic --
 4   pictograph development where they require
 5   comprehension and critical confusion testing,
 6   which wasn't done.  That testing is done by a
 7   representative sample of the user population,
 8   which wasn't done.  Testing also requires that
 9   you do it on the subject product with the
10   subject warnings, instructions, or whatever
11   you're providing, and that wasn't done.
12        This isn't a -- this isn't
13   launching a rocket to the moon.  This is
14   pretty simple stuff here.  If you're going to
15   do a usability study quote-unquote, it should
16   be with the people that are likely to use the
17   product, not your employees who've got a lot
18   of experience in the field.  And if you're
19   going to assert that the IFU that you created
20   is adequate, you need to make sure that IFU is
21   the one that -- is the one that you tested and
22   not some other earlier revision that you
23   changed and have no idea what the effects of
24   those change are.
25        Q.  Would you look at Page 8 of your
```

Page 194

W. VIGILANTE

1
2  initial report?
3      A.  Sure.
4      Q.  In the first full paragraph on
5  that page you write, "Once the user attaches
6  the insulin to the opposite side of the
7  transfer guard" --
8      A.  I'm sorry.  I got to find it.
9  Your -- top paragraph you said?
10     Q.  Middle of the top paragraph.
11     A.  Okay.  And it starts where?
12     Q.  It says, "Once the user attaches
13 the insulin" --
14     A.  Okay.
15     Q.  -- "to the opposite side of the
16 transfer guard, they have to hold the
17 reservoir upright and the insulin vial upside
18 down."
19     A.  Yes.
20     Q.  Is -- is that a true statement?
21     A.  Yes and no.
22     Q.  Okay.  How is it true?  How is it
23 not?
24     A.  It's true in the IFU that's in
25 this pack that was relevant to the one

Page 195

W. VIGILANTE

1
2  Ms. Dennert was using, but it's not true for
3  the IFU they tested back in the early 2000s.
4  In the early 2000s they tested it with the IFU
5  telling you to keep the insulin bottle on the
6  table.  So, again, they changed the IFU.  They
7  changed the instructions at some point in time
8  after that testing was done and they never
9  validated what effect that would have on
10 compliance and understanding and action.
11     Q.  This is for the purposes of
12 pressurizing the vial, correct, this step?
13     A.  It's both for pressurizing the
14 vial and for filling the reservoir or
15 extracting the insulin from the vial into the
16 reservoir or, you know, fill the reservoir.
17     Q.  Okay.  Why do you say that that's
18 different from the IFU that was tested?
19     A.  Because that's what the -- that's
20 what is noted in the IFU usability -- excuse
21 me.  That's what's noted in the usability
22 report that was disclosed as Exhibit 8 in
23 Susan McConnell's deposition.
24     Q.  Okay.  Next -- in this same
25 paragraph, you say, (as read): "However, if

Page 196

W. VIGILANTE

1
2  the reservoir is removed while the insulin
3  vial is inverted, the insulin can squirt out
4  due to the increased pressure in the vial and
5  contaminate the top of the reservoir."
6      Are you forgetting anything in
7  that step?
8      A.  I was looking at something before
9  you started reading, so I lost the place.  If
10 you wouldn't mind redoing that...
11     Q.  Last sentence of the first
12 paragraph of your report on Page 8.
13     A.  Okay.
14     I'm sorry.  Is there a question or
15 did you want me to read it?
16     Q.  Have you read it?
17     A.  That's what I was asking.  I
18 didn't know if you were going to read it.
19     (Reviewing document.)
20     Okay.  I read it.
21     Q.  Is that true in all cases?
22     A.  It's not true in all cases.  It
23 depends upon the amount of insulin and the
24 amount of air that's pumped into the insulin
25 vial when the reservoir is removed.

Page 197

W. VIGILANTE

1
2      Q.  All right.  If the insulin vial is
3  over-pressurized in other words?
4      A.  If there's enough pressure to
5  cause the insulin that's remaining in the
6  insulin vial to be pushed out, so
7  over-pressurized, yeah, I think that's, again,
8  a fuzzy word that I'm not comfortable using
9  because it hasn't been defined.
10     Q.  Do you have an understanding of
11 how the user is supposed to use the reservoir
12 to pressurize the vial?
13     A.  Yeah, it's my understanding is
14 that they connect the insulin vial to the
15 other half of the transfer guard and they push
16 the plunger in of the reservoir to inject air
17 into the insulin vial and then to pull the
18 plunger out to extract the insulin into the
19 reservoir.
20     Q.  But are -- do you have an
21 understanding of how they're supposed to
22 determine how much to pressurize the vial?
23     A.  That's not provided in any of the
24 instructions I've seen.
25     Q.  Okay.  So you don't have an

Page 198

W. VIGILANTE
1
2  understanding of that?
3      A.  My understanding is that
4  Medtronic, MiniMed, Unomedical didn't tell
5  users in the IFU how much pressure to put in.
6      Q.  Okay.
7          MR. SCHULTZ:  Sorry?
8          MS. MARTINEZ:  No.
9          MR. SCHULTZ:  Okay.
10      Q.  Mr. Vigilante, you write in this
11  Page 8 of your first report that "The user" --
12  this is now in the third full paragraph,
13  middle of the paragraph, "The user is
14  instructed to hold the button until they see
15  insulin dripping from the end of the infusion
16  set QD."
17          What do you mean by "QD" first of
18  all?
19      A.  The quick detach on the cannula.
20      Q.  Oh, okay.  So -- and that's --
21  what you're describing is part of the manual
22  prime process; right?
23      A.  That's my understanding.
24      Q.  Right.  And to your knowledge, the
25  user can see insulin dripping from the end of

Page 199

W. VIGILANTE
1
2  the infusion set; correct?
3      A.  During the prime process.
4      Q.  Right.  And if they take their
5  finger off the button and insulin continues to
6  drip from the end of the infusion set, that is
7  also visible; correct?
8      A.  Sure.
9      Q.  Okay.
10      A.  If they're looking for it.
11      Q.  It's visible; right?
12      A.  If they're looking for it, it's
13  visible.  I will agree with you.  I'm not
14  trying to argue with you, but you're using --
15      Q.  No, actually --
16      A.  -- using terms --
17      Q.  -- you are arguing --
18      A.  -- very loosely.
19      Q.  -- with me.  I asked you a
20  specific question and you want to give a
21  speech, and I'd appreciate it if you'd answer
22  my question.
23          It's visible.
24      A.  If you look --
25      Q.  Whether they see it or not, which

Page 200

W. VIGILANTE
1
2  is what you volunteered, is a different
3  question; right?
4      A.  I'm sorry.  I --
5      Q.  It's visible.
6          MR. HAVERTY:  What's visible?  The
7  insulin?
8      Q.  The insulin dripping from the end
9  of the infusion set, it's visible.
10      A.  It's visible to the patient if
11  they're looking for it, yes.
12      Q.  It's visible.
13      A.  If they are looking away from it,
14  it is not visible, it cannot be visible.  It's
15  just like a tree dropping in the woods does
16  not make a sound because there's nobody here
17  to hear it because sound is a perceptual
18  process.  If you're not looking for it, you
19  can't see it.
20      Q.  Okay.  If you -- if -- if you
21  don't see it, it's not visible?
22      A.  Well, how about this?  Because of
23  your loose use of the terms, we can say it's
24  detectable.
25      Q.  I'm being loose?

Page 201

W. VIGILANTE
1
2      A.  You are ver -- being very loose in
3  your terms.
4      Q.  I see.  Okay.
5      A.  So it's detectable.  How about
6  that?
7      Q.  I would --
8      A.  That -- that would be the correct
9  word.  It's detectable, and I will agree with
10  you.
11      Q.  Because it's visible to anybody
12  looking at it; right?
13          MR. HAVERTY:  That's what he said to
14  you.
15      A.  No, it's detectable, but if you're
16  looking at it, it is visible.
17      Q.  All right.
18      A.  You can see it if you're looking
19  at it.
20          How about we take a break?  We've
21  been going about an hour.
22      Q.  No, I'm not ready to take a break.
23      A.  Well --
24      Q.  Do you need one --
25      A.  Yes.

Page 202

W. VIGILANTE

1
2      Q.  -- for some reason?
3      A.  'Cause it's been about an hour.
4  I'll ask you -- if you got another question
5  you want to ask, I'm happy to --
6      Q.  I have many questions to you ask,
7  Mr. Vigilante.
8      A.  Then let's take --
9      Q.  If you need a break --
10     A.  Let's --
11     Q.  -- we can take a break.
12     A.  Yeah, that will work.  Thank you.
13         THE VIDEOGRAPHER:  We are now going
14  off the video record.  The time is 14:29.
15         (A recess is held from 2:29 p.m. to
16  2:38 p.m.)
17         THE VIDEOGRAPHER:  Back on, 14:39.
18  BY MR. SCHULTZ:
19     Q.  All right.  Mr. Vigilante, in a
20  moment I want to get into the details of the
21  criticisms that you narrated earlier about the
22  task analysis and the IFU.  Okay?  And I want
23  to get into that in a second, but before we do
24  that, let me ask you:  Would you agree that a
25  medical device manufacturer or for that matter

Page 203

W. VIGILANTE

1
2  any manufacturer of any product, even with
3  what you would consider to be an adequate
4  human factors evaluation, will not identify
5  all the ways in which somebody might misuse a
6  product and/or cause themselves harm?
7      A.  Sure.
8      Q.  All right.  And that, in fact, is
9  the very theory behind the fact that the FDA
10  requires post-market surveillance; right?
11     A.  Yeah, I'm not going to comment on
12  what the F -- FDA's theory is.  I don't know.
13     Q.  Okay.  Well, do you understand
14  that post-market surveillance is intended to
15  disclose and then deal with hazards that were
16  not identified at the time of development?
17     A.  Yeah, so the way you're describing
18  it, it's no different than any other product
19  where after you put it into the field you want
20  to continue to monitor its use and problems
21  that come up with its use so that you can
22  identify problems that you missed in your risk
23  analysis and human factors analysis.
24     Q.  Well, and not just that you
25  missed, but that there's no reason why you

Page 204

W. VIGILANTE

1
2  would have caught; right?
3      A.  It can be, sure.  Anything is
4  possible.
5      Q.  I mean, 'cause -- 'cause not all
6  hazards and not all user errors are
7  foreseeable, are they?
8      A.  Correct.
9      Q.  Okay.  You said earlier that this
10  hazard -- and I -- I just want to short
11  circuit so that we can be efficient here.
12         When I say "this hazard," I'm
13  referring to the prime/fill anomaly hazard.
14         You said earlier that that was
15  foreseeable to Medtronic in 2000; correct?
16     A.  Yes.
17     Q.  What -- what standard are you
18  using to determine foreseeability?
19     A.  I base foreseeability on what can
20  be discerned through an adequate risk
21  assessment and haz -- or human factors
22  assessment.
23     Q.  But how -- how can you decide what
24  would have been foreseeable through a human
25  factors evaluation?  What -- what methodology

Page 205

W. VIGILANTE

1
2  or what objective basis can you point to for
3  determining that it was foreseeable?
4      A.  Well, first you start with your
5  risk analysis, and Randy Adair testified that
6  he had all the knowledge he needed at the time
7  he designed and developed that P-cap.  What
8  they didn't do is integrate that into the
9  overall design development of the infusion
10  set --
11     Q.  Well --
12     A.  -- and that was their mistake
13  there.  If they had Randy Adair part of that
14  process, they would have had a better chance
15  of finding it.
16         Second, had they done a human
17  factors assessment of the IFU that was
18  provided to Ms. Dennert, they would have
19  realized that people are pulling the reservoir
20  out while the insulin vial is inverted and
21  they would have found the same thing that they
22  found -- let me think of the name, the
23  gentleman's name.  I'm sorry.  I referenced
24  him in my report and I can't think of his name
25  offhand.

Page 206

W. VIGILANTE

1
2     Q.  Mark Curtis?
3     A.  Is he the -- the lab test guy?
4        Yeah, Mark Curtis.  They would
5  have found the same thing Mark Curtis did,
6  that when you remove the Paradigm Reservoir
7  with the insulin vial inverted, you get the
8  potential for insulin to leak out.
9     Q.  Well, Mr. Vigilante, in fairness
10 to Mr. Adair, he did not say, "We had all the
11 knowledge necessary and we failed to integrate
12 it."  That's your interpretation of the
13 testimony that he did give; correct?
14    A.  I can just tell you what he
15 testified to.
16    Q.  That would be lovely.  Let's stick
17 to what he testified to 'cause he certainly
18 didn't say it was foreseeable, did he?
19       Did he?
20    A.  Give me a minute here and I'll --
21 I'll pull you up his testimony.
22    Q.  Could you answer my question
23 first?  He didn't say that it was foreseeable
24 in 2000, did he?
25    A.  I'm sorry.  I'm trying to answer

Page 207

W. VIGILANTE

1
2  your question.
3     Q.  Can you answer that question?  Did
4  he or did he not?
5     A.  I'm trying to answer that.  I
6  don't know why you --
7     Q.  Did he say it was foreseeable?
8     A.  I'm sorry.  I'm trying to --
9  trying to answer your question.
10       (Reviewing document.)
11       He testify at Page 45, (as read):
12 "From an engineering basis, if you have a
13 device with a movable stopper/plunger and you
14 apply an external pressure to the stopper, it
15 will move."
16       45, 46, (as read):  "Theoretically
17 possible the plunger could move without input
18 from user if there is pressure differential."
19       55, (as read):  "Vents allow for
20 flow or equalization of pressure, hydrophobic
21 means hydro -- hydrophobic membrane does not
22 allow liquid inside.  There is an increased
23 pressure in the reservoir as a result of the
24 priming process."
25       He did not consider that increased

Page 208

W. VIGILANTE

1
2  pressure in the reservoir occur -- occurs due
3  to the priming process when he designed P-cap
4  vents.
5       Page 109, 110, (as read): "If
6  pressure in housing exceed atmospheric
7  pressure, resulting forces can cause reservoir
8  piston to be driven inward, thus delivering
9  unwanted insulin."
10       111, (as read):  "If user
11 introduces pressure internally to housing
12 through priming, that could cause piston, a
13 plunger to deliver unwanted insulin if vent
14 membrane is blocked."
15       So that's apparently what he knew
16 at the time.
17    Q.  Okay.  And you equate that with
18 knowledge of the hazard that went
19 unrecognized; right?
20    A.  Well, no, he didn't recognize the
21 hazard.  That's why it was unrecognized.
22    Q.  Right.  But you're saying that
23 that was all the information necessary to
24 recognize the hazard; right?
25    A.  No.  In conjunction with the human

Page 209

W. VIGILANTE

1
2  factors analysis, they would have seen that
3  people were likely to take the reservoir off
4  with the insulin vial over it, resulting in
5  the liquid getting on the interior of the
6  P-cap.  That, together with Randy Adair's
7  knowledge, should have triggered to them that
8  there is potential for a problem.
9     Q.  Is -- and no reasonable person can
10 disagree with your statement that it was
11 foreseeable in 2000?
12    A.  Assuming they did an adequate risk
13 assessment and adequate risk -- human factors
14 analysis, they should have foreseen it in
15 2000.
16    Q.  Can a reasonable person disagree
17 with you that even with whatever you consider
18 to be an adequate human factors evaluation the
19 hazard might not be identified?
20    A.  Yeah, I wouldn't consider that
21 reasonable.
22    Q.  Okay.  You, first of all, you have
23 the benefit of hindsight; right?
24    A.  If you mean the fact that I'm
25 involved in the issue after Medtronic

Page 210

W. VIGILANTE

1  identified it in 2012 and after they had a
2  number of prime/fill anomalies recognized in
3  their call data and the unfortunate incident
4  with Ms. Dennert, yes.
5      Q.  Okay.  So you now know that, in
6  fact, this precise failure mechanism could
7  occur; right?
8      A.  I do know that, yes.
9      Q.  All right.  What, if anything,
10 have you done to avoid hindsight bias in your
11 analysis?
12     A.  I looked at what a reasonable risk
13 assessment hazard analysis would have
14 discerned.
15     Q.  Okay.  Is there a standard we can
16 point to that says objectively:  "If you do
17 all these steps, you will identify this"?
18     A.  There are standards, publications
19 on how you do an adequate risk assessment and
20 usability analysis; and if you follow those
21 steps, it's there to be seen.
22     Q.  It's inevitable that they would
23 have discovered this hazard?
24     A.  Yes.
25

Page 211

W. VIGILANTE

1      Q.  Okay.  Is there a concept of the
2  frequency of a hazard occurring that is
3  relevant to your determination of
4  foreseeability?
5      A.  One more time 'cause I'm -- got --
6      Q.  Sure.
7      A.  -- lost in that question.
8      Q.  Does it matter -- does
9  "foreseeability," as you use that phrase, take
10 into account the likelihood that something
11 will happen, the frequency of it?
12     A.  So, yes and no.
13     Q.  In what way "yes" and in what way
14 "no"?
15     A.  Well, it has to have some
16 frequency.  If it didn't have any frequency,
17 it would be, you know, not likely or not
18 happening and then it wouldn't be foreseeable.
19 But I think what you're confusing is, is that
20 frequency is used as part of the assessment of
21 risk, and risk is a function of -- of hazard
22 severity, probability of occurrence or
23 frequency and exposure rate.  So frequency
24 does play a part in your risk assessment, but
25

Page 212

W. VIGILANTE

1  not in the risk analysis.
2      Q.  Well, what I was trying to get at
3  is:  If something happens -- does it matter in
4  your mind in terms of deciding whether
5  something is foreseeable or reasonably
6  foreseeable how -- hold on.  The question is
7  not done.
8      A.  Sure.  Go ahead.
9      Q.  -- how frequently it happens?
10 Does that matter?
11     A.  So from a design -- product design
12 standpoint, you shouldn't have any of it
13 happening because the product isn't released
14 yet.  So you need to foresee what could
15 potentially happen, and part of your risk
16 analysis is identifying the potential hazards;
17 and then through your risk assessment you can
18 rank those hazards on severity, exposure, and
19 probab -- probability or likelihood and
20 determine how you're going to deal with it.
21     So when you do your risk
22 assessment, things that are high risk, high
23 hazard, you put more emphasis on.  Things that
24 are low risk, low hazard, maybe you don't
25

Page 213

W. VIGILANTE

1  catch on the first round, but you get it on
2  the second round when you have the resources
3  and time, or time and money, the resources
4  including time and money.
5      So frequency is a issue for
6  assessing the level of risk, but not in
7  identifying risk because you -- you're
8  designing a new product.  It's a -- it's a
9  new -- new cap.  It's a brand new cap, brand
10 new vents.  There's none in the -- in the --
11 there's none in the market to judge what the
12 frequency is.
13     Q.  Well, so then let's get at it at a
14 different way.
15     When you're doing this hazard
16 evaluation or risk analysis, essentially,
17 correct me if I'm wrong, I'm sure you will,
18 that you're relying on people, the engineers,
19 the human factors people, everybody involved
20 in the process to think of every way somebody
21 might misuse a product or use it incorrectly
22 and every sequence of events that might follow
23 from that that might lead to a hazard?
24     A.  Yeah, so what you're describing is
25

54 (Pages 210 to 213)

Page 214

W. VIGILANTE

1          W. VIGILANTE
2  both the failure modes effect analysis where
3  you start with what is the -- if -- if
4  something fails, the thing gets blocked, what
5  are the consequences of that.  That's exactly
6  what it is.
7          The fault tree analysis, you go
8  back and deal with if -- what if something
9  happened and -- and what are the -- the
10 consequences of that.  So you're talking about
11 what a risk analysis is.  That -- that's --
12 that's what the engineers and the -- human
13 factors people and the other people in the
14 Design Team, they're supposed to sit around
15 and brainstorm what are the potential problems
16 if X happens, if Y occurs, what is the result.
17 And --
18      Q.  And it --
19      A.  -- certainly you have a new
20 product, and this is why -- this is why I'm so
21 emphatic that a reasonable person would
22 conclude an adequate risk assessment or human
23 factors assessment would have identified this.
24          You have a new product.  The --
25 the product is the P-cap.  Medtronic or

Page 215

1          W. VIGILANTE
2  MiniMed designed and developed it to replace
3  an existing technology.  You know, how did
4  they -- how did they change it?  The major
5  change was its waterproof characteristics; and
6  to get it waterproof, they had to put those
7  vents in.
8          So the engineer should have been
9  sitting there, the Design Team should have
10 been sitting there, well, what are the
11 consequences of having these vents, what if
12 the vents get blocked, What are the
13 consequences of the vents getting blocked.
14          Randy Adair testifies, "Eh, the
15 vents get blocked, there's no pressure,
16 pressure -- or no pressuriza -- no pressure
17 equalization, you can have unwanted delivery
18 of insulin."  So it's not a -- it's not a huge
19 leap.  From an engineering standpoint, Adair
20 knew the consequences.  They just never
21 bothered to sit down apparently to -- to think
22 and do the -- the FMEA or the fault tree
23 analysis to -- to put it together.
24          We putting out a cap with vents on
25 it.  Nobody has ever done that before.  What's

Page 216

1          W. VIGILANTE
2  the potential or the problems that can occur
3  if the block -- if the vent gets blocked.
4      Q.  And if they, in that brainstorming
5  process, they don't identify everything that
6  can go wrong, they've simply failed in their
7  job?
8      A.  If -- if they took reasonable
9  steps, then they wouldn't have failed in the
10 risk assessment, but, again, they've got the
11 human factors assessment to back it up.
12      Q.  But what --
13      A.  So you're going to do the -- your
14 usability testing.  If you're doing it on the
15 IFU that Rachel Dennert was provided, you're
16 going to see that people are getting -- are
17 removing the -- the reservoir from under the
18 vial; and when it happens, depending upon the
19 pressurization, you're either going to get a
20 squirt out or you're going to get drops out,
21 but you're going to get some fluid out if
22 there's enough pressurization and insulin in
23 the vial.
24          So now you've identified another
25 problem.  Well, what just happened and what is

Page 217

1          W. VIGILANTE
2  the consequence of that?  That -- that's the
3  follow-on question.  What is the consequence
4  of that?
5          So you take it back to your Design
6  Team.  If you're a human factors guy and you
7  don't know what the consequences are, you take
8  it back to the Design Team and let them deal
9  with it.  What are the consequences of getting
10 the inside of the P-cap wet.  Randy Adair will
11 tell you, "Oh, it'll block the vent."  Well,
12 what are the consequences of that?  Randy
13 Adair will tell you, you can have no pressure
14 equalization and you can get the reservoir
15 plunger moving on its own.
16          MR. SCHULTZ:  Would you mark that?
17          (Exhibit Vigilante-12, multipage
18 document entitled Report of Protocol EP002
19 and EP003: Usability Study of the Platform
20 3 User-Filled Reservoir Assembly and Its
21 Instructions for Use, is marked for
22 identification.)
23          THE WITNESS:  Thank you.
24          (Exhibit Vigilante-13, multipage
25 document entitled ER-99-11-09-2256

55 (Pages 214 to 217)

TSG Reporting - Worldwide - 877-702-9580

Page 218

```
1              W. VIGILANTE
2    Engineering Report, is marked for
3    identification.)
4         (Pause.)
5         COURT REPORTER:  There's three?
6         MR. SCHULTZ:  There's three, yeah,
7    and they're 12, 13, 14.
8         MR. HAVERTY:  12, 13, 14.
9         (Exhibit Vigilante-14, multipage
10   document entitled ER-99-12-13-2285
11   Engineering Report, is marked for
12   identification.)
13        Q.  All right.  Mr. Vigilante, the
14   court reporter has handed you Exhibits 12, 13
15   and 14 which correspond to Exhibits 8, 9 and
16   10 respectively from the deposition of Susan
17   McConnell.
18        A.  Okay.
19        Q.  Now, again, honestly, sir, you
20   have a tendency to give speeches that are not
21   responsive to my questions.  So, you know, if
22   you can focus on my question and answer my
23   question, I'd appreciate it 'cause it's going
24   to take a long time if you don't.
25        MR. HAVERTY:  Dave, ask a question.
```

Page 219

```
1              W. VIGILANTE
2         MR. SCHULTZ:  Well --
3         MR. HAVERTY:  Don't give a speech.
4         MR. SCHULTZ:  Well --
5         MR. HAVERTY:  Don't give
6    instructions.
7         MR. SCHULTZ:  That doesn't -- that
8    doesn't lie in your mouth.
9         MR. HAVERTY:  It's your
10   deposition -- it's your --
11        MR. SCHULTZ:  Then be quiet.
12        MR. HAVERTY:  -- deposition, Dave,
13   and you're entitled to ask questions only,
14   not make speeches and --
15        MR. SCHULTZ:  And you're not
16   entitled to make speeches and yet you do it
17   in every deposition all the time, so...
18        MR. HAVERTY:  And I'll -- and I'll
19   wait until you do it when I'm taking the
20   depositions of your experts too, Dave, and
21   I'll make sure that I remind you that
22   you -- you're not supposed to either, so...
23        Q.  So, Mr. Vigilante, if you can
24   answer my question, first of all, would you
25   agree that Exhibit 12 is, in fact, a human
```

Page 220

```
1              W. VIGILANTE
2    factors evaluation?  Is it one?
3         A.  I'm sorry.  'Cause you -- you
4    sounded like you drifted off there and I
5    didn't catch what the last part of the
6    question was.
7         Q.  Exhibit 8 --
8         A.  Yes.
9         Q.  -- does that reflect that a human
10   factors analysis was performed?
11        A.  Yes, in Vigilante-12, McConnell-8
12   is the report from the usability studies that
13   were conducted --
14        Q.  Now, if you look at --
15        A.  -- in 2000 and 2001.
16        Q.  If you would look at Page 4, the
17   first -- and tell me if I've got it wrong, but
18   the steps that Medtronic went through, first
19   of all, were a task analysis followed by a
20   usability study; correct?
21        A.  They did do a task analysis
22   followed by a usability study.
23        Q.  And that is a proper sequence of
24   events to do, right, task analysis followed by
25   usability study?
```

Page 221

```
1              W. VIGILANTE
2         A.  I don't have any problem with the
3    sequence of it.
4         Q.  All right.  The task analysis you
5    are critical of, I think you said earlier,
6    because they didn't -- Medtronic did not break
7    each task down into sub-tasks; correct?
8         A.  Correct.
9         Q.  So, for example, on Page 4 of
10   Exhibit 12, Tasks Evaluated Number 7 says,
11   "Remove the transfer guard and medication vial
12   from the reservoir."
13        Do you see that?
14        A.  Yes.
15        Q.  And you criticize that because it
16   should have been broken down; is that right?
17        A.  I criticize it because if they did
18   do that, they didn't document it and I don't
19   see it anywhere.
20        Q.  Okay.  How should that have been
21   broken down in your opinion?
22        A.  Well, the -- I don't have the
23   benefit of having the IFU, but apparently
24   according to the next table, it involves the
25   unscrewing of the plunger rod and it includes
```

56 (Pages 218 to 221)

Page 222

W. VIGILANTE

1
2  pulling the plunger rod completely out of the
3  reservoir and it includes --
4       Q.  Could you tell me where you're
5  looking at?
6       A.  Yeah, you're talking about Step 8;
7  right?
8       Q.  I'm talking about Step 7.
9       A.  I'm sorry.  I apologize.  So I was
10 reading Step 8.
11      So Step 7 on Page 6, there's a
12 twist motion and then there's a pull motion.
13 So they only -- you know, they identified the
14 task, the -- the higher-level task, "Remove
15 the transfer guard from the reservoir."  But
16 what are -- what steps are necessary to
17 perform that task?  And apparently there's a
18 twisting motion and a pulling motion.  And the
19 twisting motion is in a certain direction.  Of
20 course, the pulling motion is also in a
21 certain direction depending upon the
22 orientation of the reservoir, but it's not
23 identified.
24      Q.  And so your point is in this task
25 of removing the reservoir from the transfer

Page 223

W. VIGILANTE

1
2  guard, they should break that into sub-tasks
3  of twist the reservoir and pull; is that
4  right?
5       A.  I would like to see the sub-steps.
6  I would like to see the information necessary
7  for the user to know what steps are required.
8  I would like to see an assessment of the
9  potential errors that could be made.  I would
10 like to see an assessment of whether or not
11 the individual actions are consistent with
12 norms, conventional norms, known behavioral
13 tendencies and so forth.
14      Q.  Well, we're -- we're just
15 talking -- or I was just talking about the
16 task analysis for the moment.
17      A.  That is the task analysis.
18      Q.  Okay.
19      A.  This is the -- that's -- that's my
20 point.
21      Q.  The task analysis includes
22 usability as well?
23      A.  Well -- well, yes, it's a human
24 factors analysis.  It's -- it's -- you're
25 looking at whether or not it's usable --

Page 224

W. VIGILANTE

1
2       Q.  You don't --
3       A.  -- so you -- you need to know what
4  needs to be done and whether or not what
5  you're asking them to do is -- is -- is --
6  would be defined as usable.
7       Q.  You don't distinguish between a
8  task analysis and a usability study?
9       A.  Well, no.  There is a difference
10 between a task analysis and a usability study,
11 but part of the task -- task analysis is to
12 assess the usability of the steps.  It's done
13 by the professional human factors ergonomist.
14      And part of the task assessment is
15 looking at whether or not the actual
16 individual steps would be considered usable or
17 not based upon the comfort, efficiency, number
18 of steps, whether or not it meets conventional
19 norms, whether or not it meets users'
20 expectations, whether or not the user needs
21 any special knowledge or information to
22 complete the task.  That's all part of what
23 the task analysis should be ferreting out.
24      Q.  So, I'm sorry.  Then I -- I lost
25 you.  What is your criticism exactly in this

Page 225

W. VIGILANTE

1
2  task analysis and usability study?  What is it
3  that Medtronic didn't do that it was supposed
4  to in your opinion?
5       A.  Yeah, well, number -- well, they
6  identified the top tasks, but they didn't
7  break it out, so we don't know whether or not
8  they looked at the individual sub-steps or
9  individual actions necessary to complete the
10 task.  There was no assessment as to what
11 information the user needed to complete the
12 sub -- the -- the actions or the task.
13      So, for example, with Number 7 in
14 the IFU that was assessed in the task
15 analysis, which is Step Number 6 in the IFU
16 that Mrs. Dennert was exposed to, you would
17 need to know that you have to have the
18 reservoir over the insulin vial to pull it out
19 properly.  So that's a piece of information
20 that the task analysis should have identified
21 because you're looking at the actions, what's
22 required to be done, and then you're looking
23 at, well, what knowledge does the user need to
24 have to know how to do those actions.
25      Then you need to look at whether

TSG Reporting - Worldwide - 877-702-9580

Page 226

W. VIGILANTE

1
2  or not the actions are consistent with, again,
3  conventional norms, behavioral tendencies and
4  so forth. You have to determine looking at it
5  whether or not the action is going to be
6  comfortable, whether or not it's going to be
7  inducing any undue stress, whether or not it's
8  going to be efficient or not; and I don't see
9  any of that analysis in here.
10      The other thing that task analysis
11  looks at is you're breaking them down, those
12  tasks down to sub-actions, what errors can
13  occur. This is the part of the assessment,
14  analysis that you're looking at potential
15  errors. So it gets back to your hazard
16  foreseeability and what is done from a product
17  design standpoint to identify hazards. Well,
18  the task analysis is done. And at these steps
19  you're looking at, well, where -- where can
20  they go wrong. If we're removing the
21  reservoir from the transfer guard, what can
22  they do wrong.
23      They've got several sub-actions
24  they have to do. One of the actions is make
25  sure the reservoir is on top. Second is they

Page 227

W. VIGILANTE

1
2  have to twist. Third is they have to pull.
3  Well, what can go wrong and where could they
4  make a mistake or -- or deviate from what is
5  required. Well, if they're supposed to take
6  it off upside down, what happens if they take
7  it off upside right. That's something that
8  you would expect them to identify in the task
9  analysis. And then as part of the task
10  analysis is you're looking at what are the
11  consequences of those errors, what are the
12  hazards that can result because of those --
13  because of those errors.
14      So, again, if you're a human
15  factors guy and you're doing your task
16  analysis and you realize that they have to --
17  we want them to do it with the vial below the
18  reservoir, foreseeable that somebody is not
19  going to do it that way, they're going to do
20  it the other way. Maybe they're going to do
21  it horizontally. What's the consequences.
22      Well, if you're doing your task
23  analysis, you see what the consequences are.
24  The insulin comes out. Well, what's the
25  consequence of that. If I don't know, then I

Page 228

W. VIGILANTE

1
2  got to take it to the engineer and say what's
3  the consequence of the insulin coming out.
4  And then you move it, you know, through the
5  Development Team. But these are the types of
6  things that you expect to be caught during the
7  task analysis.
8      Q.  In your report, I -- and correct
9  me if I'm wrong, you criticize Medtronic, at
10  least as I understand it, for failing to
11  recognize that the process of filling the
12  reservoir requires the user to do -- I think
13  you used the word "unnatural things" or, you
14  know, stressful movements and things of that
15  nature. You know what I'm referring to?
16      A.  Yes.
17      Q.  Okay. Can you just very briefly
18  tell me what is -- what is that critique, that
19  you're saying that the way the process was set
20  up, it was going to be difficult and
21  uncomfortable for the user and, therefore,
22  Medtronic should have seen why it would be
23  done differently?
24      A.  What I'm saying is a couple things
25  in the report, and I -- maybe I can

Page 229

W. VIGILANTE

1
2  demonstrate on the video since we're on video.
3  Maybe I can talk about it too.
4      This is the -- the reservoir
5  attached to the transfer guard as it's shipped
6  from Medtronic, and I believe it starts with
7  the plunger retracted -- retracted.
8      Part of the process is you put
9  your insulin in. You -- you press --
10      Q.  Here, I'll tell you what:  As long
11  as you're going to demonstrate -- first of
12  all, is it your testimony that this is
13  unnatural, what they're being asked to do, or
14  uncomfortable?
15      A.  Well, no, I'm getting to it.
16  If -- if you allow me to finish, I can tell
17  you what -- what the problems I have.
18      Q.  If you would allow me to set up
19  the question, please.
20      A.  I was answering your last
21  question.
22      MR. HAVERTY:  You're -- Dave, you
23  did it again. You asked him the
24  question --
25      MR. SCHULTZ:  Kevin, be quiet.

Page 230

```
 1          W. VIGILANTE
 2     MR. HAVERTY:  No.  Excuse me, Dave.
 3  Q.  Mr. Vigilante --
 4     MR. HAVERTY:  No, no, this is --
 5  this is -- this is the third time that you
 6  not allowed -- you asked a question.  He's
 7  giving you an answer.  I'm sorry that you
 8  don't like the answer, but he's giving the
 9  answer and he's entitled to give the
10  answer.
11     MR. SCHULTZ:  Kevin.
12     MR. HAVERTY:  Dave.
13     MR. SCHULTZ:  Kevin --
14     MR. HAVERTY:  Dave.
15     MR. SCHULTZ:  -- may I -- let me
16  know when I may speak.  Are you done?
17     MR. HAVERTY:  Yeah, I'm done.
18     MR. SCHULTZ:  Okay.
19     MR. HAVERTY:  Speak.
20     MR. SCHULTZ:  Here's my problem:
21  Okay?  He apparently doesn't ans -- doesn't
22  understand the question I'm asking and I
23  want to focus his attention on what I'm
24  trying to get him to answer.  Hold on.  I
25  was quiet while you interrupted.  And so
```

Page 231

```
 1          W. VIGILANTE
 2  when he gets off on a tangent, I'd like to
 3  redirect him.  That's perfectly appropriate
 4  and you -- I have wasted incredible amounts
 5  of time with this witness going off making
 6  speeches, being non-responsive and I'm
 7  simply trying to be efficient in this
 8  deposition.
 9     MR. HAVERTY:  I'm sorry that you --
10     MR. SCHULTZ:  I'm already not going
11  to finish today because of his --
12     MR. HAVERTY:  Well, he's not coming
13  back, Dave, so you're finishing it.  You're
14  either finishing --
15     MR. SCHULTZ:  I have -- no, no.
16     MR. HAVERTY:  He's not coming back.
17     MR. SCHULTZ:  Kevin, I did not
18  choose ten o'clock.  You insisted on ten
19  o'clock.  I have a plane I cannot miss.  It
20  is not my problem and I am --
21     MR. HAVERTY:  Dave --
22     MR. SCHULTZ:  -- entitled to seven
23  hours.
24     MR. HAVERTY:  You're going to -- and
25  you're -- Dave, here's the story:  This is
```

Page 232

```
 1          W. VIGILANTE
 2  the end of the line.  You've gotten every
 3  benefit from this judge and I've had to
 4  give everything to you throughout this
 5  case.
 6     MR. SCHULTZ:  Oh, Kevin.
 7     MR. HAVERTY:  And I'm done.
 8     MR. SCHULTZ:  Please.
 9     MR. HAVERTY:  I am done.  I'm done.
10  Today is the end of this routine.
11     MR. SCHULTZ:  We'll find --
12     MR. HAVERTY:  Today --
13     MR. SCHULTZ:  What routine, Kevin?
14     MR. HAVERTY:  The fact that you've
15  been on the offense the entire time for the
16  last year and a half and --
17     MR. SCHULTZ:  The fact that you
18  have a witness who can never start a
19  deposition --
20     MR. HAVERTY:  And --
21     MR. SCHULTZ:  -- before 10:00 in the
22  morning --
23     MR. HAVERTY:  And by the way --
24     MR. SCHULTZ:  -- and then has to
25  catch a plane.
```

Page 233

```
 1          W. VIGILANTE
 2     MR. HAVERTY:  And, by the way, you
 3  know, the way Medtronic has behaved
 4  throughout this litigation has been
 5  despicable, absolutely despicable.
 6     MR. SCHULTZ:  That's it.
 7     MR. HAVERTY:  Yeah, so we're
 8  finishing today or -- or he's not coming
 9  back.  He's not coming back.  End of story.
10     MR. SCHULTZ:  What has Medtronic
11  done that's despicable, Kevin?
12     MR. HAVERTY:  Let me pull out all
13  the transcripts.  How -- the two -- the two
14  depositions of Rachel Dennert.  Even the --
15  even the videographer yesterday --
16     MR. SCHULTZ:  Which I wasn't at --
17     MR. HAVERTY:  -- said to me it was
18  despicable.
19     MR. SCHULTZ:  -- right?
20     MR. HAVERTY:  No, I don't care if
21  you weren't that.  It was Medtronic's
22  counsel, and I hope that you were brought
23  in because of the way they behaved.
24     MR. SCHULTZ:  I am --
25     MR. HAVERTY:  So, you know, I'm
```

59 (Pages 230 to 233)

Page 234

```
 1            W. VIGILANTE
 2  done.  We're going to finish this
 3  deposition today.  He's not coming back.
 4        MR. SCHULTZ:  Kevin.
 5        MR. HAVERTY:  I'm not -- I'm not
 6  doing it.  I'm not producing him.
 7        MR. SCHULTZ:  Well, we'll see about
 8  that.
 9        MR. HAVERTY:  And by the way,
10  here -- I'm sorry to do this to you:  Could
11  you please -- can you get that question
12  back, the question he originally asked --
13        MR. SCHULTZ:  No, no, no.
14        MR. HAVERTY:  -- so we can see that
15  he's --
16        MR. SCHULTZ:  No, no, no.
17        MR. HAVERTY:  No?
18        MR. SCHULTZ:  We're moving on.
19  Okay?  It's my deposition, Kevin, not
20  yours.
21  BY MR. SCHULTZ:
22     Q.  Mr. Vigilante, okay, here's -- I'm
23  trying to be efficient here.  I want to hear
24  your opinion, okay, but I need to understand
25  the context for it.  The context for I think
```

Page 235

```
 1            W. VIGILANTE
 2  where you're going with this is that one of
 3  the reasons Medtronic failed to identify
 4  hazards is because they didn't appreciate, in
 5  your opinion, that the reservoir-filling
 6  process required the user to do things that
 7  were uncomfortable or stressful or unnatural.
 8  Is that a fair summary?
 9     A.  So as I was explaining, and I
10  think I'm going to answer your second question
11  if I get done with my first.  But there's a
12  couple things in the process that Medtronic
13  asking users to do that are unnatural and that
14  results in stressful postures.  So the first
15  thing --
16     Q.  And, therefore, they'll do it
17  differently?
18     A.  Therefore, it's unnatural; and if
19  it's unnatural, they're not going to naturally
20  do it.  And part of usability is having people
21  to do things that are natural so that they
22  don't need instructions and warnings to tell
23  them to do something that's contrary to what
24  they would believe is natural.
25     Q.  Are you about to --
```

Page 236

```
 1            W. VIGILANTE
 2     A.  That's the -- that's the on --
 3     Q.  -- show me what's unnatural?
 4     A.  -- that's the whole point.  I'm
 5  about to show you, so --
 6     Q.  Then let me -- let me give you
 7  something that will help you.
 8     A.  I don't need that.  I don't need
 9  that.  So --
10     Q.  I -- I would like you to use it --
11     A.  Let's stop.
12     Q.  -- please.
13     A.  Let me finish and then we can get
14  on to your -- on to your -- your
15  demonstration.
16     Q.  No, actually, I -- I'm the one
17  that gets to ask the questions, Mr. Vigilante.
18        MR. HAVERTY:  Yeah, but you don't
19  get to dictate his demonstration, Dave.
20        MR. SCHULTZ:  I didn't --
21        MR. HAVERTY:  He's answering your
22  question.  You're refusing --
23        MR. SCHULTZ:  Yes, I actually do,
24  Kevin.
25        MR. HAVERTY:  No, you don't.
```

Page 237

```
 1            W. VIGILANTE
 2     Q.  I'd like you to demonstrate the
 3  reservoir-filling process but use the vial of
 4  insulin because that is part of the process,
 5  is it not?
 6     A.  I don't need a --
 7     Q.  Here you go.
 8     A.  I don't need it for what I was
 9  trying to answer for your initial question.
10  So if I'm able to do that and if I need it for
11  an additional question, I'll take that under
12  advisement.
13        But the point I was trying to make
14  is that you've got the reservoir you're going
15  to flip, so flipping it up, now I've got to
16  elevate my shoulder, if you see where my right
17  shoulder is, so before my right shoulder was
18  down.
19        THE VIDEOGRAPHER:  Can you put your
20  screen down, please. It's blocking.
21     A.  So as I'm filling it, tapping it,
22  doing everything I need to do, my shoulders
23  in a -- are in a -- a neutral posture.  To
24  remove the reservoir, I've got to flip it up
25  putting my shoulder into a non-neutral
```

60 (Pages 234 to 237)

Page 238

W. VIGILANTE

1
2  posture.  Now, I've got to rotate my wrist
3  down and supinate it to turn and then -- I
4  pulled it the wrong way -- and then pull.
5        The more natural way to do it --
6  the other thing I want to note too is that now
7  I'm manipulating with my strong hand 'cause
8  I'm right-handed, as you would expect, and
9  I've got my dominant hand over my weak hand.
10 Most things that require fine motor skills,
11 for example, maybe turning a knob, a doorknob
12 is a good example, if it's -- if you need some
13 pressure on it, typically what you're doing is
14 you're putting your strong hand under your
15 weak hand.  Very rarely does a user come up to
16 a door and reverse it to turn the doorknob.
17 So typically you've got your strong hand under
18 your weak hand.
19        Medtronic is asking them to switch
20 that.  They're asking them to go from a
21 neutral position with your shoulders to a
22 non-neutral position with your shoulders.
23 They're asking you to make two different
24 movements with your wrist.  You've got to flex
25 it down and you have to supinate it.  If

Page 239

W. VIGILANTE

1
2  you're in a neutral position, you just have to
3  supinate it.  There is no flexion, so it's
4  less stressful.  And it's not consistent with
5  conventional norms and it puts you in a less
6  comfortable posture.
7        So, again, looking at the task
8  analysis, these things -- if they were done on
9  the IFU that was provided to Mrs. Dennert,
10 would have been a -- would have been and
11 should have been identified.
12    Q.  What do you mean "not on the IFU
13 provided"?  What -- what are you saying there?
14 I don't follow.
15    A.  Because the IFU provided to
16 Ms. Dennert is different than the IFU they did
17 the task analysis on, they did the usability
18 test on.  That was something --
19    Q.  In what way?
20    A.  -- that I argued that --
21        There's several ways.  One, in the
22 IFU they have the insulin bottle, and if this
23 is our table, sitting on the table for the --
24 whoops -- insertion, the pumping, and the
25 filling.  I -- I don't have that locked in.

Page 240

W. VIGILANTE

1
2        So in the IFU they did the task
3  analysis on, usability testing on they have
4  the insulin bottle on the table and they're
5  removing the reservoir from the insulin vial
6  while it's still sitting on the table.
7        In the IFU that is in this packet
8  that was given to Mrs. Dennert, that's not
9  what they do.  They show the user -- I don't
10 know if you can zoom in on that, these top
11 steps.  They show the user removing,
12 pressurizing with the -- the reservoir upside
13 down and then turning it upside down to push
14 air in and pull out in Step Number 3.  Turning
15 it upside down to push air in and pull air out
16 and then to tap the bottles in Step 4.  In
17 Step 5 -- I'm sorry.  3 is to pump the air
18 into the insulin reservoir.  4 is to pull the
19 insulin into the reservoir from the vial.
20 Step 5 is to tap the bubbles out.  Step 5 is
21 continuation of stepping -- tapping the
22 bubbles out and getting the insulin to the
23 level you want it, and then 6 is removing the
24 reservoir.  And 6 you have to go from this to
25 this (indicating); and that's where the

Page 241

W. VIGILANTE

1
2  problem is because if you go like this
3  (indicating) and you remove -- I'm sorry.
4  You're going -- you're supposed to go like
5  this to this (indicating) and remove the
6  reservoir.  But what's happening is
7  Ms. Dennert in the YouTube videos I shaw -- I
8  saw and Mark Curtis in his demonstration, they
9  don't do it like that.  They're filling the
10 tube.  They're tapping it out.  They're
11 getting to the right level and they're
12 removing it.  And when you do that, you're
13 giving the insulin in the vial opportunity to
14 spill out on to the top of your reservoir.
15        Now, with the top of reservoir
16 contaminated, the next step is to put it into
17 your P-cap and now you've just contaminated
18 your vents.  Take out your plunger, put it in
19 the pump, and next thing you know, you're
20 getting insulin out of the cannula quick --
21 quick disconnect.  You think your priming is
22 done.  You go about your business.
23 Unbeknownst to you the plunger continues to --
24 to move in delivering unwanted insulin.
25    Q.  Done?

Page 242

1          W. VIGILANTE
2     A.  Yes.
3     Q.  So as I understand it, you're
4 saying that the process or the requirement
5 that you flip the vial over is unnatural and
6 requires a stressful and uncomfortable
7 position; correct?
8     A.  Yeah, having to remove the --
9     Q.  May I see it?
10     A.  Sure.  Having to remove the
11 reservoir from over the insulin means you have
12 to swap it.
13     Q.  Okay.  Mr. Vigilante, do you see
14 that I have the reservoir underneath right
15 now?
16     A.  Sure.
17     Q.  You see that I now have it on top?
18     A.  Yep.
19     Q.  You see that I've flipped it back
20 to being underneath?
21     A.  Yes.
22     Q.  You see that I've never moved my
23 shoulder during that process?
24     A.  You still haven't tried to take it
25 off.

Page 243

1          W. VIGILANTE
2     Q.  I -- just one at a time, please.
3     A.  Sure.
4     Q.  Did you see that I did not move my
5 shoulder?
6     A.  I did see that.
7     Q.  Okay.
8     A.  And are --
9     Q.  If I place it on the table --
10     A.  -- are you right-handed or
11 left-handed?  Can we put that on the record?
12     Q.  Sure.  I'm right-handed.  I've
13 been using --
14     A.  Okay.
15     Q.  -- my left hand, but I can do it
16 with my right hand as well.
17     A.  Okay.
18     Q.  Okay.  Do you know, by the way,
19 which -- what the neurological studies of
20 Rachel Dennert have shown as to the dominance
21 of her hand?
22     A.  Nope.
23     Q.  Okay.
24     A.  Doesn't matter.
25     Q.  Do you know if --

Page 244

1          W. VIGILANTE
2     A.  It's weak hand, strong hand.
3     Q.  Do you know which hand is her
4 dominant hand?
5     A.  It doesn't matter.  It's weak
6 hand, strong hand.
7     Q.  So your point is that people can't
8 or don't use their weak hand for any part of a
9 process like this?
10     A.  I'm not saying they don't.  What
11 I'm saying is that the process that is in that
12 IFU is unnatural, and when you don't point it
13 out in the IFU, you're going to have people
14 doing it wrong and that is foreseeable --
15     Q.  That's the --
16     A.  -- and the consequence of that
17 foreseeability is getting insulin on the top
18 of that --
19     Q.  But the --
20     A.  -- reservoir.
21     Q.  -- the part that I don't
22 understand, which is all I'm trying to find
23 out from you, is what's unnatural?  What makes
24 this unnatural?
25     A.  Well, continue.  I'll tell you.

Page 245

1          W. VIGILANTE
2     Q.  Okay.  I've got the reservoir.
3 Put it on the table and remove it.
4     A.  There's no -- there's no
5 requirement to put it on the table.
6     Q.  Okay.  It's off the table.  What's
7 unnatural about that?
8     A.  Two things.  You have your weak
9 hand under your strong hand.  That is a
10 unnatural position.
11     Q.  Okay.  Right now will you agree
12 with me --
13         MR. SCHULTZ:  Do you have this on
14 the video?
15     Q.  Do you agree with me that I have
16 my strong hand, my dominant hand --
17     A.  Yes.
18     Q.  -- on the reservoir --
19     A.  Yes.
20     Q.  -- underneath, right?
21         The vial is not --
22     A.  Yes.
23     Q.  -- on the table and I've just
24 removed the insulin reservoir from the vial?
25     A.  You did, and you could do that,

TSG Reporting - Worldwide - 877-702-9580

Page 246

W. VIGILANTE

1  but the problem is the step before.  You're
2  holding the unit with your strong hand.
3      Q.  Okay.  You want me to do it with
4  my weak hand?  Now I'm holding it with my weak
5  hand.
6      A.  No, you're not --
7      Q.  How is that unnatural?
8      A.  -- you're not -- you're not
9  understanding.
10     Q.  I -- most clearly am not
11  understanding.
12     A.  No, you're not, so let me --
13     Q.  So --
14     A.  -- show you.
15     Q.  No.  Why don't you walk me through
16  it?  I'll hold it.  You tell me what I need to
17  do.
18     A.  Well, you need to get it off the
19  table.
20     Q.  Okay.  Which hand do you want --
21     A.  You need to --
22     Q.  -- me to hold it in?
23     A.  The strong hand's fine.
24     Q.  Okay.

Page 247

W. VIGILANTE

1      A.  We'll do it by the -- we'll do it
2  by the instructions.
3      Q.  Okay.
4      A.  All right.  So we've got our --
5  you can hold the reservoir with your strong
6  hand.  The other way.  The other way.  There
7  you go.  Now, you're going to be pumping air
8  into the insulin vial.
9      Q.  Okay.
10     A.  Okay.  You got it on there.  Now,
11  you're going to --
12     Q.  It's on there.
13     A.  -- you're going to turn the unit
14  over.
15     Q.  Okay.
16     A.  You're going to bring it up
17  because you're looking for air bubbles.
18     Q.  Bring what up?
19     A.  You're not looking at it down,
20  you're bringing the unit up.
21         Okay.  Hold on a minute.  You're
22  going to pump air in and out.  Using your
23  right hand you're going to push the plunger
24  in.

Page 248

W. VIGILANTE

1      Q.  Okay.
2      A.  Using your weak hand you're going
3  to grab the reservoir.
4      Q.  Okay.
5      A.  I'm sorry.  The transfer guard.
6      Q.  Okay.
7      A.  And you're going to pull the
8  plunger out.
9         No, no.
10     Q.  Oh, the plunger.  I'm sorry.
11        Okay.
12     A.  Okay.  Now, you're going to hold
13  the plunger body with your left hand.
14     Q.  Okay.
15     A.  Okay.  Now, you're going to flick
16  with your right hand.
17        Now, you're going to hold your
18  left -- you're going to hold the transfer
19  guard with your left hand and you're going to
20  take your right hand and you're going to move
21  the plunger in to your -- you got to be able
22  to see where it's going.  You got good eyes
23  that can see those marks at that distance?
24     Q.  Yeah.

Page 249

W. VIGILANTE

1      A.  Yeah.  Well, I think most people
2  are going to hold it up here where they can
3  see it which becomes part of the problem.  The
4  next step is, is you're going to flip it over.
5      Q.  Which hand do you want me to use?
6      A.  It shows that you're going to flip
7  it over with your right hand on the reservoir.
8  You just did it wrong.
9      Q.  On the reservoir.
10        Oh.
11     A.  You just did it wrong.
12     Q.  Does it matter if I --
13     A.  It does matter because you're
14  asking people to follow your IFU and then
15  giving them a hard time if they don't, and I'm
16  telling you the IFU is poorly done --
17     Q.  Does it matter if --
18     A.  -- so you just messed it up.
19     Q.  -- when I flip -- really?  And --
20     A.  Yes.
21     Q.  -- and that's -- that's what's
22  causing the temporary blocked vent, is that
23  instead of grabbing it with the reservoir and
24  flipping it, I -- I used the vial and flipped

W. VIGILANTE

1        W. VIGILANTE
2   it?
3        A.  What's causing it is two things.
4   One is that the IFU is not clear, does not
5   give warning; and two, the IFU is asking you
6   to do tasks and swap hands unnecessarily.  So
7   if you bring it down to a more natural, more
8   efficient manner of doing it, you wouldn't be
9   in the position to make these types of
10  mistakes.
11       Q.  Well, what's it --
12       A.  How many times did you switch
13  hands?  It's going to be --
14       Q.  As many --
15       A.  -- on the video.
16       Q.  -- times as you asked me to.
17       A.  I didn't ask you to.  The IFU
18  asked you to.
19       Q.  The IFU just shows that somebody's
20  holding it.
21       A.  The IFU's telling you --
22       Q.  Does it matter if I switch my
23  hand?
24       A.  If you're following the IFU, you
25  are.

W. VIGILANTE

1        W. VIGILANTE
2        Q.  If -- but if -- if I find that
3   unnatural for some reason, does the fact that
4   I use one hand or the other hand make a
5   difference?  It doesn't, does it?  Not in
6   terms of --
7        A.  It shouldn't -- it -- I'm sorry.
8   It shouldn't make a difference.  It shouldn't
9   make a difference.
10       Q.  It doesn't make a difference --
11       A.  So taking the --
12       Q.  -- in terms --
13       A.  -- taking the insulin vial off,
14  either for inverted or upside down shouldn't
15  make a difference to the user, it shouldn't,
16  but it does.  It makes a big difference.  It
17  makes a deadly difference and that's the
18  problem.  So it shouldn't make a difference to
19  the user because you're right, ten users come
20  in, eight, nine of them may do it one way, one
21  or two of them may not.
22       Q.  Yeah, does it...
23          (Pause.)
24       Q.  Where does it say in the IFU that
25  you have to hold the vial and the reservoir in

W. VIGILANTE

1        W. VIGILANTE
2   the hand that's depicted?
3        A.  There's nothing in the IFU that
4   says you don't have to do that.  So, again, it
5   gets back to if you're going to provide
6   somebody with a process and you want them to
7   do it a certain way to prevent a very, very,
8   very severe hazard, you have to tell them, you
9   have to give them explicit instructions, you
10  got to give them explicit warnings.  If it's
11  okay to use it any which way you want, you
12  have to recognize that as a designer and make
13  sure that a minor change in the process that's
14  depicted doesn't result in somebody becoming
15  comatose and nearly dying.  That -- that's
16  the -- that's the point.
17       Q.  In terms of the temporary blocked
18  vent condition, what matters is that the
19  patient follow the instruction that the
20  reservoir is to be above the vial when the
21  reservoir is removed from the transfer guard;
22  right?  That's what --
23          MR. HAVERTY:  What -- what in --
24       Q.  -- matters ultimately; right?
25          MR. HAVERTY:  What instruction?

W. VIGILANTE

1        W. VIGILANTE
2        A.  Yeah, so ultimately the way that
3   the unit's set up to avoid the anomaly with
4   the prime/fill anomaly due to the blocked
5   vents is to remove the reservoir when it's on
6   top of the insulin vial.  And you've already
7   made my point several times, that it doesn't
8   matter.  It shouldn't matter which hand you do
9   it in.  It shouldn't matter to the user
10  because if they -- if they make a mistake, if
11  they do it in a way that's not depicted in the
12  IFU, it shouldn't result in a catastrophic
13  injury; and because it can result in a
14  catastrophic injury, the least you could have
15  done was made sure that the IFU was explicit
16  and specific and provided warning and provided
17  information to the user that this is important
18  you do it this way.  It's important because if
19  you don't, you can have a problem; and if you
20  have a problem, it can cause severe and
21  permanent injury.
22       Q.  What you're calling the
23  catastrophic injury is not caused by what hand
24  the patient chooses to hold anything in.  It's
25  caused by removing the reservoir from the

Page 254

W. VIGILANTE

1
2   transfer guard with the vial above. Would you
3   agree with that?
4        A.  It -- they're related.
5        Q.  It doesn't matter which hand I'm
6   holding it in. The issue, if it -- if it's
7   going to exist at all, exists by virtue of the
8   orientation of the vial above the reservoir;
9   right?
10       A.  It -- it does, but they're
11  related, and they're related because the
12  orientation of the vial and the reservoir is a
13  function of the different steps you're doing;
14  and you're starting off holding it with the
15  insulin vial -- you're starting off with the
16  insulin vial down. You're flipping it up in a
17  natural position so that you can get the
18  bubbles out so that you can see and then
19  you're telling the user to flip it back over
20  to avoid a catastrophic injury, but you don't
21  highlight it, you don't put any notation in
22  here, you don't put any text in here to
23  describe what you just did and why you just
24  did it.
25       (Pause.)

Page 255

W. VIGILANTE

1
2        Q.  People who use these devices, some
3   are left-handed, some are right-handed --
4        A.  Sure.
5        Q.  -- correct?
6            Are you saying that the IFUs
7   should be created one for left-handed people
8   and one for right-handed people?
9        A.  I don't think so. I think the IFU
10  should be clear if they're requiring you to do
11  it exactly the way it is, which to avoid this
12  hazard you have to do it exactly the way it
13  is, then they should tell you.
14       Q.  Well, is it your opinion that --
15       A.  All right. If they -- if they're
16  giving you the ability to swap strong hand for
17  weak hand, then, yeah, that's fine as well.
18       Q.  Is it your testimony,
19  Mr. Vigilante, that the user has to do -- I
20  think the phrase you just used was everything
21  exactly as it is in the F -- IFU in order to
22  avoid a temporary blocked vent?
23       MR. HAVERTY:  Objection. That's not
24  what he testified.
25       MR. SCHULTZ:  Well, that's what I'm

Page 256

W. VIGILANTE

1
2   trying to find out 'cause that's what I
3   thought he said.
4        A.  It's my understanding that
5   Medtronic and Unomedical provided this --
6        Q.  That was --
7        A.  -- or maybe Medtronic provided
8   this --
9        Q.  Can you answer my question?
10       A.  I'm not done.
11           -- provided this IFU --
12       Q.  I know you're not done. I'm just
13  wondering if you can answer my question.
14       A.  -- to -- to instruct the user on
15  how to do it properly and safely. So if you
16  don't follow the IFU, you're not doing it
17  properly and you're not doing it safely. The
18  question is:  Does the user realize that
19  they're not doing it properly and, therefore,
20  it's unsafe? And the answer is no because
21  there's no warning in here to tell you that.
22  So what happens, and we've seen it with Rachel
23  Dennert, we've seen it with Mark Curtis, we've
24  seen it with the YouTube videos that I found,
25  that Medtronic's own people found, that people

Page 257

W. VIGILANTE

1
2   are not doing it properly and that exposes
3   them to the potential hazard.
4        Q.  In point of fact, we haven't seen
5   it with Rachel Dennert. There's no testimony
6   and no evidence in this case that anyone saw
7   her remove the reservoir from the vial with
8   the vial above; correct?
9        A.  That's correct.
10       Q.  Okay.
11       A.  The testimony from Mrs. Dennert's
12  mother is that she did it correctly.
13       Q.  Correct.
14       A.  But somehow or another the vent
15  got blocked.
16       Q.  Well, Mrs. Dennert did not testify
17  that the vent got blocked. She doesn't know,
18  does she?
19       A.  I didn't say that.
20       Q.  Okay.
21       A.  But we do know that Rachel had
22  testified -- or stated to her mother that
23  earlier she got -- she thought she got some
24  insulin on the reservoir while doing the
25  change. So, again --

Page 258

W. VIGILANTE

1
2      Q.   Did she say she got it on the
3   reservoir or did she say she got it on the
4   night table and the end of the infusion set?
5      A.   Maybe it's the latter.
6      Q.   Yeah.
7      A.   Sorry.
8      Q.   And that's not the infusion set
9   that's at issue in this case in any event, is
10  it?
11     A.   My understanding is that they were
12  both swapped out at the ten, eleven o'clock
13  changing.
14     Q.   Now, but the insulin spillage for
15  which we don't have any information as to how
16  it occurred occurred at six o'clock or 6:46;
17  right?
18     A.   The insulin spillage that Rachel
19  reported to her mother was at 6:00 -- the
20  6:30 --
21     Q.   Right.
22     A.   -- let's say the 6:30 change.
23     Q.   So back to my question.  In order
24  to avoid the temporary blocked vent condition,
25  the thing that is necessary is that the

Page 259

W. VIGILANTE

1
2   reservoir be removed from the vial, right,
3   with the vial below the reservoir; correct?
4   Isn't that a true statement?
5      A.   The true statement is, is to avoid
6   it is --
7      Q.   No --
8      A.   -- to follow what the IFU --
9      Q.   -- you know what, Mr. Vigilante,
10  that's a simple question.  It's a yes-or-no
11  question and I would appreciate a yes or a no
12  answer.
13          Isn't it true that to avoid the
14  temporary blocked vent condition the step that
15  is required is that the reservoir be removed
16  from the transfer guard with the vial in the
17  down position?  Is that true?
18     A.   That is not true.
19     Q.   Okay.  Do you -- would you agree
20  with me that Step 7 in the IFU depicts the
21  vial at the time of removal of the reservoir
22  from the transfer guard as beneath, below the
23  reservoir which --
24     A.   No.
25     Q.   It doesn't depict that?

Page 260

W. VIGILANTE

1
2      A.   Not in this IFU.
3      Q.   Okay.  Well, why don't we mark --
4   I don't know what IFU you're looking at.  Why
5   don't we mark the one that Ms. Dennert had.
6          MR. HAVERTY:  Dave, just for the
7      record, this is the one that Ms. Dennert
8      had, in fact, because it came from her
9      supplies.
10     A.   Are you marking that?
11     Q.   Yes, I am.
12          (Exhibit Vigilante-15, two-page
13      document entitled Medtronic MiniMed
14      Paradigm Reservoir Rx Only, is marked for
15      identification.)
16     Q.   Now, Mr. Vigilante, I'm handing
17  you what's been marked as Exhibit 15 which is
18  a true and correct copy of an IFU that was in
19  use at the time that Rachel Dennert had her
20  reservoir.
21          MR. HAVERTY:  Are you making
22      representation that it is the same IFU as
23      she would have been produced?
24          MR. SCHULTZ:  Yeah.
25          MR. HAVERTY:  Okay.  Well, let's --

Page 261

W. VIGILANTE

1
2   just for the record, let's note that this
3   IFR [sic] that Mr. Vigilante is using is
4   from a reservoir box that was provided to
5   Ms. Dennert back in July of 2009 with
6   Reference Number MMT-326A, Lot Number
7   H7480331, and I guess that the serial
8   number is 2012/05 in case there are any
9   discrepancies between one that --
10     Q.   Step 6 in both Exhibit 15 and the
11  IFU that you have been using depict the
12  removal of the reservoir from the transfer
13  guard; true?
14     A.   They do, but that wasn't your
15  question.
16     Q.   Do they both depict at the time of
17  removal of the reservoir from the transfer
18  guard that the vial is below the reservoir?
19     A.   They both do that in Step
20  Number 6.
21     Q.   Okay.  And -- and you can tell
22  that by looking at these; right?
23     A.   Sure.
24     Q.   Okay.  And it's -- there's nothing
25  unnatural, is there, about removal of the

Page 262

W. VIGILANTE

1    W. VIGILANTE
2    reservoir from the transfer guard with the
3    vial beneath the reservoir?
4        A.   Yes, there is.  I just explained
5    that before you --
6        Q.   What --
7        A.   -- took it off me and started
8    demonstrating your own demonstrating, arguably
9    demonstrating why it's a silly process and why
10   mistakes can be made and why they should have
11   figured this out.
12       Q.   Why is it unnatural --
13       A.   Here, give me --
14       Q.   -- to remove -- let me finish my
15   question --
16       A.   I'm sorry.
17       Q.   -- please.
18       A.   Yeah, you're right.
19       Q.   Why is it unnatural to remove the
20   reservoir from the transfer guard with the
21   vial held beneath it?
22       A.   May I see it?
23       Q.   Can you tell me?
24       A.   May I see it?
25       Q.   Well, can -- just tell me if you

Page 263

1    W. VIGILANTE
2    can answer my question --
3        A.   Well, first of all --
4        Q.   -- as posed.
5        A.   -- it is -- it is my reservoir and
6    transfer guard, so I -- I'm going to ask you
7    to give it back to me.  If you want --
8        Q.   Okay.
9        A.   -- to keep your insulin vial --
10       Q.   Here you go.
11       A.   -- and -- that's fine.
12       Q.   I'll get you my own reservoir and
13   transfer guard and then I'll ask you the
14   question.
15       A.   So the -- the thing that counsel
16   is neglecting to state is that in -- in Step 5
17   the reservoir is on top and it's held in this
18   position.  This is the last position in Step 5
19   that the user is in, like this (indicating).
20           Step 6 wants you to flip it like
21   this (indicating).  So now we have our strong
22   hand above our weak hand.  We have our
23   shoulder flexed.  And now to remove the
24   reservoir.  I've got to flex my wrist and I
25   got to turn it.  Oop.  Wrong way.  And turn

Page 264

1    W. VIGILANTE
2    it.
3           Now, a more natural position,
4    considering Step 5 -- you're in this position
5    again (indicating) -- a more natural position
6    is keeping your strong hand under your weak
7    hand, turning it, pulling it down.  As you
8    will see, there's no reason to have my
9    shoulder up.  My shoulder is in a neutral
10   position and there's no reason for me to flex
11   my wrist.  That's a more natural position.
12       MR. SCHULTZ:  Why don't you mark
13   this, please?
14       (Exhibit Vigilante-16, insulin vial,
15   is marked for identification.)
16       (Pause from the stenographic
17   record.)
18       MR. SCHULTZ:  All right.  Apparently
19   we have five minutes left on the tape, so
20   we need to take a break.
21       MR. HAVERTY:  Yeah.
22       THE VIDEOGRAPHER:  We are now going
23   off the video record.  That concludes DVD
24   Number 3.  The time is 15:36.
25       (A recess is held from 3:36 p.m. to

Page 265

1    W. VIGILANTE
2    3:48 p.m.)
3        (The following is not recorded on
4    the video record.)
5        (Exhibit Vigilante-17, one-page
6    document entitled Medtronic MiniMed
7    Paradigm Reservoir Rx Only, is marked for
8    identification.)
9        MR. HAVERTY:  We just had the IFU
10   from Rachel Dennert's supplies marked as
11   Vigilante-17 and that comes out of a
12   Paradigm Reservoir Reference Number
13   MMT-326A, Lot Number H7480331 and its date
14   of manufacture is 2012 -- or no.  It can't
15   be.  Must be the expiration date 2012/05.
16       (Time noted is 3:49 p.m.)
17
18
19
20   _____
21       William J. Vigilante, Jr., PhD, CPE
22   Subscribed and sworn to before me
23   this _____ day of _____, 2016.
24   _____
25   NOTARY PUBLIC

67 (Pages 262 to 265)

Page 266

```
 1              W. VIGILANTE
 2              I N D E X
 3    WITNESS                      PAGE
 4    William J. Vigilante, PhD, CPE
 5    BY MR. SCHULTZ                 6
 6          E X H I B I T S
 7    NUMBER     DESCRIPTION      PAGE
 8    Exhibit Vigilante-1, multipage document    17
         entitled William J. Vigilante Jr., PhD,
 9       CPE, Human Factors/Ergonomics Expert,
10    Exhibit Vigilante-2, multipage document    66
         entitled The Experts Robson Forensic, The
11       Robson Forensic Difference,
12    Exhibit Vigilante-3, multipage document    67
         entitled The Experts Robson Forensic,
13       Human Factors &
14    Exhibit Vigilante-4, multipage document    67
         entitled The Experts Robson Forensic,
15       Medical Device
16    Exhibit Vigilante-5, multipage document   116
         entitled William Vigilante Human Factors
17    ExpertVigilante Forensic
18    Exhibit Vigilante-6, multipage document   119
         entitled Human Factors Expert Services
19    Vigilante Forensic
20    Exhibit Vigilante-7, multipage document   120
         entitled Bill Vigilante LinkedIn
21
      Exhibit Vigilante-8, multipage document   121
22       entitled William J. Vigilante, PhD, CPE -
         SEAK, Inc. Expert Witness Directory
23
      Exhibit Vigilante-9, multipage document   127
24       entitled William J. Vigilante, Jr.:: Real
         Estate - Human Factors:: JurisPro Expert
25    Witness Directory
```

Page 267

```
 1              INDEX CONTINUED
 2    Exhibit Vigilante-10, Report of William   165
         J. Vigilante, Jr., PhD, CPE dated April
 3       19, 2016
 4    Exhibit Vigilante-11, letter dated June   165
         16, 2016 addressed to Kevin Haverty, Esq.
 5
      Exhibit Vigilante-12, multipage document  217
 6       entitled Report of Protocol EP002 and
         EP003: Usability Study of the Platform 3
 7       User-Filled Reservoir Assembly and Its
         Instructions for Use
 8
 9    Exhibit Vigilante-13, multipage document  217
         entitled ER-99-11-09-2256 Engineering
10       Report
11    Exhibit Vigilante-14, multipage document  218
         entitled ER-99-12-13-2285 Engineering
12       Report
13    Exhibit Vigilante-15, two-page document   260
         entitled Medtronic MiniMed Paradigm
         Reservoir Rx Only
14
15    Exhibit Vigilante-16, insulin vial        264
16    Exhibit Vigilante-17, one-page document   265
         entitled Medtronic MiniMed Paradigm
         Reservoir Rx Only
17
18
19
20
21
22
23
24
25
```

Page 268

```
 1
 2              CERTIFICATE
 3    COMMONWEALTH OF PENNSYLVANIA   )
 4                            ) ss:
 5    COUNTY OF PHILADELPHIA        )
 6        I, Debra Sapio Lyons, a Registered
      Diplomat Reporter, a Certified Realtime Reporter,
 7    a Certified Realtime Captioner, an Approved
      Reporter of the United States District Court for
 8    the Eastern District of Pennsylvania, a Certified
      Court Reporter for the State of New Jersey; and
 9    Notary Public within and for the States of New
      Jersey, New York and the Commonwealth of
10    Pennsylvania do hereby certify:
11        That William J. Vigilante, Jr., PhD,
      CPE, the witness whose deposition is hereinbefore
12    set forth, was duly sworn by me and that such
      deposition is a true record of the testimony
13    given by such witness, to the best of my ability
      and thereafter reduced to typewriting under my
14    direction.
15        I further certify that I am not related
      to any of the parties to this action by blood or
16    marriage and that I am in no way interested in
      the outcome of the matter.
17
          In witness whereof, I have hereunto set
18    my hand this 22nd day of August, 2016.
19
20
      _____
21    DEBRA SAPIO LYONS
      CRR, RDR, CRC, CCR, CPE
22
23
24
25
```

Page 269

```
 1    NAME OF CASE:
 2    DATE OF DEPOSITION:
 3    NAME OF WITNESS:
 4    Reason Codes:
 5      1. To clarify the record.
 6      2. To conform to the facts.
 7      3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
              _____
25
```

68 (Pages 266 to 269)

**A**

**$11,021.50** 149:18
**$350.00** 15:11
**A-N-S-I** 108:20
**a.m** 1:15 17:13,14 98:4
**A/S** 1:10 3:17
**Aami** 108:20
**abide** 4:20
**ability** 49:20 54:8 121:5 155:7 255:16 268:13
**able** 11:6 22:2 36:9 54:9 55:7 63:6 91:25 116:7 117:11 185:13 237:10 248:22
**absolutely** 72:15 233:5
**abuse** 43:13
**academia** 69:25
**academic** 32:19 69:16 81:21
**accept** 14:7
**acceptance** 69:23 69:23
**access** 12:18 13:24 114:13,15
**accessible** 70:17 163:18
**account** 12:23 211:11
**accountant** 12:17 12:25
**accurate** 8:2 65:25 120:5,8,9,11 121:3 123:15 129:4
**accurately** 19:3
**acquisition** 79:8
**act** 42:10,10 47:10 47:11,23,25 48:4
**action** 1:6 5:21 179:11 195:10 226:5 268:15
**actions** 179:9 223:11 225:9,12 225:21,24 226:2

226:24
**active** 66:15 89:12
**activities** 37:18
**actual** 69:6 224:15
**ad** 95:8
**Adair** 169:23 170:10 171:14 205:5,13 206:10 215:14,19 217:10 217:13
**Adair's** 172:23 209:6
**addition** 6:25 40:5
**additional** 19:15 123:17 124:13 125:2,13,25 174:10 186:3 237:11
**address** 29:11,13
**addressed** 92:5 165:15 178:2 267:4
**adequacy** 55:4 63:5 158:23 160:3,24 162:9 163:5,15
**adequate** 19:5 30:12 54:12,22 55:13 57:18 60:24 62:16,25 63:8 65:14,21 154:22 154:25 159:8 169:3 176:22 190:4,6,16 191:18 191:23,24 192:7 192:11,17 193:20 203:3 204:20 209:12,13,18 210:20 214:22
**adjacent** 49:3
**administered** 157:2
**Administration** 74:11,15 131:4
**admissibility** 163:7
**admissible** 162:13
**admitted** 39:22
**ads** 77:5,7,7,11 94:24
**adults** 79:9

**advance** 176:4
**advertise** 76:22
**advertisement** 77:25 79:25 80:12 82:11 83:11 94:2 95:4
**advertisements** 75:9 76:18 77:10 93:13,15,16 95:5
**advertising** 79:19 94:10 95:16
**advised** 23:8
**advisement** 237:12
**advisor** 81:21 86:15
**affidavit** 136:3
**affiliations** 69:4
**afternoon** 149:15
**ago** 58:20 65:6 100:22 145:6 153:7
**agree** 44:2,3 67:25 72:17 150:9 157:24 159:15 167:14,21 188:11 191:9,21 192:3 199:13 201:9 202:24 219:25 245:11,15 254:3 259:19
**agreeing** 106:13 188:23
**agreement** 4:6,15 4:23 14:24 15:2 24:4,4
**agreements** 24:10
**ahead** 17:20 43:15 67:15 71:11 97:4 147:2 159:11 161:16 163:11 182:7 184:6 212:9
**air** 155:7 196:24 197:16 240:14,15 240:15,17 247:8 247:18,23
**al** 5:19
**alcohol** 141:20
**ALFE** 3:21

**alleged** 139:10 161:10
**allow** 31:12 41:9,23 142:3 207:19,22 229:16,18
**allowed** 39:9 40:3,6 40:11,12,14,15 42:11,12 54:5 230:6
**allowing** 76:21
**alternative** 161:18
**Aluminum** 45:12
**America** 52:23
**amount** 11:6 12:13 30:4 56:18 92:24 157:3 196:23,24
**amounts** 231:4
**analyses** 47:24 103:24 104:12,14 110:14 111:15 114:19
**analysis** 62:19 96:3 98:16 103:9,18 108:25 109:8,17 109:18,24 111:23 114:21,24 115:4 115:10,20 137:19 147:9 157:19 163:12 167:15 169:21 171:3,15 172:10,16 174:12 176:11,13 178:19 178:24 179:23 180:3,7 190:5,7 190:17 191:19 192:10,15 202:22 203:23,23 205:5 209:2,14 210:12 210:14,21 212:2 212:17 213:17 214:2,7,11 215:23 220:10,19,21,24 221:4 223:16,17 223:21,24 224:8 224:10,11,23 225:2,15,20 226:9 226:10,14,18 227:9,10,16,23

228:7 239:8,17 240:3
**analyze** 113:9 136:17
**analyzed** 94:17
**anchor** 15:25 49:21
**and/or** 49:20 203:6
**Anita** 72:6
**Annex** 107:21
**anomalies** 210:3
**anomaly** 155:16 156:12,24 159:25 160:22 162:6 204:13 253:3,4
**ans** 230:21
**ANSI** 108:19 193:2
**answer** 8:18 9:4,14 9:16 11:4 32:12 32:12 39:11,13,17 61:2 97:14,15,17 123:23 128:25 138:7,15 147:23 148:2,17 159:6,21 160:11,14 162:15 163:10,11 172:7 181:14 182:6,7,20 183:2,3,9,12,16 184:10,13,24,25 185:4 189:8 191:3 199:21 206:22,25 207:3,5,9 218:22 219:24 230:7,8,9 230:10,24 235:10 237:9 256:9,13,20 259:12 263:2
**answered** 96:24 97:10 160:18
**answering** 62:10 183:5 185:3 229:20 236:21
**answers** 7:9 127:20 127:25
**anticipated** 54:17
**anybody** 64:16 133:3 201:11
**anyway** 147:21
**apologize** 131:10 222:9

**apparently** 30:10
175:17 208:15
215:21 221:23
222:17 230:21
264:18
**appeal** 42:20
**appealed** 42:20,22
**appear** 165:23
**APPEARANCES**
3:1
**appears** 68:4,5
**Appellate** 42:22
44:9
**applicable** 35:25
161:3
**application** 30:2,7
98:23 99:4 108:8
108:16 122:20
145:17
**applied** 23:13
105:22
**apply** 22:10 83:22
144:23 160:23
162:8,11 163:5
174:13 207:14
**Applying** 131:2
**appreciate** 189:7
199:21 218:23
235:4 259:11
**appropriate** 30:13
36:12 103:16,25
231:3
**appropriately**
147:11 148:12
**approval** 99:3
107:10 140:20
145:17
**approved** 2:14 70:9
140:14 144:18,19
268:7
**approximation**
11:7,8 13:11
**April** 71:20,25 72:3
72:5 131:24 165:5
165:11,20 168:11
267:2
**arbitrator** 128:25
**area** 20:12,17,18

49:3 50:18 58:23
61:6,9 63:22
75:18,18 126:3,5
145:3
**areas** 30:17 32:9
75:23 77:24 78:6
78:8 86:22 93:21
93:23 114:17
119:21 126:15
134:3
**arena** 28:12
**arguably** 262:8
**argue** 152:9,23
199:14
**argued** 239:20
**arguing** 199:17
**argument** 173:22
173:24
**arms** 114:4
**arrived** 63:19
**arriving** 129:14
**article** 69:6,17 79:3
79:14
**articles** 68:20 69:6
**aside** 64:3 120:11
**asked** 4:7,18 8:20
14:3 39:15 48:25
60:3,5 61:7,15
62:25 73:18 76:16
76:17 88:8 93:21
134:3 151:11,11
157:14,21 160:12
160:17 161:14
163:7 167:23
181:13,21,22
182:6 184:17
199:19 229:13,23
230:6 234:12
250:16,18
**asking** 13:17,22,25
20:19 69:5 84:18
99:24 137:13
138:8 147:19
153:25 162:4
183:13 196:17
224:5 230:22
235:13 238:19,20
238:23 249:15

250:5
**aspects** 139:7
**asphyx** 35:2
**asphyxicating** 35:3
**Assembly** 217:20
267:7
**assert** 186:21
193:19
**asserting** 191:5
**assess** 55:4 63:4
185:14,20 224:12
**assessed** 110:4
225:14
**assessing** 213:7
**assessment** 25:11
42:11 110:6,11
115:5,14,25
124:17 133:24
135:4,19 136:15
140:19 163:15
167:16 169:18
179:13,16,18
204:21,22 205:17
209:13 210:14,20
211:21,25 212:18
212:23 214:22,23
216:10,11 223:8
223:10 224:14
225:10 226:13
**assessments** 135:3
**assigned** 66:12
112:15
**associate** 63:14
**associated** 34:25
114:10 135:5
171:6,10
**Association** 34:3
82:8,16,21
**assume** 7:20 31:13
34:16 82:22
**assumed** 161:17
**assuming** 155:16
156:18 209:12
**assumption** 155:24
**assumptions**
155:19
**Atlanta** 3:16
**atmospheric** 208:6

**attached** 77:20
229:5
**attaches** 194:5,12
**attaching** 141:19
**attempting** 113:9
125:12
**attended** 31:8
**attention** 230:23
**attorney's** 58:16
**attorneys** 3:5,10,17
60:9
**August** 1:15 2:5
5:15 65:24 71:21
98:8 149:13
156:19 164:4
268:18
**author** 69:21,22
**Availability** 107:3
**available** 39:2 60:8
62:8 70:21 116:2
150:13,22,25
151:5,16 152:4,7
152:11,15,19,20
153:8 174:10,11
174:15,22
**average** 72:18
**avoid** 210:11 253:3
254:20 255:11,22
258:24 259:5,13
**aware** 51:24 73:3,4
91:12,14 124:8
146:2 151:5
166:23 169:19,20
174:6,6 175:4,19
175:25 185:12
**awfully** 190:23

**B**

**B** 266:6
**back** 17:19 34:9
37:3 42:2 44:20
76:8 77:13 80:18
81:12,13 84:23
88:6 96:8 98:6
110:6,10 111:14
124:3,18 132:9
142:11 148:7
149:11 156:14

159:12 178:2,6
185:4 186:5 189:5
195:3 202:17
214:8 216:11
217:5,8 226:15
231:13,16 233:9,9
234:3,12 242:19
252:5 254:19
258:23 261:5
263:7
**background** 17:5
125:14 126:2
**bad** 28:23 142:16
142:16
**badly** 49:7
**ballpark** 71:8
**bank** 12:23
**Bart** 65:2
**base** 204:19
**baseball** 48:22
**based** 12:12,16
33:23 58:3 62:18
79:14,20 80:2
95:8 110:7,11
134:12 135:19
163:24 164:18
171:24 172:23,24
174:8,9 176:17
185:25 224:17
**basically** 21:15
**basis** 205:2 207:12
**becoming** 76:19
252:14
**beginning** 5:15
56:15 104:20
132:3 136:6
**behalf** 6:10 37:23
38:15,18 45:18,20
47:13,15 62:13
66:4 101:12
175:11 179:5
**behaved** 233:3,23
**behavioral** 179:12
223:12 226:3
**belief** 121:23
172:21 177:25
**believe** 4:7 8:3
18:17 28:17 31:19

32:4 38:22 40:10
48:5,13 49:11
50:18 53:14 59:6
64:11 76:12 81:7
81:11 82:3,7 83:4
108:18 155:25
165:5 185:16
186:23 229:6
235:24
**benchmarking**
112:24
**beneath** 259:22
262:3,21
**benefit** 75:8 209:23
221:23 232:3
**benefits** 76:25 95:7
**Berezofsky** 1:13
2:8 3:2 6:2,5
129:9
**best** 7:17 11:13,21
12:13 39:18 48:15
50:25 60:25 66:16
119:9 121:4,5
130:12 186:11
268:13
**better** 41:12 89:25
143:6 205:14
**beyond** 4:18 42:4
46:5,25 47:6
60:14 147:21
**bias** 210:11
**big** 54:3 180:9
251:16
**bigger** 113:24
**biggest** 113:18
114:8
**bill** 58:17 73:20
86:20 120:15
182:7,9 185:3
266:20
**billable** 37:12
**billed** 149:16
**binder** 62:4
**bit** 70:6 72:9,22
100:8 103:13
137:25 140:23
141:9,12 153:7
**bless** 46:14

**blind** 69:20
**block** 216:3 217:11
**blockage** 158:2
159:17 164:11,23
187:20
**blocked** 139:11
155:15 156:20,23
157:8 161:19
179:20 188:8,10
189:17 208:14
214:4 215:12,13
215:15 216:3
249:23 252:17
253:4 255:22
257:15,17 258:24
259:14
**blocking** 237:20
**blood** 268:15
**Bluetooth** 111:6
**BMW** 52:22,25
**board** 29:22,23
30:14,20 31:6
34:8 35:23 73:5
**body** 248:14
**boiler** 55:23 59:11
**bolus** 141:8
**book** 62:3
**books** 12:18
**bothered** 215:21
**bottle** 195:5 239:22
240:4
**bottles** 240:16
**bought** 64:5 65:3,4
**box** 261:4
**brainstorm** 214:15
**brainstorming**
216:4
**brand** 111:25,25
213:10,10
**break** 72:14 81:13
97:19,22,23 98:11
148:25 149:3,4
181:19 201:20,22
202:9,11 221:6
223:2 225:7
264:20
**breaking** 226:11
**briefly** 228:17

**bring** 247:17,19
250:7
**bringing** 111:25
247:21
**broadly** 191:14
**broke** 179:2
**broken** 221:16,21
**brought** 10:14
51:16 64:6 233:22
**bubbles** 240:20,22
247:18 254:18
**bug** 88:13
**building** 56:2
**bulk** 63:25
**bullet** 90:2
**bulleted** 93:6
**bunch** 117:12
**business** 9:24 10:3
11:11 22:23 23:9
23:13 24:13
241:22
**Butte** 53:21
**button** 198:14
199:5
**Buy** 51:2

---

## C

**C** 107:21
**calculated** 11:20
**call** 23:12,22 29:4
32:17,18 62:3
95:21 133:3 134:2
210:4
**called** 37:9 102:5
121:17
**calling** 253:22
**calls** 24:2 61:3
**camera** 16:2,3,9,11
16:13,16,22 17:2
**cameras** 111:10
**cannula** 141:14
198:19 241:20
**cap** 141:4,5 213:10
213:10 215:24
**CAPA** 99:11
**Captioner** 2:13
268:7
**capture** 21:21

**care** 135:8,12,15,20
148:23 192:22
233:20
**career** 6:21 8:8
**carefully** 189:8
**Carolina** 21:10
75:15 81:20 82:23
86:12 87:16
**Carolyn** 175:11
**cars** 49:2
**case** 18:3 19:2,21
24:5 32:6 37:25
40:16 41:16,25
42:7,8,12,14,16
43:6 44:14,21
45:2,9,15,19,21
45:22,25 46:5,11
47:8,15 48:8,9
49:8,10,24 50:4,9
50:12,21 51:3,16
52:7,16,21 53:5
53:24 56:3,5,17
57:2,12,19 58:6
58:20 59:4,11,14
60:16 61:8,17
65:11,24 66:13
73:16,21,24
101:11,16 102:20
107:24 129:10
132:14 133:21
135:11,14,25
136:4,22 145:18
149:17 150:14
152:2 153:6 160:7
164:25 167:24
175:13,13,22
232:5 257:6 258:9
261:8 269:1
**case-related** 15:12
**case-specific**
138:10,13
**cases** 38:18 39:25
40:4,6,10,23 44:6
52:2,6 53:3 54:16
55:6,7,15,18
57:15 60:11 61:7
61:12 62:17,23
63:4 66:14,14,18

73:17 196:21,22
**catastrophic**
253:12,14,23
254:20
**catch** 213:2 220:5
232:25
**category** 112:4
131:16
**caught** 177:25
204:2 228:6
**causally** 158:4
159:19 160:2,6,15
161:11,25
**causation** 158:9,15
158:25 160:23
162:7
**cause** 25:21 27:15
64:22 65:15 79:17
138:8 142:5 145:9
172:12 197:5
202:3 203:6 204:5
204:5 206:17
208:7,12 211:6
218:23 220:3
238:7 253:20
256:2
**caused** 157:25
159:9,17 161:9
163:19 190:19
253:23,25
**causes** 16:24 28:9
**causing** 249:23
250:3
**caveat** 18:11
**CCR** 1:24 268:21
**Cedar** 63:23
**Center** 3:4,9
**Centered** 112:12
**CEO** 64:6,7,7,8,10
64:12,19
**CEO/President**
65:7
**certain** 30:18,22
40:12 222:19,21
252:7
**certainly** 130:3,10
132:18 139:15,22
150:17 206:17

214:19
**certainty** 101:20
**CERTIFICATE** 268:2
**certification** 29:24 30:14,21,22,25 31:6 32:25 33:7,7 33:16,23 34:5,10 34:11,20 35:6,8 35:17 36:6,6 73:4 73:5
**certifications** 19:16 29:18,20 32:9,13 32:15,21 33:9 35:21
**certified** 2:11,12,13 2:16 29:22,23 31:18 32:24,24 34:24 268:6,7,8
**certify** 268:10,15
**certifying** 34:8
**cetera** 30:13 90:3 104:7 142:3,5
**CFR** 96:20 98:20 129:22
**challenge** 44:16
**chance** 41:24 205:14
**change** 54:9,13 71:17,22 76:20 141:3 142:8 176:13 177:19 185:23 186:8 189:22 193:24 215:4,5 252:13 257:25 258:22
**change-out** 164:8
**changed** 65:7 68:5 95:8 128:13 176:16 193:23 195:6,7
**changes** 111:22 185:24,25 186:4,4 186:6
**changing** 258:13
**characteristics** 215:5
**characters** 126:9

126:10
**charge** 15:14
**Cheney** 152:16
**Cherry** 3:4
**choose** 122:23 231:18
**chooses** 253:24
**chose** 27:22
**Circle** 29:15
**circuit** 204:11
**circumstances** 38:14 69:14 73:22
**civil** 1:6 4:12,20 5:21 38:2 39:5 41:16 42:15
**clarification** 71:12 166:6
**clarify** 122:16 187:14 269:5
**class** 34:14
**classes** 84:4,5
**clause** 77:3
**clear** 5:3 25:23 43:5 84:15 100:5 103:13 137:13 138:16 160:14 164:13 250:4 255:10
**clearance** 98:24
**cleared** 147:13 148:14
**clearing** 146:3
**clearly** 246:11
**client** 8:4 24:2 60:19 61:2,6,21 62:18 73:14,19 74:3 134:2
**clients** 15:2,7 26:6 26:15 62:8
**Clinical** 180:20
**close** 73:21
**Coast** 72:3
**Code** 96:19 98:13 107:5
**Codes** 269:4
**cognitive** 75:16 115:18
**collaborate** 91:25

**collaboration** 84:21 87:10,15,15 87:21
**Collateral** 108:12
**colleague** 88:13 100:12
**colleagues** 77:8 78:17 100:16
**collect** 22:5 110:13 136:13,14
**collected** 12:19 13:4 94:16 136:16
**collecting** 15:7
**college** 180:25,25
**comatose** 252:15
**combine** 189:22
**come** 25:9 52:15 70:9 75:24 76:9 86:3 88:8 112:6 132:9 135:18 157:22,23 178:5 203:21 238:15 251:19
**comes** 164:14 227:24 265:11
**comfort** 179:14 224:17
**comfortable** 22:12 197:8 226:6 239:6
**coming** 66:9 77:12 95:23,24 101:10 101:14 134:18 144:11 228:3 231:12,16 233:8,9 234:3
**commences** 98:7 149:12
**comment** 43:2 46:24 203:11
**commented** 46:22
**commercial** 55:25 55:25 109:9,11 111:8
**committee** 88:9
**common** 42:6 46:4 46:24 73:25
**Commonwealth** 2:18 268:3,9

**communicate** 27:20
**companies** 27:5 76:21
**company** 10:18 11:9 13:2,12 14:16,23 23:7 25:18 28:21,22,24 54:3 61:18 63:24 64:8,9,10 65:3,4 68:12 72:7
**compared** 76:25
**compensate** 4:21
**compensated** 9:15
**competitive** 112:24
**complete** 7:25 18:7 30:3 100:6 119:8 125:17,19,21 126:24 179:4,6,9 224:22 225:9,11
**completely** 19:3 62:11 222:2
**completing** 79:5
**compliance** 195:10
**components** 140:2
**comprehension** 193:5
**computer** 110:18 110:21,23 178:10
**concede** 157:6
**concept** 110:3,3 112:19 211:2
**concepts** 112:21
**concerned** 112:9
**conclude** 192:11 214:22
**concluded** 156:3 164:6 176:12
**concludes** 98:2 149:7 191:22 264:23
**conclusions** 135:18
**condense** 189:22
**condensed** 134:16
**condition** 156:19 159:24 189:17 190:18 252:18 258:24 259:14

**conditions** 49:15
**conduct** 16:18 131:12 176:22
**conducted** 32:4 176:12 220:13
**conference** 69:18 69:19 132:25
**confidential** 9:9,11 9:13 91:19,21
**confined** 33:7,18 34:10,19,23 35:2 35:22
**conform** 269:6
**confusing** 23:17 211:20
**confusion** 193:5
**conjunction** 18:3 84:17 86:6 208:25
**connect** 197:14
**connected** 141:14
**connecter** 136:25 187:20
**Connecticut** 1:1 5:21 42:2 46:6
**connection** 178:20
**connotation** 27:23
**connotations** 154:16
**consequence** 179:18 217:2,3 227:25 228:3 244:16
**consequences** 214:5,10 215:11 215:13,20 217:7,9 217:12 227:11,21 227:23
**consider** 8:4 103:23 145:13 147:12 148:12 150:11,20,25 168:2,5 192:6 203:3 207:25 209:17,20
**considered** 140:18 145:16 146:18 224:16
**considering** 264:4

**consistent** 156:23
179:11 223:11
226:2 239:4
**consortium** 82:18
**consult** 74:12,16
101:16
**consultant** 33:22
38:8
**consultation** 74:18
76:16 82:7
**consulted** 96:10
**consulting** 14:17
23:2,5,9,10,11,15
23:16,23 24:3,7
24:13,20,21,24,25
25:4,7,14,25 26:4
26:11 28:14,19
36:15 37:5,8,10
37:15,17 65:10,18
66:6 96:14 99:21
99:22 100:2 122:7
**consumer** 81:3
109:9,11
**consumer/comm...**
106:6
**consumers** 76:22
**contact** 9:18 88:7
94:5,8
**contacted** 61:5
86:19 93:20
**contacting** 142:3
**contacts** 76:15
77:14 84:17,23
86:7,11,15,17
93:20
**contained** 138:4
**contaminants**
141:18 155:11
**contaminate** 196:5
**contaminated**
155:10 241:16,17
**contamination**
164:7,10,22
**content** 119:6
120:3,21,22 124:5
**context** 86:10
116:10,11 234:25
234:25

**continuation** 81:8
240:21
**continue** 31:12
78:22 134:14
203:20 244:25
**continued** 81:6
267:1
**continues** 199:5
241:23
**continuing** 30:23
31:2,7,9
**contract** 81:22 82:2
**contrary** 235:23
**contributed** 190:19
**conventional**
179:12 223:12
224:18 226:3
239:5
**conversation**
138:12 139:4
144:6,14
**conversations**
137:15 139:14
164:2
**conveying** 20:11
**conveys** 19:3
**cooperated** 74:22
**coordination** 22:7
**copies** 94:17
**copy** 18:2 19:14
61:17,22 70:16,17
72:14 119:20,22
260:18
**Corporate** 3:4
**correct** 7:5,10 12:4
12:15 13:3 19:4
20:3,22 21:6
22:22 24:11 25:5
25:16 27:10 36:20
37:5 38:6 45:19
47:7,11 63:12
65:21 72:19 74:8
74:9,10 78:8
79:16 81:4 82:23
83:15 85:2,17,21
85:23 93:2 96:11
96:12 97:13,15,17
101:21 103:10,18

103:25 104:15
106:12 109:13
115:11 117:15
119:4,20 121:17
122:7,8 123:12
126:25 127:16,21
128:2 132:6,10
139:12 140:9
143:16 145:2
150:17 151:2
152:3,25 153:11
153:14 154:7,22
155:17 156:8
161:12 164:15
165:2,7,22 166:25
169:4,13 170:15
171:17 173:3
176:15 187:11
189:18 191:7,15
191:17 192:12,18
195:12 199:2,7
201:8 204:8,15
206:13 213:18
220:20 221:7,8
228:8 242:7 255:5
257:8,9,13 259:3
260:18 269:7
**correctly** 115:16
189:19 257:12
**correspond** 218:15
**cosmetic** 111:21
**Costco** 46:12
**counsel** 5:23 9:8
14:2 41:21 233:22
263:15
**count** 71:3,7
**country** 89:16
**county** 58:12 268:5
**couple** 40:20
119:16 150:6
228:24 235:12
**course** 4:14 52:8
84:22 136:19
161:6 222:20
**courses** 33:3,4
**court** 1:1 2:15,16
5:20 7:2 17:24
41:16,20,25 42:8

42:15,23,24 43:7
43:8,17 44:9,10
44:22 45:3,4 50:2
50:10,14,15 52:8
52:18 53:13,14
58:10 67:20
116:23,24 119:17
128:20,24 148:9
159:14 165:18
218:5,14 268:7,8
**Court's** 42:22
**courtroom** 41:10
**courts** 135:25
**covered** 5:5
**covers** 30:16
**CPE** 1:18,24 2:7
6:13 17:17 121:9
165:10 265:21
266:4,9,22 267:2
268:11,21
**CRC** 1:24 268:21
**create** 55:21
**created** 27:12
106:4 127:16
187:21 190:18
193:19 255:7
**credentials** 18:8
**criminal** 38:16,18
**criminal-related**
38:6,8
**criteria** 31:11
56:19
**critical** 193:5 221:5
**criticism** 173:11
188:25 189:11
224:25
**criticisms** 184:20
202:21
**criticize** 171:24
182:14 221:15,17
228:9
**criticized** 172:8,15
173:2 185:8
**criticizing** 176:10
**critique** 228:18
**cross-noticed**
175:13,21,24
**cross-reference**

111:11
**crowd** 48:25 49:2
**CRR** 1:24 268:21
**crush** 114:4,6
**Cuker** 1:13 2:8 3:2
6:2,5 129:9
**current** 18:21 25:3
65:9 68:12 71:20
71:24
**currently** 15:11
56:22 64:11 66:11
**Curtis** 206:2,4,5
241:8 256:23
**customers** 49:21
**cut** 126:12
**CV** 1:10 3:17 18:2
18:21 19:3,10,17
19:22 20:3,7
68:19 126:19,23
**cycle** 109:21

**D**

**D** 266:2
**d/b/a** 1:7 3:11
**damage** 113:14
**damages** 37:23
**danger** 34:25
**dangerous** 190:17
190:18
**data** 84:8,23 94:16
94:17,19 96:3
100:17,24 110:12
136:13,14,14,16
136:17 141:11
210:4
**date** 5:15 18:22
19:11 25:13 71:20
122:4 174:19
265:13,15 269:2
**dated** 165:4,10,14
168:19 267:2,4
**Daubert** 44:16,23
**Dave** 4:4 43:21
97:8,9,12 146:19
147:17 158:22
161:14 162:19
163:7 173:19,20
183:18 184:14

218:25 219:12,20
229:22 230:2,12
230:14 231:13,21
231:25 236:19
260:6
**David** 3:8 6:9 9:20
**day** 22:23 265:23
268:18
**days** 142:9
**dba** 25:14 27:19
28:14 36:15 65:10
66:6
**de** 1:10 3:17
**deadline** 56:14
**deadly** 251:17
**deal** 34:20 87:21
154:12 203:15
212:21 214:8
217:8
**dealing** 154:14
**dealings** 88:3
**deals** 70:19
**dealt** 190:15
**Debra** 1:24 2:10
268:6,21
**decide** 23:4 163:22
204:23
**decided** 61:25
87:13
**decides** 9:8
**deciding** 162:17
212:5
**decision** 26:22
42:21,22 44:15
61:10
**decisions** 21:25
**declining** 8:18
**deems** 159:8
**deep** 51:8
**defects** 139:16
**defendant** 3:10,17
37:24,24 38:16,19
41:19 45:11 50:25
52:23 54:2 55:5
65:23 66:18
**defendant's** 50:6
**defendants** 1:11
6:8,11 47:19

160:5 161:2
163:16
**deficiencies** 185:15
**deficient** 176:14,19
178:14
**define** 116:7 136:8
**defined** 188:20,23
197:9 224:6
**defining** 116:13
**definition** 105:19
**degree** 20:10,16,21
**degrees** 19:16
78:19 180:25
**deliver** 208:13
**delivering** 208:8
241:24
**delivery** 187:19
215:17
**demographics**
180:17
**demonstrate** 36:10
229:2,11 237:2
**demonstrating**
262:8,8,9
**demonstration**
236:15,19 241:8
**Denise** 72:2
**Dennert** 1:3 3:5
5:18 155:13
156:15 160:19
163:13 175:13,22
180:5 181:2 195:2
205:18 210:5
216:15 225:16
233:14 239:9,16
240:8 241:7
243:20 256:23
257:5,16 260:5,7
260:19 261:5
**Dennert's** 156:18
157:25 159:16
161:7 185:21
190:19 257:11
265:10
**dep** 132:19
**department** 20:15
20:17,18 21:5,8,9
70:8 180:20

**depending** 40:15
115:22 134:15
216:18 222:21
**depends** 117:21
196:23
**depict** 259:25
261:11,16
**depicted** 252:2,14
253:11
**depicts** 259:20
**deposed** 6:23 170:4
**Deposed/Testified**
122:11 123:5
**deposition** 1:18 2:6
5:14,17 15:19,23
16:5,18 55:15
60:15 68:17 70:20
71:17 72:18 97:7
128:9 130:18
137:22 138:5
151:19 166:3,4,13
166:16,20,24
168:10,16,21
169:11 170:10
171:13 174:20
175:2,5,9 178:8
183:20 190:22
195:23 218:16
219:10,12,17
231:8 232:19
234:3,19 268:11
268:12 269:2
**depositions** 13:19
60:4 71:18 72:21
219:20 233:14
**describe** 20:2,23
48:15 125:13
143:3,3 179:25
254:23
**described** 18:5
40:23 141:6
**describing** 43:6
125:11 126:2
144:5 198:21
203:17 213:25
**description** 125:21
126:18 167:5,12
167:14 266:7

**design** 22:10 25:10
75:2 96:18 98:12
103:17 105:5,20
105:25 106:4
107:9 108:21
111:3,20 112:12
112:17,18 129:23
136:23 141:4
142:16 151:9
153:10,14,16,17
153:22 154:5,9,13
154:15,15,19,19
154:23 170:20
171:7,10,23 189:5
192:23 205:9
212:12,12 214:14
215:9 217:5,8
226:17
**designed** 169:22
205:7 208:3 215:2
**designer** 252:12
**designers** 135:9
**designing** 156:13
213:9
**designs** 93:7
**desktop** 111:7
**desktops** 111:3
**despicable** 233:5,5
233:11,18
**despite** 13:6,9
176:12
**detach** 198:19
**detail** 185:17
**details** 202:20
**detectable** 200:24
201:5,9,15
**deterioration** 48:18
**determination**
30:12 146:14
211:4
**determine** 27:15
28:9 136:17
157:20 164:21
174:12 197:22
204:18 212:21
226:4
**determined** 45:23
146:4 185:9

**determining** 205:3
**develop** 136:11
**developed** 99:17
205:7 215:2
**developers** 135:8,9
**developing** 111:24
156:14
**development** 104:6
109:20,21,23,25
111:3 112:11,20
113:6 115:23,24
167:9,17 169:10
172:10,16 178:16
189:14 190:9
191:6,15 192:20
192:23 193:4
203:16 205:9
228:5
**deviate** 227:4
**device** 27:3 67:13
74:6,8 96:15,19
98:19,24 99:4,7
99:15 100:2,7,13
101:4,9,13 103:9
105:17,19 106:8
106:25 116:11
139:21,22 140:15
140:18 144:8,17
145:13 146:3,5
202:25 207:13
266:15
**devices** 1:9 3:17
74:12,13 96:8,11
98:14 99:23 104:6
105:23 106:16,18
107:10 108:8,9,16
108:17,21 109:13
111:4,6 129:24
131:3 147:14
148:14 255:2
**DIA** 83:6,7,14,16
84:11 85:21,24
86:2
**diabetes** 1:7,9 3:11
3:12 161:8
**Dick** 152:16
**dictate** 236:19
**difference** 18:14,17

66:25 224:9 251:5
251:8,9,10,15,16
251:17,18 266:11
**different** 14:5
18:22,23 21:17
26:23 30:17 31:10
33:3,3,11 35:15
35:16 69:13,14
70:6 77:9 91:25
104:17 109:22,22
111:12 112:6,23
114:14,14 115:21
118:5 128:14
138:14 139:7
140:2 142:15
144:20,22,23
147:18 153:19
174:3 195:18
200:2 203:18
213:15 238:23
239:16 254:13
**differential** 207:18
**differently** 228:23
235:17
**difficult** 61:20
228:20
**diploma** 20:25
**Diplomat** 2:11
268:6
**direct** 81:3 88:2
**direct-to-consum...**
75:8 76:18 77:5
77:25 79:18,25
80:11 82:11 83:10
85:4,7 89:18
93:11,25 94:10
95:3,16 96:5
**directed** 87:7
**direction** 26:24
54:14 222:19,21
268:14
**directive** 87:8
**directly** 76:22
87:21 89:2,6,11
90:4,7,8,14,15,18
**directory** 121:10
122:2,10,17 127:8
127:14,24 266:22

**266:25
dirt** 48:17
**disagree** 209:10,16
**disallowed** 43:9
**discern** 54:8,9
**discernable** 133:16
**discerned** 204:20
210:15
**disciplined** 34:6
**disciplines** 110:11
**disclose** 56:25
60:11 203:15
**disclosed** 55:11
56:13 57:9,12
60:18 65:20
178:18 182:24
195:22
**disclosure** 56:14
136:3
**disconnect** 241:21
**discovered** 210:24
**discovery** 134:18
135:7 137:5,7
138:6,11
**discrepancies**
261:9
**discretion** 42:25
43:13,18
**discuss** 178:18
187:9
**discussed** 141:21
186:23
**discussion** 5:11
131:16,17 143:4,5
146:17
**discussions** 86:6
87:10 171:8
**dispute** 5:6
**dissertation** 75:7
75:11,13 78:11,18
78:21,25 79:6,16
79:18 80:3,5,14
86:19,21
**distance** 248:24
**distinct** 137:14
153:23
**distinguish** 224:7
**distinguishing**

109:12
**distracted** 142:14
**distraction** 142:21
**district** 1:1,1 2:14
2:15 5:20,20
50:16 53:15 268:7
268:8
**Division** 1:7 3:11
**doctor** 20:25
**doctorate** 20:14,21
20:25 21:4
**doctors** 89:14
**document** 17:16
18:4 66:24 67:8
67:12 102:4,9
103:14,15,22
104:9 105:2
116:19 117:2
118:13,16 119:13
120:15 121:8
124:23 127:6,19
129:22 130:25
170:18 196:19
207:10 217:18,25
218:10 221:18
260:13 265:6
266:8,10,12,14,16
266:18,20,21,23
267:5,8,10,12,15
**documents** 130:8
130:10,14 138:5
138:11
**doing** 23:13 24:13
24:24 30:5 58:5
61:21 76:14,23
80:3 81:18 84:24
87:11 91:2,4,23
92:13 94:4 95:2
96:2 100:13,20
115:2,13,17
130:12 134:5
135:3 139:8
157:15 213:16
216:14 227:15,22
234:6 237:22
238:13 244:14
250:8 254:13
256:16,17,19

257:2,24
**dollar** 11:6
**dollars** 11:13
**dominance** 243:20
**dominant** 238:9
244:4 245:16
**door** 238:16
**doorknob** 238:11
238:16
**download** 130:2
**dozen** 112:3,4
**Dr** 130:19 131:18
132:5,12,21
138:12,22 139:24
141:6 143:6
145:25 146:11,13
147:8 148:21
155:6 164:6
**draft** 119:6 120:21
**drafted** 99:6 120:3
**drafting** 133:6
134:11
**dragged** 134:17
**drastic** 54:13
**drifted** 220:4
**drill** 77:16
**drip** 199:6
**dripping** 198:15,25
200:8
**Drive** 3:3
**driven** 208:8
**driver's** 72:25
**dropped** 141:3
**dropping** 200:15
**drops** 216:20
**drug** 74:11,15
80:11 82:8,15,21
131:4
**DT** 77:24
**DTC** 77:24 78:10
80:25 85:13 86:18
86:25 87:2 88:21
88:25 92:13 93:25
**due** 35:3 162:6
196:4 208:2 253:4
**duly** 6:14 268:12
**DVD** 98:2,7 149:7
149:12 264:23

**dying** 252:15

---

**E**

**E** 266:2,6
**ear** 21:22
**earlier** 22:20 34:2
68:17 144:4
193:22 202:21
204:9,14 221:5
257:23
**early** 78:10 156:14
167:20 170:6
178:3 189:5 195:3
195:4
**earned** 8:7 10:4,8
10:23 20:16 21:5
**ease** 179:14
**East** 3:3 72:3
**Eastern** 2:15 268:8
**easy** 22:12 51:13
**Eckhardt** 65:2
**edges** 113:19
**edit** 20:6
**edited** 123:25
124:6,6,14 126:13
**editor** 69:19,22
**edits** 18:18 124:8
**education** 30:23
31:2,7,9,10 123:3
**educational** 17:5
**effect** 55:2 114:24
141:24,25 195:9
214:2
**effective** 146:6
186:7
**effectiveness**
146:15
**effects** 79:7 193:23
**efficacy** 147:12
148:13
**efficiency** 179:14
224:17
**efficient** 204:11
226:8 231:7
234:23 250:8
**effort** 15:18
**Eh** 215:14
**eight** 251:20

eight-feet 51:8
either 26:25 31:19
    41:25 44:9 46:6
    97:21 111:24
    138:4 161:18
    174:17 182:13
    187:3 216:19
    219:22 231:14
    251:14
electric 114:8,9
electrocution 114:9
Electrolux 72:5
elevate 237:16
eleven 164:9
    258:12
emphasis 212:24
emphatic 214:21
employed 74:7
employee 29:5 64:3
    64:13 167:4
employees 28:18
    28:20 29:3,7
    169:16,17 172:5
    172:25 180:12,19
    192:14 193:17
employer 8:13 9:11
employment 65:9
EN 107:20,22
endeavor 32:10
ended 47:17
ends 73:24
engaged 24:8 27:21
    38:15 176:10
engagement 62:13
    73:13
engagements 25:3
    25:15 59:23 60:23
    66:10
engineer 47:16
    153:11,12 215:8
    228:2
engineering 104:5
    107:2 108:17,21
    110:9 114:23
    131:3 154:6
    207:12 215:19
    218:2,11 267:9,11
engineers 213:19

214:12
ensures 35:17
ensuring 35:8
entire 184:16
    188:16 190:25
    232:15
entitled 17:16
    66:24 67:8,12
    97:14 116:19
    119:13 120:15
    121:8 127:6
    181:25 182:5
    187:17 217:18,25
    218:10 219:13,16
    230:9 231:22
    260:13 265:6
    266:8,10,12,14,16
    266:18,20,22,24
    267:6,9,11,13,16
EP002 217:18
    267:6
EP003 217:19
    267:6
equal 77:3
equalization
    207:20 215:17
    217:14
equate 208:17
equipment 35:16
    35:19 83:19 84:7
equipment's 35:19
ER-99-11-09-2256
    217:25 267:9
ER-99-12-13-2285
    218:10 267:11
ergonomic 30:17
ergonomics 20:11
    20:18,22 21:10,13
    21:14 22:16 30:18
    32:20 35:23 73:2
    73:10 75:16
    112:14 126:17
ergonomics/hum...
    30:6
ergonomist 29:23
    224:13
Ergonomists 73:7
error 113:13 116:4

116:6,8
errors 18:19 110:5
    120:7,10 179:16
    179:19 204:6
    223:9 226:12,15
    227:11,13 269:7
ESOP 64:3,13,14
Esq 165:16 267:4
ESQUIRE 3:2,3,8
    3:15
essence 168:24
essentially 35:2,24
    62:4 213:17
established 37:17
estate 89:24 127:7
    266:24
estimate 11:13 14:4
    14:6,12
estimated 11:24
    12:2,3,6,9,12
et 5:19 30:13 90:3
    104:6 142:3,4
European 107:22
evaluate 113:16
    185:14
Evaluated 221:10
evaluation 105:4
    169:4,9 176:23
    178:15 186:20
    187:9 191:23,24
    203:4 204:25
    209:18 213:17
    220:2
evaluations 150:16
    151:8
event 5:5 15:17
    46:15 48:21 92:19
    155:3 158:4 159:9
    159:20 160:16
    161:23 164:14
    258:9
events 161:12
    213:23 220:24
eventually 64:5
    141:3
everybody 5:4
    213:20
evidence 141:13

257:6
ex 41:21
exact 39:16 167:4
exactly 51:6,14
    100:19 124:7
    144:11 151:10
    168:8 214:5
    224:25 255:11,12
    255:21
exam 30:16,16,19
    30:19,20
EXAMINATION
    6:17
examined 6:14
example 32:23
    33:13 61:4,16
    68:8 69:15 89:4
    110:25 118:12
    128:8 137:16
    179:19 221:9
    225:13 238:11,12
exceed 208:6
exception 68:25
excessive 157:3
exclude 47:20
excluded 39:7
exclusively 90:22
    91:7
excuse 32:12 96:23
    97:8 173:10 188:8
    195:20 230:2
execute 4:8,10,19
exercise 36:9
exhibit 17:15,25
    19:23 66:23 67:7
    67:11 68:8 116:18
    116:25 118:21
    119:12,18,19
    120:2,14,17 121:7
    123:19 125:2
    127:5 165:9,14,19
    165:20 166:22
    170:8 195:22
    217:17,24 218:9
    219:25 220:7
    221:10 260:12,17
    261:10 264:14
    265:5 266:8,10,12

266:14,16,18,20
    266:21,23 267:2,4
    267:5,8,10,12,14
    267:15
exhibits 67:21
    151:22 166:4,19
    169:13 170:8
    178:7 218:14,15
exist 254:7
existed 91:19
    163:14 168:6
    192:19
existence 168:9
existing 111:20
    215:3
exists 254:7
expect 151:12
    227:8 228:6 238:8
expectancies
    179:13
expectations
    224:20
experience 18:25
    19:4,20 37:22
    39:6 74:6 96:7
    120:23 126:24
    180:15,23 193:18
experienced 159:23
    160:20
experiences 125:15
expert 4:16 6:22
    8:8 10:5,8,14,24
    13:13 14:14 17:17
    37:8 41:20,23
    47:14 57:11 61:11
    70:19 73:13
    119:13 121:9,16
    121:20 122:2,10
    122:17 126:16
    127:8,14,24
    128:16,21,24
    133:8 139:23
    150:10,19 163:4
    192:13 266:9,18
    266:22,24
expert's 53:7
expertise 145:4
    147:21

**experts** 66:24 67:8
67:12 219:20
266:10,12,14
**ExpertVigilante**
116:20 266:17
**expiration** 265:15
**expired** 26:21
**explain** 86:17
100:10
**explained** 85:25
262:4
**explaining** 143:6
235:9
**explicit** 252:9,10
253:15
**exposed** 114:15,16
225:16
**exposes** 257:2
**exposure** 211:24
212:19
**expressing** 142:20
**extended** 93:7
**extent** 47:3 84:21
115:9
**external** 207:14
**extra** 90:2
**extract** 197:18
**extracting** 195:15
**eye** 16:8,24
**eyes** 248:23

_____

**F**

**F** 203:12 255:21
**fact** 55:16 62:16
114:3,11 137:9,23
140:16 141:13,16
141:17 142:19
145:5 155:23
156:11,12 157:8
157:24 159:4,7,16
177:16,19 185:22
186:20 191:22
203:8,9 209:24
210:7 219:25
232:14,17 251:3
257:4 260:8
**factors** 21:14 22:8
22:17 30:6,17

32:20 42:18 43:4
50:11 67:9 73:2,9
74:23 101:25
102:7 103:2,8,17
103:24 104:4,12
104:13 105:3
107:2 108:20
112:13 116:20
119:13 122:22
126:17 127:7
129:23 131:2
150:16 151:7
167:16,19 169:3,9
169:18,21 170:5
170:14,20,22
171:15,20,21
172:2,10,16,22
173:8 176:11,13
176:22 177:7
178:15 185:12
186:20 190:4,7,16
191:19,23,24
192:10,15 203:4
203:23 204:21,25
205:17 209:2,13
209:18 213:20
214:13,23 216:11
217:6 220:2,10
223:24 224:13
227:15 266:13,16
266:18,24
**Factors/Ergono...**
17:17 266:9
**facts** 60:16 133:6
134:19 137:18
138:3,4,10,13
142:23 143:3,4
269:6
**factual** 133:11
137:13 138:19
**faculty** 81:19
**failed** 176:22
187:25 188:12,19
189:14 191:6
206:11 216:6,9
235:3
**failing** 172:15
185:8 190:7

228:10
**fails** 214:4
**failure** 54:11
114:24 132:14
139:11 159:7
162:5 190:3,5,6
190:15 191:25
210:7 214:2
**fair** 5:7 7:22 35:20
132:15 235:8
**Fairfax** 50:18
**fairness** 206:9
**fall** 33:6,18 34:11
35:5,21 41:17
42:16 88:7 131:16
140:3 154:13
**false** 173:11
**familiar** 35:9,25
101:22 102:3,8,10
102:18 107:14,17
108:5,10,11,14,15
108:19 116:3,5,12
129:12 145:2
146:23
**far** 37:16 82:25
85:16
**Fargo** 3:9
**fashion** 40:18,19
**fault** 114:25 214:7
215:22
**favorable** 55:5,8
73:18
**FDA** 74:18,22
75:12,23 76:8,16
77:14 80:15 81:23
82:2,4 83:15
84:18,22,23,24,25
85:16 86:6,7,11
86:23 87:7,10,16
87:22 88:3,9,23
90:6,14 91:11,15
91:17,20 92:6,11
92:14 93:18,20,20
94:6,11,13,15
95:9 96:9,10
98:19,24 99:4
101:23 102:5,25
103:7,22 104:9

105:7 106:24
129:22 130:25
140:21 144:18,19
145:13,18 146:4
146:14,18 147:11
148:11,19 203:9
**FDA's** 203:12
**features** 74:23 75:2
75:2 76:4 77:20
154:10,19
**fed** 76:8 109:23
110:6,10
**Federal** 4:11 41:25
42:8 44:22 46:9
46:10 50:2,14
52:8,18 53:12,14
58:10 60:11 83:23
96:20 98:13 99:18
106:8,16,19 107:5
107:9
**fee** 4:6,15,22 14:24
**feedback** 69:22
**feeding** 77:13
84:22
**feel** 16:25 56:24
**feeling** 17:2 101:15
**feet** 35:13
**felt** 47:22 52:12
62:14
**ferreting** 224:23
**field** 30:5 32:14
42:5,17 43:4 46:3
46:23 48:11 49:3
126:3,5 193:18
203:19
**fields** 126:16
**figure** 187:14
**figured** 262:11
**file** 105:17,19,21,25
106:4 136:23
**fill** 195:16
**filled** 128:12
**filling** 180:23
195:14 228:11
237:21 239:25
241:9
**final** 15:8 73:20
**finally** 176:9

**find** 11:17 15:21,22
60:7,10 61:11
62:19,24 63:6,7
194:8 232:11
244:22 251:2
256:2
**finding** 77:12
205:15
**findings** 77:13
88:20 132:5,21,23
138:23
**fine** 41:2,3 97:24
184:22 238:10
246:24 255:17
263:11
**finger** 199:5
**finish** 97:14 182:5
182:25 183:8,11
184:13 185:3,4
229:16 231:11
234:2 236:13
262:14
**finished** 78:17
183:16
**finishing** 80:4
231:13,14 233:8
**fired** 74:2
**firm** 4:7,8,18 56:8
63:21 129:9,12
**first** 6:14 12:7
31:18 56:3 58:16
77:18 80:21
102:20,25 124:17
143:14 146:19
149:21,22 151:2,6
151:23 164:25
166:15 168:25
171:25 175:8,14
176:4,7,9,21
177:5 180:18,18
184:14 185:5,11
194:4 196:11
198:11,17 205:4
206:23 209:22
213:2 219:24
220:17,18 229:11
235:11,14 263:3
**fit** 112:4 126:3,11

126:22 153:16
**fits** 128:22
**five** 150:2 264:19
**fixed** 113:23
**flex** 238:24 263:24 264:10
**flexed** 263:23
**flexion** 239:3
**flick** 248:16
**flip** 237:15,24 242:5 249:5,7,20 254:19 263:20
**flipped** 242:19 249:25
**flipping** 237:15 249:25 254:16
**Florida** 41:17 44:14 45:2,5,6 72:3
**flow** 207:20
**fluid** 216:21
**FMEA** 215:22
**FMEAs** 114:23
**focus** 21:18 93:24 113:12,14 115:7,8 115:18 123:2 218:22 230:23
**focussing** 87:3
**foldout** 89:23
**folks** 113:20
**follow** 104:4,15,18 105:8 136:7 163:2 181:25 210:21 213:23 239:14 249:15 252:19 256:16 259:8
**follow-on** 217:3
**follow-up** 124:21
**followed** 89:10 220:19,22,24
**following** 4:2 5:12 148:8 159:13 250:24 265:3
**follows** 6:15
**font** 89:5 92:21,23 93:4
**fonts** 90:3
**Food** 74:11,15

131:4
**foot** 51:10
**football** 48:22
**forces** 208:7
**forensic** 10:19 11:10 14:17 23:10 23:12,14,24 24:11 24:14 25:15,16,18 27:8,9,13,19,21 28:14,15 37:11 61:23 65:11 66:6 66:25,25 67:9,13 68:6 116:20 119:14 266:10,11 266:12,14,17,19
**forensic-related** 27:23 28:2,4
**Forensics** 9:23 10:2 10:22,23 11:19 12:14 13:2 22:21 23:5 36:16,17 59:2,9 63:10 67:23 68:2 96:14 101:8
**foresee** 212:15
**foreseeability** 204:18,19 211:5 211:10 226:16 244:17
**foreseeable** 47:18 49:15 135:4 142:10 156:13 188:15 204:7,15 204:24 205:3 206:18,23 207:7 209:11 211:19 212:6,7 227:18 244:14
**foreseen** 113:4 209:14
**forgetting** 142:21 196:6
**Forgive** 119:24
**forgot** 56:21
**forgotten** 142:13
**forklift** 32:24 33:17
**form** 22:24 23:4 31:4,6 39:3 40:25

110:4 123:3,4,7 126:8,21 127:20 128:12 162:2 169:11
**formal** 54:25 55:10 108:24 109:7,16
**formalize** 135:21
**format** 79:7 89:25
**formatting** 74:23 74:25 76:3 77:19 80:19
**formed** 22:21 65:18 122:6
**forming** 24:20 28:13
**forms** 127:17
**formulate** 133:20
**formulated** 152:2 153:5
**formulating** 137:10 138:20 150:12 155:13
**formulation** 131:14 136:22
**forth** 21:20,23 22:7 70:2,10 71:18 76:12 90:6 92:5 134:21 139:8 142:22 223:13 226:4 268:12
**forward** 42:13
**found** 42:3,9 46:17 60:2 156:23 205:21,22 206:5 256:24,25
**Foundation** 33:2 33:15
**founder** 63:20,25 64:10
**four** 40:3,6,23 41:8 71:4
**four-year** 60:12 71:13
**fourth** 11:21 12:4 50:9
**frame** 42:3 134:15
**free** 9:9 16:25 123:3,4,7

**free-form** 123:19
**frequency** 211:3,12 211:17,17,21,24 211:24 213:6,13
**frequently** 212:10
**front** 16:2 117:14 122:9
**full** 14:13,16 62:6 111:22 194:4 198:12
**fully** 25:22 83:17 83:25 84:9,9,11 145:13 146:18 147:11 148:12
**function** 111:20 211:22 254:13
**fund** 83:17,24 86:5
**funded** 82:8 83:14 84:9,9,12
**funding** 82:10
**further** 268:15
**future** 93:24
**fuzzy** 100:9 101:17 197:8

**G**

**GA** 3:16
**game** 48:22,22
**gases** 35:4
**gate** 55:20 56:4 59:5 61:17
**gather** 150:11
**gathering** 112:19 134:19 163:25
**general** 7:6 61:15 72:16 122:21 125:14 132:10 133:19 134:3
**generally** 54:6 111:19 167:8 191:16
**generate** 10:18 12:15 14:22
**generated** 11:9,10 13:12 24:23 25:17 26:2,18 166:2,10
**generating** 13:3
**gentleman's** 205:23

**GERARD** 3:21
**getting** 26:11 80:5 80:6 92:14 112:21 152:16 182:7 209:5 215:13 216:16 217:9 229:15 240:22 241:11,20 244:17
**gist** 49:8
**give** 7:25 11:4,6 13:10,17 14:6,12 30:20 31:23 38:11 40:13,14,15 61:3 69:22 73:17,23 78:25 88:8 110:25 116:9 124:16 128:20 139:2 177:22 199:20 206:13,20 218:20 219:3,5 230:9 232:4 236:6 250:5 252:9,10 262:13 263:7
**given** 30:11 54:10 70:7 91:15,17 126:12 154:23 155:12,16 166:13 174:16 240:8 268:13
**giving** 88:14 230:7 230:8 241:13 249:16 255:16
**glucose** 141:10
**go** 17:8,20 20:5 34:23,24 42:12 43:15 67:15 71:11 71:17 72:9 96:2 97:4 100:16 111:22 122:18 124:18 132:4 138:23 144:17 147:2 159:11 161:16 163:11 180:14 182:7,8 184:5 185:3 212:9 214:7 216:6 226:20 227:3 237:7 238:20

240:24 241:2,4,22
247:8 263:10
**goal** 22:8
**God** 42:10 46:14
47:10,11,23 48:2
48:4
**goes** 139:21 144:19
**going** 7:20 9:4,12
9:15 12:22 16:13
16:21 17:11 21:19
35:13 41:19,23
47:2 51:7 54:5
61:10 66:7 67:3
80:18,23 81:12,13
84:14 96:2 97:16
97:17,25 116:9
118:11 123:22
124:3 128:7
132:22 149:6,22
162:18,25 181:19
182:10 183:11
186:8 190:23
193:14,19 196:18
201:21 202:13
203:11 212:21
216:13,16,19,20
216:21 218:23
226:5,6,8 227:19
227:19,20 228:20
229:11 231:5,10
231:24 234:2
235:2,10,19
237:14 241:4
244:13 247:8,12
247:14,17,23,24
248:3,8,13,16,18
248:19,20,21,23
249:3,5,7 250:13
252:5 254:7 263:6
264:22
**good** 5:25 6:9,19
14:9 29:13 61:25
111:11 149:15
173:16 186:17
238:12 248:23
**gotcha** 123:10
**gotten** 31:4 232:2
**govern** 105:25

107:9
**governing** 106:16
106:18
**government** 83:23
**grab** 248:4
**grabbing** 249:24
**grad** 95:22
**graduate** 79:15,21
79:22 80:22 81:16
95:2
**graduating** 81:9
**grammar** 18:18
**grammatical** 120:7
120:10
**grant** 83:5,21,22
84:9,10,12,12
86:2
**graphic** 117:13
**great** 185:17
**gross** 11:18
**grounds** 14:3
**groups** 91:25
115:18
**guard** 179:24 180:2
194:7,16 197:15
221:11 222:15
223:2 226:21
229:5 248:6,20
252:21 254:2
259:16,22 261:13
261:18 262:2,20
263:6,13
**guess** 13:17,19,22
14:2,7 20:19 23:7
31:3 49:7 50:23
51:7 61:9 80:2
94:20 128:21
261:7
**guidance** 101:23
102:2,5,9,15,17
102:22,25 103:14
103:15,20,22
104:3,3,9 105:9
106:23 108:2
131:3
**guideline** 103:4,6
**gust** 49:4
**guy** 169:22 206:3

217:6 227:15
_____
**H**
_____
**H** 266:6
**H7480331** 261:7
265:13
**half** 79:5 197:15
232:16
**hallway** 115:19
**hand** 17:20 67:15
238:7,9,9,14,15
238:17,18 243:15
243:16,21 244:2,2
244:3,4,6,6,8
245:9,9,16,16
246:3,5,6,21
247:7,24 248:3,14
248:17,20,21
249:6,8 250:23
251:4,4 252:2
253:8,23 254:5
255:16,17 263:22
263:22 264:6,7
268:18
**hand's** 246:24
**handed** 17:25
67:21 116:25
119:18 218:14
**handing** 260:16
**hands** 250:6,13
**Hansel** 3:3 6:4,4
**happen** 141:8
211:12 212:16
**happened** 39:24
56:15 62:21 93:19
134:19,20,21
155:21,23,25
214:9 216:25
**happening** 211:19
212:14 241:6
**happens** 73:21
141:7 212:4,10
214:16 216:18
227:6 256:22
**happy** 9:14 19:13
30:15 71:15 97:22
149:2 174:11
177:21 202:5

**hard** 249:16
**harder** 15:17 80:7
**hardware** 110:22
110:23
**harm** 203:6
**Haverty** 3:2 4:4 5:2
5:25 6:2 8:6 9:17
17:8 24:5 28:5
39:12 40:24 41:5
41:12 43:10,12,15
43:21 53:17 57:3
57:5,8 67:6,17
70:24 85:22 92:25
93:3 97:2,4,8,12
129:6 133:4
137:16 138:17,21
143:21 146:7,19
146:22 147:15,24
148:16 155:18
156:9 157:10
158:6,8,16,19,22
159:10 160:8,13
160:17 161:13,16
162:2,14,19,22,24
163:3 165:15
173:19,22,24
174:3,22 175:4,17
181:14,18,21,24
182:3,5,9 183:5,8
183:11,15,18,21
183:24 184:4,7,12
184:17,20,23
185:2 200:6
201:13 218:8,25
219:3,5,9,12,18
229:22 230:2,4,12
230:14,17,19
231:9,12,16,21,24
232:7,9,12,14,20
232:23 233:2,7,12
233:17,20,25
234:5,9,14,17
236:18,21,25
252:23,25 255:23
260:6,21,25
264:21 265:9
267:4
**Haverty's** 143:19

**haz** 190:4 204:21
**hazard** 42:9 47:17
47:23 48:7,9
49:22 51:7,19,23
51:25 76:24 187:8
187:10,17,21,24
188:2,13,19,20,23
188:25 189:15
190:8 191:7,11,14
191:25 192:2
204:10,12,13
208:18,21,24
209:19 210:14,24
211:3,22 212:24
212:25 213:16,24
226:15 252:8
255:12 257:3
**hazardous** 58:5
**hazards** 110:5
114:6 135:5
179:19 203:15
204:6 212:17,19
226:17 227:12
235:4
**He752009** 108:20
**hear** 90:11,16
200:17 234:23
**heard** 26:20,25
**hearing** 21:22
44:23,23 46:22
**heater** 55:23 59:12
**heavy** 49:15 51:11
**height** 35:11
**heighth** 35:12
**held** 2:7 5:11 17:13
32:8 98:4 149:9
202:15 262:21
263:17 264:25
**help** 25:9 48:18
83:18 84:13 93:14
100:16 236:7
**helped** 81:7 95:11
100:17
**helpful** 45:24 46:17
73:23
**helping** 81:5 96:3,4
**hereinbefore**
268:11

**hereunto** 268:17
**hey** 86:20 162:17
  183:21
**hierarchy** 154:14
**high** 48:13 180:22
  212:23,23
**high-voltage**
  114:11,17
**higher** 89:14
**higher-level** 222:14
**highest** 43:7
**highlight** 254:21
**Hill** 3:4
**hindsight** 209:23
  210:11
**Hine** 3:15 6:7
**hired** 38:18,20 55:3
  74:11,17 101:8
**history** 60:12 71:14
  86:9 105:17,19,20
  105:25 106:4
  136:23 140:22
**hold** 29:21 32:13
  32:14,22 68:10
  72:8,24,25 170:16
  177:13 178:9
  194:16 198:14
  212:7 230:24
  246:17,23 247:6
  247:22 248:13,18
  248:19 249:3
  251:25 253:24
**holding** 246:3,5
  250:20 254:6,14
**home** 10:14 29:9
  72:5 117:4,16,17
  117:20,22,24
  118:2,4,6,8,17
**honestly** 218:19
**honor** 4:14
**hope** 186:10 233:22
**hopefully** 15:3
**hoping** 45:17
**horizontally**
  227:21
**horses** 55:21 56:4
**hour** 15:11,13
  201:21 202:3

**hourly** 14:23,25
  15:3,4,5,10
**hours** 14:18,20
  16:3 37:12 150:3
  231:23
**housing** 208:6,11
**Hovermill** 50:23
**huge** 215:18
**human** 17:17 21:14
  22:8,17 30:17
  32:19 42:18 43:4
  50:11 67:9 73:2,9
  101:25 102:7
  103:2,8,17,24
  104:4,12,13 105:3
  106:25 108:20
  112:13 116:19
  119:13 122:22
  126:17 127:7
  129:23 131:2
  142:19,20 150:15
  151:7 167:15,19
  169:3,9,17,20
  170:5,14,20,22
  171:15,19,21
  172:2,9,16,22
  173:8 176:11,12
  176:22 177:7
  178:14 185:12
  186:20 190:4,6,16
  191:19,23,24
  192:10,15 203:4
  203:23 204:21,24
  205:16 208:25
  209:13,18 213:20
  214:12,22 216:11
  217:6 219:25
  220:9 223:23
  224:13 227:14
  266:9,13,16,18,24
**hundred** 6:24
  37:19 50:19 51:13
**hunk** 77:6
**hurrying** 142:14,22
**hurt** 49:7
**hydro** 207:21
**hydrophobic**
  207:20,21

**hypoglycemia**
  155:14 156:18
  157:25 159:16
  161:7
**hypoglycemic**
  161:22
**hypotheses** 134:11
  136:12,18

**I**

**IBM** 70:4,12,14
  109:19 110:15
  111:17 113:8
  115:13
**idea** 8:9 10:7,13
  31:24 51:11 61:25
  92:3 193:23
**ideas** 84:20
**identifiable** 189:2,3
  189:4
**identification**
  17:18 67:2,10,14
  116:21 119:15
  120:16 121:10
  127:9 165:12,16
  187:17 217:22
  218:3,12 260:15
  264:15 265:8
**identified** 77:18
  115:6 137:20
  139:16 156:11,25
  178:24 180:3,6
  182:19 190:14
  191:14,20 203:16
  209:19 210:2
  214:23 216:24
  222:13,23 225:6
  225:20 239:11
**identify** 113:2,22
  114:10 178:21
  179:2,9 187:10,25
  188:13,19 189:15
  190:8 191:7,25
  203:4,22 210:18
  216:5 226:17
  227:8 235:3
**identifying** 115:3
  135:4 171:6,9

212:17 213:8
**identity** 57:11
**idiopathic** 161:8
**idiopathically**
  161:9
**idiosyncrasy** 161:8
**IEC** 108:12,16
**IFR** 261:3
**IFU** 141:23 144:18
  145:15,19 161:2
  173:9 176:17
  180:4 185:20,23
  193:19,20 194:24
  195:3,4,6,18,20
  198:5 202:22
  205:17 216:15
  221:23 225:14,15
  239:9,12,15,16,22
  240:2,7 244:12,13
  249:15,17 250:4,5
  250:17,19,24
  251:24 252:3
  253:12,15 255:9
  255:21 256:11,16
  259:8,20 260:2,4
  260:18,22 261:11
  265:9
**IFU's** 250:21
**IFUs** 135:15
  178:20 255:6
**Ileana** 3:15 6:6
**imagine** 13:5 62:7
**implemented** 89:3
  180:4
**important** 253:17
  253:18
**improper** 58:5
**improperly** 1:8
  3:12
**inaccuracies** 20:5
**inaccurate** 20:2
  124:15 173:14,15
  189:24
**inadequate** 62:20
  177:2,9,10,11,12
  177:14,20,22
**inadmissible** 40:22
  40:25 47:25

**inadvertently**
  142:18
**inappropriate**
  154:5
**inattention** 142:21
**incident** 27:14 28:8
  47:9 48:4 144:3
  163:19 210:4
**include** 133:12
  154:6
**included** 121:20
  140:10 141:22,23
**includes** 221:25
  222:3 223:21
**including** 213:5
**income** 10:14,17
  11:19 14:22 24:23
**incomplete** 124:14
  125:6,7,9,10
**incorporate** 103:10
  103:16
**incorporated**
  143:10
**incorporating**
  101:25 102:7
  103:23 106:25
**incorporation**
  104:12
**incorrect** 128:10
  171:18
**incorrectly** 213:22
**increased** 196:4
  207:22,25
**incredible** 231:4
**indeterminant**
  56:18
**INDEX** 267:1
**indicate** 7:18
**indicated** 4:9,19
**indicating** 119:21
  240:25 241:3,5
  263:19,21 264:5
**indication** 178:25
  179:5,8,10
**individual** 223:11
  224:16 225:8,9
**indoors** 51:17
**inducing** 226:7

industry 82:19
  101:23 102:5
  106:24 128:15
  131:4
inevitable 210:23
inform 49:21
information 9:11
  12:17,24 21:21,24
  22:3,4,5,9 31:23
  31:25 39:2 52:12
  57:23 58:3,3 60:8
  60:19,21,22 61:16
  75:3,8,20 76:5,8
  76:11,25 81:2
  82:8,15,21 84:8
  89:8,9,17,25
  91:15,16 92:15,16
  93:10 121:15,19
  121:21,25 123:17
  123:20,24 124:13
  125:2,13,25
  126:12 128:5,6,11
  130:4,8 134:8,13
  134:18 135:17
  137:14 138:19
  139:10 143:11
  145:21 150:12,15
  150:21,24 151:4
  151:11,15,24
  152:23 163:25
  167:22 169:11
  174:9,11,15,24
  176:17 179:5
  208:23 223:6
  224:21 225:11,19
  253:17 258:15
infusion 139:18,21
  140:6,8,17 141:14
  143:15 144:7,21
  145:20 147:13
  148:13 163:17
  164:3 171:3
  173:10 176:18
  178:20 180:22,24
  181:4 185:21
  187:22 198:15
  199:2,6 200:9
  205:9 258:4,8

ingredients 89:12
initial 112:19,20
  124:5 134:12,13
  136:12 140:24,25
  152:2 165:4,20
  166:22 168:4,7
  169:15 172:14,20
  187:6 194:2 237:9
initially 124:19
  176:23 177:16
initiate 94:6
initiated 87:16 94:5
  94:7
initiation 143:24
inject 197:16
injure 49:16 114:5
injuries 112:9
  113:15 190:20
injuring 47:17
injury 113:10,12
  161:25 162:4
  253:13,14,21,23
  254:20
input 111:4 127:18
  207:17
inputted 127:16
insertion 239:24
inside 207:22
  217:10
insisted 231:18
installed 55:24
installer 114:13
institution 20:20
  81:25
instruct 256:14
instructed 7:12
  198:14
instruction 49:19
  54:21 55:12 57:17
  62:15,24 65:21
  99:7 252:19,25
instructional
  135:16
instructions 65:13
  135:14 140:20
  153:23 154:21,25
  156:8 158:3,23
  159:8,18 160:4,25

161:24 162:9
163:16 179:25
193:10 195:7
197:24 217:21
219:6 235:22
247:3 252:9 267:7
instructor 33:4
insulin 155:10
  157:2,3 179:21
  180:22,23 187:19
  188:3 189:16
  194:6,13,17 195:5
  195:15 196:2,3,23
  196:24 197:2,5,6
  197:14,17,18
  198:15,25 199:5
  200:7,8 205:20
  206:7,8 208:9,13
  209:4 215:18
  216:22 225:18
  227:24 228:3
  229:9 237:4
  239:22 240:4,5,18
  240:19,22 241:13
  241:20,24 242:11
  244:17 245:24
  247:9 251:13
  253:6 254:15,16
  257:24 258:14,18
  263:9 264:14
  267:14
integrate 205:8
  206:11
integrated 109:20
intend 4:9
intended 203:14
intending 27:20
intent 120:12 121:6
interact 21:16
interest 86:23
interested 21:20
  26:7 268:16
interim 166:12
interior 209:5
internal 70:4
internally 70:14
  88:24 208:11
interpret 22:4

interpretation 77:2
  206:12
interrupted 230:25
interviews 131:13
introduce 5:23
introduces 208:11
inverted 196:3
  205:20 206:7
  251:14
investigation 27:14
  28:8 132:23
  133:23 164:19,21
investigator 84:4
invoice 15:4,9
  149:18
invoices 24:10,12
involve 55:18
  115:10 145:12
involved 27:16
  28:10 32:16 37:4
  48:8,10 52:24
  55:22 60:16 73:17
  80:15 88:17 98:22
  99:2,10,13 109:19
  110:15,18 114:19
  134:20 135:2
  157:19 167:15,19
  170:14 171:2,15
  209:25 213:20
involvement 24:5
  75:13 143:24
involves 28:8
  221:24
involving 57:21
  59:5,11 101:16
inward 208:8
irrelevant 163:14
ISO 108:6
iss 154:12
issue 4:25 24:9
  41:18 57:22
  113:21 114:8
  132:14 143:9
  146:23 160:16
  161:12 164:3
  185:19 186:13
  209:25 213:6
  254:6 258:9

issued 33:23
  105:10,11 169:2
issues 12:21 33:9
  84:18 114:3,5
  115:3,4,5 154:13
  160:7
it'll 217:11

---

**J**

J 1:18 2:7 5:17 6:13
  17:16 121:8 127:6
  165:10 265:21
  266:4,8,22,24
  267:2 268:11
Jersey 2:17,18
  268:8,9
job 1:25 112:15
  114:16 150:19
  167:5,8,12,13
  216:7
John 175:10
join 4:24
Joseph 72:4
journal 69:18,19
  80:8
journals 69:25
  94:20
Jr 1:18 2:7 6:13
  17:16 127:7
  165:10 265:21
  266:8,24 267:2
  268:11
judge 9:18 39:8,19
  39:20 40:2,9 41:9
  41:11,17,22 42:3
  42:9,15,16 43:19
  46:3,16,21 47:9
  47:20 52:12 53:8
  163:21 183:24
  184:4,7 213:12
  232:3
judge's 42:20,21,25
  43:18
July 19:11 36:24
  56:15 102:13
  106:20 261:5
June 165:15 168:12
  168:19 176:3

267:4
**junior** 81:5
**JurisPro** 127:8,13
 127:24 266:24
**jury** 42:4 45:24
 46:5,18 47:2
 173:20

**K**

**K&G** 72:6
**Karen** 175:10
**keep** 30:21 38:25
 39:4 48:16 55:21
 56:4 59:22 195:5
 263:9
**keeping** 264:6
**Kevin** 3:2 5:25
 158:21 165:15
 183:17 229:25
 230:11,13 231:17
 232:6,13 233:11
 234:4,19 236:24
 267:4
**keyboards** 111:4
**Kilowicz** 131:18
**kind** 23:17 33:8,21
 61:8,14 62:9
 65:15 73:2 84:8
 111:11 113:15
 140:22
**Klimowicz** 130:19
 131:20 132:2,5,12
 132:12 133:11
 138:12,17,22
 139:24 141:6
 142:25 143:6
 144:6 145:23,25
 146:11,13,25
 147:8 148:21
 155:6 164:2,6,15
**Klimowicz's**
 130:21 132:21
 133:6 146:17
**knew** 8:12 49:12
 70:8 152:4,6
 153:8 177:18
 208:15 215:20
**knob** 238:11

**Knolls** 63:23
**know** 7:16 8:10
 10:6,10 11:3,15
 14:15 17:6 18:22
 20:24 21:2 23:16
 31:16 32:6 35:9
 35:18 36:7,7,11
 38:4,10 39:16
 40:20,21 41:10
 43:22,23 44:3,7
 45:6,14 46:7,11
 51:6,12,14,22
 52:7 53:5,10,15
 53:20 54:23 56:20
 57:4,13 58:4,9,9
 58:10,11,16 62:9
 66:7,21 67:24
 69:20,21 71:13,19
 73:15 76:2 78:19
 80:17 81:8 82:25
 83:2 85:3,16,18
 85:19 86:8,20
 87:19 88:23 89:2
 89:4,10,15 90:22
 90:24 91:6,23
 92:10,12,14 93:21
 94:7,12,21,24
 95:6 105:16,18,20
 105:24 107:12,16
 107:19,20,24
 108:2 113:3
 115:20 118:13,14
 118:18 120:8
 121:12,12 122:3
 122:24 123:25
 124:10 125:16
 126:14 128:14
 129:11 132:22
 133:14 134:6
 136:10 137:4,6
 138:7,15,24
 139:25 140:5,16
 141:6,12 142:9,12
 143:2,20 144:10
 146:8,8,23 147:8
 147:17,25 148:18
 148:18,20,23
 149:23 150:22

152:10,11,13,15
 152:17,17,19,19
 157:12 163:21
 168:6,23 170:22
 170:23 171:16,19
 174:17,19,21,24
 175:6,23 177:21
 188:16 190:13
 191:11 195:16
 196:18 203:12
 207:6 210:6,9
 211:18 215:3
 217:7 218:21
 222:13 223:7
 224:3 225:7,17,24
 227:25 228:4,14
 228:15 230:16
 233:3,25 240:10
 241:19 243:18,25
 244:3 256:12
 257:17,21 259:9
 260:4
**knowledge** 36:10
 47:4 79:7 119:9
 147:8 198:24
 205:6 206:11
 208:18 209:7
 224:21 225:23
**known** 49:13 51:18
 143:7 155:15
 156:20 223:12
**Kubiak** 175:10,10
 175:11

**L**

**lab** 75:14,16,19
 77:4 206:3
**label** 79:7 93:7 99:7
 145:16
**labeling** 74:24 75:4
 75:20 76:5,7,12
 78:3 81:14 85:9
 85:11 87:4 89:4
 89:19 98:18
 103:17 107:10
**labels** 77:20 80:19
 89:10,23 122:22
**lack** 35:3

**lag** 80:4,9
**laid** 105:2 137:20
**Lake** 3:3
**Lancaster** 58:22
 59:7,17 63:23
**Lance** 63:21 65:5
**land** 118:7
**landing** 117:15,17
 117:20,25 118:3,3
 118:10,16,18
**language** 117:18
**lapse** 34:17
**lapsed** 34:10,12,15
**laptops** 111:3
**large** 51:4 74:21
 114:3,7,7
**larger** 89:24 90:3
**late** 15:3 75:5 76:19
 78:9,10 80:20
 81:15 156:14
 189:6
**launching** 193:13
**law** 4:7,8,17 7:2
 56:7 76:21
**lawsuit** 155:4
 160:16 161:12
**lawyer** 45:14 56:7
 61:18
**lawyers** 58:15
 59:20
**lead** 77:9 84:3
 112:12 213:24
**leading** 93:8
**leak** 206:8
**leap** 215:19
**learn** 21:25 22:9
 168:8
**learned** 170:3
 173:8
**learning** 186:19
**leave** 139:23
 146:10,12 147:7
 148:20 163:21
**leaving** 155:5
**led** 77:9,10
**left** 48:13,20
 143:25 243:15
 248:14,19,20

264:19
**left-handed** 243:11
 255:3,7
**legal** 3:21 27:9,11
 27:12 56:16
 128:15 146:22
 147:18 162:20
 163:8,10
**legal-related** 24:9
**Lenox** 3:16
**let's** 17:7 41:6 74:5
 81:12,12 96:7
 109:4 116:15
 178:5 183:24
 184:4 191:2 202:8
 202:10 206:16
 213:14 236:11
 258:22 260:25
 261:2
**letter** 165:14 267:4
**letting** 184:9
**level** 44:9,10 213:7
 240:23 241:11
**liabilities** 12:20
**libraries** 111:9
 113:25 114:2,6
**library** 111:9
 113:25
**license** 72:25
**licenses** 72:25 73:3
**lie** 219:8
**lifted** 49:14
**liked** 151:25 152:5
 152:7 153:8
**likelihood** 211:11
 212:20
**limited** 40:9,18,19
 52:5 53:4 54:17
 126:8,10
**line** 232:2 269:8,10
 269:12,14,16,18
 269:20,22
**lines** 93:9
**link** 118:15
**LinkedIn** 120:15
 120:20 266:20
**liquid** 207:22 209:5
**liquids** 141:18

142:3
list 31:7 68:19
   70:24,25 71:21
   89:15 93:6 104:16
   122:25 142:15
   180:17
listed 31:12 33:5
   70:4 71:4 129:14
   130:5,15,19,22,24
   189:20
listen 189:8
listing 127:13
lists 59:22 90:2
litany 142:17
litigation 24:9
   25:19 26:13 28:12
   28:16 37:13,14,19
   37:22 38:2 62:13
   101:6 129:6 233:4
litigation-related
   32:5 36:20 37:4,8
little 23:17 36:24
   70:6 72:9,22,22
   100:8 103:13
   137:25 140:23
   141:9,12 153:7
LiveNote 2:13
livestock 55:22
living 58:22 59:7
   59:16
LLC 22:25 23:8,8
   23:12,16 24:7,13
   24:17,20,24
LLCs 24:16
LLP 6:10
loader 57:21
location 29:12
locked 239:25
logo 68:5
long 9:21,22 31:11
   36:23 58:20 124:3
   126:20 168:15
   190:23 218:24
   229:10
longer 80:9
look 16:24 17:2
   22:5 78:25 91:22
   134:4,22 135:7,10

135:13 157:18
   167:5,11 175:7
   192:5,9 193:2,25
   199:24 220:14,16
   225:25
looked 16:8 77:4
   93:4,5,6,7,8
   121:14 129:20,25
   130:3 210:13
   225:8
looking 11:5 16:8
   16:11,12,21 26:17
   37:3 68:8 71:24
   76:15 86:18,21
   112:7,10 134:7,7
   134:9 154:20,24
   177:7,9 196:8
   199:10,12 200:11
   200:13,18 201:12
   201:16,18 222:5
   223:25 224:15
   225:21,22 226:4
   226:14,19 227:10
   239:7 247:18,20
   260:4 261:22
looks 12:19,20,20
   12:25 117:3,4,9
   120:19 128:4
   226:11
loose 77:2 117:19
   117:24 200:23,25
   201:2
loosely 199:18
lost 65:15 196:9
   211:8 224:24
lot 75:16 139:19
   154:15 193:17
   261:6 265:13
lovely 206:16
low 212:25,25
lunch 148:25 149:3
luncheon 149:9
Lyons 1:24 2:10
   268:6,21

――――― M ―――――
M 58:19
machine 113:14

114:17
machines 21:17
   22:11 114:11
maintain 30:25
maintained 106:3
major 63:20 93:15
   95:12 182:18
   185:19 186:13
   215:4
majority 38:17,19
   62:23 63:3,6 64:2
making 43:2 49:2
   61:10 111:21
   142:17 155:19
   231:5 260:21
malfunction
   160:20 161:10,20
   161:22 162:5
   163:20
Malone 72:6
man 50:22
management 70:10
   102:2,8 107:2
   108:9
Manager 109:25
managers 63:22
manipulating
   238:7
manner 250:8
manual 52:10,14
   57:23 141:11
   198:21
manufacture
   265:14
manufacturer 25:9
   49:12 54:22 55:13
   58:4 62:15 65:23
   66:3,19 74:8
   96:16 99:8,25
   100:7 101:4,9,13
   104:14,18 135:11
   191:10 202:25
   203:2
manufacturer's
   52:11 57:17 60:24
   65:13,20 134:23
manufacturers
   27:3 50:7 55:3

66:5 82:18 103:9
   103:16,23 104:4
   105:7 135:12
manufacturing
   113:20
mark 9:9,13 67:3
   72:14 113:22
   119:11 127:4
   206:2,4,5 217:16
   241:8 256:23
   260:3,5 264:12
marked 17:18,25
   19:22 67:2,9,13
   67:21 116:20
   119:14 120:16
   121:10 127:9
   165:11,16,19
   217:21 218:2,11
   260:14,17 264:15
   265:7,10
market 1:14 2:9
   112:2 213:12
marketed 48:12
marketing 61:24
   61:24 93:12
marking 260:10
marks 248:24
marriage 268:16
Martinez 3:15 4:24
   6:6,6 158:13
   198:8
Martinez's 4:8
Maslon 3:8 6:10
mat 48:10,14,19,20
   49:5,12,13,20,21
   51:3,4,6,17
material 135:7
   137:5,7
materials 93:12
   129:18 155:9
mats 50:8
matter 5:18 8:5
   133:8 159:4
   167:22 175:10
   202:25 211:9
   212:4,11 243:24
   244:5 249:13,14
   249:18 250:22

253:8,8,9 254:5
   268:16
matters 129:6
   137:16 252:18,24
McConnell 151:20
   151:21 166:5,7,13
   166:17,18,23
   169:12 170:4
   218:17
McConnell's
   174:20,25 178:8
   195:23
McConnell-8
   178:18 220:11
MDD 107:12
mean 9:2 14:15
   25:6 27:24 28:3
   39:14 51:12 61:20
   64:18,25 69:12
   71:7 72:20 73:15
   73:25 117:8
   125:16 126:21
   136:8 144:15
   146:21 152:9,16
   170:9 192:24
   198:17 204:5
   209:24 239:12
meaning 26:21
   118:19
meanings 69:14
means 43:22
   175:24 207:21
   242:11
meant 120:9
   125:17,18,20
   131:11 145:7,8
mechanism 132:14
   139:11 154:7
   210:7
medical 27:3 67:13
   74:5,8,12,13 96:8
   96:10,15,19 98:14
   98:19,24 99:4,7
   99:14,23 100:2,7
   100:13 101:4,9,13
   101:16 103:9
   104:6 105:22
   106:5,7,16,18,24

107:10 108:8,9,16
108:17,21 109:2,4
109:6,13 116:11
118:14 129:23
131:3 140:14,18
144:7,17 146:3
157:4 202:25
266:15
**medication** 74:24
75:4,19 76:4,7,11
78:2 79:25 80:20
89:19 221:11
**medications** 75:9
75:21 77:21 78:24
79:10 80:13 95:5
**Medtronic** 1:6,6,7
1:8,9 3:10,11,11
3:11,12 5:19 6:11
151:8 156:11,24
162:10 167:4
169:2,16 171:25
172:5,8,15 173:2
176:10,14,21
178:16 182:14
185:8 186:19
187:10,25 188:12
188:19,23 189:14
191:5 192:14,15
198:4 204:15
209:25 214:25
220:18 221:6
225:3 228:9,22
229:6 233:3,10
235:3,12 238:19
256:5,7 260:13
265:6 267:13,16
**Medtronic's** 4:25
233:21 256:25
**Medtronics** 150:16
**meet** 30:22 31:11
31:14,15 56:19
**meets** 30:13 224:18
224:19
**member** 81:19
**members** 109:22
129:8
**memberships** 69:3
**membersips** 69:3

**membrane** 155:8
155:10 157:8
158:2 159:17
207:21 208:14
**memorialize**
135:21
**memorialized**
136:4
**memorializing**
136:20
**memory** 22:2,3
101:18
**Mens** 72:6
**mentioned** 38:4
65:12 78:16
**merely** 161:22
**messed** 249:19
**met** 135:12,15,20
**method** 133:23
136:3,7,9,11
163:20
**methodologies**
95:24
**methodology**
109:15 114:20
204:25
**mic** 5:9
**mice** 111:5
**mid** 75:5 78:9
80:20 81:15
**middle** 194:10
198:13
**Mike** 86:15
**mind** 66:9 79:2
101:10,14 196:10
212:5
**mine** 58:18 77:8
88:13
**Mini** 180:11
**MiniMed** 1:6 3:11
167:3 169:16
170:24 180:11,20
198:4 215:2
260:13 265:6
267:13,16
**minimum** 35:12
89:5
**Minneapolis** 3:10

**minor** 111:21
252:13
**minute** 170:16
178:9 206:20
247:22
**minutes** 264:19
**mis** 132:20
**misleading** 20:3,4,6
**missed** 166:8
203:22,25
**missing** 126:18
**misstated** 177:4
**misstating** 187:13
**mistake** 205:12
227:4 253:10
**mistaken** 78:12
**mistakes** 179:16
250:10 262:10
**misunderstand**
142:13
**misunderstanding**
7:19
**misuse** 203:5
213:22
**MMT-326A** 261:6
265:13
**MN** 3:10
**mode** 103:8
**modes** 114:24
214:2
**moment** 13:24
14:12 17:10
124:12 143:13
145:5 202:20
223:16
**monetary** 82:6
**money** 10:4,7,21,23
11:9 12:19 64:2
83:5,17,24 84:12
84:13 86:4 213:4
213:5
**monies** 83:9
**monitor** 141:10
203:20
**monitors** 111:4
**Mont** 166:17
**Monta** 166:17
**Montana** 53:5,12

53:16,16
**Montell** 166:17
**month** 72:19
**months** 25:14
134:17 165:25
166:11 176:7
**moon** 193:13
**morning** 5:25 6:9
6:19,20 232:22
**mother** 144:2
164:17 257:12,22
258:19
**motion** 222:12,12
222:18,18,19,20
**motor** 238:10
**motorcycle** 33:2,13
33:14 52:25
**mountain** 54:12
**mouth** 219:8
**movable** 55:20
56:4 59:5 61:17
207:13
**move** 9:18 96:7
161:4 207:15,17
228:4 241:24
243:4 248:21
**moved** 56:17 58:21
58:23 242:22
**movements** 228:14
238:24
**moving** 81:9 114:3
217:15 234:18
**mud** 48:17
**muddled** 160:11
**multipage** 17:15
66:23 67:7,11
116:18 119:12
120:14 121:7
127:5 217:17,24
218:9 266:8,10,12
266:14,16,18,20
266:21,23 267:5,8
267:10
**multiple** 22:14
33:11 49:6 78:5
83:19 84:14
115:12
**murky** 147:20

**N**

**N** 266:2
**name** 24:11 27:22
45:9 46:11 50:4,6
50:6,20,23 52:20
53:23 54:2 56:25
58:17,19 65:7
108:7 129:12
205:22,23,24
269:1,3
**named** 1:8 3:12
**Naples** 45:7
**narrated** 202:21
**narrative** 181:17
**National** 34:2
**natural** 235:21,24
238:5 250:7
254:17 264:3,5,11
**naturally** 235:19
**nature** 25:12 31:24
33:8 42:10 45:13
88:2 133:12
137:17 151:2
228:15
**NC** 21:2 77:8
**near** 45:5
**nearly** 252:15
**necessary** 147:9
206:11 208:23
222:16 223:6
225:9 258:25
**need** 35:14 36:7
60:2,8,10 92:5
93:23 97:19,22,23
138:16 142:8
148:24 149:3
193:20 201:24
202:9 212:15
224:3 225:17,23
225:25 234:24
235:22 236:8,8
237:6,8,10,22
238:12 246:17,19
246:22 264:20
**needed** 84:20
126:12 179:6,9
205:6 225:11
**needs** 142:2 224:4

224:20
**neglecting** 263:16
**negotiate** 15:8
**neurological** 243:19
**neutral** 237:23 238:21 239:2 264:9
**never** 44:17 60:2 63:17,18 74:7,10 74:17 96:9 106:3 147:3 171:8 180:4 181:2,4 186:5 195:8 215:20 232:18 242:22
**new** 2:16,17,18 18:15 42:2 46:6 77:3 104:6 111:24 111:25,25 183:13 183:15 213:9,10 213:10,10,11 214:19,24 268:8,9 268:9
**newer** 18:13
**newscaster** 15:25
**night** 156:22 164:4 164:8 258:4
**nine** 251:20
**nine-feet** 51:8
**NJ** 3:4
**nomenclature** 27:7
**non-factual** 137:17
**non-lawyers** 26:16
**non-litigation** 25:8 26:16 37:13
**non-neutral** 237:25 238:22
**non-public** 91:16
**non-responsive** 231:6
**Nope** 243:22
**norms** 179:12 223:12,12 224:19 226:3 239:5
**North** 21:10 52:23 75:15 81:19 82:23 86:12 87:16
**Northeast** 3:16

**Notary** 2:17 265:25 268:9
**notation** 254:21
**note** 148:16 238:6 261:2
**noted** 195:20,21 265:16
**notes** 132:16,24 133:16 139:14,15 144:5 145:9 167:11
**notice** 106:19
**noticed** 120:6
**NRA** 33:3,25
**number** 5:21 38:11 65:5 76:3 94:20 98:3,8 100:22 106:23 107:18 111:18 116:22,25 119:18,19 120:18 122:11 123:5 128:23 137:22 149:8,13 165:19 165:21 179:22 210:3 221:10 224:17 225:5,13 225:15 240:14 261:6,6,8,20 264:24 265:12,13 266:7
**numbers** 13:23 66:13 72:17

**O**

**o'clock** 164:9,9 231:18,19 258:12 258:16
**O.D.E** 108:2
**Object** 40:25
**objected** 14:2
**objection** 39:12 40:24 43:10,21 85:22 92:25 146:7 147:16 148:16 155:18 156:9 160:17 162:2 173:19 255:23
**objections** 183:23

**objective** 205:2
**objectively** 210:17
**obligate** 4:17
**obligated** 4:11
**obligation** 4:14 150:11
**oblige** 97:22 149:2
**obscured** 117:13 117:18
**obtain** 150:20,23
**obtained** 143:21,23
**Obviously** 128:10
**occasion** 102:21
**occasions** 41:8 128:19,23
**occur** 131:23 142:15 164:23 208:2 210:8 216:2 226:13
**occurred** 155:4 164:7,11,14 258:16,16
**occurrence** 211:23
**occurring** 211:3
**occurs** 208:2 214:16
**October** 9:25 10:3 10:3,17 11:11 22:21 23:3 122:5 128:10,13
**offense** 232:15
**offer** 11:21 23:10 62:2 157:7,10 158:16
**offered** 33:16 35:8 39:20 126:4,5
**offering** 153:13,21 154:4,8 155:2 158:9,10,13,14,19 162:17
**offhand** 51:6 56:9 108:4 205:25
**office** 29:8,9 38:16 38:21 143:19
**offices** 2:8
**Oh** 34:9 56:10 71:2 71:11 93:17 97:15 139:13 154:8

155:5 198:20 217:11 232:6 248:11 249:11
**okay** 5:9 7:4,8,15 7:18 8:14 12:3,6 13:16 14:13,22 15:21 16:23,25 18:14,20,24 19:7 19:12 20:7,19 21:4,9 22:24 23:22 24:8,15 25:20,24 26:5 27:2,17,24 28:21 29:8,17,24 36:19 37:2 38:20 43:25 45:2,22 47:5,8 48:3,7 51:11,15 53:2,12,21,23 56:3,24 57:14 58:25 59:4 61:14 64:21 66:2,10,16 68:7,17,25 70:13 70:16 71:23 72:16 74:10,14 75:12 77:16 78:4,13 80:18 81:22 82:20 83:3,13 85:7,9,16 85:19 87:4,6,20 88:16,23 90:20 91:13 93:11,17 94:9,14 96:13 97:18 100:5,10 101:2,11,19 102:12,17 103:6 106:15 107:4,20 108:5,11 109:7,11 109:15 112:5 114:18 115:8 116:7,15 117:6,11 118:7 119:10,24 120:5,24 121:2 124:22,24 126:23 127:19 129:5 130:7,21 131:8,21 132:9,24 133:5,10 135:23 137:8,24 139:6 143:13,20 144:4 145:5,10,21

146:2 147:10 148:10 149:5 150:4,8,14 154:3 156:4 159:10,23 164:18 165:24 169:5 173:17 176:8 181:19 182:4 186:25 187:5 188:9 190:10,22,25 191:9,13,21 192:19 194:11,14 194:22 195:17,24 196:13,20 197:25 198:6,9,20 199:9 200:20 201:4 202:22 203:13 204:9 208:17 209:22 210:6,16 211:2 218:18 221:20 223:18 228:17 230:18,21 234:19,22,24 242:13 243:7,14 243:17,18,23 245:2,6,11 246:4 246:21,25 247:4 247:10,11,16,22 248:2,5,7,12,13 248:15,16 252:11 257:10,20 259:19 260:3,25 261:21 261:24 263:8
**old** 62:2
**older** 62:4 79:9 95:22
**once** 30:6 72:19 110:3 135:6 194:5 194:12
**one-page** 265:5 267:15
**ones** 44:11 54:18 68:21
**online** 80:12 122:19 134:6
**Oop** 263:25
**open** 23:8 26:22
**opened** 9:24 11:11

23:8
**opening** 10:2 25:18
**operating** 25:14
**operation** 33:17
**operator** 32:25
52:10
**opine** 62:25 167:23
**opined** 55:12
**opining** 47:10
132:13 150:15
**opinion** 39:6,20,21
40:17,18,21 44:8
47:21,22 49:9,11
51:22 52:3,4,14
55:10 57:16,25
65:12,19 73:18,23
131:13 136:21
137:11 153:24
154:4 155:2,7
157:7,11,17
162:23 169:2
176:13,21,23
177:6,6 178:14
182:24 187:9,15
187:18 188:17
190:25 192:21
221:21 225:4
234:24 235:5
255:14
**opinions** 19:2,21
40:8,13,14 42:3
44:5 46:4,25
47:16,24 52:5,9
53:7,7,9 54:7 55:5
129:14 132:5,21
133:6,20 135:21
137:19 138:20,23
147:4 150:12
152:2,24 153:5,14
153:21 154:9
155:13 156:7
158:3,9,10,15,22
158:25 159:5,18
159:25 160:22,24
161:11,23 162:7,8
163:4,22 164:25
174:13 176:16

177:13 189:20
190:2,3
**opportunity** 124:25
241:13
**opposed** 37:9,24
115:15,17 164:18
**opposing** 55:11
**opposite** 194:6,15
**Option** 64:4,13
**order** 30:25 37:14
66:13 89:8 92:21
92:23 255:21
258:23
**ordering** 76:5 89:9
89:17 93:10
**organization** 29:25
32:19 83:22 91:9
**organizations**
23:20 32:18
**orientation** 222:22
254:8,12
**original** 164:19
166:12
**originally** 234:12
**OSHA** 33:20,21,22
34:22 35:8 36:2
**OSHA's** 33:24
**OTC** 76:14 78:9
82:9,12,14 83:10
87:23 88:4,10,22
89:2 92:13,22
93:22
**other's** 92:3
**outcome** 88:17
268:16
**outdated** 128:5,6
**outdoor** 48:12
**outdoors** 48:11
**over-delivery**
188:3
**over-pressurized**
197:3,7
**over-the-counter**
74:24 75:4,21
76:4,6,11 77:21
78:2 79:10,12
80:19 81:14 85:8
85:11 87:4 89:18

**overall** 86:8 153:15
154:13 205:9
**overdose** 157:2
**overlap** 53:6,9
**overloaded** 100:15
**overseen** 85:20
109:24
**overturned** 42:21
**owned** 54:3 63:23
63:25 64:9
**owner** 28:24 63:25
64:5 65:3 68:12
**oxygen** 35:3

_____

**P**
**P-cap** 136:24
139:17 141:19
151:9 153:14,22
154:7,20 157:9
164:7 167:9,16
169:4,10,22
170:21,23,24
171:7,10,23
172:11,17 178:16
179:20 187:20
189:14 191:6
192:20 205:7
208:3 209:6
214:25 217:10
241:17
**p.m** 98:5 149:10,10
202:15,16 264:25
265:2,16
**PA** 29:16
**pack** 194:25
**package** 36:4
**packet** 240:7
**page** 68:23,24 69:2
117:4,5,14,15,16
117:17,18,20,20
117:22,25 118:3,3
118:4,4,5,6,8,10
118:10,16,17,18
118:21,23,24,25
119:3,23,25 120:7
120:20 122:9,18
137:22 154:17
170:21,23 171:4

171:10 193:25
194:5 196:12
198:11 207:11
208:5 220:16
221:9 222:11
266:3,7 269:8,10
269:12,14,16,18
269:20,22
**page's** 117:24
**pages** 69:16 70:4
118:6 123:18
126:20 171:7
**paid** 12:3 13:7,10
**panel** 30:11
**paper** 79:4,24
122:20
**Paradigm** 139:18
140:23,24 163:17
173:9,10 187:21
206:6 260:14
265:7,12 267:13
267:16
**paragraph** 93:6
194:4,9,10 195:25
196:12 198:12,13
**paraphrase** 189:21
**parlance** 74:2
**part** 36:4 61:9,24
63:21 79:15 81:10
84:16 87:24 88:3
93:12 110:2 120:9
131:13 133:9
136:19,21 139:4
139:15 140:11
172:13 173:12
188:14,15 198:21
205:13 211:21,25
212:16 220:5
224:11,14,22
226:13 227:9
229:8 235:20
237:4 244:8,21
249:4
**partially** 86:4
**participants** 84:6
**participate** 96:18
111:16
**particular** 58:12

74:6 79:13 114:20
123:19 137:23
**particularly** 94:2
133:24
**parties** 33:12 50:21
52:20 53:24 57:2
58:13 59:18 92:2
92:15,16 109:22
268:15
**partner** 63:20
**partners** 63:22
64:6
**parts** 100:18 105:4
114:14 153:2
**party** 55:11 137:21
137:22
**pass** 30:20
**passing** 30:19
**patient** 200:10
252:19 253:24
**pattern** 55:16
**Pause** 67:5 218:4
251:23 254:25
264:16
**pay** 4:12 11:24 12:2
12:6 15:3,3 84:5,6
84:7 115:22
**paying** 83:25 84:3
**pdf** 118:13
**peer** 68:22 69:13
69:17,20 70:13
**peer-review** 70:5
**peer-reviewed** 32:3
68:18 69:8,9,11
80:8 94:19
**Pembrooke** 29:15
**pen** 55:21
**Pender** 72:2
**pending** 56:22
**Pennsylvania** 1:14
2:10,15,19 58:7,8
268:3,8,10
**people** 21:16,18,21
28:10 34:23 36:7
49:6,7 91:23
114:5 142:18
180:15 193:16
205:19 209:3

213:19,20 214:13
214:13 216:16
235:20 244:7,13
249:2,15 255:2,7
255:8 256:25,25
**perceived** 79:8
**percent** 37:14,15
37:19 50:19 63:24
64:8 180:24,25
**percentage** 37:7,12
37:22
**perception** 75:17
**perceptual** 200:17
**perfectly** 231:3
**perform** 109:16
169:3 222:17
**performed** 82:22
98:15 108:24
109:7 150:16
151:8 178:15,22
220:10
**period** 31:15
149:19
**permanent** 253:21
**person** 77:9 115:17
137:9 138:3,18
192:5,8 209:9,16
214:21
**personally** 61:21
**perspective** 154:6
154:21
**Ph.D** 1:18 2:7 20:8
20:9 79:6
**pharmaceutical**
27:5 76:21 82:19
**pharmaceuticals**
74:16,19 95:18
**pharmacists** 89:13
**PhD** 6:13 17:17
121:9 165:10
265:21 266:4,8,22
267:2 268:11
**Philadelphia** 1:14
2:9 52:17 58:23
59:16 268:5
**Philosophy** 20:15
21:2
**Phoenixville** 29:16

**phone** 183:25
184:8
**phrase** 36:3 41:7
64:22,25 116:3,8
116:12 145:12
211:10 255:20
**physical** 22:6 110:4
112:22 153:22
**physically** 121:13
**pic** 193:3
**picked** 49:4 113:19
**pickers** 111:9
114:2
**pictograph** 193:4
**picture** 68:9,11
**piece** 12:24 225:19
**pinned** 58:11
**piston** 208:8,12
**pitfalls** 92:4
**Pittsburgh** 61:6
**place** 118:12 196:9
243:9
**plaintiff** 1:4 3:5 6:3
6:5 41:19 45:10
45:18,21 47:15,18
50:22 52:13,22
54:8 58:2 62:13
63:2,4 101:13
144:2
**plaintiff's** 41:21,21
50:5 54:2
**plaintiffs** 37:23
47:14
**plan** 71:9 99:18
129:16
**plane** 231:19
232:25
**planned** 40:13
**planning** 157:14
**platform** 48:16,16
111:24 217:19
267:6
**play** 211:25
**please** 41:5 68:11
159:12 172:7
182:21,23,24
183:4 184:23
187:6 229:19

232:8 234:11
236:12 237:20
243:2 262:17
264:13
**plunger** 197:16,18
207:17 208:13
217:15 221:25
222:2 229:7
241:18,23 247:24
248:9,11,14,22
**plus** 122:12 128:16
128:17,22
**point** 13:5 44:25
65:6 89:5 90:12
111:10 126:14
129:2 148:23
156:7,11,22 159:2
159:2,3 161:21
164:22 168:14
175:15 181:8
182:12 185:14,18
186:17 191:13
195:7 205:2
210:17 222:24
223:20 236:4
237:13 244:7,12
252:16 253:7
257:4
**pointed** 86:24,24
**points** 31:10,11
114:14
**pole** 48:10,14 49:4
49:12,13 50:8,8
51:3,5
**poor** 117:3,6,9
119:22
**poorly** 249:17
**population** 180:10
186:22 193:7
**portfolio** 30:9,10
**portion** 70:18
119:20 146:16
148:8 159:13
**posed** 183:4 263:4
**position** 4:25 48:3
48:6 54:10 73:9
188:12 238:21,22
239:2 242:7

245:10 250:9
254:17 259:17
263:18,18 264:3,4
264:5,10,11
**possessed** 180:21
**possible** 34:11
124:3 129:11,20
204:4 207:17
**post-dissertation**
80:24
**post-market** 99:14
99:17 101:24
102:6 203:10,14
**post-release** 113:3
**posture** 237:23
238:2 239:6
**postures** 235:14
**potential** 34:25
49:22 51:18,23,25
60:19 62:8 110:4
110:5,5 113:9,11
113:14 114:10
130:3 171:6,9
180:14 206:8
209:8 212:17
214:15 216:2
223:9 226:14
257:3
**potentially** 49:16
212:16
**pounds** 51:13
**powerful** 48:24
**Practice** 119:21
123:4
**practiced** 114:24
**pre-market** 99:3
101:23 102:6
**precise** 11:5 170:9
170:13 174:14
210:7
**prefer** 167:6
**prepare** 60:15,15
**preparing** 71:16
**prerequisites** 30:4
30:8
**prescribed** 156:15
**prescription** 75:9
75:21 80:11 95:4

**present** 3:20 21:3
35:4 37:3 44:24
79:23 84:7 89:23
89:24 92:22 175:5
**presentation** 75:3,7
75:20 76:10 88:8
88:11,14,15,16
89:12 92:24
135:16
**presentations**
69:15
**presented** 41:22
76:6 89:9 91:20
95:7
**presenting** 76:24
**press** 229:9
**pressure** 196:4
197:4 198:5
207:14,18,20,23
208:2,6,7,11
215:15,16,16
217:13 238:13
**pressuriza** 215:16
**pressurization**
216:19,22
**pressurize** 197:12
197:22
**pressurizing**
195:12,13 240:12
**pretty** 44:19,21
48:23 193:14
**prevent** 28:11
48:18 114:16
252:7
**primarily** 112:8
**prime** 141:11
198:22 199:3
**prime/fill** 155:15
156:12,24 159:25
160:22 162:6
204:13 210:3
253:4
**primed** 141:15
**priming** 141:7
207:24 208:3,12
241:21
**principal** 63:17,18
64:16,18,23 65:8

95:12
**principals** 95:21
**print** 77:7,11
**printers** 111:5
**printout** 117:3,5,7
117:10 120:19
121:15
**printouts** 67:22
**prior** 8:13 9:10
23:3 36:15 60:22
61:7 156:22
166:21 174:23
189:2,3
**privy** 174:24
**probab** 212:20
**probability** 211:23
212:20
**probably** 37:13
38:2 51:13 53:17
71:8,8,21 72:23
80:2 82:22 128:12
148:4 173:15
**problem** 113:18
160:20 163:21
178:2 182:18
209:8 216:25
221:2 230:20
231:20 241:2
246:2 249:4
251:18 253:19,20
**problems** 15:6
110:5 113:3
139:20 142:5
157:4 180:6 186:9
203:20,22 214:15
216:2 229:17
**procedure** 4:12,20
29:25 141:11
**proceed** 7:22
**proceeding** 7:5
**process** 70:6 76:9
77:15 98:22 99:2
99:11 105:5
109:15 112:18
115:23,24 133:19
133:19 136:22
139:22,23,24
140:4,15 144:20

144:22 145:6,10
145:14 146:4,9,14
146:24 147:7,7,9
148:18,20 178:21
189:5 198:22
199:3 200:18
205:14 207:24
208:3 213:21
216:5 228:11,19
229:8 235:6,12
237:3,4 242:4,23
244:9,11 252:6,13
262:9
**processes** 104:5,13
105:8 114:19
144:25
**produce** 71:15
**produced** 138:5
165:2 170:7
260:23
**producing** 234:6
**product** 25:10
52:10,24 57:24
65:24 101:17
109:2,3,5,6,8,20
109:21,23,25
110:2,8 111:19,25
112:2,11 115:14
115:23 133:25
134:7,9,10 135:5
135:8 139:17
140:20 146:18
153:16 154:14,24
181:5 192:22
193:9,17 203:2,6
203:18 212:12,14
213:9,22 214:20
214:24,25 226:16
**products** 21:17,20
22:10,11 55:19
72:5 106:5,6
109:10,12 111:12
111:21,23 112:4,7
112:22,25 113:8
113:11,13,17,24
118:15 144:24
156:16 169:18
180:16

**professional** 29:23
32:9,17,19 35:23
69:3 73:7,10,10
224:13
**professionals** 70:7
**profile** 121:20
**program** 64:4,13
99:14
**prohibited** 52:3
**project** 80:10,16
81:5 83:25 84:10
85:5 87:24,25
88:4 92:23 93:15
94:3 100:6 101:2
**projectile** 49:14
**projection** 12:13
**projects** 74:21
75:25 76:15 77:19
78:6,7,22 82:9
83:18 84:13,14,20
86:5 87:13 95:23
**promoted** 64:6,7
**pronounced** 36:17
**pronunciation**
50:25
**proof** 31:8
**proper** 43:20 159:5
186:22 190:16
220:23
**properly** 43:8
225:19 256:15,17
256:19 257:2
**proposal** 26:18
**proposals** 24:22
26:4,14,21 27:2
**proprietary** 136:25
**prose** 93:7
**prosecuting** 38:21
**prosecutor's** 38:16
**protection** 33:6,19
34:11 35:5,22
**Protocol** 217:18
267:6
**prototypes** 112:20
112:21 115:5
**proven** 176:25
**provide** 7:9 9:4,12
9:15 12:18 19:13

52:12 53:8 54:5
54:12 61:16 83:24
84:11 104:16
138:18 159:8
252:5
**provided** 18:2,16
36:5 49:19 54:22
55:13 57:23 58:4
62:15 82:6,10
84:12 86:4 121:16
121:21,25 123:18
124:5,7 127:24
130:5,7,15 137:9
138:3 143:15
145:22 151:13
153:4 160:4,25
162:10 163:16
166:3,16 168:9
180:5 197:23
205:18 216:15
239:9,13,15
253:16,16 256:5,7
256:11 261:4
**providing** 26:10
94:15 193:11
**province** 42:4 46:5
47:2
**provision** 10:24
**psychology** 20:12
20:16 21:5,8 42:5
46:3,23
**psychology/ergo...**
20:9
**pub** 78:15
**public** 2:17 91:10
146:6 265:25
268:9
**publication** 70:11
78:23 80:24
**publications** 68:20
69:7,9,15 210:19
**publish** 79:23
91:10
**published** 78:11
79:3 80:7,7 81:10
90:25 91:3 94:19
192:25
**publishing** 79:6

**pull** 12:22 180:14
197:17 206:21
222:12 223:3
225:18 227:2
233:12 238:4
240:14,15,18
248:8
**pulled** 129:21
238:4
**pulling** 205:19
222:2,18,20 264:7
**pump** 140:14,18,24
144:8,17 145:16
160:21 161:10
162:6 163:14
173:9 180:22
181:2,3 240:17
241:19 247:23
**pumped** 196:24
**pumping** 239:24
247:8
**pumps** 180:24
**purchase** 83:18
**purchases** 80:13
**purport** 4:17
**purpose** 131:25
**purposes** 195:11
**pursuant** 98:16,19
**push** 197:15 240:13
240:15 247:24
**pushback** 89:13
**pushed** 197:6
**put** 5:3,9 61:25
73:25 76:12 86:2
86:21 88:10 89:22
90:5 110:3 123:24
128:9 130:13
136:13 153:19
198:5 203:19
212:24 215:6,23
229:8 237:19
241:16,18 243:11
245:3,5 254:21,22
**puts** 239:5
**putting** 215:24
237:25 238:14

**Q**

**QD** 198:16,17
**qualification** 25:20
**qualifications** 18:8
69:24 126:16
**qualified** 128:20
157:7,13,16
**quarreling** 156:4
**quarter** 11:22 12:4
12:7,10
**question** 7:16,20
8:19 9:5,16 10:20
10:21 11:12 25:22
28:23 39:15,17
41:2,12 47:9
56:19 62:10 65:16
76:23 96:25 97:11
97:21 134:3
137:25 147:20
148:7,10 149:2
159:5,12,15
161:14 163:6,8,11
166:9 172:7,13
173:23 174:4
181:13,15,21,22
182:6,11,20 183:2
183:3,6,14,16
184:11,14,25
185:3,5 188:18
189:8,9 190:24
191:3 196:14
199:20,22 200:3
202:4 206:22
207:2,3,9 211:8
212:7 217:3
218:22,23,25
219:24 220:6
229:19,21,24
230:6,22 234:11
234:12 235:10
236:22 237:9,11
256:9,13,18
258:23 259:10,11
261:15 262:15
263:2,14
**questioning** 60:9
**questionnaire**
95:25
**questions** 7:9 9:14

60:5 85:8 95:25
124:21 127:20,23
127:23 136:11
140:6 146:11,12
147:6 148:21
202:6 218:21
219:13 236:17
**quick** 148:23
198:19 241:20,21
**quickly** 17:9
168:20
**quiet** 219:11
229:25 230:25
**quote-unquote**
94:13 193:15
**quoted** 14:24

**R**
**Rachel** 1:3 3:5 5:18
155:13 156:18
157:25 159:16
160:19 161:6
163:13 216:15
233:14 243:20
256:22 257:5,21
258:18 260:19
265:10
**Rachel's** 164:16
**Railway** 72:3
**Randy** 170:10
172:23 205:5,13
209:6 215:14
217:10,12
**rank** 212:19
**rarely** 238:15
**rate** 14:25 15:4,5
15:10 128:13
211:24
**rates** 14:23
**Raymond** 33:16
**RDR** 1:24 268:21
**react** 54:8
**read** 44:5 52:14
102:11,15,21
104:2 105:14,15
106:15,17,19
107:8 108:18,22
117:11 124:13,16

124:20,25 148:7,9
158:11 159:11,14
170:10 174:25
184:16 195:25
196:15,16,18,20
207:11,16,19
208:5,10
**readability** 79:8
**reading** 44:24
144:5 196:9
222:10
**ready** 5:9 201:22
**real** 17:9 76:2
89:24 127:7
148:23 266:24
**realize** 227:16
256:18
**realized** 97:13
205:19
**really** 25:21 100:18
138:8 249:20
**Realtime** 2:12,12
268:6,7
**reason** 4:10 7:24
19:6 23:18 51:15
91:13 202:2
203:25 251:3
264:8,10 269:4,8
269:10,12,14,16
269:18,20,22
**reasonable** 11:7
13:11 14:4,6,11
146:15 192:5,8
209:9,16,21
210:13 214:21
216:8
**reasonably** 129:4
146:5 212:6
**reasons** 142:18
177:22 235:3
**rec** 90:17
**recall** 38:24 45:8
45:10 46:8 50:5,6
50:17 54:6 56:6,6
56:20 58:14,18
59:13,16,19,21
62:5 83:12 85:12
88:21,22 100:21

100:25 108:22
121:24 124:4,11
144:8,11 151:10
175:7
**receive** 20:10
130:18 137:3
**received** 19:15
32:25 83:9 137:6
138:11 169:10
176:9
**receiving** 168:15
168:21
**recertification**
34:17,18
**recess** 17:13 98:4
149:9 202:15
264:25
**reciting** 146:25
**recognize** 18:4
42:17 50:11 67:25
68:14 102:24
117:2 119:19
120:17 121:11
127:10 208:20,24
228:11 252:12
**recognized** 43:4
210:3
**recollection** 66:17
**recommendation**
89:23 90:18 103:5
103:7
**recommendations**
89:7,20 90:5
92:20
**recommended**
104:14 105:9
**recommending**
104:11
**recommends** 104:3
104:10
**record** 4:3 5:4,11
5:13 8:15,17,22
9:3,12 17:9,11
43:6 98:2,7 148:8
148:24,24 149:7
149:12 159:13
160:15 184:16
202:14 243:11

260:7 261:2
264:17,23 265:4
268:12 269:5
**recorded** 4:2 5:12
265:3
**recovered** 144:3
**redacted** 62:6,7
**redirect** 231:3
**redo** 174:12
**redoing** 196:10
**reduced** 268:13
**Redundancy** 53:11
**refer** 136:24
**Reference** 261:6
265:12
**referenced** 33:25
205:23
**referring** 33:10
151:4,18 192:25
204:13 228:15
**refers** 107:13,21
**refill** 142:8
**refilling** 164:8
**reflect** 220:9
**reflected** 19:17,22
**refusing** 236:22
**regard** 90:21
178:23
**regarding** 74:16
150:15 160:24
**regardless** 167:13
**register** 106:20
**Registered** 2:11
268:6
**registry** 31:13
**regular** 16:4
**regulation** 76:20
**regulations** 36:2
77:4 89:3,22 95:9
96:20 98:13,13,15
98:16 99:19
105:24 106:9
107:6,9 144:23
**regulatory** 76:9
77:15 140:4
144:20
**regurgitate** 190:24
**reinforcing** 143:7

**reiterated** 141:17
**rejection** 69:23
**relate** 147:6
**related** 9:14 11:10
  12:21 25:8,19
  26:14,16 27:9,12
  28:16 30:4 32:14
  32:15 47:24 52:9
  52:10 74:19 75:19
  76:3,17 78:24
  79:24 80:14,25
  85:8 90:25 92:17
  92:17,21 93:9,13
  114:5 118:13
  134:8,9 142:24
  157:3 158:4
  159:19 160:2,2,7
  160:15,21 161:9
  161:11,25 167:16
  169:12 254:4,11
  254:11 268:15
**relates** 39:16
  153:15
**relating** 18:24
**relative** 61:7
**relatively** 66:8 90:3
**relayed** 142:24
**released** 70:11
  73:16 212:14
**relevant** 130:11
  150:11,17 151:11
  151:15 152:24
  167:22 194:25
  211:4
**reliance** 52:11
**relied** 137:10
  138:19 139:4
**relieved** 73:12
**relook** 174:12
**rely** 18:25 129:25
  130:2,8 133:22
**relying** 19:20
  129:16,19 130:4
  133:5,9 146:16
  147:4 213:19
**remaining** 197:5
**remember** 32:6
  35:12 44:24 48:21

50:20 53:25 55:16
55:23,24 56:7,10
57:19 61:20
122:19 123:4
**remind** 219:21
**removal** 259:21
  261:12,17,25
**remove** 179:24
  206:6 221:11
  222:14 237:24
  241:3,5 242:8,10
  245:3 253:5 257:7
  262:14,19 263:23
**removed** 180:2
  196:2,25 245:24
  252:21 259:2,15
**removing** 216:17
  222:25 226:20
  240:5,11,23
  241:12 253:25
**render** 55:7 157:17
**rendered** 54:25
  55:9 57:16 65:12
  65:19 165:25
**rendering** 19:21
  155:6 164:24
**repetitive** 112:9
**rephrase** 10:22
  41:4 103:13
  137:24 154:3
**replace** 215:2
**report** 32:4 56:13
  56:14 61:17,22
  70:11,18 71:14,19
  129:15 130:5,15
  130:22,25 132:4
  133:7 136:5
  137:20 138:25
  139:2,3 143:11
  149:20,22 151:2,6
  151:15,23 158:12
  158:21 159:6
  165:4,6,9,20,21
  165:24,25 166:11
  166:12,16,22
  167:11 168:4,7,16
  168:17,22,25
  169:2,15,20,25

170:3 171:25
172:14,20 173:7
174:8,9 176:5,7,9
177:8 178:17,25
182:13,13,23
184:16 185:7,11
186:18 187:4,6,16
189:21 190:2
191:5 194:2
195:22 196:12
198:11 205:24
217:18 218:2,11
220:12 228:8,25
267:2,6,9,11
**report's** 168:18
**reported** 1:24
  258:19
**reporter** 2:11,12,13
  2:14,16 17:24
  67:20 116:23,24
  119:17 148:9
  159:14 165:18
  166:6 218:5,14
  268:6,6,7,8
**reporting** 3:21
  138:24
**reports** 62:2,5,6
  69:10,12 70:3,5,9
  80:6 94:18 129:15
  130:16,16,17,20
  130:23 133:13
  135:22 136:2
  165:2 170:7
**represent** 112:16
**representation**
  260:22
**representative**
  180:10 185:9
  193:7
**represented** 181:6
**representing**
  112:17
**request** 26:15 30:8
  83:5 86:2 124:17
**requested** 83:14
  85:20,24 93:18,24
**require** 34:12
  102:25 103:4

136:2 193:4
238:10
**required** 4:21 9:7
  60:14 179:3 223:7
  225:22 227:5
  235:6 259:15
**requirement** 89:5
  103:20 104:10
  141:2 142:17
  242:4 245:5
**requirements**
  30:23 31:14 33:24
  35:10,10,18 76:10
  94:24 112:19
  140:25
**requires** 193:8
  203:10 228:12
  242:6
**requiring** 255:10
**research** 32:3
  68:18 69:17 74:19
  75:17,24,25 77:6
  77:11 78:18 79:4
  79:14 80:24 82:4
  82:11,22 84:2,19
  84:20 85:2,17,20
  86:3 87:6,11,12
  87:13 88:6,17,20
  88:24 89:6,11,15
  89:21 90:8,9,14
  90:15,19,23,24
  91:7,24 92:6,8,11
  92:20 93:12,17
  94:9,15,22 95:10
  95:11,15 96:2
  134:5,6 136:12
**researcher** 95:13
**researchers** 84:2
**researching** 83:21
**reservoir** 139:18
  140:8,17 141:19
  142:4,8 143:14
  144:7,21 145:19
  147:13 148:14
  163:17 173:10
  176:18 178:19
  179:24 180:5
  185:21 187:22

194:17 195:14,16
195:16 196:2,5,25
197:11,16,19
205:19 206:6
207:23 208:2,7
209:3 216:17
217:14,20 221:12
222:3,15,22,25
223:3 225:18
226:21,25 227:18
228:12 229:4
237:14,24 240:5
240:12,18,19,24
241:6,14,15
242:11,14 244:20
245:2,18,24 247:6
248:4 249:8,10,24
251:25 252:20,21
253:5,25 254:8,12
257:7,24 258:3
259:2,3,15,21,23
260:14,20 261:4
261:12,17,18
262:2,3,20 263:5
263:12,17,24
265:7,12 267:7,13
267:16
**reservoir-filling**
  235:5 237:3
**residence** 55:25
**Resort** 54:3
**resources** 116:2
  213:3,4
**respect** 54:7 68:7
  81:14 94:15 95:15
  96:10 98:14 99:22
  101:24 111:13
  113:8 148:19
  153:17 154:9
  160:3,23 162:7,8
**respectively** 218:16
**responses** 61:15
**responsibility**
  28:10 115:2,15
**responsible** 95:22
  112:13 171:5,9
**responsive** 184:3
  184:19 218:21

**result** 89:11 135:2
 155:14 161:7
 162:5 166:3 188:4
 188:7,7 207:23
 214:16 227:12
 252:14 253:12,13
**resulted** 156:19
 190:7
**resulting** 187:19
 189:16 208:7
 209:4
**results** 76:7 91:9
 146:14 235:14
**retain** 60:20 61:18
**retained** 4:16 45:20
 56:8 62:18 63:4
 65:23 66:2,4
 74:15 96:9,15
 99:25 100:7 101:3
 101:12
**retracted** 229:7,7
**retrospect** 153:3
**revenue** 11:17 13:2
 13:11 25:17
**revenue-generati...**
 37:18
**revenues** 12:14
 26:2,11
**reverse** 238:16
**review** 69:13,17
 101:24 102:6
 129:18 134:12,13
 136:23 144:25
 150:20
**reviewed** 68:22
 70:14 106:4 107:4
 107:23 129:13
 152:23 178:7
**reviewers** 30:11
 69:20 106:24
**reviewing** 95:24
 100:19,24 124:23
 170:18 178:10
 196:19 207:10
**reviews** 145:18
**revision** 193:22
**revolved** 139:10
**Rifle** 34:2

**right** 7:13,24 9:19
 11:12,25 13:6,7,9
 19:19 21:13 22:20
 24:18 26:8,8
 28:25 31:17 34:17
 34:19 35:20 37:16
 54:20 60:4,7
 63:11,14 67:17
 68:8,12,15 69:5
 71:6 72:23 73:6,8
 77:19,22 80:22
 82:21 85:6,7
 87:17 92:10 97:20
 101:6,22 103:21
 105:6,10,16 106:7
 107:6,8 117:17,18
 117:23 118:8,23
 120:10 122:9
 123:14,15,21
 125:23 127:3
 128:22 131:8,12
 136:6 139:9
 142:25 143:11
 145:7 149:23
 150:21,24 151:17
 151:24 152:8,20
 152:22 153:3,10
 153:13 154:11
 158:17,20 164:12
 164:24 165:6,8
 166:5,7,14,24
 168:20 171:22
 177:3 178:12,12
 183:25 184:8
 188:13 191:17
 192:2 197:2
 198:22,24 199:4
 199:11 200:3
 201:12,17 202:19
 203:8,10 204:2
 208:19,22,24
 209:23 210:8,10
 218:13 220:24
 221:4,16 222:7
 223:4 227:7
 233:19 237:16,17
 241:11 242:14
 243:16 245:11,20

 247:5,24 248:17
 248:21 249:8
 251:19 252:22,24
 254:9 255:15
 258:17,21 259:2
 261:22 262:18
 264:18
**right-handed** 238:8
 243:10,12 255:3,8
**risk** 75:7,17 76:24
 98:16 101:25
 102:7 107:2 108:9
 108:25 109:8,16
 109:18,24 110:6
 110:10,14 111:15
 111:22 114:19,20
 135:4 167:15
 169:21 171:2,6,9
 190:4,6 191:19
 203:22 204:20
 205:5 209:12,13
 210:13,20 211:22
 211:22,25 212:2
 212:16,18,22,23
 212:25 213:7,8,17
 214:11,22 216:10
**risks** 95:7 114:10
**road** 3:16 5:6
**ROB-SON** 36:17
 36:18
**ROBE-SON** 36:16
**robotic** 114:4
**Robson** 37:11 59:2
 59:9,15 61:23
 63:10,21 65:5
 66:24,25 67:8,12
 67:22 68:2,6
 96:14 100:12
 101:3,7 266:10,11
 266:12,14
**Robson's** 64:23
**rocket** 193:13
**rod** 221:25 222:2
**role** 36:19 95:14
 96:14 99:22 100:2
 111:13 112:5,11
 112:15 113:5
**roles** 28:9

**root** 27:15 28:9
**rotate** 238:2
**roughly** 71:9
**round** 213:2,3
**roundabout** 62:9
**routine** 232:10,13
**rule** 13:18 16:18
**ruled** 39:9,20 40:2
 40:22,25 41:17,22
 42:16 43:12
**rules** 4:11,12,13,18
 4:20,22 7:4 16:19
**ruling** 42:19 43:2
 43:17,20 44:4,18
 44:18,20 46:16
**rulings** 39:16
**run** 14:16 54:10,15
 84:13 109:24
**running** 77:6
**Rx** 260:14 265:7
 267:13,16

_____
### S

**S** 266:6
**SA** 1:9 3:17
**safe** 22:13 146:5
**safeguard** 49:23
**safely** 256:15,17
**safest** 123:22
**safety** 33:2,15
 34:22 35:10
 106:25 146:15
 147:12 148:12
 154:14 170:24
**salary** 8:12 9:10
**sample** 140:7
 182:15 185:9
 193:7
**Sapio** 1:24 2:10
 268:6,21
**Sarah** 3:3 6:4
**satisfaction** 146:5
**Saturday** 61:5
**save** 173:19
**saw** 44:22 93:23
 241:8 257:6
**saying** 14:5 15:22
 103:21 105:7

 144:9 160:11
 163:3 171:25
 172:9 173:3
 182:15 187:24
 188:18,20 208:22
 228:19,24 239:13
 242:4 244:10,11
 255:6
**says** 20:7,8,25
 122:10 128:8
 146:17 194:12
 210:17 221:10
 252:4
**scanners** 111:5
**school** 48:12,13
 51:16 95:2
**Schultz** 3:8 4:5 5:7
 6:9,10,18 17:20
 17:23 41:3,6
 53:19 67:3,15,19
 97:6,10,23 98:10
 116:22 119:11
 127:3 147:22
 148:3,6 149:14
 158:11,14,17,20
 159:3,11 160:10
 161:4,15,17
 162:16,20,23,25
 163:9 173:21,23
 181:23,25 182:4,8
 182:10 183:7,10
 183:13,17,19,22
 184:2,5,10,15,18
 184:22,24 198:7,9
 202:18 217:16
 218:6 219:2,4,7
 219:11,15 229:25
 230:11,13,15,18
 230:20 231:10,15
 231:17,22 232:6,8
 232:11,13,17,21
 232:24 233:6,10
 233:16,19,24
 234:4,7,13,16,18
 234:21 236:20,23
 245:13 255:25
 260:24 264:12,18
 266:5

science 21:15 42:18
  50:11
scientific 32:3
  69:25 133:23
  136:7,9,10
scope 40:7,8 52:5
score 30:18,19
screen 237:20
SEAK 121:9,17,25
  122:17 123:25
  266:22
search 129:23
second 12:9 45:22
  55:22 77:17 78:25
  84:16 87:3 118:21
  149:21 164:8
  165:24 175:16
  177:6 182:18
  185:16,18 186:12
  202:23 205:16
  213:3 226:25
  235:10
section 96:20
  187:16,18
see 35:24 44:19
  84:19 95:5 103:12
  112:6 122:13
  124:4,18 135:10
  167:11 191:2
  198:14,25 199:25
  200:19,21 201:4
  201:18 216:16
  221:13,19 223:5,6
  223:8,10 226:8
  227:23 234:7,14
  237:16 242:9,13
  242:17,19,22
  243:4,6 248:23,24
  249:4 254:18
  262:22,24 264:8
seek 34:17,18
seeking 37:23
  60:20 61:18
seen 44:7,17,18
  107:18 119:16
  197:24 209:2
  210:22 228:22
  256:22,23,24

257:4
segment 187:8
select 122:24
selected 123:11
  180:11
selection 123:6,9
  123:11,15
selections 122:23
send 23:25 24:3
  88:6 91:18,21
  118:11
sense 21:24 27:9
  42:6 46:4,24
senses 21:22,23
sensor 114:9
sent 24:4,12 26:18
  88:11 94:17,22
  122:19
sentence 86:12
  196:11
separate 23:19
  24:15
sequence 213:23
  220:23 221:3
serial 261:7
service 113:2
  121:16
servicer 114:12
services 10:15,25
  13:13 26:10
  119:14,23,24
  180:20 266:18
set 64:3 139:18
  140:6,8,17 142:8
  143:15 144:7,21
  145:20 147:13
  148:13 163:17
  164:3 173:10
  176:18 178:20
  181:4 185:21
  187:22 198:16
  199:2,6 200:9
  205:10 228:19
  229:18 253:3
  258:4,8 268:12,17
sets 144:24 171:3
  180:24
seven 231:22

Seventh 3:9
severe 252:8
  253:20
severity 211:23
  212:19
shareholder 64:19
shareholders 64:12
shares 64:3 65:5
sharp 113:18
shaw 241:7
sheet 139:13
shelter 48:25
shipped 185:20
  229:5
shock 114:9
short 48:16 204:10
shorten 124:2
shoulder 237:16,17
  237:17,25 242:23
  243:5 263:23
  264:9,9
shoulders 237:22
  238:21,22
show 182:16,23
  236:3,5 240:9,11
  246:15
shown 243:20
shows 249:7 250:19
sic 35:3 139:21
  261:3
sick 184:5
side 45:5,15 56:16
  114:23 115:11
  156:5 194:6,15
sign 4:15,22
significant 75:18
  126:15
signs 145:19
silly 262:9
similar 60:5 61:12
simple 193:14
  259:10
simply 20:11 216:6
  231:7
sir 125:8 186:16
  218:19
sit 30:16 34:13
  66:17 214:14

215:21
sitting 15:25 88:9
  215:9,10 239:23
  240:6
situation 16:4
six 258:16
size 51:5 92:21,23
  93:5
ski 54:3,10,11
skid 57:21
skiers 54:13
skills 238:10
Sky 54:3
slash 108:20
slope 54:10,11,14
slower 72:9
small 48:16
smaller 113:17
Sneeze 46:13
software 110:19,21
sold 64:10 140:12
sole 115:17
solely 16:8 52:12
  172:23
solicit 84:25 85:17
solution 179:22
  180:3
somebody 203:5
  213:21 227:18
  252:6,14
somebody's 250:19
soon 185:2
sorry 8:16 43:14
  65:15 70:22 72:8
  74:9,25 85:10
  95:19 96:24
  106:13 107:14,17
  118:24,25 125:7
  130:17 131:22
  148:5 152:9 158:7
  166:8 168:14,23
  172:4 182:25
  189:10 190:5
  194:8 196:14
  198:7 200:4
  205:23 206:25
  207:8 220:3 222:9
  224:24 230:7

231:9 234:10
  240:17 241:3
  248:6,11 251:7
  258:7 262:16
sort 73:25
sound 71:6 200:16
  200:17
sounded 220:4
source 138:13
South 3:9
southeast 58:8
space 33:7,18 34:10
  34:19 89:21 90:2
  92:24 93:10
spaces 34:23 35:2
  35:22
spacing 93:5
speak 230:16,19
speaking 132:2
  183:23 191:15,16
special 224:21
SPECIALIST 3:21
Specialties 122:21
Specialty 123:2
specific 61:9,16
  83:21 101:18
  118:19 122:4
  153:17 154:9
  168:13 191:2
  199:20 253:16
specifically 94:23
  95:14 137:21
specifics 55:17
specified 106:8
specify 103:8
  104:13,19,25
speculate 13:19
  162:18
speech 199:21
  219:3
speeches 218:20
  219:14,16 231:6
spell 50:24
spelling 18:19
spill 241:14
spillage 258:14,18
spoke 26:17
sponsor 82:4,5

**sponsored** 94:11,13
**spring** 31:20,20
**squirt** 196:3 216:20
**SRU** 1:6
**ss** 268:4
**staff** 101:24 102:3
  102:6 131:5
**stage** 115:22,24
**stages** 112:18
**stand** 26:19 43:2
**standard** 51:5
  107:22,24 108:7
  108:12 135:8,12
  135:15,20 147:18
  147:19 192:19,22
  192:25 204:17
  210:16
**standards** 30:13
  193:3 210:19
**standpoint** 34:22
  34:22 110:7,8
  112:8 134:23
  163:13 212:13
  215:19 226:17
**start** 87:25 109:4
  133:25 134:5,11
  134:19 136:11
  139:3 205:4 214:3
  232:18
**started** 22:23 58:19
  66:14 85:13
  184:15 185:24
  196:9 262:7
**starting** 156:7,10
  254:14,15
**starts** 134:2,18
  194:11 229:6
**state** 2:16 11:18
  21:2,10 40:15
  42:15,17,23,23
  43:3,7,17 44:8,10
  45:4 46:9 50:14
  50:15 53:13 58:10
  75:15 77:8 81:20
  82:23 86:12 87:17
  263:16 268:8
**stated** 174:8 189:19
  257:22

**statement** 18:7
  107:5 126:24
  191:17 194:20
  209:10 259:4,5
**statements** 138:20
**states** 1:1 2:14,17
  5:20 179:25 268:7
  268:9
**statute** 107:18,19
**statutes** 106:16,17
**stenographic**
  264:16
**step** 142:11 195:12
  196:7 222:6,8,10
  222:11 225:15
  240:14,16,17,20
  240:20 241:16
  246:2 249:5
  259:14,20 261:10
  261:19 263:16,18
  263:20 264:4
**stepping** 92:2
  240:21
**steps** 210:18,22
  216:9 220:18
  222:16 223:7
  224:12,16,18
  226:18 240:11
  254:13
**stick** 206:16
**Stock** 64:3,13
**stomach** 88:12
**stop** 236:11
**stopper** 207:14
**stopper/plunger**
  207:13
**storage** 111:7,7,8,8
  114:7,7
**storm** 48:23,24
**story** 231:25 233:9
**strap** 49:20
**street** 1:14 2:9 3:9
  29:11,13
**strength** 22:6
**stress** 112:9 179:14
  226:7
**stressful** 15:16,23
  16:4,7 228:14

235:7,14 239:4
  242:6
**strike** 28:23 96:6
  161:4
**strong** 238:7,14,17
  244:2,6 245:9,16
  246:3,24 247:6
  255:16 263:21
  264:6
**struck** 49:6
**student** 21:7 79:21
  79:22 80:22 81:4
  81:6,16
**students** 95:22
**studied** 20:13,17
**studies** 21:16 76:3
  83:13,20 170:6,7
  170:15 178:22
  180:8 181:7
  182:22 186:14
  192:9 220:12
  243:19
**study** 86:22 170:5
  177:20,24 180:18
  182:16 185:10,13
  185:22 186:2,21
  186:22 193:15
  217:19 220:20,22
  220:25 224:8,10
  225:2 267:6
**stuff** 33:14 76:14
  78:9,10 82:9,12
  82:14 83:10,11
  85:13 86:25 87:2
  87:23 88:10,25
  89:2 92:14 93:22
  93:25 94:2 193:14
**sub** 179:7,7,17
  225:12
**sub-actions** 226:12
  226:23
**sub-step** 179:3,11
  179:17
**sub-steps** 179:3,7
  179:10 223:5
  225:8
**sub-task** 179:15
**sub-tasks** 221:7

223:2
**subject** 86:19 133:8
  155:3 167:22
  193:9,10
**subjects** 180:19
**submission** 100:13
  100:14 140:15
**submit** 30:6,8 31:6
  31:22 73:19
**submits** 69:19
**submitted** 26:3,14
  31:25 32:2,4
  69:18 71:14,20
  83:5 91:11 98:18
  124:4,19 145:17
**submitting** 98:23
  99:3
**Subscribed** 265:22
**sudden** 54:13
**suffered** 155:14
  157:5
**sufficiency** 57:22
  162:21
**sufficient** 58:2
**suggesting** 103:22
  147:10 148:11
**suggests** 103:15
**suing** 101:13
**suit** 143:25
**Suite** 1:14 2:9
**summary** 35:21
  120:22 132:15
  171:12 235:8
**summer** 52:9
**supersedes** 105:13
**supervision** 81:19
**supinate** 238:3,25
  239:3
**supplemental**
  165:6,21,25
  166:11 168:17,18
  168:25 186:18
  187:4
**supplies** 260:9
  265:10
**support** 137:19
**supported** 136:18
**supposed** 16:10

69:21 125:22,24
  197:11,21 214:14
  219:22 225:3
  227:5 241:4
**Supreme** 42:23,24
  43:17 44:10
**sure** 4:5 5:4 7:11
  7:14,23 25:22
  27:18 37:6 39:23
  44:19,21 50:19
  60:6 61:2 62:10
  65:17 66:21 68:11
  72:10,15 81:21
  87:5 91:18 103:3
  103:12 109:14
  116:13 118:22
  124:22 132:6
  136:10 138:8
  140:9 143:23
  150:13,18,23
  153:25 154:16
  164:13 166:10
  167:25 169:7
  173:4,15 181:3
  187:7 191:12
  193:20 194:3
  199:8 203:7 204:3
  211:7 212:9
  213:18 219:21
  226:25 242:10,16
  243:3,12 252:13
  253:15 255:4
  261:23
**surf** 95:3
**surveillance** 99:14
  99:18 203:10,14
**surveys** 95:25
**Susan** 151:20,21
  166:4,7,13,17,18
  166:23 169:12
  170:3 178:7
  195:23 218:16
**suspect** 70:17
**swab** 141:21
**swap** 242:12 250:6
  255:16
**swapped** 258:12
**switch** 238:19

250:12,22
**sworn** 6:14 265:22
268:12
**symbol** 193:3
**synonymous** 22:18
28:22
**synonyms** 21:15
**syringes** 180:23
**system** 123:24
140:2 169:23
171:4
**systems** 21:18,19
22:11

**T**
**T** 266:6
**table** 195:6 221:24
239:23,23 240:4,6
243:9 245:3,5,6
245:23 246:20
258:4
**take** 19:25 22:9
25:2 34:9 44:20
47:10 48:25 84:4
91:22 106:3
124:12 143:8
148:25 149:3,4
190:23 199:4
201:20,22 202:8
202:11 209:3
211:10 217:5,7
218:24 227:5,6
228:2 237:11
241:18 242:24
248:21 264:20
**taken** 5:17 128:9
175:9,25 176:3
**takes** 15:18 80:8
**talk** 16:2 74:5 97:9
116:15 189:12
193:3 229:3
**talked** 68:18 94:18
132:18 139:19,20
139:25 140:12,13
140:16 141:9,16
142:7,10 147:5
**talking** 85:6 92:22
98:12 132:8,11

143:8 176:20
214:10 222:6,8
223:15,15
**tangent** 231:2
**tap** 240:16,20
**tape** 111:7,8,8,9
113:25,25 114:2,6
114:7 264:19
**tapping** 237:21
240:21 241:10
**task** 36:12 115:4,10
115:20 178:18,23
179:15,22,23,23
180:3,7 202:22
220:19,21,24
221:4,7 222:14,14
222:17,24 223:16
223:17,21 224:8
224:10,11,11,14
224:22,23 225:2
225:10,12,14,20
226:10,18 227:8,9
227:15,22 228:7
239:7,17 240:2
**tasks** 100:25
178:24 179:2,4
221:10 225:6
226:12 250:6
**taught** 142:12
**tax** 12:16,20
**taxes** 10:9,11 11:3
11:16,23,24 12:2
12:4,6,9,12,21
13:7,10,14
**teach** 84:5
**Team** 61:24,25
109:23 112:12,12
112:17 214:14
215:9 217:6,8
228:5
**teams** 110:9,10
112:15 113:6
**technical** 69:9,12
70:3,5,8,11 80:6
105:18
**technically** 20:14
22:25 27:13 28:7
31:3 34:21 40:3

56:12,18
**techniques** 112:23
**technology** 215:3
**teleconference**
132:17,20 138:22
147:6
**telephone** 131:17
132:25
**television** 77:7,10
80:12
**tell** 10:16 13:14
17:4 20:24 52:5
53:2 62:17 66:20
68:21 72:12 85:3
85:4,12 121:24
122:4 124:13
132:17 133:11,18
133:19 170:16
178:13 181:18
185:25 186:4
198:4 206:14
217:11,13 220:17
222:4 228:18
229:10,16 235:22
244:25 246:17
252:8 255:13
256:21 261:21
262:23,25
**telling** 10:13
181:24 195:5
249:17 250:21
254:19
**tells** 12:22
**temporary** 139:11
155:15 156:20
161:19 189:17
249:23 252:17
255:22 258:24
259:14
**ten** 25:13 38:12,13
126:20 150:3
164:9 176:7
178:24 180:19,19
231:18,18 251:19
258:12
**tendencies** 142:20
179:12 223:13
226:3

**tendency** 218:20
**tendered** 4:6
**term** 116:5 117:19
117:23 118:9
154:15
**terminated** 73:9
**terms** 18:24 27:7
28:22 37:18
199:16 200:23
201:3 212:5 251:6
251:12 252:17
**test** 136:14 206:3
239:18
**tested** 193:21 195:3
195:4,18
**testified** 6:15 7:2
46:2 52:7,13
54:21,24 60:23
71:3 128:24
137:23 147:3
169:17 170:4,13
170:19,21 171:14
205:5 206:15,17
255:24 257:22
**testifies** 215:14
**testify** 15:17 39:10
40:3,7,11,12
41:10,20,24,24
42:7,19 45:18
47:3 55:14 123:7
148:6 207:11
257:16
**testifying** 45:17
52:4 72:18 192:13
192:14
**testimony** 8:2 14:8
14:10 15:13,15,19
16:5,20 18:16
39:7,20,21 40:8
40:19,22 41:22
43:9 45:23 46:17
53:3 54:17 57:20
60:12 70:19,24,25
71:13,24,25 92:7
128:21 138:5
139:24 164:16
169:12 170:17
171:13 172:5,23

172:24,25 206:13
206:21 229:12
255:18 257:5,11
268:12
**testing** 25:11 35:24
100:14 110:9,12
112:21,21,22
113:21 115:3,6,9
115:18,19 118:14
136:16 167:19
170:20,22,24
171:20,21 172:2
172:22 177:8,8
180:13 192:6,16
193:5,6,8 195:8
216:14 240:3
**tests** 173:8
**text** 117:12 126:9
126:10 254:22
**Thank** 17:22 67:18
149:5 165:13,17
202:12 217:23
**Thanks** 29:14
**Theoretically**
207:16
**theory** 203:9,12
**Thereabouts** 150:8
**they'd** 160:11
162:12
**thick** 51:9
**thing** 26:13 32:20
53:18 60:10 118:2
123:2 130:24
131:15 135:3
148:22 152:16
175:15 180:9
205:21 206:5
214:4 226:10
235:15 238:6
241:19 258:25
263:15
**things** 20:8 22:6
25:11 33:8 60:4
83:16 87:11 88:5
122:16 130:4
132:7,17,19 134:9
142:15,18 143:6
157:12 177:5

187:13 188:22
212:23,24 228:6
228:13,14,24
235:6,12,21
238:10 239:8
245:8 250:3
**think** 7:6 9:6 16:10
16:19 30:3 31:5
32:2,11 33:4 34:9
34:14 35:11 38:12
38:17 41:13 44:13
44:17 48:21 54:18
55:14 57:3,10,15
57:21 60:13,25
65:2,7,17,22,24
66:12 68:19 73:15
76:19 78:11,23
86:8,22 88:7
91:20 94:12
102:11 103:4,20
110:16,20 111:10
117:24 123:2
128:11 130:12
132:3 138:15
145:12 151:3
157:16 159:4
162:3,12 173:13
173:25 174:5
180:16 187:3,12
189:20 197:7
205:22,24 211:20
213:21 215:21
221:5 228:12
234:25 235:10
241:21 249:2
255:9,9,20
**third** 77:10 124:17
198:12 227:2
230:5
**Thompson** 3:15 6:7
**thorough** 140:19
177:24 180:21
**thought** 151:15
256:3 257:23
**thousand** 150:6
**three** 31:5 39:25
44:12 57:14 65:6
87:18 112:3 142:9

218:5,6
**three-ring** 62:4
**throw** 186:10
**thunderstorm**
48:24
**tied** 35:14
**time** 5:16 11:22
13:5 14:13,16
17:12 31:15 34:15
37:7 38:3,19 42:3
44:15,19,25 56:18
64:17 65:18 66:5
73:16 77:3 78:13
79:23 81:6 86:16
88:21 91:5 98:3,8
100:20 102:20
103:11 109:19
110:15 111:16
114:14 115:25
128:8,12 134:15
149:8,13,19,24
151:14 164:10,22
166:21 167:8,10
168:2,3,6 169:19
172:12 174:10
190:8,23,24
192:20 195:7
202:14 203:16
205:6 208:16
211:6 213:4,4,5
218:24 219:17
230:5 231:5
232:15 243:2
249:16 259:21
260:19 261:16
264:24 265:16
**times** 6:22 7:2 17:3
35:14 38:9,23
39:8,24 40:17
66:8 71:4 74:20
87:18 122:11
123:5,11 250:12
250:16 253:7
**tired** 183:22
**title** 63:13
**titled** 24:6
**today** 7:25 122:5
130:6 150:5

231:11 232:10,12
233:8 234:3
**toes** 92:3
**told** 43:24 46:20
61:13 146:25
**tools** 104:17,23
105:3 115:12,21
**top** 69:2 142:4
194:9,10 196:5
225:6 226:25
240:10 241:14,15
242:17 244:17
253:6 263:17
**topic** 62:25 83:21
106:23 144:11
**topics** 86:3,5 90:21
90:25 92:17
145:25
**town** 53:16
**track** 39:2,4 48:10
48:12 49:3,5
**tracks** 114:4
**traditional** 23:11
23:14,23 24:2,21
24:24 25:4,6 26:4
37:9,15 69:16
96:13 99:22
**trained** 15:24
36:12
**training** 18:25 19:4
19:20 33:23 34:12
35:17 36:4,5,8,8
36:10
**transcript** 44:22,25
**transcription** 269:7
**transcripts** 233:13
**transfer** 179:24
180:2 194:7,16
197:15 221:11
222:15,25 226:21
229:5 248:6,19
252:21 254:2
259:16,22 261:12
261:17 262:2,20
263:6,13
**transmits** 141:10
**travel** 84:7 155:8
**tree** 200:15 214:7

215:22
**trees** 114:25
**trial** 15:19 16:5
42:20,24 43:8,18
44:15,15 46:21
50:10 57:20 70:20
72:18
**trick** 190:22
**tried** 242:24
**triggered** 209:7
**trip** 41:17 42:16
**true** 119:8,19 120:5
121:2 123:14
169:6 172:11,19
194:20,22,24
195:2 196:21,22
259:4,5,13,17,18
260:18 261:13
268:12
**truthful** 125:4
**try** 190:25
**trying** 39:17 50:24
86:17 113:7 138:2
182:25 185:18
187:23 189:21
190:21 199:14
206:25 207:5,8,9
212:3 230:24
231:7 234:23
237:9,13 244:22
256:2
**TSG** 3:21
**tube** 141:14,15
241:10
**tumbled** 49:5
**turn** 118:20 178:13
187:5 238:3,16
247:14 263:25,25
**turned** 62:12
**turning** 142:11
238:11 240:13,14
264:7
**TV** 93:13,14 94:24
95:6,8,10,11,15
**twist** 222:12 223:3
227:2
**twisting** 222:18,19
**two** 23:19 24:15

31:21 55:15 63:21
63:21 64:6,12
65:6 73:22 74:21
77:19,23 78:6
79:4,5 83:16
86:16 112:3
122:24 124:18
144:24 149:2
157:12 164:3
165:2,25 166:11
170:5 173:8 177:6
178:21 188:22,25
233:13,13 238:23
245:8 250:3,5
251:21
**two-page** 260:12
267:12
**type** 5:5 32:15
84:18,19 125:15
126:2 135:2 181:5
**typed** 127:25
**types** 21:17 31:10
110:12 111:12
155:9 180:16
228:5 250:9
**typewriting** 268:13
**typical** 69:24
114:12
**typically** 27:11,12
38:15 73:20 83:20
91:23 92:6,8,11
94:25 95:3 107:23
126:8 133:25
238:13,17
**typos** 119:16
120:11

---

**U**

**ultimately** 43:7
252:24 253:2
**unable** 7:25 13:10
73:23
**unaware** 175:12
**unbeknownst**
169:8 241:23
**unclarity** 7:19
**uncomfortable**
228:21 229:14

235:7 242:6
**under-administr...**
179:21
**under-delivery**
189:16
**underneath** 242:14
242:20 245:20
**understand** 7:8,15
10:11 18:9 25:21
27:18,25 41:13
46:16,18 47:5
82:20 132:13
152:18 154:18
162:3 177:15
187:23 203:13
228:10 230:22
234:24 242:3
244:22
**understandable**
192:2
**understanding** 7:7
13:18 16:14,17
41:15 43:16 46:21
64:22,24 82:17
103:19 104:8
105:7,12 132:7,11
139:7 140:10
143:22 144:16
145:11,15,22
155:20,22 156:2
156:21 163:24
164:5,14 167:7
169:14 170:2
172:21 175:9
180:21 188:24
195:10 197:10,13
197:21 198:2,3,23
246:10,12 256:4
258:11
**understood** 7:21
**undue** 226:7
**unfair** 173:17,25
174:5,8
**unfortunate** 210:4
**unfortunately**
88:12
**unintended** 187:19
188:3 189:15

**unit** 246:3 247:14
247:21
**unit's** 253:3
**United** 1:1 2:14
5:20 268:7
**units** 114:7
**University** 21:11
75:15 86:13 87:17
**unknown** 188:5
**unnatural** 228:13
229:13 235:7,13
235:18,19 236:3
242:5 244:12,23
244:24 245:7,10
246:8 251:3
261:25 262:12,19
**unnecessarily**
250:6
**Unomedical** 1:9,10
3:17,17 6:7
162:10 169:16
172:6 198:4 256:5
**unreasonable**
192:17
**unreasonably**
190:17,18
**unrecognized**
208:19,21
**unrelated** 159:24
**unrepresentative**
182:15
**unsafe** 256:20
**unscrewing** 221:25
**unusual** 16:3
**unwanted** 208:9,13
215:17 241:24
**update** 18:10,12
**updated** 19:10,17
71:15,18 95:8
**uphill** 54:12
**upright** 194:17
**upside** 194:17
227:6,7 240:12,13
240:15 251:14
**Ursy** 72:4
**usability** 25:10
104:5,17 108:13
108:17 112:14,23

113:13 115:2,9,11
115:18 118:14
131:2 177:7,20,24
178:21 180:8,12
180:18 181:6
182:16,22 185:10
185:12,22 186:2
186:13,21 192:6,9
192:16 193:15
195:20,21 210:21
216:14 217:19
220:12,20,22,25
223:22 224:8,10
224:12 225:2
235:20 239:17
240:3 267:6
**usable** 223:25
224:6,16
**use** 21:16 22:12,13
22:14,15 41:7
77:14 84:24 86:23
87:12 94:21 103:2
106:25 116:4,8
118:9,19 146:6
158:24 174:7
179:14 180:9,22
185:8 186:21
193:16 197:11
200:23 203:20,21
211:10 213:22
217:21 236:10
237:3 244:8 249:6
251:4 252:11
255:2 260:19
267:7
**useful** 75:25
**user** 22:9 112:12,16
112:17 113:13
114:12 115:6
116:6 118:11
179:6,13 193:7
194:5,12 197:11
198:11,13,25
204:6 207:18
208:10 223:7
224:20 225:11,23
228:12,21 235:6
238:15 240:9,11

251:15,19 253:9
253:17 254:19
255:19 256:14,18
263:19
**user's** 110:7,8
**User-Filled** 217:20
267:7
**users** 22:12,14
49:22 112:23
180:10,14 181:3,4
185:10 187:21
198:5 224:19
235:13 251:19
**usually** 62:23
113:19
**utilize** 104:24
**utilized** 114:21
115:13,21
**utilizing** 182:14
192:21

---

**V**

---

**valid** 160:3,12
161:3 163:23
**validate** 180:13
186:5,11
**validated** 195:9
**validation** 96:19
98:12 112:24
**value** 82:6 149:24
**variable** 15:9
**variables** 27:15
**various** 35:25
67:22
**vault** 48:10,14 49:4
49:12,13 50:8
51:3,5
**vaults** 50:8
**Venice** 45:5,7
**vent** 139:12 141:4
155:15 157:8
161:19 164:11
189:17 208:13
216:3 217:11
249:23 252:18
255:22 257:14,17
258:24 259:14
**vented** 188:8

**venting** 154:7
158:2 159:17
**vents** 141:4 156:20
156:23 164:11,23
187:20 188:10
207:19 208:4
213:11 215:7,11
215:12,13,15,24
241:18 253:5
**venued** 45:25 46:6
49:24 50:12 52:16
56:5 58:6 59:12
**ver** 201:2
**veracity** 41:18
**verbally** 138:18
**version** 18:13,15,15
19:2 105:12,13
**versus** 5:18 37:13
46:12 72:2,4,6
93:6
**vial** 142:11 194:17
195:12,14,15
196:3,4,25 197:2
197:6,12,14,17,22
205:20 206:7
209:4 216:18,23
221:11 225:18
227:17 237:3
240:5,19 241:13
242:5 245:21,24
247:9 249:25
251:13,25 252:20
253:6 254:2,8,12
254:15,16 257:7,8
259:2,3,16,21
261:18 262:3,21
263:9 264:14
267:14
**video** 3:21 5:13
15:18 17:11 98:2
98:7 149:7,12
202:14 229:2,2
245:14 250:15
264:23 265:4
**videographer** 5:8
5:14 17:10,19
97:25 98:6 149:6
149:11 202:13,17

233:15 237:19 264:22

**videos** 241:7 256:24

**videotaped** 1:18 2:6 4:3 15:12,15 15:22 16:6,12,15 16:20 57:20

**videotaping** 16:13 16:21

**view** 22:16 124:14

**Vigilant-8** 121:11

**Vigilante** 1:18 2:7 4:1,5 5:1,17 6:1 6:13,19 7:1 8:1,5 9:1,6,21,22 10:1,2 10:18,22,23 11:1 11:19 12:1,14 13:1,2 14:1,3 15:1 16:1 17:1,3,16,24 18:1 19:1 20:1 21:1 22:1,21 23:1 23:2,5,5,9,12,13 23:16,23 24:1,7 24:11,13,14,20,24 25:1,14,15,25 26:1,11 27:1 28:1 28:14,14,18 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,15,16 37:1 37:17 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1,10,10 65:18 66:1,6,6 67:1,20 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1

85:1 86:1,20 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1,3 98:1,11 99:1 100:1 101:1 101:7 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1,19,24 117:1 118:1 119:1,14,17 120:1,15,17 121:1 121:8 122:1,7 123:1 124:1 125:1 126:1 127:1,6 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1,15 150:1,10 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 165:10,18 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1,12 183:1,3 184:1,25 185:1 186:1 187:1 188:1 189:1,7 190:1,21 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1,10 199:1 200:1 201:1 202:1,7,19 203:1 204:1 205:1 206:1 206:9 207:1 208:1 209:1 210:1 211:1

212:1 213:1 214:1 215:1 216:1 217:1 218:1,13 219:1,23 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1,3 231:1 232:1 233:1 234:1,22 235:1 236:1,17 237:1 238:1 239:1 240:1 241:1 242:1,13 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1,19 256:1 257:1 258:1 259:1 259:9 260:1,16 261:1,3 262:1 263:1 264:1 265:1 265:21 266:1,4,8 266:16,19,20,22 266:24 267:2 268:11

**Vigilante-1** 17:15 266:8

**Vigilante-10** 165:9 267:2

**Vigilante-11** 165:14 267:4

**Vigilante-12** 217:17 220:11 267:5

**Vigilante-13** 217:24 267:8

**Vigilante-14** 218:9 267:10

**Vigilante-15** 260:12 267:12

**Vigilante-16** 264:14 267:14

**Vigilante-17** 265:5 265:11 267:15

**Vigilante-2** 66:23 266:10

**Vigilante-3** 67:7 266:12

**Vigilante-4** 67:11 266:14

**Vigilante-5** 116:18 266:16

**Vigilante-6** 119:12 119:22 266:18

**Vigilante-7** 120:14 266:20

**Vigilante-8** 121:7 266:21

**Vigilante-9** 127:5 127:10 266:23

**Virginia** 42:9,14,17 42:23 43:3,8 44:8 44:16 49:25 50:10

**virtue** 254:7

**visible** 199:7,11,13 199:23 200:5,6,9 200:10,12,14,14 200:21 201:11,16

**visual** 21:23

**Vitale** 72:4

**volume** 106:22,23

**volunteered** 200:2

**vs** 1:5

___

**W**

**W** 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1

69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1

213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
**wait** 122:15,15,15
147:15 219:19
**waiting** 172:12
178:3
**Wald** 46:12
**walk** 246:16
**walk-throughs**
115:19
**want** 5:3 10:21
15:8 16:24 23:11
27:17 29:11,12
67:24 68:10 91:24
95:21 97:5,20,20
122:16 148:22
154:16 158:24
159:6 160:14
164:12 178:5
180:12 184:10
196:15 199:20
202:5,20,22
203:19 204:10
227:17 230:23
234:23 238:6
240:23 246:4,21
249:6 252:6,11
263:7
**wanted** 23:6,6
25:22 75:23 84:14
89:14 132:4,19
140:9 175:15

**wants** 9:8 24:2
263:20
**warn** 191:10 192:2
**warning** 25:11
49:19 54:12,21
55:4,12 57:17
60:24 62:14,20,24
63:5,7,7 65:20
99:6 135:9,9
141:22,23,25
163:6 250:5
253:16 256:21
**warnings** 65:13,24
75:17 122:22
133:24 134:25
135:14,16 141:22
153:16,23 154:22
154:25 156:8
158:3,10,24
159:19 160:4,25
161:24 162:9
163:15 193:10
235:22 252:10
**warranty** 112:25
113:2
**wasn't** 15:24 40:24
41:19,23 44:23
47:2 48:4 83:20
90:4 91:21 95:12
147:9 151:5
157:14 160:21
169:20 173:17
174:6,16,24
175:14 177:5
185:11 193:6,8,11
233:16 261:14
**wasted** 231:4
**watching** 112:25
**waterproof** 141:2
215:5,6
**way** 7:22 8:20 17:7
20:22 24:19 26:25
34:6 36:3 39:15
39:18 46:19 48:15
49:2 60:25 62:10
64:9 69:24 75:24
94:11 95:6 97:21
112:6 118:9

123:22 130:13
136:13,14 138:15
144:8 147:25
153:20 189:25
203:17 211:14,14
213:15,21 227:19
227:20 228:19
232:23 233:2,3,23
234:9 238:4,5
239:19 243:18
247:7,7 251:20
252:7,11 253:2,11
253:18 255:11,12
263:25 268:16
**ways** 35:15 203:5
239:21
**we'll** 9:18 85:14
132:9 189:12
232:11 234:7
247:2,2
**we're** 5:3 21:20
43:5 85:6 111:21
111:24 135:3
152:16 154:17
223:14,14 226:20
229:2 233:7 234:2
234:18
**we've** 37:16 201:20
247:5 256:22,23
256:23
**weak** 238:9,15,18
244:2,5,8 245:8
246:5,5 248:3
255:17 263:22
264:6
**web** 75:10 77:5
129:22
**website** 62:2 64:23
67:23 93:16 117:9
117:10,15 118:11
118:16,18 119:3
119:20 121:13
122:18 126:7,21
**websites** 81:2 94:3
94:10 95:4 129:21
129:25
**week** 14:18,20
**weeks** 134:16

**weighed** 51:14
**well-known** 7:5
**Wells** 3:9
**went** 121:13 123:25
133:20 140:5,22
141:11,12 145:25
151:22 166:19
180:10 185:17
186:5 208:18
220:18
**weren't** 51:24
166:23 181:6
233:21
**west** 45:5
**wet** 217:10
**whereof** 268:17
**white** 62:3 89:20
90:2 92:24 93:5
93:10
**who've** 193:17
**Whoa** 147:15
162:14
**whoops** 239:24
**wide** 51:8
**wife** 64:11,12,20
65:4
**wild** 14:7
**William** 1:18 2:7
5:17 6:13 17:16
58:17 116:19
121:8 127:6
165:10 265:21
266:4,8,16,22,24
267:2 268:11
**Williams** 1:13 2:8
3:2 6:2,4 129:9
**willing** 72:13
**wind** 49:4
**winds** 49:15
**wipe** 142:4
**wiped** 141:20
**wireless** 111:6
**wise** 37:12
**wish** 14:20
**wished** 153:4
**withdrawn** 34:6
**witness** 6:22 8:8
10:5,8,24 13:13

14:14 17:21,22
57:12 67:18 73:13
121:9,16,20 122:2
122:10,17 127:8
127:14,24 148:5
165:13,17 217:23
231:5 232:18
266:3,22,25
268:11,13,17
269:3
**witness's** 10:15
**Wogalter** 86:16
**wondering** 256:13
**woods** 200:15
**word** 27:18 173:16
197:8 201:9
228:13
**words** 26:9 55:10
123:20 128:18
137:12 144:10
197:3
**work** 11:10 14:18
14:19 15:12 23:15
24:3,9,25 25:16
25:24 26:4,17
27:8,13,21,23
28:2,4,12,15 29:9
30:5,9,10 31:23
32:16 36:20 37:8
38:6,8 65:10
73:19 75:18 76:17
77:24 79:15,17,20
80:3,5 81:6,8,13
81:15 84:2,16
92:13 95:2 100:6
100:14,14,14,15
101:7 125:15
126:2 139:5 145:2
149:24 202:12
**worked** 14:20
61:11,23 68:2,15
74:18 75:6,14
111:2,5,7,9,12
112:3,16 128:15
129:5,8
**working** 35:11,14
47:12,15 75:22
92:18 95:20

112:22 113:2
115:13
**workplace** 34:21
**works** 91:24
186:12
**world** 76:2
**worry** 113:18
**wouldn't** 32:16,18
39:9 40:2 42:6,19
52:14 111:22
152:11,13,23
159:25 160:6,15
160:23 185:13
196:10 209:20
211:19 216:9
250:8
**wrist** 238:2,24
263:24 264:11
**write** 122:21
168:16,21,24
194:5 198:10
**writing** 96:4 132:4
138:25,25 139:3
170:3 173:7
**written** 44:14,18,20
56:14 122:12
145:9 153:24
**wrong** 173:5
176:25 177:16
192:17 213:18
216:6 220:17
226:20,22 227:3
228:9 238:4
244:14 249:9,12
263:25
**wrote** 123:8,20,23
151:5,14,23
166:15,22 167:10
169:15,19,25
186:19

**X**

**X** 214:16 266:2,6

**Y**

**Y** 214:16
**Yazdani** 52:22
**yeah** 9:10 10:20
11:24 14:25 15:24

19:5 20:14 23:6
27:22 28:7 29:6
39:14 40:10 41:5
43:14,16 46:2
47:22 51:24 57:4
57:7,10 63:18
64:18 66:21 69:8
71:2 72:8,11,20
83:2 85:10,15,25
87:8,18 90:17
91:8 93:4,19
94:12 95:17,19
97:5 103:3 106:15
108:4 117:8,19
120:13,25 126:21
128:4 132:16
133:22 137:18
138:14 141:16
143:23 145:3
146:10 148:2,3,17
150:7 151:3,14
154:8,23 155:20
156:21 157:12
159:3,22,23
160:19 161:15
163:12 164:20
166:15 174:5
175:23 176:6,16
177:2,18 184:23
197:7,13 202:12
203:11,17 206:4
209:20 213:25
218:6 222:6 225:5
230:17 233:7
236:18 242:8
248:25 249:2
251:22 253:2
255:17 258:6
260:24 262:18
264:21
**year** 8:11 10:10
11:3,17 36:14
72:21 79:4 128:17
176:2 189:13
232:16
**years** 30:5,10 31:5
31:21 34:13,14
36:25 63:16 65:5

71:5 79:4,5 94:20
100:22 122:12
123:3,6 128:15
**Yep** 83:8 242:18
**yes-or-no** 97:11
259:10
**yesterday** 233:15
**York** 2:18 42:2
46:6 268:9
**younger** 79:9
**YouTube** 241:7
256:24

**Z**

**Z** 3:15
**zoom** 240:10

**0**

**08002** 3:4

**1**

**1** 17:25 19:23 98:3
269:5
**1:37** 149:10
**10** 37:15 68:24 70:4
165:19 166:22
178:7 218:16
**10:00** 232:21
**10:07** 1:15
**10:10** 5:16
**10:20** 17:12,13
**10:22** 17:14,19
**109** 208:5
**11** 165:21
**11:49** 98:3,4
**110** 208:5
**111** 208:10
**111357** 1:25
**116** 266:16
**119** 266:18
**12** 36:25 63:16
72:20 218:7,8,14
219:25 221:10
**12:02** 98:5,9
**12:58** 149:8,10
**120** 266:20
**121** 266:21
**122** 171:7,11
**123** 171:7

**127** 266:23
**13** 36:14 128:17
131:24 218:7,8,14
**13-year** 6:21 8:8
**13:37** 149:13
**1300** 1:14 2:9
**138** 106:23
**14** 31:20 128:16
218:7,8,15
**14:29** 202:14
**14:39** 202:17
**1441** 107:20
**14971:2007** 108:6
**15** 10:3 31:20 63:23
260:17 261:10
**15:36** 264:24
**1515** 1:14 2:8
**16** 165:15 267:4
**165** 267:2,4
**16th** 168:12,19
**17** 266:8
**18** 1:15 2:5 102:13
106:20 149:13
**18th** 5:15 98:8
**19** 165:11 168:11
267:3
**19102** 1:14 2:10
**19460** 29:16
**1990s** 78:8 80:20
81:15 189:6
**1999** 76:13
**19th** 165:5,20
**1st** 9:25 10:4,17
11:11 22:21 23:3
122:5

**2**

**2** 67:6,17,21 68:8
98:8 123:18 149:8
189:11 269:6
**2:29** 202:15
**2:38** 202:16
**20** 35:13
**200** 29:15
**2000** 102:2,9,11,14
105:13 106:20
189:13 204:15
206:24 209:11,15

220:15
**2000s** 78:11 156:15
167:20 170:6
178:3 189:5 195:3
195:4
**2001** 78:12 102:13
220:15
**2002** 68:3 78:20
**2003** 36:24 37:3
63:10 78:20 79:4
88:7,7
**2004** 42:2 44:21
78:20
**2005** 79:24 80:25
81:11
**2006** 130:25 131:6
131:9
**2007** 80:11
**2009** 156:19 164:4
189:3 261:5
**2010** 58:23,24
**2012** 178:3 189:2
210:2 265:14
**2012/05** 261:8
265:15
**2013** 178:4
**2015** 9:25 10:4,17
11:22 12:4 22:22
63:10 68:3 122:5
128:10,13 176:2,3
**2016** 1:15 2:5 5:16
12:7,10 19:11
66:13 71:25 98:8
102:10,17,21
103:14 105:10,11
105:12 131:6,7,11
131:24 149:13
165:5,11,15
168:11,12,19
265:23 267:3,4
268:18
**21** 96:20 98:20
**210** 3:3
**217** 267:5,8
**218** 267:10
**22nd** 268:18
**23rd** 176:3
**260** 267:12

**264** 267:14
**265** 267:15

**3**

**3** 67:17,21 118:24
  118:25 123:18
  149:13 217:20
  240:14,17 264:24
  267:6 269:7
**3-11-cv-01229(S...**
  5:22
**3:11-CV-01229** 1:6
**3:36** 264:25
**3:48** 265:2
**3:49** 265:16
**30** 35:13
**30326** 3:16
**32** 128:25
**3300** 3:9
**35** 128:22
**3560** 3:16
**36** 7:3 129:2

**4**

**4** 67:17,21 122:12
  123:6 220:16
  221:9 240:16,18
**40** 14:18,20 35:13
  180:25
**435** 15:13
**45** 207:11,16
**46** 71:3 207:16

**5**

**5** 37:14 64:8 68:23
  69:2,16 116:22,25
  118:21 147:7
  240:17,20,20
  263:16,18 264:4
**50** 66:13,17 122:12
  123:11
**501** 145:8
**501(k)** 139:21
  145:6
**510(k)** 98:23 145:7
  145:8,9,10 146:3
  146:9,14,24 147:7
  147:18
**511** 171:3

**6**

**6** 119:18,19 222:11
  225:15 240:23,24
  261:10,20 263:20
  266:5
**6:00** 258:19
**6:30** 258:20,22
**6:46** 258:16
**60** 14:21 180:24
**60/40** 38:3
**60601-1-6:2010**
  108:12
**62366:2007** 108:16
**65** 106:23
**66** 266:10
**67** 266:12,14

**7**

**7** 120:18 179:22,23
  221:10 222:8,11
  225:13 259:20
**70** 14:21
**71** 170:21,23,25

**8**

**8** 69:16 70:4 89:5
  125:2 139:19
  156:19 178:7
  193:25 195:22
  196:12 198:11
  218:15 220:7
  222:6,10
**801** 98:20
**802.11** 111:6
**820.30** 96:20
**8th** 164:4

**9**

**9** 178:7 218:15
**90** 3:9 37:14
**90s** 75:5,22 76:19
  78:9,10,10 80:21
  156:14
**92** 171:4
**93/42/EEC** 107:12
**95** 37:14

**55**

**55** 207:19
**55402** 3:10