# **EXHIBIT E**

# Deposition Transcript of William J. Vigilante, Jr., Ph.D., CPE (03.10.17)

| PAGE:LINE(S) CITED IN MEMORANDUM OF LAW |
| --- |
| 21:2-12 |

# In The Matter Of:

*Estate of Robert J. Glad vs.*
*Demby, et al*

---

*William J. Vigilante, Jr., Ph.D.*
*March 10, 2017*

---

*Media Court Reporting*
*216 West Front Street*
*Media, PA  19063*
*610.566.0805  fax 610.566.0318*
*www.mediacourtreporting.com*

Original File wv03102017[1].txt

**Min-U-Script® with Word Index**

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

---

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
 2              (CIVIL ACTION-LAW)
                    - - -
 3
 4   MARIANNE GARDNER        :NO. 1:13-CV-2473-CCB
     Personal representative :
 5   For THE ESTATE OF       :
     ROBERT J. GLAD          :
 6        Plaintiff          :
                             :
 7    vs.                    :
                             :
 8   MARKEITH DORON DEMBY    :
     Et al                   :
 9        Defendants         :
10                    - - -
11            Friday, March 10, 2017
              Media, Pennsylvania
12                    - - -
13
14        Telephonic deposition of WILLIAM J.
15   VIGILANTE, JR., Ph.D. taken pursuant to notice at
16   the offices of Media Court Reporting, 216 West
17   Front Street, Media, Pennsylvania 19063, on the
18   above date, beginning at approximately 10:11 a.m.,
19   before Joanne H. Gusler, Registered Professional
20   Reporter and Notary Public for Pennsylvania.
21
22           MEDIA COURT REPORTING
              216 West Front Street
23              Media, PA 19063
           610.566.0805  fax 610.566.0318
24          www.mediacourtreporting.com
             mcr@mediacourtreporting.com
25
```

---

Page 2

```
 1   A P P E A R A N C E S :
 2
 3        JUSTIN ZUBER, ESQUIRE
          Miller & Zois, LLC.
 4          One South Street, Suite 2450
            Baltimore, MD 21202
 5
            Counsel for the Estate of Robert J.
 6          Glad
 7
 8        MARK A. KOZLOWSKI, ESQUIRE
          Law Office of Jonathan P. Stebenne
 9          100 South Charles Street
            1101 - Tower II
10          Baltimore, MD 21201
11          Counsel for the Estate of Robert J.
            Glad
12          (Via Phone)
13
14        IMOH E. APKAN, ESQUIRE
          Franklin & Prokopik, P.C.
15          2 North Charles Street, Suite 600
            Baltimore, MD 21201
16
17          Counsel for Defendants, Markeith D.
            Demby, Thomas H. Pauls, LLC., and
18          Vernetta Sherman
19
20
21
22
23
24
25          (INDEX at end of transcript.)
```

---

Page 3

```
 1
 2        WILLIAM J. VIGILANTE, JR., having been
 3   duly sworn, was examined and testified as
 4   follows:
 5      ---DIRECT EXAMINATION---
 6      BY MR. AKPAN:
 7   Q.  Good morning, Doctor.  Can I call you
 8   Doctor?
 9   A.  Sure.
10   Q.  My name is Imoh Akpan and I represent
11   Markeith Demby, Thomas Pauls, LLC., and Vernetta
12   Sherman in reference to a lawsuit that was
13   originally brought by Robert Glad, but now is
14   being brought by his Estate and his personal
15   representative, Marianne Gardner.
16      Have you ever had your deposition
17   taken before?
18   A.  Yes.
19   Q.  Approximately how many times?
20   A.  It would be 120.
21   Q.  So you're familiar with the process.  But I
22   will go over a few pointers that will make the
23   process easier on both you, me and the court
24   reporter.  First thing's first.
25      Let me finish my question before you
```

---

Page 4

```
 1      Dr. Vigilante - Direct
 2   start to answer and I'll do the same courtesy
 3   before I ask you the next question.  Your answers
 4   have to be verbal:  Yeses, noes, complete
 5   sentences.  No shakes of the head or ah-huh or
 6   unh-unhs.
 7      If you need a break at any time, let
 8   us know.  And if you need me to rephrase a
 9   question, I will gladly do so.  Okay?
10   A.  Yes.
11   Q.  Doctor, can you please state your full name
12   and business address.
13   A.  Sure.  William John Vigilante, Jr., 200
14   Pembrooke Circle, "P," as in Paul, E-M, as in
15   Mary, B-R-O-O-K-E, Phoenixville, Pennsylvania,
16   19460.
17   Q.  And that business address is for what
18   business?
19   A.  Vigilante Consulting, LLC., and doing
20   business as Vigilante Forensic.
21   Q.  Understood.  And are you the owner of that
22   business?
23   A.  Yes.
24   Q.  And what is your occupation?
25   A.  I'm the owner/operator of a consulting firm
```

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 5

Dr. Vigilante - Direct

1     Dr. Vigilante - Direct
2  dealing with human factors and ergonomics-related
3  issues.
4  Q.  And how long has Vigilante Consulting been
5  in existence?
6  A.  The LLC., was filed in, let's say September
7  maybe, of 2015; Vigilante Forensic started
8  officially October 1st, 2015.
9  Q.  Is it incorporated in Pennsylvania?
10  A.  Yes.
11  Q.  Doctor, can you tell me briefly your
12  educational background from undergraduate through
13  graduate school?
14  A.  Sure.  I have a Bachelor's of Science
15  Degree in psychology focusing on cognition or
16  human information processing from the University
17  of Scranton in Scranton, Pennsylvania.
18     I have a Master's of Science Degree
19  and a Doctorate in Ergonomics Psychology from
20  North Carolina University.
21  Q.  And is your Ph.D., is that from North
22  Carolina State University?
23  A.  Yes, sir.
24  Q.  And before you were at Vigilante
25  Consulting, where did you work?

Page 6

1     Dr. Vigilante - Direct
2  A.  I worked for a company called Robson
3  Forensic.
4  Q.  And how long did you work there?
5  A.  I started there in July of 2003.
6  Q.  And what was your position while you were
7  there?
8  A.  I had multiple positions.  Generally I was
9  considered an associate.  I was also the practice
10  group leader for the human factors practice group,
11  and I was the area manager for the Philadelphia
12  office for Robson Forensic from about 2010 till
13  the beginning of 2015.
14  Q.  Was Robson Forensic a regional firm, was it
15  a national firm in terms of the area where they
16  took cases?
17  A.  They took cases from anywhere domestically
18  and internationally.
19  Q.  Approximately how many employees were at
20  Robson Forensic?  And when I say, "employees," I
21  mean experts, engineers of that sort.
22  A.  When I left, I'm going to hazard a guess or
23  estimate if that is better.  About 63 full-time
24  experts and maybe another 50 part-time independent
25  consultants that were associated with the firm.

Page 7

1     Dr. Vigilante - Direct
2  Q.  Are you still associated with the firm as
3  an independent consultant?
4  A.  No.
5  Q.  And how many employees are at Vigilante
6  Consulting?
7  A.  Just myself.
8  Q.  Doctor, can you briefly describe for me any
9  professional associations or teaching experience
10  that you have?
11  A.  Teaching assistance, I was a T.A. in
12  undergraduate for statistics and research methods
13  in graduate school.  I didn't have a formal role
14  as teaching but I did teach some classes for
15  professors when they were maybe out on a
16  conference or other activity.
17  Q.  And was that in ergonomics, human factors
18  or statistics?
19  A.  It would have been in human factors.  Human
20  factors and ergonomics are synonyms.
21  Q.  And what about professional associations?
22  A.  Sure.  I was going to say I didn't finish
23  the question because there were two.  I'm a member
24  of the Human Factors and Ergonomic Society.  The
25  Illuminating Engineering Society.

Page 8

1     Dr. Vigilante - Direct
2     The Transportation Research Board.
3  The American Society of Safety -- excuse me.
4  American Society of Safety Engineers.  And I'm a
5  member of the Board of Certification in
6  Professional Ergonomics.
7  Q.  So assuming that I know nothing about human
8  factors or ergonomics, tell me what a human
9  factors expert is.
10  A.  Well, it's person who's an expert and has
11  experience, educational experience, work
12  experience, research experience in the fields of
13  human factors and ergonomics.
14  Q.  And what is the field of human factors and
15  ergonomics?
16  A.  Human factors is basically the science that
17  studies how people interact with or use all
18  different types of products, machines, and
19  systems, like for example vehicles in the roadway
20  system.  What we're interested in are people's
21  abilities and limitations with respect to such
22  things as visual perception, perception-reaction
23  time, decision-making, memory, learning, training.
24     Physical abilities and limitations,
25  like strength, anthropometric constraints or

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 9

Dr. Vigilante - Direct

1    limitations or ranges.  And what we do from an
2    applied standpoint is we apply the knowledge that
3    we develop on those topics to design and the
4    development of systems such as roadway systems,
5    vehicles, consumer products, aviation, the
6    aviation industry and so forth.
7       The goal of human factors is to design
8    and develop products, systems, machines that are
9    easy to use, that are comfortable to use, and that
10   are safe to use for the people that are going to
11   be using, maintaining those systems.
12   Q.  Now, I'm assuming that there's some part of
13   that field of study that is academic or
14   research-based and then you also mentioned sort of
15   an applied or applied science part of it; is that
16   fair to say?
17   A.  It is an applied science, yes.
18   Q.  And in terms of developing designs for the
19   ease of use for particular systems, you're looking
20   at or is it fair to say that you're looking at the
21   user as a sort of general user, but you're not
22   necessarily going specific to each individual
23   person like someone that's seven years old or
24   Jennifer who is six-foot tall as opposed to -- do

Page 10

Dr. Vigilante - Direct

1    you get the difference that I'm sort of getting
2    to?
3    A.  I think I may understand what you're
4    asking --
5    Q.  Okay.
6    A.  -- and if I can answer, and if that
7    doesn't --
8    Q.  Sure.
9    A.  -- help clarify things, we can try again?
10   Q.  Sure.
11   A.  Human factors both from a research
12   perspective and a design applied perspective is
13   interested in the range of the user group expected
14   to be using the system, so there are systems that
15   are made for the general population.
16      So a subset of the general population
17   would be, drivers between the ages of
18   16 and let's say 90.  We're not concerned about
19   designing the driving controls for minors, young
20   children.
21      We're interested in designing the
22   driving controls and the driving seat and so forth
23   for folks that are about 16 up to, you know, 90 to
24   100 years old.  And within that population, we

Page 11

Dr. Vigilante - Direct

1    design for both either fifth to 95th percentile or
2    sometimes first to 99 percentile.  So it just
3    depends upon the project and the type of product
4    that you're interested in.
5       There are other systems that are
6    designed for a more constrained group of people.
7    So it just depends on the particular product or
8    system.  For general consumer products, the
9    population that we're typically interested in, if
10   it's a consumer product geared to adults, we're
11   interested in the adult population.
12      If it's we use, "worldwide," we're
13   interested in the adult population worldwide.  If
14   it's tailored to a specific country, we're
15   interested in the characteristics of the
16   population from that country.
17      If it's a child's toy, we're
18   interested in the attributes of say a four- to
19   six-year-old, if the toy is geared to young
20   children.  We're not focused on the abilities and
21   limitations of a senior adult --
22   Q.  Understood.
23   A.  -- so it depends on the project.
24   Q.  Would it be, and again, I want to make some

Page 12

Dr. Vigilante - Direct

1    general statements so that I kind of get an
2    understanding and you just correct me if my
3    statement is incorrect, that's where I'm going.
4    So would it be fair to say that, I guess, in that
5    study, you are looking at demographics such as age
6    for a particular product but you're not getting
7    down to the particular physical abilities of an
8    individual in your study or in your sort of
9    practice?  Is what I'm getting to.
10   A.  Yeah.  So typically the data is built upon
11   individuals that are participating and if we're
12   running a particular research study, to gather
13   data on the population of users.  So it gets back
14   into things like statistical sampling.
15      You know what your population or
16   subgroup is and then you sample from that group
17   and then you find a performance on a particular
18   trade.  Let's say contrast sensitivity or
19   peripheral visual field, which is probably more
20   related to this case.
21      You would bring folks in from a basic
22   science standpoint and test their peripheral
23   visual field.  The performance over that test of
24   all the people that -- of your sample will equate

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 13

Dr. Vigilante - Direct

1
2  what we term, "the natural curve."  So it's going
3  to have a mean, it's going to have standard
4  deviations, and it's going to approximate the
5  normal curve.
6      Based upon that, we can predict where
7  people will fall all across that population
8  somewhere within that normal curve.
9  Q.  Understood.
10  A.  So from a design standpoint, oftentimes the
11  designers that are building a particular system or
12  a particular vehicle, let's say, will bring
13  individuals into their study and again, they'll
14  try to make it representative of the population of
15  users, and then they'll again apply the
16  statistical techniques to get an idea of what the
17  standard curve of performance will be for whatever
18  they're testing.
19  Q.  Now, is there a certification or licensing
20  process for a human factors expert?
21  A.  There is a voluntary certification process
22  for human factors and ergonomics and that's the
23  Board of Certification of Professional Ergonomics.
24  Q.  Now, you said, "it's voluntary"?
25  A.  Yes.

Page 14

Dr. Vigilante - Direct

1
2  Q.  So and what was the name of that governing
3  body again?
4  A.  The name of the organization is the Board
5  of Certification and Professional Ergonomics.
6  Q.  Is there a particular reason why it's
7  voluntary?
8  A.  Well, for example, in comparison to state
9  engineering requirements or state medical or as
10  you in your field, attorney, to be licensed to
11  practice in a particular state, there's no
12  requirement for a human factors/ergonomics
13  professional at a state or federal level.
14      Now, there are some requirements for
15  different contracts that may require the lead
16  researcher, the lead consultant to have their
17  certification from the Board, a Certification of
18  Professional Ergonomics, but there's not a state
19  or federal requirement.
20  Q.  Understood.  And when you mean certain
21  contracts, I'm assuming you mean government
22  contracts or something like that?
23  A.  It could be government, it could be private
24  industry.  It depends on, you know, whoever's
25  offering the contract.

Page 15

Dr. Vigilante - Direct

1
2  Q.  So it would be fair to say that there's no
3  standardized set of requirements to become a human
4  factors/ergonomics expert?
5  A.  Well, from the certification, the board
6  certification, there is.  Anybody can hang a
7  shingle and claim that they're a human
8  factors/ergonomics expert, and I do see it
9  oftentimes.  And people support that claim in
10  different ways.
11      One of the most common in the field
12  that I'm in and what we're talking about today in
13  accident reconstruction, crash reconstruction, is
14  a, you know, an engineer or a state trooper or an
15  ex-law person will get experience in crash
16  reconstruction; they'll take the two-week or
17  four-week course at Northwestern University and
18  they'll have, you know, one class that spends one
19  hour on human factors of driving and then will try
20  to claim to be a human factors expert.
21      So I think any reasonable person
22  that's gone through an accredited human factors/
23  ergonomics advanced graduate course would have or
24  take issue with somebody claiming to be an expert
25  in human factors when that is their only

Page 16

Dr. Vigilante - Direct

1
2  qualification.
3  Q.  Understood.  What is the certification
4  process by that governing body that you mentioned?
5  A.  So the board certification in professional
6  ergonomics require certain things.  They require
7  an advanced degree in an accredited or accepted
8  school or university.
9      They require a certain number of years
10  of experience in a field that is directly related
11  to human factors/ergonomic.  So you have to have a
12  job description, job title for at least five years
13  that is in ergonomics and human factors.
14      So you can't be a dishwasher or the
15  electrical engineer at a company and then try to
16  apply that as your work experience.  You have to
17  provide a body of work, a portfolio of work of
18  design projects that you worked on, research
19  projects that you worked on to the certification
20  board.  They send that to their -- a peer review
21  staff that looks at the portfolio to determine
22  whether or not they're legitimate human factor and
23  ergonomics projects.
24      Then if you proceed through those
25  steps, you have to sit for an exam.  I think the

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 17

Dr. Vigilante - Direct

1  exam is half a day, I don't recall, but it's
2  basically an exam.  And then you have to pass that
3  exam with a certain number or percentage of
4  correct answers, and then you become certified.
5      And then to hold your certification,
6  you have to provide the Board with evidence or
7  support that you've had continuing education,
8  whether they be classes, workshops, conferences
9  that you've attended, research that you've done,
10  et cetera.
11  Q.  Do you remember when you became certified?
12  A.  I believe that I did it in the spring of
13  2015.
14  Q.  So before the spring of 2015, would you
15  still have considered yourself a human factors
16  expert?
17  A.  Yes.
18  Q.  But just not a certified human factors
19  expert?
20  A.  I wouldn't have been certified by that
21  board.
22  Q.  Gotcha.  Gotcha.  And you were mentioning
23  that there's some sort of recertification
24  component?

Page 18

Dr. Vigilante - Direct

1  A.  Yes.
2  Q.  Is there a timeline:  Is it like every two
3  years, every three years?  I couldn't remember
4  what you said.
5  A.  I don't recall if it's two or three years.
6  Q.  And the advanced degree requirement for
7  this governing body, I'm assuming it's in some
8  sort of science or can it be in a range of topic
9  areas for that advanced degree?
10  A.  I don't recall the specific requirements.
11  I would think it would be something related to
12  human factors and ergonomics.
13      Now, the Human Factors and Ergonomics
14  Society is this country's largest professional
15  organization for human factors and ergonomics
16  professionals.
17      They have an accreditation for
18  advanced degrees for universities giving advanced
19  degrees.  So a school like North Carolina State
20  University has been accredited for, I don't know,
21  since the '80s I think.
22  Q.  Okay.
23  A.  So a small school that may have a program
24  but that may not be accredited and then wouldn't

Page 19

Dr. Vigilante - Direct

1  be recognized as an accredited degree in human
2  factors and ergonomics.
3  Q.  Gotcha.  And your Ph.D. is in psychology,
4  correct?
5  A.  It is in ergonomic psychology.
6  Q.  Ergonomic psychology, okay.  And in terms
7  of the advance degrees or the members of the
8  certified human factors or ergonomic experts, the
9  range of degrees can be psychology, engineering,
10  all sorts of things?
11  A.  For the Board of Certification of
12  Professional Ergonomics, I don't recall their
13  requirements, but traditionally human factors/
14  ergonomics programs were either in the psychology
15  department and/or industrial engineering
16  department at the universities.
17      From the, let's say the late '90s
18  onward, computer science departments developed
19  human factors/ergonomics programs.  They were
20  focused strictly on human computer interaction
21  which is a subset or a subfield within the human
22  factors and ergonomics so they are the three most
23  likely.
24      You wouldn't find -- be hard-pressed

Page 20

Dr. Vigilante - Direct

1  to find a human factors program buried within the
2  mechanical engineering or electrical engineering
3  or civil engineering program.  Or I should say a
4  human factors/ergonomics curriculum within one of
5  those programs.
6  Q.  And Doctor, you would not consider yourself
7  an engineer, correct?
8  A.  I am not a professional engineer.
9  Q.  Why did you qualify that you're saying that
10  you're not a professional engineer?
11  A.  Because there's different definitions of
12  engineer and there's different classifications and
13  qualifications.  From a forensic practice where
14  most states require the person holding themself
15  out to be an engineer, to be a professional
16  engineer, I do not fall into that classification;
17  however, for example, when I was with the IBM
18  Corporation, my title was human factors engineer.
19      Back in the beginning days of the
20  field of human factors and ergonomics, the field
21  was known as engineering psychology.  So there is
22  some historical use of that term with respect to
23  human factors professionals, but from a
24  professional engineering standpoint, I am not.

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Dr. Vigilante - Direct

1
2  Q.  Understood.  And Doctor, you are not a
3     licensed physician?
4  A.  I am not.
5  Q.  Since you're not, do you feel that you
6     would have the expertise to dispute a physician's
7     medical diagnosis?
8  A.  Typically I don't get into diagnosis
9     issues.  I mean some of my background, I've got
10    more training on anatomy and neurology than any
11    physicians depending upon their subspecialty but I
12    don't do diagnosis.
13 Q.  And Doctor, do you consider yourself an
14    accident reconstructionist?
15 A.  Well, again, that has a broad range of
16    definitions as well.  From our case specifically,
17    the term, "crash reconstruction," typically refers
18    to our cases like ours, typically refers to the
19    gentleman or the person, the woman, I don't want
20    to be sexist or anything --
21 Q.  Understood.
22 A.  -- but the person that goes out and
23    determines the speed of the crash, the physics of
24    the crash, the dynamics of the vehicle movement,
25    maybe occupant movement within the vehicle during

Dr. Vigilante - Direct

1
2  the crash, so I don't do that type of work.  But
3  technically accident reconstruction is a part of
4  human factors but we're looking at the accident of
5  how it occurred, why it occurred from the stand-
6  point of the people that were involved in the
7  incident.
8  Q.  Let's then, I'll use your term of,
9     "crash reconstruction," as opposed to the general
10    term of, "accident reconstruction."  Do you
11    consider yourself a crash reconstructionist as
12    you've described it?
13 A.  Not as I've described.
14 Q.  So then would you feel comfortable then
15    disputing the conclusions of a crash
16    reconstructionist?  Do you think you would have
17    that basis or that expertise to do so?
18 A.  It depends on their conclusions.
19 Q.  How about mathematical conclusions?
20 A.  Again it depends on the conclusions and
21    what they're trying to mathematically prove.
22 Q.  Would you dispute a crash
23    reconstructionist's conclusions about distances or
24    measurements taken at the scene of an accident?
25 A.  It depends.  If I was out there and I took

Dr. Vigilante - Direct

1
2  measurements that differed from the other experts,
3  then certainly I would stand by my work.
4  Q.  Understood.  Doctor, the next set of
5     questions I'm going to ask you about the amount of
6     times or instances where you've been qualified as
7     an expert in litigation matters --
8  A.  Okay.
9  Q.  -- do you understand that?  Okay.  Do you
10    know offhand or independently how many times
11    you've been qualified as a human factors or
12    ergonomics expert in litigation in the State of
13    Maryland?
14 A.  I've testified in trial at least twice, if
15    not, three times in the State of Maryland as a
16    human factors and ergonomics expert.  I've been
17    through at least one Daubert motion in the State
18    of Maryland in federal court and was found -- the
19    motion was dismissed.
20    So whatever the defense was in that
21    case was trying to argue was not agreed to by The
22    Court.  I don't recall any other Daubert motions
23    in the State of Maryland.
24 Q.  Understood.  And do you remember how long
25    ago that Daubert motion was filed?

Dr. Vigilante - Direct

1
2  A.  I can give maybe an estimate of --
3  Q.  (Nods head.)
4  A.  -- let's say 2008-2009 time frame.
5  Q.  Gotcha.  And do you know if that case was
6     in federal or state court in Maryland?
7  A.  It was federal court.  And just to -- I
8     know I'm sure in Maryland state court if they
9     apply Daubert or Frye or another --
10 Q.  Understood.  So I understood your reference
11    to Daubert as someone, generally speaking,
12    challenging whether or not you were qualified to
13    testify.  I wasn't testing your knowledge of case
14    names or anything like that.
15 A.  But only in federal court.  Yeah.
16 Q.  Understood.  How many times would you say
17    you've testified as a human factors expert in a
18    trial or at a trial?
19 A.  I think it's maybe 27, 28 times.
20 Q.  Now --
21 A.  I have to -- my estimate for testifying in
22    the State of Maryland, I think, is three or four.
23    I forgot one criminal case that I testified in
24    Maryland a number of years ago.
25 Q.  Now, I know you've provided a case list and

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

---

Page 25

Dr. Vigilante - Direct

1   I don't know if, I think that case list was
2   probably -- do you think that case list covers the
3   28 times you testified?
4   A.   No.  It was only a four-year list that I
5   keep.
6   Q.   Do you know offhand how many times of those
7   27 to 28 times that you've testified, that it was
8   in reference to an automobile accident?
9   A.   I don't know a specific number but I would
10  think that it's about half.
11  Q.   Of the three or four for Maryland, do you
12  remember offhand what the nature of that testimony
13  was?
14  A.   One case involved a cigarette race boat on
15  the Chesapeake Bay that struck a jet ski, that was
16  a criminal case.  I did a civil case involving a
17  bicycle, a single vehicle bicycle collision, I
18  think that was in Montgomery County.
19       The third case was a premises trip and
20  fall case.  And then it's the fourth one that I
21  don't know exists; I can't think of what it is but
22  I've got a -- I'm not sure if there was a fourth
23  one but for some reason I think there was and I
24  just can't remember what it was about.

---

Page 26

Dr. Vigilante - Direct

1   Q.   Understood.
2   A.   Yeah.  No.  I was thinking of another one
3   but that was actually in D.C.  If I recall, I'll
4   let you know.
5   Q.   Understood.  And in the cases where you are
6   retained as a human factors expert, do you
7   generally produce a written report?
8   A.   Sometimes I do.
9   Q.   And the reason why you wouldn't is because
10  it wasn't requested?
11  A.   Or required.
12  Q.   Do you keep copies of your trial testimony
13  or your reports that you prepare in litigation
14  matters?
15  A.   Generally I don't keep copies of testimony,
16  whether it's deposition or trial.  Reports,
17  typically I do.
18  Q.   Do you know if you have the reports for the
19  cases that you testified for in Maryland?
20  A.   I do not.  And I don't know if there were
21  reports done for those cases.
22  Q.   Gotcha.  Understood.
23  A.   Typically Maryland doesn't require a report
24  in state court.

---

Page 27

Dr. Vigilante - Direct

1   Q.   Correct.  Okay.
2   A.   Those three were state court cases.
3   Q.   Understood.  And I didn't ask you about
4   publications but I know from your C.V. that you've
5   written a number of, we'll say, academic articles;
6   would that be fair to say we'll call them?
7   A.   Scientific research articles.
8   Q.   Sure.  Do you keep copies of those?
9   A.   I have some, I don't have all of them.
10  Q.   And I know you've done several
11  presentations as well.  Do you keep copies of
12  those presentations?
13  A.   Some, but not all.
14  Q.   I want to go back to sort of the field of
15  human factors and ergonomics and ask you to narrow
16  it down and explain what human factors are
17  involved with driving generally.
18  A.   Okay.  Typically topics that are of
19  interest in the driving environment are things
20  such as visual perception.  Ninety percent of the
21  driving task is visual.  So therefore it's a
22  significant focus of human factors and ergonomics
23  research in the driving environment.
24       Other areas that are of interest are

---

Page 28

Dr. Vigilante - Direct

1   expectancies and how they affect the driving task.
2   Decision-making.  Human information processing.
3   Decision-making which gets into be or which is
4   related to expectancies.
5       We're interested in perception-
6   reaction time.  That's another area that's
7   received a lot of interest in the field of human
8   factors and ergonomics.
9       We look at in conjunction with
10  expectancies and decision-making and information
11  processing, what we term, "guidance."  This is the
12  information from the roadway, both formal guidance
13  that's built into the roadway, and informal
14  guidance, that's the cues that are available in
15  the environment and how they affect both -- how
16  they affect driver performance; specifically with
17  respect to visual perception, perceptual-reaction
18  time and decision-making.
19  Q.   And as we discuss some of these terms and
20  topics, I might ask you again to explain a little
21  further but thank you for that.
22       (Documents marked for identification
23  as V-1 and V-2.)
24       BY MR. AKPAN:

---

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 29

1      Dr. Vigilante - Direct
2  Q.  Dr. Vigilante, I'm showing you what I have
3  marked as your deposition Exhibits Nos. 1 and 2.
4  For Mark on the phone, they are -- we'll do away
5  with some of the formalities.  They are Dr.
6  Vigilante's C.V. from Robson Forensic and then two
7  is his C.V., I believe, from Vigilante
8  Consulting/Forensic.  Okay.
9      BY MR. AKPAN:
10  Q.  Doctor, I want you to take a look at those
11  V-1 and V-2 and tell me if you recognize it for
12  the record.
13  A.  Yes.  I do recognize them.
14  Q.  Can you tell us what they are?
15  A.  V-1 appears to be my C.V. from January,
16  2014 when I was employed by Robson Forensic; it's
17  on the Robson Forensic letterhead.
18      And V-2 is an outdated version of my
19  current C.V. and it's on the Vigilante Forensic
20  letterhead.
21  Q.  And you said V-2 is outdated.  How do you
22  know it's outdated?
23  A.  The date on the bottom left corner of the
24  first page is 11/1/2015.
25  Q.  And do you have a more recent C.V. for us?

Page 30

1      Dr. Vigilante - Direct
2  A.  Yes.  The date on my current C.V. is
3  September 29, 2016.
4  Q.  Can I take a look at it?
5  A.  Sure.  Absolutely.
6  Q.  Do you have an extra copy of this?
7  A.  I don't, but you're welcome to --
8  Q.  I can mark it and keep it with us?
9  A.  Sure.
10      MR. AKPAN: Can you mark that as
11  three.
12      (Document marked for identification as
13  V-3.)
14      BY MR. AKPAN:
15  Q.  Doctor, you can choose to use whichever
16  C.V. you like.  I was going to the next set of
17  questions we're going to go to what is on V-2 --
18  A.  Okay.
19  Q.  -- I believe.  But I know it's probably the
20  information is the same on V-3.  We know you
21  started Vigilante Forensics October 1, 2015
22  officially.  Was there a particular reason why you
23  left Robson Forensic?
24  A.  Personal and professional growth.
25  Q.  For your work on this case, it started

Page 31

1      Dr. Vigilante - Direct
2  while you were at Robson Forensic and it now
3  continues while you're at Vigilante
4  Consulting/Forensic.  Do you possess the entire
5  file under Vigilante Consulting?
6  A.  Yes and no.
7  Q.  Explain.
8  A.  It depends on your definition of, "entire
9  file."  So I have my file that I consider my
10  expert file if you will.
11  Q.  Okay.
12  A.  I don't have access to the invoices that
13  were sent by Robson Forensic or the statements
14  that were sent by Robson Forensic while I was
15  employed by them.  So if that's considered part of
16  the overall file, I don't have that.
17      So there are some administrative
18  things I don't have.
19  Q.  Gotcha.  Saying invoices are sort of the
20  administrative stuff.  In terms of the documents
21  that would formulate your opinions in this case,
22  you contain or have or possess that file under
23  Vigilante Forensics?
24  A.  I do have it.
25  Q.  I wanted you to take a look at, so I think

Page 32

1      Dr. Vigilante - Direct
2  it's the first page of either the Vigilante
3  Forensic C.V.'s and I wanted to ask you about a
4  few of these topic areas.  Vision and driving, I
5  think we've talked about, but is there anything
6  involved in that topic area that you haven't
7  discussed already?
8  A.  That's a loaded question.
9  Q.  Generally.  Sorry.  Generally.  Generally.
10  I understand.  I just want to get an understanding
11  of what you mean in terms of your expertise with
12  vision and driving.
13  A.  Well, my expertise is in human vision:  How
14  people collect information through the visual
15  sense, the eyes.  How that information is
16  processed, sent to the brain, and how it's further
17  processed, and how its translation to perception,
18  perception translates into decision-making with
19  the intermix of information-processing,
20  expectancies, memory and so forth.  I apply that
21  to the driving environment.
22      And as I mentioned earlier, driving is
23  90 percent visual as far as collecting information
24  from the environment.
25  Q.  In that field of study, do you deal with or

Page 33

Dr. Vigilante - Direct

1  do any research on how diseases of the eyes would
2  affect perception, vision and/or driving?
3  A. I am familiar with some of that, yes.
4  Q. What are you familiar with in terms of
5  diseases of the eyes and how it affects perception
6  and driving?
7  A. Again it's a loaded question. I know that
8  different diseases, different conditions,
9  generally as we age, it can affect visual
10 performance. Typically it's related to the
11 ability of the eye to capture information from the
12 environment.
13     Also the translation of that visual
14 information into responses is affected by aging in
15 different types of illnesses or diseases or
16 degenerative issues.
17 Q. Have you done any research or applied
18 science that has accounted for the differences or
19 the effect in perception or vision with someone
20 that has a disease of the eye such as glaucoma or
21 cataracts or macular degeneration or anything of
22 the sort?
23 A. Yeah. I'm familiar with all of them and
24 generally how they affect the ability to capture

Page 34

Dr. Vigilante - Direct

1  information from the eyes.
2  Q. Have you done -- my question is a little
3  bit more specific -- have you done any specific
4  work such as research or technical reports,
5  anything outside of just being aware and familiar
6  with it? Do you understand what I mean?
7  A. I have not personally performed any studies
8  in the driving environment where those issues were
9  controlled for and looked at but I'm familiar with
10 research related to those topics on the driving
11 environment.
12     So those three things are, you know,
13 recognizes potential items that are deferments to
14 driving performance; particularly, for elderly
15 drivers.
16 Q. Somewhere down, let's see here. Somewhere
17 in the middle of the page, there's a reference to
18 aging?
19 A. Yes.
20 Q. What is that area of study or that sort of
21 focus of study?
22 A. Well, whether they be older drivers, older
23 consumers, older users, they bring a set of
24 characteristics that generally don't exist in a

Page 35

Dr. Vigilante - Direct

1  younger group of users. So from a human factors
2  standpoint when you're designing products, trying
3  to understand human performance and systems, you
4  have to account for those factors.
5     So part of my study, formal study as
6  an undergraduate and graduate and some of my
7  research focused on factors that are known to be
8  at issue as we get older. So performance
9  differences in seniors and older adults and how
10 that affects performance on a given task.
11 Q. For let's focus on the driving task. Are
12 there any set of, and you're going to kill me for
13 the phrasing I use, sort of general understandings
14 in your field about the difference between an
15 aging driver or an older driver as opposed to a
16 younger driver?
17 A. Sure.
18 Q. Tell me about them.
19 A. Well, for some examples, we know based upon
20 research, that older drivers tend to be slower in
21 their perception reaction times than younger
22 adults, compared to younger adults. So there's
23 typically attributed to delays in information-
24 processing and reaction, not necessarily in

Page 36

Dr. Vigilante - Direct

1  perception. We know that as we age, the changes
2  to the lens of the eye, whether it be the
3  hardening or the yellowing associated with
4  cataract, it affects our ability to collect
5  information at night.
6     So typically older adults have more
7  issues with collecting information through the
8  visual senses at night compared to younger
9  drivers, so their contrast sensitivity is higher.
10 Of course, visual acuity tends to drop off as we
11 get older.
12     Most people, you know, if they didn't
13 need correction, corrective lenses younger,
14 they're more likely to need them as they get
15 older. We know that older adults tend to, again
16 due to changes in the anatomy of the eye, have
17 more problems with glare at night.
18     So these types of things can affect
19 their ability to detect an object. So where a
20 younger driver may be able to detect an object at
21 night at let's say 200 feet, the older driver may
22 be limited to about 100 foot of detection ability.
23     We know that older driver lose some
24 ability in their neck and their upper body. And

Dr. Vigilante - Direct

1    one of the direct results of that is older drivers
2    have a hard time looking behind them.
3    (Indicating.)  And I'm turning my head to the left
4    and to the right.  So as we age, we typically lose
5    the ability or the range of motion in our neck, so
6    it hinders an older driver's ability to see behind
7    them.
8        Let's see what else do we know about
9    older drivers?  There's a lot more research on it
10   but those are kind of some of the examples that
11   are popping into mind quickly as we sit here.
12   Q.  I appreciate that.  The next thing I want
13   you to take a look at is your list of publications
14   and presentations.  So --
15   A.  Okay.
16   Q.  -- let's use your most recent C.V.  Do you
17   know how many presentations you've given on vision
18   and driving?  And I don't necessarily particularly
19   care about the count but if you could identify
20   them on your C.V., that would be even great.
21   Would even be better.
22       And while you're looking, that
23   question should be vision and driving and aging
24   presentations.

Dr. Vigilante - Direct

1  A.  I have not done any presentations or
2  publications related to aging and driving.  I've
3  done research on the effects of aging with the
4  ability to read and acquire knowledge and
5  information from product labels --
6  Q.  Gotcha.  Okay.
7  A.  -- but not driving environment.
8  Q.  Okay.  And what you told me there was
9  strictly for presentations or did that also
10 encompass publications?
11 A.  I think there's only -- to be fair.
12 There's only one item in that list that was not an
13 actual publication, it was only a presentation.
14 So yes.  To answer your question, it did include
15 both publications and presentations.
16 Q.  Understood.  And just to make sure that you
17 answered my original question.  Can you point to
18 me on that C.V. any publications in the area of
19 vision and driving?
20 A.  I have not done any publications -- I've
21 not written any publications with regard to vision
22 and roadway operation.  The only vision and
23 vehicle operation I've done is the one listed on
24 page five which is the, "Eckhardt, Vigilante and

Dr. Vigilante - Direct

1  Coste visibility factors in small boat
2  collisions."
3  Q.  Gotcha.  Gotcha.  Do you know if you have a
4  copy of that publication?
5  A.  I do not know if I have a copy of that
6  publication.  I will say that everything under
7  publications and presentations are publicly
8  available.
9  Q.  Gotcha.  Okay.
10 A.  The items under the technical reports are
11 not generally publicly available, they're IBM
12 confidential documents.
13 Q.  Gotcha.  And that was going to be my next
14 sort of topic was what are the technical reports?
15 And you said they are about IBM computers
16 essentially?
17 A.  All the technical reports are from my
18 career at IBM.  They were all user-based studies
19 or other studies related to consumer and
20 commercial computer-related products.
21 Q.  Gotcha.  And is it fair, I see that you
22 have a handful of or maybe more than a handful of
23 published patents.  Were they related to your work
24 at IBM?

Dr. Vigilante - Direct

1  A.  Yes.
2  Q.  And how long were you at IBM?
3  A.  About five years.
4  Q.  And when did you work at IBM?  Sorry.
5  A.  I believe I started at IBM, it's in my
6  C.V., so I'll take a look so I don't give the
7  incorrect information.  I started in 1998 at IBM
8  and left in July of 2003.
9  Q.  I'm going to ask you, I want to go through
10 a little bit of the research experience and the
11 work experience.  And let's start at the
12 University of Scranton, Department of
13 Psychology --
14 A.  Okay.
15 Q.  -- from '92 to 1993.  What was the field of
16 study or focus of that research experience that
17 you have there?
18 A.  From '92 to '93, there were two different
19 studies, general areas of study that I was working
20 on.  One of them had to do with predicting relapse
21 rates of dually-diagnosed psychiatric inpatients
22 that generally have nothing to do with the work I
23 do now; it's more of a clinical consulting
24 practice.

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 41

Dr. Vigilante - Direct

1
2    The other area of study was designing
3    a perception-reaction time experiment.  So that
4    would be more related to human factors and
5    ergonomics where we're looking at and studying
6    perception-reaction time and how it's influenced
7    by different factors.
8  Q.  Gotcha.  And that perception and reaction
9    time research at the University of Scranton was in
10   driving, was it in some other sort of system?
11 A.  It was more general.  It wasn't specific to
12   the driving environment, it was more general
13   performance.
14 Q.  Gotcha.
15 A.  The other thing I did at the University of
16   Scranton was, it was part of my T.A. where I
17   worked with students in statistics and research
18   methods.  So that's all covered under that time
19   period.
20 Q.  The next under research experience was 1994
21   to 2001 at North Carolina State University.  Can
22   you tell me briefly what research you were doing
23   there?
24 A.  Mostly all of the work I did from '94 to
25   2001 as a research assistant dealt with the topics

Page 42

Dr. Vigilante - Direct

1
2    of warnings:  How people perceive and respond to
3    warnings, whether they be warning labels or
4    warning signs, and how people perceive risks and
5    the factors that affect those perceptions of risk.
6    So that was both my own published
7    research and the research I was helping other lab
8    members conduct.
9  Q.  Then I think we're in the heading of
10   professional experience and we go back to 1995 at,
11   looks like at Penn State?
12 A.  Okay.
13 Q.  And what work were you doing there in 1995?
14 A.  At Penn State University, I worked for the
15   Center for Cumulative Trauma Disorders.  They were
16   basically a university, state-sponsored outreach
17   program to industries in Pennsylvania.
18   Essentially I went out to different
19   commercial and industrial facilities to identify
20   risk factors that were associated with high
21   incident rates of worker injury.  Collected data
22   on the tasks that were being performed and
23   identified what those risk factors were and then
24   work with part of the engineering team to provide
25   mitigation strategies, whether they're redesigning

Page 43

Dr. Vigilante - Direct

1
2    the job, redesigning the task, providing aids, et
3    cetera.
4  Q.  The next listing there is '94 to '97 at
5    North Carolina State University as an academic
6    advisor.  I think maybe it melds into some of the
7    stuff you talked to me about before with the
8    research experience?
9  A.  No.  This was a separate position I had at
10   North Carolina State University for my first three
11   years.  It was a way to -- it was kind of like a
12   work study program and essentially it was just
13   advising undergraduate students the requirements
14   they needed to matriculate and graduate.
15 Q.  And then are those --
16 A.  Are they the same thing:  Matriculate?  I'm
17   sorry.
18   MR. ZUBER:  What was the questions?
19   THE WITNESS:  I'll ask you later when
20   we're off the record.
21   BY MR. AKPAN:
22 Q.  And then '97 to 2003, we have the
23   International Business Machine or IBM Corporation.
24   Tell me sort of generally the work that you were
25   doing at IBM.

Page 44

Dr. Vigilante - Direct

1
2  A.  Thank you.  So I made a mistake a little
3    bit earlier when I said I worked for IBM from 1998
4    to 2003.  I actually started with IBM in 1997 and
5    left in July of 2003.
6    So from basically, I think, the summer
7    of '97 to December 31st of 1997, I was a co-op
8    intern at IBM and I was working in a Web design
9    and development studio designing and developing
10   Web sites.  In 1998, I moved over to the
11   networking hardware division at IBM as a human
12   factors engineer consultant.  And there, they -- I
13   was assigned to the personal systems group at IBM
14   where I worked on the design and development of
15   P.C.-related products:  So desktops, laptops and
16   P.C.-based servers, and then the peripherals that
17   attach to them.
18   And later on, I think in 2002, I was
19   assigned between the software group doing software
20   usability for internal IBM applications.  And then
21   I was working with the storage systems group
22   designing and developing commercial-based storage
23   systems.
24   So these are the large refrigerator-
25   sized units that are in like, maybe used by Google

Page 45

Dr. Vigilante - Direct

1   to store all their data, where they have huge
2   server farms and data storage farms.  So that's
3   kind of a progression of work through IBM.
4   Q.  And then from 2001 to 2003, A-R-C-C-A,
5   Inc., what work were you doing there?
6   A.  So ARCCA is a forensic engineering firm
7   based out of Bucks County, Pennsylvania, and I was
8   essentially moonlighting with ARCCA doing human
9   factors forensic investigations while I was
10  working with IBM.
11      Apparently when I finished my Ph.D., I
12  didn't know what to do with all the time I had, so
13  I decided to get a part-time job to occupy myself.
14  Q.  Understood.  And what area of work or
15  forensic science work were you doing at ARCCA?
16  A.  Similar to what I've done for Robson
17  Forensic and Vigilante Forensic, I investigated
18  car collisions, people being injured with consumer
19  products, and environmental.  I think I did a case
20  where a boy climbed a high voltage tower and was
21  electrocuted.
22      It's the general types of work I do
23  now.
24  Q.  Gotcha.

Page 46

Dr. Vigilante - Direct

1      (Document marked for identification as
2   V-4.)
3      MR. AKPAN: And Mark, for you, we are
4   looking at V-4. I'm showing Dr. Vigilante what
5   is the trial testimony history that was part of
6   the Rule 26(a)(2) disclosure.  So this might be
7   more up-to-date now but this came -- this
8   relates to V-2.  That's what came with --
9      MR. KOZLOWSKI: I'm with you.
10     MR. AKPAN: Gotcha.
11     BY MR. AKPAN:
12  Q.  Doctor, I'm showing you what I've marked as
13  your deposition Exhibit V-4. Can you take a look
14  at it and tell me if you recognize what it is?
15  A.  This looks like a history of trials that
16  I've testified in.  And I don't remember putting
17  together this document.
18  Q.  You think someone at Robson put that
19  together?
20  A.  I don't want to hazard a guess.
21  Q.  Gotcha.
22  A.  I mean I potentially could have done it
23  myself but I just don't recall doing it.  And it's
24  not a document that I typically keep.

Page 47

Dr. Vigilante - Direct

1   Q.  On the casework that's listed there, that
2   was all done while you were at Robson Forensic?
3   A.  Yes.  2004 to 2014.  So this would have all
4   been during my employment with Robson Forensic.
5   Q.  I wanted to ask you about, particularly
6   about a couple of those cases.  See what you
7   remember about -- you got it?
8      MR. ZUBER: Yeah.  I got a copy.
9      BY MR. AKPAN:
10  Q.  The first one is on the first page, trial
11  list one, the Neida Robau case.  It looks like
12  that was in Miami Dade County, Florida.  Did you
13  testify in that trial?
14  A.  Yeah.  These are all cases I testified in.
15  Up until, I don't know if it's complete, but it
16  looks like up until 2014.
17  Q.  Do you remember which party retained you in
18  that case?
19  A.  I think it was the defense.
20  Q.  And do you remember what the scope of your
21  work in that case was for?
22  A.  I think what's written here is kind of the
23  scope.  Topics addressed:  Expectancy violation.
24  Perception-reaction time.  Driver distraction.

Page 48

Dr. Vigilante - Direct

1   Visibility distance to tractor trailer.  Ability
2   of Plaintiff to avoid collision.
3   Q.  Do you remember what the outcome of that
4   case was?
5   A.  It went to the jury.
6   Q.  They didn't tell you what happened?
7   A.  I don't -- I mean I probably knew at the
8   time but I don't recall now.
9   Q.  Gotcha.
10  A.  And I may be wrong.  I may have -- I can't
11  say whether I testified on behalf of the plaintiff
12  or defendant in this case; I don't recall.
13  Q.  In the methodology, that last paragraph,
14  there's a reference to inattention, distraction
15  and/or fatigue and drowsiness.  Do you remember,
16  was there a theory or a thought that one of the
17  drivers had fallen asleep in that case?
18  A.  I don't recall that being -- I mean this is
19  a very old case, but I don't recall that as being
20  an issue.  It looks like, the way it's written,
21  that the issue would have been more with regard to
22  fatigue and drowsiness as opposed to falling
23  asleep.  They're related but they're two different
24  topics.

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 49

Dr. Vigilante - Direct

1
2   Q.   Tell me the difference.
3   A.   Well, fatigue/drowsiness oftentimes results
4    in the driver falling asleep, so that's why
5    they're related; it's kind of a precursor.  But
6    fatigue/drowsiness on its own is a different area
7    of -- a specific area of focus.  So that's why I
8    kind of differentiate them.
9   Q.   And again I know it's a long time ago, but
10   you know, tell me what your memory recall or say
11   that you don't remember it.  Do you know if your
12   research in that case involved reviewing any
13   medical records?
14   A.   I don't recall.
15   Q.   The next case I want you to look at is the
16   Terence and Patricia Smith case from, it looks
17   like August, 2007.
18   A.   (Witness complies.)  Okay.
19   Q.   That's in, looks like it's here in
20   Pennsylvania.  Again the methodology references
21   inattention, distraction and/or fatigue and
22   drowsiness.
23       Do you remember what the issues of
24   fatigue, inattention, distraction or drowsiness
25   were involved in that case?

Page 50

Dr. Vigilante - Direct

1
2   A.   That may have been this is -- I do recall
3    this case as working on behalf of the plaintiff.
4    This case happened at sunrise.  So I don't
5    remember the time of year.  If it was, you know,
6    mid-summer, sunrise could have been fairly early.
7       So there may have been some contention
8    of fatigue/drowsiness.  And I don't remember if
9    the plaintiff driver was on his way to work, maybe
10   he's on his way home from work, I just don't
11   recall.
12   Q.   Gotcha.  In the cases that you testify at a
13   trial, do you think it's more likely than not that
14   you produced a report in that case?
15   A.   In that case?
16   Q.   Or not in this particular case but in the
17   cases where it went to trial, do you think it's
18   more likely than not that you produced a written
19   report?
20   A.   I can't say.  I do know that, for example,
21   Florida is much like Maryland, they don't require
22   a report, so I don't know.
23   Q.   Gotcha.  And do you, for the Smith case in
24   August, 2007, do you remember what the outcome of
25   that case was?

Page 51

Dr. Vigilante - Direct

1
2   A.   That was a jury verdict for the plaintiff.
3   Q.   The next case I want you to take a look at
4    is the David Shore case from January, 2008.
5   A.   (Witness complies.)  Okay.
6   Q.   Again this, in the methodology it
7    references terms, "inattention, distraction,
8    fatigue and drowsiness."  Do you remember what
9    issues of fatigue, inattention, distraction and/or
10   drowsiness were involved in that case?
11   A.   Generally --
12       (Interruption for secretary.)
13       THE WITNESS: That was a collision
14   that happened before sunrise, so in the early
15   morning.  It was wintertime, so I don't know how
16   early.  Sun rises generally a little bit later
17   in the morning in summertime.
18       So I was working on behalf of the
19   defendant driver who struck a pedestrian, and
20   I'm assuming that the plaintiff alleged that the
21   cause of the collision was related to
22   inattention, distraction and/or
23   fatigue/drowsiness.
24       BY MR. AKPAN:
25   Q.   Gotcha.  Want to take a break?

Page 52

Dr. Vigilante - Direct

1
2   A.   Yeah.
3       (Brief recess.)
4       MR. AKPAN: Ready to go?
5       (No response.)
6       BY MR. AKPAN:
7   Q.   Doctor, when we left off, we were talking
8    about the David Shore case from January, 2008, and
9    I think you had answered my question about what
10   the issue around inattention, distraction and/or
11   fatigue was.  Do you remember what the outcome of
12   that case was?
13   A.   I'm fairly certain it went to the jury and
14   was a defense verdict.
15   Q.   And in that case you worked for, you were
16   retained by the defense or --
17   A.   Yes.
18   Q.   -- plaintiff?
19   A.   Defense.
20   Q.   The next case I want you to take a look at
21   is the Commonwealth of Pennsylvania, June, 2012.
22   A.   (Witness complies.)  Yep.
23   Q.   And again I focus on that because the
24   methodology included inattention, distraction
25   and/or fatigue/drowsiness.  Do you remember what

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 53

1     Dr. Vigilante - Direct
2   the facts of that case were related to those
3   issues?
4  A.  Yeah.  That was a single-vehicle collision
5   at night or early morning hours; I don't remember
6   if it was like 3:00 in the morning, 4:00 in the
7   morning, whatever, and there was a contention that
8   the collision was caused by alcohol and/or
9   fatigue/drowsiness.
10     So I looked at the factors associated
11   with those issues.  Looked at the fact pattern of
12   the crash and came to opinions.
13  Q.  And I'm assuming that you were retained by
14   the defendant?
15  A.  Yes.
16  Q.  Gotcha.  Do you remember the outcome of
17   that case?
18  A.  I'm pretty sure that was, I don't remember
19   if that was a jury trial or a bench trial, but the
20   charges associated with the DUI and/or fatigue/
21   drowsiness were dismissed.
22  Q.  And then the last one particular case I
23   want to ask you about is the one from August of
24   2014, Eric Carter case.  And again I focus on that
25   because it included in the methodology the terms,

Page 54

1     Dr. Vigilante - Direct
2   "inattention, distraction and/or
3   fatigue/drowsiness."  Do you remember what the
4   facts of that case were related to those issues?
5  A.  Yeah.  This was a single-vehicle -- no, no,
6   no, no, no.  I'm sorry.  It was a two-vehicle
7   collision.  It happened in the early morning
8   hours, I think like 5 o'clock, 5:00 a.m.  So it
9   was dark.
10     It was on a high-speed highway,
11   multiple-lane highway.  It happened at an
12   interchange where the State had the off-ramp
13   closed.  They closed it with traffic cones.
14     The defendant in that case was a
15   United States military member, that's why it was
16   against the U.S. America.  So he had intended to
17   get off on that exit and was going to the airport
18   and didn't know how to get to the airport
19   otherwise.
20     So there was a work vehicle stopped on
21   the off-ramp side on the off-ramp to the right of
22   the traffic cones near the end of the -- where the
23   off-ramp started to diverge significantly from the
24   heading of the roadway which was straight.
25     The defendant pulled up next to the

Page 55

1     Dr. Vigilante - Direct
2   truck in the far right lane.  I think it was at
3   least three, maybe four lanes, thru lanes, with
4   his lights on.  The work truck had its lights on.
5   Overhead light on.  Revolving yellow light on.
6   Taillights on, et cetera.
7     They asked him how, I think he asked
8   him how to, you know, to get to the airport with
9   the exit closed.  While he was stopped there, the
10   plaintiff, Eric Carter, I think he's deceased; he
11   died in the collision.  He ran square into the
12   back of him with no apparent response, reaction
13   prior to the crash.
14  Q.  Understood.  Understood.  Do you remember
15   who you were retained by in that case?
16  A.  The defendant.
17  Q.  And do you remember what your conclusion
18   was about the gentleman who ran into the back of
19   that truck?
20  A.  Generally that there was enough visual cues
21   for a reasonably attentive driver to detect,
22   identify and avoid the stopped vehicle in the
23   right travel lane.
24  Q.  Did you produce a report in this case?
25  A.  Most likely --

Page 56

1     Dr. Vigilante - Direct
2  Q.  Or prepare a report?
3  A.  Most likely because it's a federal court
4   case.
5  Q.  Do you know if Robson Forensic still has a
6   copy of that report?
7  A.  You know what, I have no idea.
8  Q.  Doctor, do you keep records which show how
9   many times you've been retained on behalf of a
10   plaintiff versus a defendant?
11  A.  Since 2016, I do.
12  Q.  Before 2016, did you?
13  A.  I did not keep a formal record.  I don't
14   know if Robson kept a formal record.  Generally on
15   case intake, we would designate
16   plaintiff/defendant.
17     To shortcut your questions.  Overall,
18   my plaintiff/defendant work is about 60, 65
19   plaintiff and it kind of varies over time.  For
20   the roadway work, driving and driving environment,
21   it's closer to 50/50.
22     For product warnings work, it's
23   heavily skewed to the plaintiff.
24  Q.  Doctor, do you know offhand how many times
25   have you been retained in a case by Paul

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 57

Dr. Vigilante - Direct

1   Dr. Vigilante - Direct
2   Blumenthal?
3   A.  I personally, I believe this is the only
4   case.  I can't speak for Robson Forensic.
5   Q.  Do you know how many times you have been
6   retained by Laura Zois or Miller & Zois, that law
7   firm?
8   A.  I was retained and worked for Ms. Zois on
9   one other case and I believe that we've discussed
10  a second case but I don't know that I was ever
11  officially retained on it or did any work on it.
12  Q.  Gotcha.  Doctor, do you know how many times
13  you were retained by a party in a case but your
14  conclusions and/or opinions were adverse to their
15  theory or position in the case?
16  A.  It happens.  I don't keep track of that.
17  The last one I recall was, and I recall because I
18  had a hard time collecting the bill, it was on
19  behalf of a defendant for SEPTA which is the
20  Philadelphia Southeast or the Pennsylvania
21  Southeast -- Southeast Pennsylvania Transit
22  Authority here in Philadelphia.
23      The bus, a city bus hit a pedestrian
24  and there was a question as to whether or not the
25  pedestrian was attentive or not, not paying

Page 58

1   Dr. Vigilante - Direct
2   attention.  And when I did my analysis and
3   investigation, it showed that the, unfortunately,
4   the pedestrian was more attentive than she should
5   have been and she was actually -- she walked in
6   front of the bus because the bus driver had a
7   trainer/supervisor standing in the front well that
8   waved her over.
9       It was a tragic accident.  The
10  plaintiff was killed in the collision.
11  Q.  Understood.  Understood.  So other than
12  that case that sticks out in your mind, can you
13  remember any other times when your ultimate
14  conclusions were adverse to the theory of the case
15  for the person that retained you?
16  A.  You know, it happens a couple times a year.
17  I mean the other one I remember is a collision
18  involving two motorcycles and an older gentleman,
19  an older woman pulled out from an intersection and
20  the motorcyclist had not been correct in their
21  speed estimation at their depositions.  And you
22  know, we found out that they were traveling at
23  like two, three times the rate that they alleged
24  they were traveling or stated they were traveling.
25      So once that information was factored

Page 59

1   Dr. Vigilante - Direct
2   in my analysis, I couldn't support an opinion on
3   behalf of defense in that case.  Or I'm sorry.
4   The plaintiff in that case.
5   Q.  Let's start talking about this case.
6   Doctor, do you know when you were first contacted
7   by an attorney for Robert Glad in this case?
8   A.  I do.
9   Q.  And when was that?
10  A.  (Looks at computer.)  April 1st, 2014 it
11  appears.
12  Q.  And was that Attorney Paul Blumenthal?
13  A.  Yes.
14  Q.  And did Mr. Blumenthal tell you what he
15  wanted you to do?
16  A.  I don't know that he told me what he wanted
17  me to do.  He gave me kind of a thumbnail sketch
18  of what the collision involved, what the facts
19  were, because he knew them at the time or at least
20  as he expressed them to me at the time.
21  Q.  And you are looking at a computer.  Did he
22  send you an email or something like that?
23  A.  No.  I have a copy of a case in Courier
24  form.  So when Mr. Blumenthal called, I don't know
25  if he got me directly or he was transferred over

Page 60

1   Dr. Vigilante - Direct
2   to me.  But typically I fill out an inquiry, and
3   you know, the attorney contact information,
4   party's names.  Whether it was plaintiff or
5   defendant.  Where it was located.  Date of the
6   incident and kind of a brief description of what
7   happened.
8   Q.  And what was your brief description of what
9   happened in this case?
10  A.  I can read it to you.
11  Q.  That would be great.
12  A.  And I'm pretty sure it was sent over with
13  that subpoena request, so you should have a copy
14  of it.
15  Q.  Okay.
16  A.  If you don't, I'm happy to, you know,
17  provide it.  About a paragraph long so --
18  Q.  That's fine.
19  A.  -- bear with me.  Eighty-plus years old.
20  Drives back and forth from New York to Florida.
21  And there's some abbreviations in here that I'm
22  just going to state out.
23      Day of incident, driving back with a
24  friend.  Plaintiff and friend are switching, it
25  says of driving but it should be off driving.

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 61

Dr. Vigilante - Direct

1   Route 301, four lanes:  Two north, two south.
2   Just south of Delaware line on Route 301.  1:17
3   p.m.
4
5        Rural road.  Dump truck going south
6   made a J-turn to swing around north to make a
7   right up the road.  Plaintiff hits dump trailer
8   with left front of his car into right rear of the
9   dump truck.
10        Defense:  Contributory negligence.
11   Police report said Plaintiff stated that he must
12   have fallen asleep.  Passenger stated they were
13   talking and the plaintiff was not asleep.
14        EMTs said he was unconscious at scene
15   upon arrival.  Plaintiff driving in right lane,
16   had cruise control on.  Sixty-three miles per hour
17   at impact.  Did not apply brake before impact.
18        Plaintiff does not know how collision
19   occurred or excuse me.  Happened.  Did not see
20   tractor trailer before impact.  S-E-A.  Defense
21   expert said Plaintiff had 12 seconds to see
22   tractor trailer before or dump truck before
23   impact.
24        U.S. 301 just south of Massey-Galena
25   Road, Kent County.

Page 62

Dr. Vigilante - Direct

1
2   Q.  And after Mr. Blumenthal contacted you,
3   what was your understanding of what he wanted you
4   to do in this case?
5   A.  At that point, I don't recall, but
6   eventually he asked me to determine if Mr. Demby's
7   lane change was improper and violated Mr. Glad's
8   reasonable expectancy in a manner which caused the
9   collision.  To determine if Mr. Glad had
10   sufficient time and distance to avoid the
11   collision once Mr. Demby began changing lanes.
12        And if the collision was consistent
13   with Mr. Glad falling asleep at the wheel.
14   Q.  And I'm going to get to, we'll get to your
15   report, but I will get to those particular three
16   topics.
17        (Document marked for identification as
18   V-5.)
19        MR. AKPAN: Mark, I'm showing the Rule
20   26(a)(2) disclosure for the plaintiff.
21   BY MR. AKPAN
22   Q.  Dr. Vigilante, I'm showing you --
23        MR. KOZLOWSKI: Got it.
24        BY MR. AKPAN:
25   Q.  -- what I marked as your deposition Exhibit

Page 63

Dr. Vigilante - Direct

1
2   V-5.  Have you seen that document before today?
3   A.  I don't recall seeing this document and I
4   don't have it in my file.
5   Q.  Did you participate in drafting it, in
6   drafting any part of that document?
7   A.  I don't have any recollection of helping
8   the creation of the document.
9   Q.  Let's talk about who you've spoken to about
10   this case.  Okay?
11   A.  Okay.
12   Q.  Did you speak with Robert Glad at any point
13   in time about this case?
14   A.  I don't believe so.
15   Q.  Did you talk to Mr. Glad's passenger at any
16   time about this case?
17   A.  Not that I'm aware of.
18   Q.  Did you speak to Markeith Demby, the dump
19   truck driver, about this case at any time?
20   A.  No.
21   Q.  Do you know who Glen Reuschling is?
22   A.  Yes.
23   Q.  Have you ever worked with him before this
24   case?
25   A.  I don't know.

Page 64

Dr. Vigilante - Direct

1
2   Q.  Did you know him before this case?
3   A.  I don't recall.
4   Q.  Did you speak to Glen Reuschling about this
5   case?
6   A.  Multiple times.
7   Q.  Can you tell me about how many times?
8   A.  I'd have to hazard a guess.
9   Q.  Sure.
10   A.  Maybe three times.
11   Q.  Do you remember the last time you spoke to
12   him about this case?
13   A.  I do not.
14   Q.  Would it have been in 2016?
15   A.  I don't recall doing any work on this case
16   in 2016, so probably not.
17   Q.  And do you have any independent
18   recollection about what you talked about when you
19   spoke to Mr. Reuschling those three times?
20   A.  Independent, no.
21   Q.  You can venture a guess though?
22   A.  Well, I know what we talked about on a
23   couple, on at least a couple of occasions.
24   Q.  Did you ever meet Glen Reuschling with
25   respect to this case?

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

---

Page 65

Dr. Vigilante - Direct

1
2  A.  Yes.
3  Q.  When?
4  A.  May 14th, 2014.
5  Q.  And was that at the scene?
6  A.  It was at the site.
7  Q.  At the site, okay.  And how long were you
8   at the site on May --
9  A.  14.
10  Q.  -- 14th, 2014?
11  A.  I don't recall.  If you've got the invoices
12   there, I might notice in the invoices.  I mean I
13   can...
14  Q.  Was that the only time that you had been to
15   the scene of the accident?
16  A.  Well, I was never at the scene but I've
17   been at the site twice.
18  Q.  I'm sorry.  The site.  But you said you've
19   been to the site twice?
20  A.  Yes.
21  Q.  Did you take any measurements when you went
22   to the site?
23  A.  I don't believe I took any physical
24   measurements.
25  Q.  Did you take any photographs at the site?

---

Page 66

Dr. Vigilante - Direct

1
2  A.  Yes.
3  Q.  Why did you go to the scene on May 14th,
4   2014?
5  A.  I went to the site as part of my
6   investigation.  I'm sorry.  Did you say the 14th?
7  Q.  Yeah.  May 14th, 2014.
8  A.  Okay.  Yeah.  So on the 14th, specifically
9   I was meeting Glen Reuschling and some of his
10   colleagues, I believe, and Mr. Reuschling arranged
11   to have a dump truck come down to the site and
12   perform some maneuvers through the J-turn, so I
13   came down for that event.
14  Q.  And then you told me that you had been to
15   the site a second time, correct?
16  A.  Prior to that, I had.
17  Q.  When was that time?
18  A.  The day before.
19  Q.  Gotcha.  And what did you do the day before
20   at the site?
21  A.  Give me one second.  (Looks at computer.)
22   I took some photographs and some videos and then
23   took some notes.
24  Q.  And you still have those photographs,
25   videos?

---

Page 67

Dr. Vigilante - Direct

1
2  A.  Yes.
3  Q.  Do you remember what the photographs and
4   videos were of that you took?
5  A.  They were of the intersection and then
6   traveling north and south on 301 near the
7   intersection -- near the point of impact, and I
8   should say the J-turn.
9  Q.  So traveling north and south and
10   maneuvering that J-turn?
11  A.  Yes.
12  Q.  Do you know who Paul Kelly is?
13  A.  Not offhand.
14  Q.  Do you know if you've spoken to Paul Kelly
15   about this case?
16  A.  I don't know at this point.
17  Q.  Do you know who State Trooper Anthony
18   Tobolski is?
19  A.  I know who he is, I've never met him.
20  Q.  Have you spoken to him --
21  A.  I have not.
22  Q.  -- about this case?
23  A.  Not that I'm aware of.
24  Q.  Do you know Anthony Cornetto?
25  A.  I know who he is, I don't believe I've ever

---

Page 68

Dr. Vigilante - Direct

1
2   met him.
3  Q.  Gotcha.  And so having not met him, I'm
4   assuming you haven't spoken to him either about
5   this case?
6  A.  About this case, I have not.
7  Q.  Have you ever had a case with Mr. Cornetto
8   before?
9  A.  Not that I'm aware of.  You mean were we
10   working for the same party?
11  Q.  In the same case.
12  A.  I don't recall.  It's possible, I just
13   don't recall.
14  Q.  Understood.  Do you know who Marianne
15   Gardner is?
16  A.  Oh, I do know who she is, I've never talked
17   to her.
18  Q.  Gotcha.  Do you know how many times you --
19  A.  Correct that.
20  Q.  Sorry.  Go ahead.
21  A.  I'm not aware of ever speaking with her.
22  Q.  Do you know how many times you've spoken to
23   Paul Blumenthal about this case?
24  A.  I have to hazard a guess.
25  Q.  Okay.  Sure.

---

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 69

Dr. Vigilante - Direct

1
2  A.  Over a dozen.
3  Q.  Do you know the last time you spoke to him
4  about this case?
5  A.  The last time, I'd say within six months.
6  Q.  Do you know --
7  A.  (Indicating.)
8  Q.  Sorry.  Go ahead.
9  A.  Yeah.  I don't know that we discussed the
10  case other than where it was at and its
11  scheduling.  I don't know if we -- I don't believe
12  we discussed my opinions or any additional work or
13  anything like that.
14  Q.  Understood.  Do you know how many times
15  you've spoken with someone from Miller & Zois
16  about this case?  And when I mean, "someone," an
17  attorney about this case.
18  A.  Less than a dozen times.
19  Q.  Do you know the most recent not having to
20  do with your deposition here today?
21  A.  I don't recall.
22  Q.  Let's talk briefly about today's
23  deposition.  What did you do to prepare for today?
24  A.  One of the things I did was to talk to
25  Justin from Miller & Zois.  We met this morning.

Page 70

Dr. Vigilante - Direct

1
2  We talked on the phone earlier in the week.  I put
3  together my file.  I reviewed my report.  I
4  reviewed the depositions of the plaintiff and his
5  passenger.
6  I reviewed the report of Mr. Cornetto
7  and Mr. Reuschling.  I reviewed the police report.
8  I reviewed the references I cited in my report.
9  (Looks at computer.)
10  I reviewed the crash report overlay.
11  I reviewed my inspection photos and videos from
12  the 13th and the 14th.  I looked at the defense
13  interrogatories and the responses, the answers to
14  interrogatories.  The request for production of
15  documents, and what is this one?
16  Request for admission of facts and
17  genuineness of documents.  I looked at the photos
18  I had of the dump truck.  The photos of Mr. Glad's
19  Buick, and the site photos that were taken.  I'm
20  not sure offhand who took them, they may have been
21  taken by Mr. Reuschling, I don't know at this
22  moment or I don't recall at this moment.
23  I looked at the three videos taken by
24  Glen Reuschling during our inspection on the 14th.
25  I looked at the ERD data that they retrieved from

Page 71

Dr. Vigilante - Direct

1
2  the Glad vehicle.  Looked at the police report,
3  the DOT exam.  The drug/alcohol test results, and
4  the drug testing slips.
5  And then I looked at the discovery
6  documents from Thomas Pauls, including their job
7  tickets, their driver receipt.  Paul's
8  alcohol/drug policy.  Their loss wage statement
9  and whatever else was included with that.  I
10  looked at Google Earth and Google Maps again of
11  the site.
12  I looked at the distances from the
13  point of impact to the Bay Bridge and the point of
14  impact to the Richmond area.  I looked at the
15  depositions of Mr. Cornetto and Mr. Demby,
16  Mr. Cooper, Mr. Reuschling, Trooper Tobolski.  And
17  the exhibits attached to Reuschling's and
18  Cornetto's deposition.  And I don't recall if
19  there were exhibits to Demby's and Cooper's and
20  Tobolski's deposition, I don't recall offhand.
21  And I think that's it.  Did I say I
22  reviewed my report and opinions?
23  Q.  No.  But you can --
24  A.  I did that as well.
25  (Document marked for identification as

Page 72

Dr. Vigilante - Direct

1
2  V-6.)
3  MR. AKPAN: Mark, Exhibit 6 are the
4  invoices from Robson Forensic.
5  MR. KOZLOWSKI: Got it.
6  BY MR. AKPAN:
7  Q.  Doctor, I'm showing you what I have marked
8  as your deposition Exhibit V-6.  Can you take a
9  look at it and tell me if you recognize what they
10  are?
11  A.  Yeah.  They appear to be invoices from
12  Robson Forensic to Mr. Blumenthal for my work
13  activity related to this case.
14  Q.  And --
15  A.  And to correct the record.  It looks like I
16  did put that trial history together back in April
17  of 2015 because I billed for it.
18  Q.  Now, you listed for me a lot of the
19  documents and things that you did to prepare for
20  today.  And I'm assuming you haven't invoiced them
21  yet for that work?
22  A.  I have not.
23  Q.  The last invoice I have or that's there for
24  Robson Forensic is for the trial history from
25  April 30th, 2015.  Do you know if you did any work

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 73

Dr. Vigilante - Direct

1   between April, 2015 and before you prepped for
2   today's deposition?
3   A.   Yes and no.  So some of the documents I
4   looked at, I wouldn't necessarily say -- well,
5   they were in preparation for the deposition,
6   because if I didn't have the deposition scheduled,
7   I wouldn't have realized I didn't have them.
8        So then I asked for them and was
9   provided them and then I reviewed them.  But I
10  would have reviewed them even if there wasn't a
11  deposition and I had been aware of them, and that
12  the case was still going on.  So that's kind of a
13  yes or no.
14       Prior to, let's say two weeks ago, I
15  don't recall doing any active work on the case,
16  but I can't say for 100 percent sure I didn't.
17  And if I did, it wouldn't have been a lot.
18  Q.   Understood.  So you don't know if this is
19  the last invoice under Robson Forensic; do you
20  know?
21  A.   I don't know.
22  Q.   And have you prepared an invoice under
23  Vigilante Consulting?
24  A.   I have not yet.

Page 74

Dr. Vigilante - Direct

1   Q.   Let us go to your report.
2   A.   (Witness complies.)  Okay.
3        MR. AKPAN:  And Mark, it's going to be
4   V-7.
5        (Document marked for identification as
6   V-7.)
7        BY MR. AKPAN:
8   Q.   Doctor, what I'm showing you is what I've
9   marked as your deposition Exhibit V-7.  Do you
10  recognize what that document is?
11  A.   It appears to be a copy of my May 20th,
12  2014, report in this matter.
13  Q.   Doctor, the opinions that are expressed in
14  that report, are they your current opinions as we
15  sit here today?
16  A.   Yeah.  I don't think I was asked to provide
17  any additional opinions at this point.
18  Q.   Now, do you know if there's anything that
19  you would change in this report based on the new
20  information that you reviewed after May 20th,
21  2014?
22  A.   No.  I did notice a typo in here though.
23  Q.   Where was that?
24  A.   Page two.  I've got the collision occurred

Page 75

Dr. Vigilante - Direct

1   at 120 feet north of the J-turn.
2   Q.   That was going to be one of my questions.
3   A.   Yeah.  So that appears to be a typo,
4   because I would have relied upon Glen Reuschling
5   for that.  And his is like 200, like low 200s.
6   Q.   Gotcha.  Okay.  Other than that change in
7   the report, is there anything that you would like
8   to amend specifically to your opinions based on
9   the new information that you received?
10  A.   I can't think of anything at the moment.
11  Q.   And I think you told me --
12  A.   Oh, I did receive another document.
13  Q.   Okay.
14  A.   It was from (looks at computer) -- it was
15  the report of Dr. Ranade, so I forgot to mention
16  that.
17  Q.   And do you know the date of that report?
18  A.   Yes.  One second.  It looks like the letter
19  to Mr. Blumenthal is dated August 22nd, 2014.
20       MR. AKPAN:  And Madam Court Reporter,
21  Ranade is R-A-N-A-D-E.
22       MR. ZUBER:  Yeah.  Good.
23       THE REPORTER:  Thanks.
24       BY MR. AKPAN:

Page 76

Dr. Vigilante - Direct

1   Q.   And I think you told me that you have not
2   prepared a supplemental report, correct?
3   A.   I have not.
4   Q.   And have you been asked to?
5   A.   No.  As of today.
6   Q.   As of today.  Doctor, let's take a look at
7   the subsection that is entitled, "Introduction."
8   And before we were talking about what you were
9   asked to do and then you referenced these three, I
10  guess, sort of topics that you were asked to
11  investigate.
12       These topics were something that you
13  came up with or were they something that
14  Mr. Blumenthal asked you to address?
15  A.   They would have been a collaboration
16  between myself and Mr. Blumenthal as to areas that
17  I would be comfortable opining, areas that I was
18  qualified to opine, and areas that he was
19  interested in me opining.
20  Q.   These three topic areas, were they
21  communicated or that collaboration, was that
22  something done at the initial time you were
23  retained or was this -- or sort of tell me when
24  this was discussed leading up to the preparation

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

---

Page 77

1     Dr. Vigilante - Direct
2  of this report.
3  A.  It would have been early in the
4  investigation.
5  Q.  Then the next question I have for you is
6  why is the first one entitled or referenced,
7  "Determine whether Demby's lane change was
8  improper and violated Glad's reasonable expectancy
9  in a manner which caused the collision"?  How did
10  that come about as being the first issue you
11  wanted to determine?
12  A.  Like the first in order?  I don't know that
13  it was the first in order but it's just the way I
14  wrote the report because I thought it flowed that
15  way.
16  Q.  I'll ask a better question.  Actually I'll
17  get back to that later.  I'll get back to that
18  later.  Let's go to materials available for
19  review, okay.
20     You gave me a list of additional
21  documents that you had reviewed, so I don't have
22  to ask you about those.  One of the things I don't
23  know if you mentioned was did you review S-E-A's
24  supplemental report from February of this year?
25  A.  Yes.  I reviewed a supplemental report, let

---

Page 78

1     Dr. Vigilante - Direct
2  me check the date.  Yep.  February 6th, 2017.
3  Q.  Did you see Mr. Cornetto's simulation video
4  of the accident?
5  A.  I have not seen the video, just the
6  photographs that were attached or put into the
7  report.
8  Q.  And you mentioned that you had seen the
9  videos that Mr. Reuschling made about the model
10  dump truck, that array, that turning lanes?  Him
11  turning, making that J-turn?
12  A.  Are you talking about the ones that he
13  recorded at the site?
14  Q.  Yes.
15  A.  Yes.  I did see those videos.
16  Q.  Have you seen Glen's animation video of
17  this accident?
18  A.  I don't believe so.
19  Q.  And other than the August 22nd, 2014, I
20  guess report from Dr. Ranade, have you reviewed
21  any of Mr. Glad's medical records?
22  A.  Yeah.  I don't recall reviewing any other
23  medical records from Mr. Glad.  The only things I
24  can think of if there were any exhibits to, oops,
25  the -- (looks at computer.)

---

Page 79

1     Dr. Vigilante - Direct
2  Q.  Depositions or something like that?
3  A.  Yeah.  Specifically of the EMT that
4  arrived, the off-duty EMT that arrived,
5  Mr. Cooper.  I'm not seeing any exhibits attached
6  to his deposition.  At this point, I don't recall
7  seeing any other -- any additional medical records
8  for Mr. Glad.
9  Q.  Let's turn to Subsection C of your report,
10  the description of the collision and site
11  conditions.
12  A.  Okay.  (Witness complies.)
13  Q.  We already corrected at the bottom of page
14  two about the collision occurring at 120 feet.
15  You're saying now relying on Glen's report, that
16  it's somewhere in the low 200s, correct?
17  A.  Yeah.  I would have relied on Glen
18  Reuschling to determine the point of impact.
19  Q.  But that statement continues that the
20  collision occurred in the right travel lane.  What
21  evidence are you relying on that the collision
22  occurred in the right travel lane?
23  A.  I'm relying upon Glen Reuschling to
24  determine the travel lane.  But I will say it's
25  consistent with Mr. Glad and Mr. Reuschling's

---

Page 80

1     Dr. Vigilante - Direct
2  deposition testimony but specifically I'm leaving
3  opinions with regard to location of the collision
4  and the location relative to the lanes and the
5  J-turn to Mr. Reuschling.
6  Q.  So I'll take that part and say that you're
7  relying on Glen's report for the location of the
8  accident but you also said that it's consistent
9  with, at least your recollection, of what Mr. Glad
10  and Mr. Borycens testified to, correct?
11  A.  Yeah.  They both testified that Mr. Glad
12  was traveling in the right lane with his cruise
13  control on.
14  Q.  Gotcha.  And so that's why you believe it's
15  consistent with their testimony?
16  A.  Yes.  The other thing I'll note too is the
17  police report has it occurring in lane two as
18  well.
19  Q.  Okay.
20     (Document marked for identification as
21  V-8.)
22     BY MR. AKPAN:
23  Q.  Before I show you Exhibit 8.  Doctor, do
24  you know where in the right travel lane the
25  accident occurred?

---

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 81

Dr. Vigilante - Direct

1     Dr. Vigilante - Direct
2 A.  Do you mean laterally or do you mean like
3  longitudinally?
4 Q.  Both.
5 A.  Both?  I'm relying upon Mr. Reuschling for
6  those determinations.  So I note what he notes in
7  his report, but beyond his analysis, I haven't
8  done my own.
9 Q.  Is there any particular reason why you're
10  relying on Mr. Reuschling's determination as
11  opposed to Mr. Cornetto's?
12 A.  I wasn't asked to rely upon Mr. Cornetto's
13  and I didn't rely upon Mr. Cornetto's.
14 Q.  When you say you were not asked to, what do
15  you mean by that?
16 A.  Well, I assumed that Mr. Reuschling's
17  analysis was correct.
18 Q.  And are you making any assumptions about
19  Mr. Cornetto's determination or you weren't asked
20  to?
21 A.  I wasn't asked to critique his report with
22  regards to those issues.
23 Q.  Doctor, I'm showing you what is marked as
24  your deposition V-8.  I want you to take a look at
25  that and tell me if you recognize what it is.

Page 82

1     Dr. Vigilante - Direct
2 A.  It appears to be a copy of the State of
3  Maryland Motor Vehicle Accident Report for this
4  collision.
5 Q.  Yes.  And if you turn to page three of your
6  report under, again, the heading, "Description of
7  the collision and site conditions," I note that
8  you reference the police report and that Glad
9  stated that it says that, "Glad stated that he
10  fell asleep."
11    Is there any reason why you didn't
12  include in your report that Glad's passenger also
13  stated that he must have fallen asleep?  It didn't
14  include that reference, is there any reason why?
15 A.  I don't recall there being a reason.
16 Q.  Let's turn to Subsection D, the analysis.
17 A.  (Witness complies.)  Okay.
18 Q.  And the first, I guess, D-1 is, "Demby's
19  improper lane change was a violation of Glad's
20  reasonable expectancy."  Tell me what you mean by
21  improper lane change.
22 A.  Well, it's my understanding that Mr. Demby
23  went from the J-turn in the median, crossed into
24  the left travel lane and then changed or moved
25  into the right travel lane without providing

Page 83

1     Dr. Vigilante - Direct
2  Mr. Glad with the time and distance he needed to
3  safely change his path and speed.  And it's my
4  understanding that Mr. Demby had a responsibility
5  to ensure that when he was pulling out, that he
6  didn't cause any disturbance in the traffic flow
7  of the vehicles approaching.
8 Q.  When, in terms of at least your
9  understanding of how this accident happened and in
10  particularly, the reference to an improper lane
11  change, are you assuming that after Mr. Demby made
12  that J-turn, that he fully established his vehicle
13  north and south in the left lane, lane one, as
14  part of your conclusion about an improper lane
15  change?
16 A.  That he was perfectly north and south?
17 Q.  Not perfectly north and south but had
18  established himself traveling north in lane one.
19 A.  At some point, yes.  In the left lane.
20 Q.  And what facts are you relying on to
21  support that assumption or that conclusion?
22 A.  I'm just relying upon Mr. Reuschling's
23  investigation.
24 Q.  I understand.  Aside from Mr. Reuschling's
25  investigation, what facts or other things, because

Page 84

1     Dr. Vigilante - Direct
2  and I'll clarify.  I will reference
3  Mr. Reuschling's investigation as an expert report
4  and/or opinion.  I'm taking a step back from an
5  ultimate conclusion of a report.
6    I'm talking about the underlying facts
7  that something will be based on or a conclusion
8  will be based on.  That's where I'm going to.  So
9  I'm looking for where in deposition testimony,
10  where in statements made by any of the drivers or
11  passengers involved that indicate that Mr. Demby
12  was established in lane one after he made the
13  J-turn?
14 A.  Yes.  So I think there's a little bit of
15  confusion.  I wasn't asked to determine if or what
16  his path was to the point of impact.  I'm allowed
17  to rely upon Glen Reuschling's analysis and
18  opinions as a basis for extending mine.
19    So I didn't go into the fact pattern
20  and do my own investigation.  I relied upon
21  Mr. Reuschling's investigation and opinions to
22  determine what he believed to a reasonable degree
23  of his engineering certainty or whatever certainty
24  that he uses, as to what occurred.
25    Taking that assumption, my opinions

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 85

Dr. Vigilante - Direct

1     Dr. Vigilante - Direct
2  are that that was an improper lane change that
3  violated Mr. Glad's reasonable expectancy.  Now,
4  as I mentioned earlier, aside from that, there's
5  consistency with the testimony of Mr. Glad and
6  Mr. Borycens.
7  Q.   And the consistency in that testimony is
8  that they were traveling in the right lane?
9  A.   Yes.
10  Q.   And based on your review of Mr. Glad's
11  testimony, do you believe he testified that
12  Markeith Demby changed lanes from lane one to lane
13  two into the path of his vehicle?
14  A.   He testified he doesn't recall seeing him.
15  Q.   With respect to his passenger,
16  Mr. Borycens, is it your recollection that he
17  testified that Mr. Demby's vehicle changed lanes
18  from lane one into lane two?
19  A.   I don't believe Mr. Borycens testified that
20  he recalled seeing Demby either.
21  Q.   I know you read Mr. Demby's deposition.  Is
22  it your recollection of his testimony that he
23  testified that he fully established himself into
24  lane one and changed lanes into lane two?
25  A.   No.  He testified that he went over into

Page 86

1     Dr. Vigilante - Direct
2  the shoulder and came back into the right lane.
3  He also testified that Glad was in the left lane.
4  Q.   Understand.  And I think you've already
5  said that your conclusion about sort of how this
6  or your opinions about the improper lane change
7  and sort of throughout your report are based on at
8  least -- are based on Glen Reuschling's version of
9  how or the path of Mr. Demby's vehicle; is that
10  fair to say?
11  A.   Yeah.  If you look on page six, I give a
12  recitation of what Glen Reuschling concluded with
13  regards to the collision.  And taking that as my
14  working assumption, that's how, in part, I got to
15  my opinion.
16  Q.   And if Glen Reuschling's conclusion about
17  how --
18  A.   I'll take another one.  Demby also
19  testified that he didn't signal that he was moving
20  into the right lane.
21  Q.   My question, Doctor, is if Glen
22  Reuschling's summation or conclusion about the
23  path of Mr. Demby's vehicle is incorrect, would it
24  then or how would that affect your opinions in
25  this case?

Page 87

1     Dr. Vigilante - Direct
2  A.   I'd have to look at it.
3  Q.   Doctor, let's talk about expectancy, okay.
4  Is it a fair statement that expectancy, when we're
5  talking about human factors, relates to a driver's
6  readiness to respond to situation, events and
7  information predictable -- in predictable and
8  successful ways?
9  A.   Sure.
10  Q.   And --
11  A.   Sounds like something I wrote.
12  Q.   It is.  And I think one of the references
13  that you cite in your report talks about two types
14  of driver expectancies:  One that is long-term or
15  apriority and --
16  A.   Yes.  I'm sorry.  I thought you were --
17  Q.   I'm sorry.  No problem.  No problem.  One
18  that is long-term or apriority and another one
19  that's short-term called, "Ad hoc"?
20  A.   Yes.
21  Q.   And to summarize.  Long-term, a long-term
22  drive expectancy is one which the driver brings to
23  the task of driving?
24  A.   Well, it's --
25  Q.   Based --

Page 88

1     Dr. Vigilante - Direct
2  A.   It's developed over time.
3  Q.   And so sort of that long-term driver
4  expectancy is based on sort of -- well, you tell
5  me.  What makes a long-term driver expectancy?
6  A.   Well, in the way we're dealing with it in
7  the driving environment, it's based upon the
8  things that are formalized in the driving
9  environment, whether they be the traffic control
10  device standardization.  Whether they be the
11  standardization of rules of road.  Whether they be
12  the standardization of proper driver behavior as
13  noted in the different driver manuals.
14     And then consistently experiencing the
15  application of those rules and guidelines and
16  procedures over time builds the apriority
17  expectations.  So it's something that develops
18  over time based upon consistent experience in
19  repetition with the same or similar types of
20  environments, events and actions.
21  Q.   And what are short-term or what is
22  short-term driver expectancy?
23  A.   Ad hoc expectancy are things that are
24  site-specific.  So an example of an ad hoc
25  expectancy is if I'm traveling on a windy road and

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 89

Dr. Vigilante - Direct

1  the curves are preceded by a curve ahead sign, I
2  will expect both from apriority and ad hoc that
3  all future curves that are along this particular
4  stretch of roadway will be preceded by a curve
5  ahead warnings.  So that's an ad hoc expectancy.
6      The ad hoc is built upon the apriority
7  that's a general expectancy that dangerous or
8  hazardous roadway conditions are warned or signed
9  ahead of time by experiences on that road suggests
10  that it's going to continue.  Now, the reverse of
11  that is if I'm on a windy road and the curves are
12  not signed, I will develop an ad hoc expectancy
13  that there could be curves in the future on that
14  road, shortly in the future on that road that
15  won't be signed either.
16  Q.  The expectancy that you're referencing in
17  D-1, sort of Demby's improper lane change was a
18  violation of Glad's reasonable expectancy, is that
19  in relation to his long-term driver expectancy,
20  his short-term driver expectancy or none of the
21  above?
22  A.  It's apriority, so it's long-term.
23  Q.  Gotcha.  Okay.  And explain how Demby's
24  improper lane change violated that apriority
25

Page 90

Dr. Vigilante - Direct

1  expectancy.
2  A.  Yeah.  Well, that's what I have in the
3  report.  That drivers are required to signal their
4  intention before lane changing.  They're required
5  to provide drivers with sufficient time and
6  distance before they move over.
7      Typically drivers are instructed to
8  pull, if they're going to pull into a situation
9  like this, into the lane closest to where they're
10  coming out of, not the far lane.
11      So it's the expectation based upon the
12  overall rules and the standardization of rules and
13  guidelines and policies that a driver is not going
14  to come from the J-channel -- J-turn or the median
15  and pull into the far right lane or shoulder; that
16  they're going to pull into the left lane.
17      And if they're going to pull into the
18  left lane, that they're going to stay there until
19  they have enough time and distance to safely move
20  to the right.  And that before they move to the
21  right lane, that they're going to provide a turn
22  signal, an indication that they're going to move,
23  so that the driver approaching behind can see what
24  their intentions are and then have the time and
25

Page 91

Dr. Vigilante - Direct

1  distance to respond.  So with Demby moving over
2  into the right lane without signalling and without
3  sufficient time and distance to avoid it, that was
4  contrary to established rules, procedures,
5  policies which then therefore is a violation of
6  the expectancy that's built upon those rules,
7  policies, guidelines, et cetera.
8
9  Q.  Doctor, probably an hour ago or so when we
10  were talking about human factors generally and I
11  think we probably were also discussing sort of
12  vision and driving, I think you said, and correct
13  me if I'm wrong, maybe you said the driving task
14  is 90 percent visual or you gave me some 90
15  percent number; do you remember talking about
16  that?
17  A.  Yes.
18  Q.  How does vision impact expectancies in
19  general, long-term expectancies and short-term
20  expectancies?
21  A.  No.  You have it backwards.
22  Q.  Okay.
23  A.  So the expectancies affect visual
24  perception, visual performance.  So I think I list
25  them in the report.  So for example, the

Page 92

Dr. Vigilante - Direct

1  likelihood of detecting a hazard or hazardous
2  event is decreased when you violate expectancy
3  because you're not looking for it.
4      A dump truck ahead of me in the left
5  lane with its turn signal on, I'd start looking at
6  the dump truck and seeing what he was doing so if
7  he did move over into the right lane, at least I
8  had some forewarning of what his intentions were.
9  So expectancy is going to result in me tracking
10  him, keeping an eye on him.
11      If he's got no turn signal and I'm
12  expecting him to stay in the left lane, my
13  attention is going to be focused on the roadway
14  beyond him.  So now you're going to have to detect
15  his movement into your lane from peripheral vision
16  which is going to be more difficult than if it was
17  in central vision.
18      So that's an example of how expectancy
19  can affect visual performance or vision related to
20  the driving task.
21  Q.  And I apologize.  Can you tell me again
22  what you said expectancies related to peripheral
23  vision and central vision again?
24  A.  Well, it doesn't relate directly.  What it
25

Page 93

Dr. Vigilante - Direct

1  relates to is the fact that if you believe the
2  truck is going to stay where it's at, you're going
3  to be not worried about it, all right.  So you're
4  not going to be focused on it.
5     And if you're not focused on it, it
6  means the truck is going to appear in peripheral
7  vision assuming that you're looking somewhat
8  forward.  If you check, you, of course, if you
9  check your right mirror as you're approaching the
10  truck to check for traffic behind you, which is
11  what you're required to do periodically as a
12  reasonably attentive driver, and that truck moves
13  over, it's not going to be in your peripheral
14  vision; it's going to be outside of your
15  peripheral vision because your head's turned.
16     So that's another example of how
17  expectancies affect visual performance.  If you're
18  not looking in the direction of the hazard because
19  you don't know it's going to be a hazard, you're
20  not going to see it when it becomes a hazard.
21     If you're looking forward, your
22  central -- and you're not expecting him to be
23  coming over, you're likely to be looking beyond
24  him.  So your central vision is going to be to the

Page 94

Dr. Vigilante - Direct

1  right of the truck.  It's going to be farther down
2  the road.  So any movement that the truck does is
3  going to be in peripheral vision.
4  Q.  Understood.  So is it fair for me to
5  construct it this way, that under the umbrella of
6  the driving task, okay, that expectancies that
7  we've discussed affect your, I don't want to say
8  vision but it implicates what you will be
9  reasonably expected to see at a certain time; is
10  that?
11  A.  Well, that can.  So for example, on an
12  unlit road at night, if you expect to see a
13  pedestrian in the roadway, you're going to be able
14  to see them at about maybe 50 to 100 percent
15  greater distance.  If you're not expecting them,
16  you've got to be much closer before you're able to
17  predict them.
18     So that's an issue of how expectancy
19  affects visual detection or the detection part --
20  I want to clarify.  Vision perception, you know,
21  is different than sensation.  So sensation is
22  actually having the stimulus trigger your rods and
23  cones to send a signal to the brain.
24     Once it gets into the brain, your

Page 95

Dr. Vigilante - Direct

1  brain starts to make sense of that, so it starts
2  giving it meaning.  So that's your perception,
3  okay.  So expectancy affects both the likelihood
4  of detecting, but more importantly, the likelihood
5  of perceiving it.
6     So perceiving then gets into not only
7  realizing it's there, but giving it a pattern and
8  giving that pattern an understanding of what it
9  is.
10  Q.  Understood.
11  A.  Okay.  So in cases where the visual
12  conditions are not ideal, so nighttime fog, rain,
13  what have you, where your ability to capture that
14  stimulus through your eye senses, through your
15  eyeballs or through your retina, through the
16  cones, through the rods, that is affected by
17  expectancy.  But then the ability to realize that
18  there's something there and put a pattern to it
19  and to identify that is also affected by
20  expectancy.
21     And then of course, if you misidentify
22  it because you were expecting something else and
23  you perceive it as that something else because
24  that's the way you expected to find it, it's going

Page 96

Dr. Vigilante - Direct

1  to affect your decision-making, because now you're
2  going to make a decision based upon an incorrect
3  identification.
4  Q.  Gotcha.  So to sum up, because I was trying
5  to understand it in a little bit shorter way than
6  you just stated it, but expectancy affects your
7  visual detection.  Can affect the way that your
8  perception of the event, and then could also
9  affect down the line how you react to it?
10  A.  The way I like to explain it and probably
11  the easiest way --
12  Q.  Yep.
13  A.  -- is to put it in terms of
14  perception-reaction time, okay.  So in the driving
15  environment, because most of the information we
16  collect from the roadway is visual, that's what
17  we'll deal with:  Visual perception,
18  perception-reaction time as it relates to the
19  collection of visual information.
20     So expectancy can affect the detection
21  part of that, okay.  Perception -- let me back up
22  again.  Perception-reaction time generally
23  consists of four different processes, four
24  different stages.

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

---

Page 97

Dr. Vigilante - Direct

1   Detection.  If I don't detect it, I
2   can't respond to it.  Identification.  Once I
3   detect it, now I have to identify what it is, what
4   it's doing, what it's likely to do, is it a
5   hazard, can it be a hazard, et cetera.
6   Once I've identified it, whether I've
7   identified it correctly or incorrectly, I'm going
8   to make a decision.  The decision is going to
9   affect what I do with respect to my reaction.  Do
10  I continue doing what I'm doing.  Do I change it.
11  So for example, do I hit the brakes.
12  Do I change lanes.  Do I steer, swerve, et cetera.
13  And then we react.  Reaction is the implementation
14  of that decision.
15  So expectancies affect the detection.
16  So whether or not we're likely to detect it and
17  how close or how far away we are when we detect it
18  is affected by expectancies.  How we identify it.
19  How we identify what it is, what it's doing, what
20  it's going to do, whether it's a hazard, whether
21  or not it's going to be a hazard is also affected
22  by expectancies.  Okay.
23  And then based upon what we identify,
24  we make a decision.  So if we misidentify, we're
25

---

Page 98

Dr. Vigilante - Direct

1   going to have incorrect and insufficient
2   information, incorrect and/or insufficient
3   information to make a decision.  So we're going to
4   respond.  We're going to make a decision based
5   upon our identification which is in part based
6   upon expectancy, and we're going to react to
7   whatever our decision is, which is based upon the
8   identification, which is based upon the expectancy
9   in part.  So that's how it all relates.
10  Q.  Understand.  Doctor, probably more than an
11  hour ago we were -- I talked to you about diseases
12  of the eye --
13  A.  Sure.
14  Q.  -- and how that affected the driving task
15  and sort of visual perception of an event.  Would
16  you agree with me that depending on the
17  significance of the disease or the particular
18  disease of the eye, that that can also affect
19  one's ability to detect under that rubric of what
20  we were talking about how expectancy affects
21  perception and reaction time?
22  MR. ZUBER:  Well, objection to the
23  extent that you know medically how it could
24  affect perception and vision.
25

---

Page 99

Dr. Vigilante - Direct

1   THE WITNESS:  Well, we can talk about
2   macular degeneration because I think that's the
3   potential vision issue Mr. Glad was dealing
4   with --
5   BY MR. AKPAN:
6   Q.  I wouldn't assume that but...
7   A.  Okay.  Well, we'll say macular
8   degeneration, glaucoma, cataract, whatever can
9   potentially affect visual performance; it can have
10  an effect on detection.  So again if your, say for
11  example, you wake up one morning and your vision
12  is cloudy.  Maybe you've got a head cold, maybe
13  you took some Sudafed or something, I don't know.
14  It's going to impact detection, okay.
15  So that you're going to take longer.
16  You're going to need to be closer.  It's going to
17  have to be brighter/bigger for you to detect it
18  relative to clear vision.  Now, the problem with
19  that is, is that there's an interaction, again,
20  with expectancy.
21  Because now if your expectancy is
22  violated, it's going to be even more difficult to
23  detect that object, event or hazard because you're
24  not looking for it.  If you're expecting it, you
25

---

Page 100

Dr. Vigilante - Direct

1   can attend and or you can shift more resources
2   into detecting the object.  And this is the same
3   thing that happens, for example, at night.
4   One of the examples I like to give is
5   when you get up in the middle of the night and
6   you've got to use the restroom and you're in your
7   own room, you pretty much get up in the dark, make
8   your way around the corner of the bed, maybe
9   you've got a dresser there, weave your way into
10  the bathroom successfully and safely.
11  As you're doing that, the objects in
12  the room, you can get a feel for where they are.
13  Your vision is going to pick them up and it's
14  going to be a very light stimulus.  But because
15  you know what's there and you're expecting it
16  there, your mind puts a pattern to that very light
17  stimulus.
18  When you're in the hotel room and you
19  wake up at 3 o'clock in the morning and you stub
20  your toe on the end of the bed or excuse me.
21  Maybe there's a dresser or your suitcase is at the
22  end of the bed, as you're walking to it, you don't
23  see it.
24  When you hit your foot on it, you're
25

---

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

---

Page 101

Dr. Vigilante - Direct

1 likely to actually to see what you just hit and
2 then you, you know, there's usually an expletive
3 involved and then you go on about your way.
4 What's happening is, is that you have this very
5 light stimulus because it's dark. So your eyes
6 are not getting a lot of input.
7     You're not familiar with the room, so
8 you don't really have any of these expectancies
9 that are built in to help give identification to
10 that light stimulus. Once you hit your toe, then
11 you remember, damn, that's my bag. Now your brain
12 puts a pattern to the light stimulus that your
13 eyes are receiving and now you can see it.
14     So the same thing happens with the
15 cloudy vision is if you're expecting it, your
16 brain can give an identification to the pattern
17 for that light stimulus that's coming through. If
18 you don't expect it, that light stimulus coming
19 through, because of the cloudy vision, your brain
20 can't put a pattern on it because it doesn't know
21 what it is, it just thinks it's noise.
22 Q. What do you mean when you say if your
23 brain's expecting it with respect to cloudy
24 vision; expecting what? That your vision will be

---

Page 102

Dr. Vigilante - Direct

1 cloudy?
2 A. No. It could be anything. So it could be
3 anything. If you've got cloudy vision and you're
4 expecting to see the dresser on the far side of
5 the room, assuming there's some light coming
6 through to the back of the retina, when your
7 perceptual process, that's the brain part, when
8 the brain perceives that stimulus coming through,
9 it could put a pattern on it. And say, oh, yes.
10 That's my dresser.
11     If I'm in an unfamiliar room and I
12 wake up with cloudy vision, assuming the same
13 amount of light is coming through from that
14 dresser, your brain is going to see -- you're just
15 going to detect some light coming through. Some
16 stimulus is out there, but it's not going to have
17 a pattern to put on it; therefore, it may dismiss
18 it as noise or it may identify it as something
19 else. Maybe, you know, maybe a person or the
20 door.
21     So that's how the expectancy affects
22 the ability of your brain to put a pattern on the
23 stimulus that comes in. You remember, the
24 stimulus comes in, it hits the back of the eye and

---

Page 103

Dr. Vigilante - Direct

1 the rods and cones fire. They go to other neurons
2 that fire. All it is, is signals. It's just
3 signals coming in.
4     The perceptual process is your brain's
5 putting a pattern to those signals and it's giving
6 meaning to those signals. If it doesn't expect
7 the object, it has a hard time putting the meaning
8 on it. If it expects it, it's an easier time
9 putting a meaning on what those signals are.
10 Q. I understand. To add to that. If someone
11 is suffering from an eye disease, would that
12 create a longer perception time for the brain to
13 pick up that stimulus?
14 A. It could. And if it's not expected, it
15 becomes even longer.
16 Q. Understood. Depending on the severity of
17 the eye disease, could that affect the
18 identification sort of prone in that perception
19 protocol that you discussed?
20 A. It can. And it's going to be more
21 difficult with the violation of expectancy.
22 Q. And would, depending again on the severity
23 of the eye disease, could it affect or impact the
24 decision-making process in the perception rubric

---

Page 104

Dr. Vigilante - Direct

1 that you discussed?
2 A. If the stimulus, whether it be an object or
3 hazard, what have you, is misidentified and/or not
4 detected, it can certainly affect decision-making.
5 Q. And can an eye disease, depending again on
6 the severity, affect the reaction time in that
7 perception rubric that we were discussing?
8 A. It can.
9 Q. And Doctor, sitting here today, do you know
10 the medical status or the status or what sort of
11 eye problems, if at all, that Robert Glad was
12 suffering from at the time of this accident?
13 A. I think he testified that he had slight or
14 some macular degeneration in the left eye or at
15 least was diagnosed with it.
16 Q. That was your understanding when you wrote
17 this report?
18 A. Yes, I believe so. Because I had his
19 deposition at the time.
20 Q. Do you know if your report references
21 anything about Mr. Glad's macular degeneration?
22 A. It does not.
23 Q. Is there a particular reason why?
24 A. Because there's nothing in the report that

---

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 105

Dr. Vigilante - Direct

1 suggests that it was affecting his driving.
2
3 Q. In which report?
4 A. I'm sorry. There's nothing in the evidence
5 that suggests that it was affecting his driving.
6 Q. I understand that. And the evidence you're
7 talking about would be evidence that does not
8 contain his medical records?
9 A. What I'm talking about is that there's no
10 testimony that there were any problems driving
11 from Florida up to Route 301 and Massey-Galena
12 Road. There were no problems driving back and
13 forth on prior occasions.
14 That there was no problem or an
15 indication from his doctor that there was a need
16 to stop driving or to practice or implement any
17 additional cautions. So I didn't see any evidence
18 at the time to suggest that it was a problem.
19 Q. Understood. If you did see evidence of
20 that sort, would it affect your opinions in this
21 case?
22 A. It could. Possibly. I'd have to see it.
23 Q. In terms of the, and taking you back to
24 when we were discussing an hour ago and it was
25 probably right at the beginning of the deposition,

Page 106

Dr. Vigilante - Direct

1 I was asking you about sort of the demographics
2
3 and the studies and the systems that you do and
4 whether or not you go and you're taking sort of a
5 mean or bell curve over the population to sort of
6 -- to apply certain things and expectations with
7 reaction time and those sorts of things. Do you
8 remember us discussing that?
9 A. I remember discussing normal or standard
10 curve.
11 Q. Yeah. For this report, were you relying on
12 the normal and standard curve for Glad's ability
13 to perceive, his perception? His visual
14 perception?
15 A. I assumed that he had normal visual
16 perception; that there was nothing abnormal about
17 it. So he was within the 95th percentile of adult
18 drivers. You want to take a break for a little
19 bit? We've been going on for a little.
20 Q. Sure.
21 MR. ZUBER: Yeah. Sure.
22 (Brief recess.)
23 (Mr. Kozlowski is not on the phone.)
24 BY MR. AKPAN:
25 Q. We're back on. Doctor, let's talk about

Page 107

Dr. Vigilante - Direct

1 your conclusion number two.
2
3 A. Okay.
4 Q. And that is D-2 on your report. And it
5 says, "Demby deprived Glad of time and distance he
6 needed to safely avoid the collision." And I know
7 that leads into some of the things that we've
8 already been talking about; is that fair to say?
9 A. A little bit, yeah.
10 Q. In particular, I wanted to ask you about
11 perception-reaction time in general. I know
12 you've referenced it before, but can you just talk
13 about it one more time?
14 A. Yeah. Perception-reaction time is the time
15 it takes to detect, identify, determine a choice
16 of action and initiate a response to a roadway
17 event, hazard or situation.
18 Q. And that was, it was perception-reaction
19 time where you gave us sort of the four things:
20 The detection, identification, decision and
21 reaction?
22 A. Yes.
23 (Document marked for identification as
24 V-9.)
25 BY MR. AKPAN:

Page 108

Dr. Vigilante - Direct

1 Q. Doctor, I am showing you what I have marked
2
3 as your deposition Exhibit V-9. Do you recognize
4 what is depicted in V-9?
5 A. It appears to be the EDR airbag module
6 download.
7 Q. And in your investigations that you've done
8 with accidents, have you had occasion to review
9 data or airbag module data like that before?
10 A. Yes. I've looked at the downloads before.
11 Q. Now, under the D-2 perception-reaction, I
12 shouldn't call it the perception-reaction time,
13 but under D-2, page seven in particular.
14 A. Okay.
15 Q. You referenced Glen's conclusion about 25
16 miles per hour and that it would have taken Demby
17 approximately 30 to 42 feet or one to two seconds
18 respectfully to move laterally from the left lane
19 to the point of impact in the right lane.
20 And then you wrote, "The one to two
21 seconds that it took Demby to move from the left
22 lane to the point of impact was faster than the
23 perception-reaction time required by a reasonably
24 attentive driver to respond and avoid an
25 unexpected roadway hazard." My question is

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

---

Page 109

1    Dr. Vigilante - Direct
2  generally what did you mean by that?  And if you
3  could or if it impacts that, explain it using the
4  CDR data or the EDR data.
5  A.  Well, I don't think EDR data has anything
6  to do with it.
7  Q.  That was my first question.  First question
8  answered.  Then explain to me what you meant in
9  writing that sentence that I read back.
10  A.  Yeah.  On the pages, on page six I discuss
11  a little bit about what the research shows a
12  reasonable perception-reaction time is for an
13  unexpected event.  And that could be anywhere from
14  one-and-a-half to two-and-a-half seconds if not
15  longer depending on the complexity and the
16  expectancy violation that occurs.
17    So if you only have one to two seconds
18  to respond to the event, initiation, and maybe I
19  could back this up a little bit.  The initiation
20  of the event is Demby's movement into the right
21  lane.
22    Prior to his movement into the right
23  lane, he's not a threat to him.  If he's not
24  a threat to him, there's no reason to be concerned
25  with him.  So it's the point at which he moves

Page 110

1    Dr. Vigilante - Direct
2  into the right lane and then becomes a threat.  At
3  that point, Mr. Glad has to go through the
4  perception-response time.
5    He's got to detect the threat.  He's
6  got to identify it.  He's got to identify what it
7  is, what it's doing, what it's likely going to do,
8  and what the potential hazards it's going to
9  create.  And then he's got to make a decision on
10  what he's going to do:  Brake, change lanes,
11  swerve, so forth.  And then he's got to initiate
12  that reaction.
13    If he needs a perception-reaction time
14  of one-and-a-half to two-and-a-half seconds but it
15  only takes that truck one to two seconds once it
16  becomes a threat to the point of impact, there's
17  simply no time to respond.
18  Q.  So going back to six and then we'll get to
19  seven then.  For an unexpected roadway event, the
20  perception-reaction time can be from
21  one-and-a-half seconds to two-and-a-half seconds
22  or longer; is that fair to say?
23  A.  Generally the unexpected the -- excuse me.
24  Perception-reaction time to unexpected
25  straightforward event is about one-and-a-half to

Page 111

1    Dr. Vigilante - Direct
2  two-and-a-half seconds for a reasonably attentive
3  driver.
4  Q.  And when we're talking about that
5  perception-reaction time, we are talking about
6  from zero is perception that's hidden in the back
7  of your eye; fair to say?
8  A.  You start with the detection, if you want,
9  starts at, I guess the way you're trying to lay it
10  out.  Detection starts at zero point once it
11  becomes detectable.
12    So if you have a, for example, a cloth
13  is pulled away from the object that it's hiding,
14  okay, the moment it's pulled away, the object is
15  now detectable.  If at night and we're talking
16  about detection, it's the point at which the
17  pedestrian first becomes detectable to the driver.
18    So if it's 100 feet, prior to
19  100 feet, the object is not detectable; therefore,
20  perception-reaction cannot start.  If it's
21  detectable at 100 feet, that's the point at which
22  perception-reaction time starts.  Okay.
23    So in this event, Demby's not a hazard
24  to Glad until he crosses into the right lane.  So
25  the movement into the right lane is the start of

Page 112

1    Dr. Vigilante - Direct
2  detection.
3  Q.  And so from zero for the scale of the
4  one-and-a-half to two-and-a-half seconds, the zero
5  is perception, that last figure, whether it's one-
6  and-a-half, two-and-a-half or longer is reaction?
7  A.  Yeah.  The detection starts at the moment
8  the hazard becomes detectable.  The one-and-a-half
9  to two-and-a-half seconds later is the initiation
10  of the reaction.
11  Q.  And is there an additional time period from
12  the initiation of a reaction to something that we
13  would see on an EDR data report?
14  A.  You mean the actual engagement of the brake
15  --
16  Q.  Yeah.
17  A.  -- or the actual changes of steering?
18  Q.  Yes.
19  A.  Typically for steering, it's almost
20  instantaneous.  There is little lag for brake
21  depending upon where the foot is.  So typically
22  what you would see in an EDR or CDR, depending on
23  what they're calling it, but the airbag module is
24  if the driver has their foot on the accelerator,
25  actively giving it gas, the reaction would count

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 113

Dr. Vigilante - Direct

1    when the driver lets off the accelerator.  That's
2    the only way we can tell when the reaction
3    started.  So there's probably -- there's going to
4    be a delay between let's off the accelerator and
5    actually engages the brake.
6        Here, we don't know that because he's
7    got cruise control.  We don't know exactly where
8    his foot was.  Okay.  We don't know.  But it
9    doesn't really matter:  He doesn't have enough
10   time to initiate and carry out the braking if he
11   so chose to broke.  If he so chooses to brake.
12 Q.  Gotcha.  This might be a dumb question but
13   we'll do some dumb math and I'll ask you.  We
14   shouldn't assume, based on your writing in this
15   report, that he would have needed at least four-
16   and-a-half seconds to react?
17 A.  In this situation, I think four-and-a-half
18   seconds is probably near the upper end.  Again
19   perception-reaction time is on the standard of the
20   normal curve.  There's a median -- there's a mean
21   and then there's 95th, 99 percentiles.  The two-
22   and-a-half seconds gets you up to about the 90th
23   percentile.
24       So there is a segment of the

Page 114

Dr. Vigilante - Direct

1    population, particularly elderly, that are going
2    to take longer just because of the decrements
3    associated with aging.  So it's possible with
4    reasonably attentive, older driver may need three-
5    and-a-half, four-and-a-half seconds.
6 Q.  I gotcha.  The last conclusion that you
7    have here is that the collision is not consistent
8    with Glad falling asleep.  Now, I think it
9    probably starts with page eight -- well, no.  It
10   starts at seven.
11       You reference several characteristics
12   of a crash that involves a driver falling asleep,
13   saying the crash occurs during the late night.
14   Typically the driver's alone in the vehicle, and
15   that a single vehicle leaves the roadway.
16       (Phone beeps.)
17     MR. AKPAN:  Mark, are you there?
18       (No response.)
19     MR. ZUBER:  Maybe that was him coming
20   off.
21     MR. AKPAN:  You want to just push on?
22     MR. ZUBER:  Yeah, that's fine.
23     BY MR. AKPAN:
24 Q.  Sorry, Doctor.  I'll rephrase it.  In

Page 115

Dr. Vigilante - Direct

1    talking about this collision not being consistent
2    with Glad falling asleep, you referenced some
3    characteristics of crashes involving drivers, I
4    guess, being asleep at the wheel and you
5    referenced crashes occurred late at night; that
6    the driver's alone, and that or a single vehicle
7    leaves the roadway.
8        Doctor, you would agree with me that
9    those characteristics are not the only
10   characteristics of a driver falling asleep in
11   terms of crashes in the roadway, that those are
12   not the outer limits?
13       There's other, you know, you can have
14   a driver fall asleep in a crash where none of
15   those characteristics exist?
16 A.  Anything's possible.
17 Q.  Is there a particular reason why you choose
18   those three?  Are those the three that are most
19   prevalent?
20 A.  These are common characteristics of fall-
21   asleep-at-the-wheel-crash.  So there are crash
22   characteristics that indicate or lead one to
23   believe that the collision was involved with
24   falling asleep at the wheel.

Page 116

Dr. Vigilante - Direct

1        There's research that looks at factors
2    that can predict when you're likely to fall asleep
3    at the wheel.  And there's also the fact of the
4    matter that pre-collision, you know, pre-event,
5    there are symptoms of the potential for falling
6    asleep at the wheel.
7        So I looked at those three things
8    combined and shown in the report that they're not
9    consistent with what the record and the evidence
10   shows.  So before we even get to a fall-
11   asleep-at-the-wheel-crash, there's events that
12   occurred prior to that.  Sleepiness doesn't happen
13   instantaneous, it occurs over time.
14       You get drowsy, you get fatigue.  And
15   that leads to expression of the risk of falling
16   asleep at the wheel.  And these include most --
17   the two most common symptoms are lane drifting,
18   lane deviation and/or speed irregularity.
19       So a driver who's falling asleep at
20   the wheel, this isn't really related to cruise
21   control but just as an aside, can't give a
22   consistent speed.  So you get a lot of, you know,
23   the body starts to relax.  The muscles in the
24   ankles start to relax, and therefore they let up

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

---

Page 117

Dr. Vigilante - Direct

1  Dr. Vigilante - Direct
2  off of the accelerator and the speed goes down.
3  And they realize it and they give it more gas and
4  then they start falling asleep and so forth.
5  Same thing happens with the steering
6  wheel. You're giving input to the steering wheel,
7  you start drowsing. Getting fatigued. Your body
8  starts to relax. You're getting less muscle input
9  into the arms. You stop giving input to the
10  steering wheel. The vehicle starts to drift,
11  okay. This is what you expect to see before a
12  fall-asleep-at-the-wheel event. That didn't
13  happen in this case.
14  There's no evidence whatsoever that
15  that happened in this case. Okay. So then you
16  look at the things that predict a driver being
17  drowsy or falling asleep. And they have to do,
18  you know, assuming that there's not a medication-
19  related issue: You're hopped up on Sudafed for
20  your asthmas or your allergies, but just assuming
21  a normal driver, these are all related to sleep.
22  When you last slept; that is, how long
23  you've been awake. How good of sleep you got, and
24  how long you were asleep for. And when you looked
25  at the testimony, there's nothing to indicate that

---

Page 118

1  Dr. Vigilante - Direct
2  he was at risk for being drowsy driving in the
3  middle of the day. So then you look at the
4  characteristics of the crash. How it occurred.
5  When it occurred. Where it occurred. What was
6  involved.
7  So typically falling asleep at the
8  wheel involves a driver alone in the vehicle. And
9  there's a good reason for that: There's less
10  stimulus. The other passenger can't interact with
11  you. Can't talk to you, can't keep you awake.
12  Can't keep you alert. Can't warn you and say,
13  hey, Bob, you know, you're starting to fall asleep
14  at the wheel. Maybe we should change.
15  Another common characteristic is the
16  fact that the single vehicle leaves the road,
17  okay. We talked about the fact that the muscles
18  relax and steering input ceases and you get the
19  lane drift and you fall asleep, you don't recover,
20  it keeps going.
21  Third, driving for an extended period
22  of time. Mr. Glad and Mr. Borycens just swapped
23  driving, I think, got a map, they said at the Bay
24  Bridge, they swapped driving. From where they're
25  at to the Bay Bridge, it's only about 42 miles or

---

Page 119

1  Dr. Vigilante - Direct
2  42 minutes, so it's not an extended period of
3  driving. When they left in the morning, they left
4  from north of the Richmond area. So they're not
5  even on the road that long.
6  They said they left about 8:00 or 9:00
7  and maybe stopped a few times. To get from where
8  they're going up 301, and I know they -- I think
9  Mr. Glad testified they went up 95 and then cut
10  over to 301, but assuming they left Richmond and
11  immediately got on 301, we're looking at a trip
12  time of three hours. So if they left at 8:00 and
13  the collision occurs a little after 1:00, they had
14  to have stopped several times or at least an
15  extended period of time.
16  So again, it's not like they've been
17  traveling all night. So it's inconsistent with
18  falling asleep at the wheel. The crash occurred
19  early afternoon.
20  The reason why late at night and later
21  in the afternoon are associated with
22  fall-asleep-at-the-wheel-crashes has to do with
23  our circulating rhythm. So our natural body
24  rhythm has two troughs. The major one is in the
25  evening, early morning hours. This is why we

---

Page 120

1  Dr. Vigilante - Direct
2  sleep typically at night unless we're on shift
3  work which screws with our normal rhythm. The
4  other one is later mid-afternoon.
5  Well, this is occurring before that
6  trough. So the characteristics of the crash, the
7  predictors of the crash, and what happened prior
8  to the crash are not consistent with the driver
9  falling sleep at the wheel. And it's also
10  consistent -- not falling asleep at the wheel is
11  also consistent with the testimony of Borycens and
12  Glad.
13  They testified that they were talking
14  in the car. Borycens testified that Glad was, you
15  know, looking straight ahead. His head wasn't
16  lolling or anything like that. So there was no
17  indication that there was any drowsiness, fatigue
18  leading to fall-asleep-at-the-wheel prior to the
19  crash.
20  Q.  And I understand your summation why you
21  believe that the sort of underlying factors aren't
22  consistent with, you know, falling asleep at the
23  wheel. How did you wrestle with the result of the
24  fact of the testimony from both Mr. Demby and the
25  trooper that there was communication from both the

---

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 121

Dr. Vigilante - Direct

1 driver and the passenger that he did fall asleep
2 at the wheel?
3 A.  One, Demby has absolutely no idea what was
4 occurring in that vehicle --
5 Q.  I understand that.  And I don't -- what I
6 mean with that is how did you resolve or deal with
7 the testimony from those gentlemen that Mr. Glad
8 himself said that he fell asleep?
9 A.  Oh, I don't think that Mr. Glad said he
10 fell asleep.  I think the testimony is, is that
11 Mr. Glad may have expressed to the officer that he
12 thinks he may have fell asleep, because you know,
13 he doesn't have an explanation of how the incident
14 occurs.
15 So that doesn't mean he fell asleep,
16 that just -- you know, my understanding is he
17 suffered a traumatic brain injury.  He was in and
18 out of consciousness shortly -- when the off-duty
19 EMT arrived shortly after the collision.  TBI's,
20 you know, they wreak havoc on short-term memory,
21 that the memory that just occurred.  So that
22 specific event memory.
23 So it is very likely that Mr. Glad
24 woke up or came out of consciousness or came into
25

Page 122

Dr. Vigilante - Direct

1 consciousness, whatever level he was at, not
2 knowing what the heck just happened and not being
3 able to remember because of the traumatic brain
4 injury.  And this is also expressed in the report
5 of Dr. Ricarda.
6 Mr. Borycens testified that he never
7 told the police officer that he fell asleep.  He
8 never told Mr. Demby that he fell asleep.  He said
9 he didn't know what happened.  He said it happened
10 quickly.  He didn't know what happened, but he
11 didn't state anything to the cop or to Demby what
12 happened.
13 The police officer testified he spoke
14 to Demby first and Demby told him that they may
15 have fallen asleep.  So that may have skewed the
16 police officer's thinking but the officer, I don't
17 think, has a specific memory of Borycens or Glad
18 telling him that.
19 And then we have the EMT that shows up
20 that there's before the police officer that says
21 that Glad's in and out of consciousness and he
22 never spoke to the officer.  So there seems to be
23 a lot of inconsistencies in what people are saying
24 happened or saying what other people said
25

Page 123

Dr. Vigilante - Direct

1 happened --
2 Q.  Did you know --
3 A.  -- so I can only rely upon what evidence we
4 have, and there's no evidence leading up to it
5 that suggested this is a fall-asleep-at-the-wheel.
6 Q.  What if Mr. Glad was mistaken about it
7 being an issue of him falling asleep?  What if he
8 blacked out?  Would, my question is, would someone
9 blacking out be all of the characteristics you
10 listed about drowsiness, about a vehicle leaving
11 the roadway, about speed, about night, driving at
12 night, all those incidences, would they be
13 inconsistent with Mr. Glad simply blacking out
14 right before the collision?
15 A.  So you mean like all of a sudden he's up,
16 he's awake and then the next second, he's out for
17 no reason?
18 Q.  A sudden medical emergency.
19 A.  If that happened, then there would be no
20 prior indication of him being fatigued or drowsy
21 or falling asleep at the wheel.  It would have
22 been an acute event that just so happened to occur
23 when Mr. Demby moved into the lane and I don't
24 believe in coincidences like that.
25

Page 124

Dr. Vigilante - Direct

1 Q.  What if Mr. Glad had a history --
2 A.  Yeah.
3 Q.  -- of blacking out?
4 A.  I haven't seen it.
5 Q.  But going back.  We were talking about
6 blacking out and in that context, it wouldn't
7 matter if the crash occurred late at night or
8 early morning?
9 A.  Hypothetically if a driver blacks out for,
10 you know, an unknown medical reason, with no
11 forewarning that the event is going to occur, then
12 I'd have to say it doesn't matter whether it's the
13 morning or evening.
14 Q.  And it wouldn't matter if the driver was
15 alone in the vehicle either?
16 A.  If there's no forewarning to the acute
17 event, then it wouldn't matter.
18 Q.  And it wouldn't matter if it's a
19 single-vehicle collision or a two-car collision?
20 A.  Yeah.  Again if it's a blackout with no
21 advanced warning, then it doesn't matter what type
22 of collision it is.
23 MR. AKPAN: I have no further
24 questions.
25

Case 2:17-cv-02101-SHL-cgc  Document 124-6  Filed 09/14/18  Page 35 of 52  PageID
3225
Estate of Robert J. Glad vs.
Demby, et al
William J. Vigilante, Jr., Ph.D.
March 10, 2017

Page 125

1      Dr. Vigilante - Direct
2      MR. ZUBER: I have no questions.  As I
3  guess Mark's not on the line anymore.  Right?  I
4  guess that's it then.  We will read and sign.
5      THE WITNESS: Mark, you there?
6  (No response.)
7  (Witness excused.)
8  (Telephonic deposition concluded at
9  1:14 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 127

1              CERTIFICATE
2       I HEREBY CERTIFY that the proceedings,
3  evidence and objections are contained fully and
4  accurately in the stenographic notes taken by me
5  upon the telephonic deposition of WILLIAM J.
6  VIGILANTE, JR., taken on March 10, 2017, and that
7  this is a true and correct transcript of same.
8
9
10
11
12
13
14                    _____
15                    JOANNE H. GUSLER, RPR and
                      Notary Public
16
17
18       (The foregoing certification of this
19  transcript does not apply to any reproduction of
20  the same by any means, unless under the direct
21  control and/or supervision of the certifying
22  reporter.)
23
24
25

Page 126

1              I  N  D  E  X
2
3
4  WITNESS                 DR.   CR.  RDR.  RCR.
5  WILLIAM J. VIGILANTE, JR.  3
6
7
8
9
10          E X H I B I T S
11 NUMBER        DESCRIPTION           PAGE
   V-1           Dr. Vigilante's C.V. from  28
12                 Robson Forensic
13 V-2           Dr. Vigilante's C.V. from  28
                  Vigilante Forensic
14
15 V-3           More current C.V. of       30
                  Dr. Vigilante
16 V-4           Trial testimony history of 46
                  Dr. Vigilante
17
18 V-5           Plaintiff expert witness   62
                  Disclosures Rule 26(a)(2)
19 V-6           Robson Forensic package of 71
                  Invoices on Glad case
20
21 V-7           Report dated 5/20/14       74
22 V-8           State of Maryland Motor    80
                  Vehicle Accident Report dated
                  4/9/13
23
24 V-9           Pre-crash data report,     107
                  Event record 2 and event record
25                 1

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 36 of 52   PageID
3226
Estate of Robert J. Glad vs.
Demby, et al
William J. Vigilante, Jr., Ph.D.
March 10, 2017

## 1

**1 (2)**
29:3;30:21
**1:00 (1)**
119:13
**1:14 (1)**
125:9
**1:17 (1)**
61:3
**100 (7)**
10:25;36:23;73:17;
94:15;111:18,19,21
**11/1/2015 (1)**
29:24
**12 (1)**
61:21
**120 (3)**
3:20;75:2;79:14
**13th (1)**
70:12
**14 (1)**
65:9
**14th (8)**
65:4,10;66:3,6,7,8;
70:12,24
**16 (2)**
10:19,24
**19460 (1)**
4:16
**1993 (1)**
40:16
**1994 (1)**
41:20
**1995 (2)**
42:10,13
**1997 (2)**
44:4,7
**1998 (3)**
40:8;44:3,10
**1st (2)**
5:8;59:10

## 2

**2 (1)**
29:3
**200 (3)**
4:13;36:22;75:6
**2001 (3)**
41:21,25;45:5
**2002 (1)**
44:18
**2003 (6)**
6:5;40:9;43:22;44:4,
5;45:5
**2004 (1)**
47:4
**2007 (2)**
49:17;50:24
**2008 (2)**
51:4;52:8

**2008-2009 (1)**
24:4
**200s (2)**
75:6;79:16
**2010 (1)**
6:12
**2012 (1)**
52:21
**2014 (13)**
29:16;47:4,17;53:24;
59:10;65:4,10;66:4,7;
74:13,22;75:20;78:19
**2015 (9)**
5:7,8;6:13;17:14,15;
30:21;72:17,25;73:2
**2016 (5)**
30:3;56:11,12;64:14,
16
**2017 (1)**
78:2
**20th (2)**
74:12,21
**22nd (2)**
75:20;78:19
**25 (1)**
108:15
**26a2 (2)**
46:7;62:20
**27 (2)**
24:19;25:8
**28 (3)**
24:19;25:4,8
**29 (1)**
30:3

## 3

**3 (1)**
100:20
**3:00 (1)**
53:6
**30 (1)**
108:17
**301 (8)**
61:2,3,24;67:6;
105:11;119:8,10,11
**30th (1)**
72:25
**31st (1)**
44:7

## 4

**4:00 (1)**
53:6
**42 (3)**
108:17;118:25;119:2

## 5

**5 (1)**
54:8
**5:00 (1)**

**54:8**
**50 (2)**
6:24;94:15
**50/50 (1)**
56:21

## 6

**6 (1)**
72:3
**60 (1)**
56:18
**63 (1)**
6:23
**65 (1)**
56:18
**6th (1)**
78:2

## 8

**8 (1)**
80:23
**8:00 (2)**
119:6,12
**80s (1)**
18:22

## 9

**9:00 (1)**
119:6
**90 (5)**
10:19,24;32:23;
91:14,14
**90s (1)**
19:18
**90th (1)**
113:23
**92 (2)**
40:16,19
**93 (1)**
40:19
**94 (2)**
41:24;43:4
**95 (1)**
119:9
**95th (3)**
11:2;106:17;113:22
**97 (3)**
43:4,22;44:7
**99 (2)**
11:3;113:22

## A

**abbreviations (1)**
60:21
**abilities (4)**
8:21,24;11:21;12:8
**ability (15)**
33:12,25;36:5,20,23,
25;37:6,7;38:5;48:2;

95:14,18;98:20;102:23;
106:12
**able (4)**
36:21;94:14,17;122:4
**abnormal (1)**
106:16
**above (1)**
89:22
**Absolutely (2)**
30:5;121:4
**academic (3)**
9:14;27:6;43:5
**accelerator (4)**
112:24;113:2,5;117:2
**accepted (1)**
16:7
**access (1)**
31:12
**accident (16)**
15:13;21:14;22:3,4,
10,24;25:9;58:9;65:15;
78:4,17;80:8,25;82:3;
83:9;104:13
**accidents (1)**
108:8
**account (1)**
35:5
**accounted (1)**
33:19
**accreditation (1)**
18:18
**accredited (5)**
15:22;16:7;18:21,25;
19:2
**acquire (1)**
38:5
**across (1)**
13:7
**action (1)**
107:16
**actions (1)**
88:20
**active (1)**
73:16
**actively (1)**
112:25
**activity (2)**
7:16;72:13
**actual (3)**
38:14;112:14,17
**actually (7)**
26:4;44:4;58:5;
77:16;94:23;101:2;
113:6
**acuity (1)**
36:11
**acute (2)**
123:23;124:17
**Ad (5)**
87:19;88:23,24;89:3,
6,7,13
**add (1)**
103:11

**additional (6)**
69:12;74:18;77:20;
79:7;105:17;112:11
**address (3)**
4:12,17;76:15
**addressed (1)**
47:24
**administrative (2)**
31:17,20
**admission (1)**
70:16
**adult (4)**
11:12,14,22;106:17
**adults (6)**
11:11;35:10,23,23;
36:7,16
**advance (1)**
19:8
**advanced (7)**
15:23;16:7;18:7,10,
19,19;124:22
**adverse (2)**
57:14;58:14
**advising (1)**
43:13
**advisor (1)**
43:6
**affect (27)**
28:2,16,17;33:3,10,
25;36:19;42:5;86:24;
91:23;92:20;93:18;
94:8;96:2,8,10,21;
97:10,16;98:19,25;
99:10;103:18,24;104:5,
7;105:20
**affected (6)**
33:15;95:17,20;
97:19,22;98:15
**affecting (2)**
105:2,5
**affects (8)**
33:6;35:11;36:5;
94:20;95:4;96:7;98:21;
102:22
**afternoon (2)**
119:19,21
**again (27)**
10:10;11:25;13:13,
15;14:3;21:15;22:20;
28:21;33:8;36:16;49:9,
20;51:6;52:23;53:24;
71:10;82:6;92:22,24;
96:23;99:11,20;103:23;
104:6;113:19;119:16;
124:21
**against (1)**
54:16
**age (4)**
12:6;33:10;36:2;37:5
**ages (1)**
10:18
**aging (7)**
33:15;34:19;35:16;

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 37 of 52   PageID
3227
Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

37:24;38:3,4;114:4
**ago (7)**
    23:25;24:24;49:9;
    73:15;91:9;98:12;
    105:24
**agree (2)**
    98:17;115:9
**agreed (1)**
    23:21
**ahead (7)**
    68:20;69:8;89:2,6,10;
    92:5;120:15
**ah-huh (1)**
    4:5
**aids (1)**
    43:2
**airbag (3)**
    108:5,9;112:23
**airport (3)**
    54:17,18;55:8
**AKPAN (31)**
    3:6,10;28:25;29:9;
    30:10,14;43:21;46:4,11,
    12;47:10;51:24;52:4,6;
    62:19,21,24;72:3,6;
    74:4,8;75:21,25;80:22;
    99:6;106:24;107:25;
    114:18,22,24;124:24
**alcohol (1)**
    53:8
**alcohol/drug (1)**
    71:8
**alert (1)**
    118:12
**alleged (2)**
    51:20;58:23
**allergies (1)**
    117:20
**allowed (1)**
    84:16
**almost (1)**
    112:19
**alone (4)**
    114:15;115:7;118:8;
    124:16
**along (1)**
    89:4
**amend (1)**
    75:9
**America (1)**
    54:16
**American (2)**
    8:3,4
**amount (2)**
    23:5;102:14
**analysis (6)**
    58:2;59:2;81:7,17;
    82:16;84:17
**anatomy (2)**
    21:10;36:17
**and/or (6)**
    19:16;33:3;48:16;
    49:21;51:9,22;52:10,

25;53:8,20;54:2;57:14;
    84:4;98:3;104:4;116:19
**and-a-half (4)**
    112:6;113:17,23;
    114:6
**animation (1)**
    78:16
**ankles (1)**
    116:25
**answered (3)**
    38:18;52:9;109:8
**Anthony (2)**
    67:17,24
**anthropometric (1)**
    8:25
**anymore (1)**
    125:3
**Anything's (1)**
    115:17
**apologize (1)**
    92:22
**apparent (1)**
    55:12
**Apparently (1)**
    45:12
**appear (2)**
    72:11;93:7
**appears (3)**
    29:15;59:11;74:12;
    75:4;82:2;108:5
**application (1)**
    88:15
**applications (1)**
    44:20
**applied (6)**
    9:3,16,16,18;10:13;
    33:18
**apply (7)**
    9:3;13:15;16:16;
    24:9;32:20;61:17;106:6
**appreciate (1)**
    37:13
**approaching (3)**
    83:7;90:24;93:10
**approximate (1)**
    13:4
**Approximately (3)**
    3:19;6:19;108:17
**April (4)**
    59:10;72:16,25;73:2
**apriority (7)**
    87:15,18;88:16;89:3,
    7,23,25
**ARCCA (3)**
    45:7,9,16
**A-R-C-C-A (1)**
    45:5
**area (12)**
    6:11,15;28:7;32:6;
    34:21;38:19;41:2;
    45:15;49:6,7;71:14;
    119:4
**areas (8)**

18:10;27:25;32:4;
    40:20;76:17,18,19,21
**argue (1)**
    23:21
**arms (1)**
    117:9
**around (3)**
    52:10;61:6;100:9
**arranged (1)**
    66:10
**array (1)**
    78:10
**arrival (1)**
    61:15
**arrived (3)**
    79:4,4;121:20
**articles (2)**
    27:6,8
**Aside (3)**
    83:24;85:4;116:22
**asleep (38)**
    48:18,24;49:4;61:12,
    13;62:13;82:10,13;
    114:9,13;115:3,11,15,
    25;116:3,7,17,20;117:4,
    17,24;118:7,13,19;
    119:18;120:10,22;
    121:2,9,11,13,16;122:8,
    9,16;123:8,22
**asleep-at-the-wheel-crash (2)**
    115:22;116:12
**assigned (2)**
    44:13,19
**assistance (1)**
    7:11
**assistant (1)**
    41:25
**associate (1)**
    6:9
**associated (8)**
    6:25;7:2;36:4;42:20;
    53:10,20;114:4;119:21
**associations (2)**
    7:9,21
**assume (2)**
    99:7;113:15
**assumed (2)**
    81:16;106:15
**assuming (15)**
    8:7;9:13;14:21;18:8;
    51:20;53:13;68:4;
    72:20;83:11;93:8;
    102:6,13;117:18,20;
    119:10
**assumption (3)**
    83:21;84:25;86:14
**assumptions (1)**
    81:18
**asthma (1)**
    117:20
**attach (1)**
    44:17
**attached (3)**

71:17;78:6;79:5
**attend (1)**
    100:2
**attended (1)**
    17:10
**attention (2)**
    58:2;92:14
**attentive (7)**
    55:21;57:25;58:4;
    93:13;108:24;111:2;
    114:5
**attorney (5)**
    14:10;59:7,12;60:3;
    69:17
**attributed (1)**
    35:24
**attributes (1)**
    11:19
**August (5)**
    49:17;50:24;53:23;
    75:20;78:19
**Authority (1)**
    57:22
**automobile (1)**
    25:9
**available (4)**
    28:15;39:9,12;77:18
**aviation (2)**
    9:6,7
**avoid (6)**
    48:3;55:22;62:10;
    91:4;107:6;108:24
**awake (3)**
    117:23;118:11;
    123:17
**aware (6)**
    34:6;63:17;67:23;
    68:9,21;73:12
**away (4)**
    29:4;97:18;111:13,14

## B

**Bachelor's (1)**
    5:14
**back (24)**
    12:14;20:20;27:15;
    42:10;55:12,18;60:20,
    23;72:16;77:17,17;
    84:4;86:2;96:22;102:7,
    25;105:12,23;106:25;
    109:9,19;110:18;111:6;
    124:6
**background (2)**
    5:12;21:9
**backwards (1)**
    91:21
**bag (1)**
    101:12
**Based (22)**
    13:6;35:20;45:8;
    74:20;75:9;84:7,8;
    85:10;86:7,8;87:25;

88:4,7,18;90:12;96:3;
    97:24;98:5;6,8,9;113:15
**basic (1)**
    12:22
**basically (4)**
    8:16;17:3;42:16;44:6
**basis (2)**
    22:17;84:18
**bathroom (1)**
    100:11
**Bay (4)**
    25:16;71:13;118:23,
    25
**bear (1)**
    60:19
**became (1)**
    17:12
**become (2)**
    15:3;17:5
**becomes (5)**
    93:21;103:16;110:2,
    16;111:11,17;112:8
**bed (3)**
    100:9,21,23
**beeps (1)**
    114:17
**began (1)**
    62:11
**beginning (3)**
    6:13;20:20;105:25
**behalf (6)**
    48:12;50:3;51:18;
    56:9;57:19;59:3
**behavior (1)**
    88:12
**behind (4)**
    37:3,7;90:24;93:11
**bell (1)**
    106:5
**bench (1)**
    53:19
**better (3)**
    6:23;37:22;77:16
**beyond (3)**
    81:7;92:15;93:24
**bicycle (2)**
    25:18,18
**bill (1)**
    57:18
**billed (1)**
    72:17
**bit (10)**
    34:4;40:11;44:3;
    51:16;84:14;96:6;
    106:19;107:9;109:11,
    19
**blacked (1)**
    123:9
**blacking (4)**
    123:10,14;124:4,7
**blackout (1)**
    124:21
**blacks (1)**

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 38 of 52   PageID
3228
Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

124:10

**Blumenthal (10)**
57:2;59:12,14,24;
62:2;68:23;72:12;
75:20;76:15,17

**Board (11)**
8:2,5;13:23;14:4,17;
15:5;16:5,20;17:7,22;
19:12

**boat (2)**
25:15;39:2

**Bob (1)**
118:13

**body (8)**
14:3;16:4,17;18:8;
36:25;116:24;117:7;
119:23

**Borycens (9)**
80:10;85:6,16,19;
118:22;120:11,14;
122:7,18

**both (14)**
3:23;10:12;11:2;
28:13,16;38:16;42:6;
80:11;81:4,5;89:3;95:4;
120:24,25

**bottom (2)**
29:23;79:13

**boy (1)**
45:21

**brain (14)**
32:16;94:24,25;95:2;
101:12,17,20;102:8,9,
15,23;103:13;121:18;
122:4

**brain's (2)**
101:24;103:5

**brake (6)**
61:17;110:10;112:14,
20;113:6,12

**brakes (1)**
97:12

**braking (1)**
113:11

**break (3)**
4:7;51:25;106:18

**Bridge (3)**
71:13;118:24,25

**Brief (4)**
52:3;60:6,8;106:22

**briefly (4)**
5:11;7:8;41:22;69:22

**brighter/bigger (1)**
99:18

**bring (3)**
12:22;13:12;34:24

**brings (1)**
87:22

**broad (1)**
21:15

**broke (1)**
113:12

**B-R-O-O-K-E (1)**

4:15

**brought (2)**
3:13,14

**Bucks (1)**
45:8

**Buick (1)**
70:19

**building (1)**
13:11

**builds (1)**
88:16

**built (5)**
12:11;28:14;89:7;
91:7;101:10

**buried (1)**
20:2

**bus (4)**
57:23,23;58:6,6

**business (6)**
4:12,17,18,20,22;
43:23

**C**

**call (3)**
3:7;27:7;108:12

**called (3)**
6:2;59:24;87:19

**calling (1)**
112:23

**came (8)**
46:8,9;53:12;66:13;
76:14;86:2;121:25,25

**Can (55)**
3:7;4:11;5:11;7:8;
10:7;10,13:6;15:6;18:9;
19:10;24:2;29:14;30:4,
8,10,15;33:10;36:19;
38:18;41:21;46:14;
58:12;60:10;64:7,21;
65:13;71:23;72:8;
78:24;90:24;92:20,22;
94:12;96:8,21;97:6;
98:19;99:2,9,10;100:2,
2,13;101:14,17;103:21;
104:5,6,9;107:12;
110:20;113:3;115:14;
116:3;123:4

**capture (3)**
33:12,25;95:14

**car (3)**
45:19;61:8;120:14

**care (1)**
37:20

**career (1)**
39:19

**Carolina (6)**
5:20,22;18:20;41:21;
43:5,10

**carry (1)**
113:11

**Carter (2)**
53:24;55:10

**case (95)**
12:21;21:16;23:21;
24:5,13,23,25;25:2,3,
15,17,17,20,21;30:25;
31:21;45:20;47:12,19,
22;48:5,13,18,20;49:12,
15,16,25;50:3,4,14,15,
16,23,25;51:3,4,10;
52:8,12,15,20;53:2,17,
22,24;54:4,14;55:15,24;
56:4,15,25;57:4,9,10,
13,15;58:12,14;59:3,4,
5,7,23;60:9;62:4;63:10,
13,16,19,24;64:2,5,12,
15,25;67:15,22;68:5,6,
7,11,23;69:4,10,16,17;
72:13;73:13,16;86:25;
105:21;117:13,15

**cases (12)**
6:16,17;21:18;26:6,
20,22;27:3;47:7,15;
50:12,17;95:12

**casework (1)**
47:2

**cataract (2)**
36:5;99:9

**cataracts (1)**
33:22

**cause (2)**
51:21;83:6

**caused (3)**
53:8;62:8;77:9

**cautions (1)**
105:17

**CDR (2)**
109:4;112:22

**ceases (1)**
118:18

**Center (1)**
42:15

**central (4)**
92:18,24;93:23,25

**certain (7)**
14:20;16:6,9;17:4;
52:13;94:10;106:6

**certainly (2)**
23:3;104:5

**certainty (2)**
84:23,23

**Certification (14)**
8:5;13:19,21,23;14:5,
17,17;15:5,6;16:3,5,19;
17:6;19:12

**certified (5)**
17:5,12,19,21;19:9

**cetera (5)**
17:11;43:3;55:6;
91:8;97:6,13

**challenging (1)**
24:12

**change (17)**
62:7;74:20;75:7;
77:7;82:19,21;83:3,11,

15;85:2;86:6;89:18,25;
97:11,13;110:10;
118:14

**changed (4)**
82:24;85:12,17,24

**changes (3)**
36:2,17;112:17

**changing (2)**
62:11;90:5

**characteristic (1)**
118:15

**characteristics (12)**
11:16;34:25;114:12;
115:4,10,11,16,21,23;
118:4;120:6;123:10

**charges (1)**
53:20

**check (4)**
78:2;93:9,10,11

**Chesapeake (1)**
25:16

**children (2)**
10:21;11:21

**child's (1)**
11:18

**choice (1)**
107:15

**choose (2)**
30:15;115:18

**chooses (1)**
113:12

**chose (1)**
113:12

**cigarette (1)**
25:15

**Circle (1)**
4:14

**circulating (1)**
119:23

**cite (1)**
87:13

**cited (1)**
70:8

**city (1)**
57:23

**civil (2)**
20:4;25:17

**claim (3)**
15:7,9,20

**claiming (1)**
15:24

**clarify (3)**
10:10;84:2;94:21

**class (1)**
15:18

**classes (2)**
7:14;17:9

**classification (1)**
20:17

**classifications (1)**
20:13

**clear (1)**
99:19

climbed (1)
45:21

**clinical (1)**
40:24

**close (1)**
97:18

**closed (3)**
54:13,13;55:9

**closer (3)**
56:21;94:17;99:17

**closest (1)**
90:10

**cloth (1)**
111:12

**cloudy (7)**
99:13;101:16,20,24;
102:2,4,13

**cognition (1)**
5:15

**coincidences (1)**
123:25

**cold (1)**
99:13

**collaboration (2)**
76:16,22

**colleagues (1)**
66:10

**collect (3)**
32:14;36:5;96:17

**Collected (1)**
42:21

**collecting (3)**
32:23;36:8;57:18

**collection (1)**
96:20

**collision (35)**
25:18;48:3;51:13,21;
53:4,8;54:7;55:11;
58:10,17;59:18;61:18;
62:9,11,12;74:25;77:9;
79:10,14,20,21;80:3;
82:4,7;86:13;107:6;
114:8;115:2,24;119:13;
121:20;123:15;124:20,
20,23

**collisions (2)**
39:3;45:19

**combined (1)**
116:9

**comfortable (3)**
9:10;22:14;76:18

**coming (10)**
90:11;93:24;101:18,
19;102:6,9,14,16;103:4;
114:20

**commercial (2)**
39:21;42:19

**commercial-based (1)**
44:22

**common (4)**
15:11;115:21;116:18;
118:15

**Commonwealth (1)**

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

52:21
**communicated (1)**
76:22
**communication (1)**
120:25
**company (2)**
6:2;16:15
**compared (2)**
35:23;36:9
**comparison (1)**
14:8
**complete (2)**
4:4;47:16
**complexity (1)**
109:15
**complies (6)**
49:18;51:5;52:22;
74:3;79:12;82:17
**component (1)**
17:25
**computer (8)**
19:19,21;59:10,21;
66:21;70:9;75:15;78:25
**computer-related (1)**
39:21
**computers (1)**
39:16
**concerned (2)**
10:19;109:24
**concluded (2)**
86:12;125:8
**conclusion (11)**
55:17;83:14,21;84:5,
7;86:5,16,22;107:2;
108:15;114:7
**conclusions (7)**
22:15,18,19,20,23;
57:14;58:14
**conditions (5)**
33:9;79:11;82:7;
89:9;95:13
**conduct (1)**
42:8
**cones (5)**
54:13,22;94:24;
95:17;103:2
**conference (1)**
7:16
**conferences (1)**
17:9
**confidential (1)**
39:13
**confusion (1)**
84:15
**conjunction (1)**
28:10
**consciousness (4)**
121:19,25;122:2,22
**consider (4)**
20:7;21:13;22:11;
31:9
**considered (3)**
6:9;17:16;31:15

**consistency (2)**
85:5,7
**consistent (13)**
62:12;79:25;80:8,15;
88:18;114:8;115:2;
116:10,23;120:8,10,11,
22
**consistently (1)**
88:14
**consists (1)**
96:24
**constrained (1)**
11:7
**constraints (1)**
8:25
**construct (1)**
94:6
**consultant (3)**
7:3;14:16;44:12
**consultants (1)**
6:25
**Consulting (8)**
4:19,25;5:4,25;7:6;
31:5;40:24;73:24
**Consulting/Forensic (2)**
29:8;31:4
**consumer (5)**
9:6;11:9,11;39:20;
45:19
**consumers (1)**
34:24
**contact (1)**
60:3
**contacted (2)**
59:6;62:2
**contain (2)**
31:22;105:8
**contention (2)**
50:7;53:7
**context (1)**
124:7
**continue (2)**
89:11;97:11
**continues (2)**
31:3;79:19
**continuing (1)**
17:8
**contract (1)**
14:25
**contracts (3)**
14:15,21,22
**contrary (1)**
91:5
**contrast (2)**
12:19;36:10
**Contributory (1)**
61:10
**control (5)**
61:16;80:13;88:9;
113:8;116:22
**controlled (1)**
34:10
**controls (2)**

10:20,23
**co-op (1)**
44:7
**Cooper (2)**
71:16;79:5
**Cooper's (1)**
71:19
**cop (1)**
122:12
**copies (4)**
26:13,16;27:9,12
**copy (9)**
30:6;39:5,6;47:9;
56:6;59:23;60:13;
74:12;82:2
**corner (2)**
29:23;100:9
**Cornetto (4)**
67:24;68:7;70:6;
71:15
**Cornetto's (6)**
71:18;78:3;81:11,12,
13,19
**Corporation (2)**
20:19;43:23
**corrected (1)**
79:13
**correction (1)**
36:14
**corrective (1)**
36:14
**correctly (1)**
97:8
**Coste (1)**
39:2
**count (2)**
37:20;112:25
**country (2)**
11:15,17
**country's (1)**
18:15
**County (4)**
25:19;45:8;47:13;
61:25
**couple (4)**
47:7;58:16;64:23,23
**Courier (1)**
59:23
**course (5)**
15:17,23;36:11;93:9;
95:22
**court (11)**
3:23;23:18,22;24:6,7,
8,15;26:25;27:3;56:3;
75:21
**courtesy (1)**
4:2
**covered (1)**
41:18
**covers (1)**
25:3
**crash (24)**
15:13,15;21:17,23,

24;22:2,9,11,15,22;
53:12;55:13;70:10;
114:13,14;115:15,22;
118:4;119:18;120:6,7,8,
19;124:8
**crashes (3)**
115:4,6,12
**create (2)**
103:13;110:9
**creation (1)**
63:8
**criminal (2)**
24:23;25:17
**critique (1)**
81:21
**crossed (1)**
82:23
**crosses (1)**
111:24
**cruise (4)**
61:16;80:12;113:8;
116:21
**cues (2)**
28:15;55:20
**Cumulative (1)**
42:15
**current (3)**
29:19;30:2;74:15
**curriculum (1)**
20:5
**curve (10)**
13:2,5,8,17;89:2,5;
106:5,10,12;113:21
**curves (4)**
89:2,4,12,14
**cut (1)**
119:9
**CV (12)**
27:5;29:6,7,15,19,25;
30:2,16;37:17,21;
38:19;40:7
**CV's (1)**
32:3

## D

**D-1 (2)**
82:18;89:18
**D-2 (3)**
107:4;108:11,13
**Dade (1)**
47:13
**damn (1)**
101:12
**dangerous (1)**
89:8
**dark (3)**
54:9;100:8;101:6
**data (12)**
12:11,14;42:21;45:2,
3;70:25;108:9,9;109:4,
4,5;112:13
**date (5)**

29:23;30:2;60:5;
75:18;78:2
**dated (1)**
75:20
**Daubert (5)**
23:17,22,25;24:9,11
**David (2)**
51:4;52:8
**day (5)**
17:2;60:23;66:18,19;
118:3
**days (1)**
20:20
**DC (1)**
26:4
**deal (3)**
32:25;96:18;121:7
**dealing (3)**
5:2;88:6;99:4
**dealt (1)**
41:25
**deceased (1)**
55:10
**December (1)**
44:7
**decided (1)**
45:14
**decision (10)**
96:3;97:9,9,15,25;
98:4,5,8;107:20;110:9
**decision-making (9)**
8:23;28:3,4,11,19;
32:18;96:2;103:25;
104:5
**decreased (1)**
92:3
**decrements (1)**
114:3
**defendant (9)**
48:13;51:19;53:14;
54:14,25;55:16;56:10;
57:19;60:5
**defense (9)**
23:20;47:20;52:14,
16,19;59:3;61:10,20;
70:12
**deferments (1)**
34:14
**definition (1)**
31:8
**definitions (2)**
20:12;21:16
**degeneration (5)**
33:22;99:3,9;104:15,
22
**degenerative (1)**
33:17
**Degree (7)**
5:15,18;16:7;18:7,10;
19:2;84:22
**degrees (2)**
18:19,20;19:8,10
**Delaware (1)**

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 40 of 52   PageID 3230

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

61:3
**delay (1)**
113:5
**delays (1)**
35:24
**Demby (22)**
3:11;62:11;63:18;
71:15;82:22;83:4,11;
84:11;85:12,20;86:18;
91:2;107:5;108:16,21;
120:24;121:4;122:9,12,
15,15;123:24
**Demby's (12)**
62:6;71:19;77:7;
82:18;85:17,21;86:9,
23;89:18,24;109:20;
111:23
**demographics (2)**
12:6;106:2
**department (3)**
19:16,17;40:13
**departments (1)**
19:19
**depending (8)**
21:11;98:17;103:17,
23;104:6;109:15;
112:21,22
**depends (8)**
11:4,8,24;14:24;
22:18,20,25;31:8
**depicted (1)**
108:4
**deposition (24)**
3:16;26:17;29:3;
46:14;62:25;69:20,23;
71:18,20;72:8;73:3,6,7,
12;74:10;79:6;80:2;
81:24;84:9;85:21;
104:20;105:25;108:3;
125:8
**depositions (4)**
58:21;70:4;71:15;
79:2
**deprived (1)**
107:5
**describe (1)**
7:8
**described (2)**
22:12,13
**description (5)**
16:12;60:6,8;79:10;
82:6
**design (8)**
9:4,8;10:13;11:2;
13:10;16:18;44:8,14
**designate (1)**
56:15
**designed (1)**
11:7
**designers (1)**
13:11
**designing (6)**
10:20,22;35:3;41:2;

44:9,22
**designs (1)**
9:19
**desktops (1)**
44:15
**detect (14)**
36:20,21;55:21;
92:15;97:2,4,17,18;
98:20;99:18,24;102:16;
107:15;110:5
**detectable (6)**
111:11,15,17,19,21;
112:8
**detected (1)**
104:5
**detecting (3)**
92:2;95:5;100:3
**detection (15)**
36:23;94:20,20;96:8,
21;97:2,16;99:11,15;
107:20;111:8,10,16;
112:2,7
**determination (2)**
81:10,19
**determinations (1)**
81:6
**determine (10)**
16:21;62:6,9;77:7,11;
79:18,24;84:15,22;
107:15
**determines (1)**
21:23
**develop (3)**
9:4,9;89:13
**developed (2)**
19:19;88:2
**developing (3)**
9:19;44:9,22
**development (3)**
9:5;44:9,14
**develops (1)**
88:17
**deviation (1)**
116:19
**deviations (1)**
13:4
**device (1)**
88:10
**diagnosed (1)**
104:16
**diagnosis (3)**
21:7,8,12
**died (1)**
55:11
**differed (1)**
23:2
**difference (3)**
10:2;35:15;49:2
**differences (2)**
33:19;35:10
**different (17)**
8:18;14:15;15:10;
20:12,13;33:9,9,16;

40:19;41:7;42:18;
48:24;49:6;88:13;
94:22;96:24,25
**differentiate (1)**
49:8
**difficult (3)**
92:17;99:23;103:22
**DIRECT (124)**
3:5;4:1;5:1;6:1;7:1;
8:1;9:1;10:1;11:1;12:1;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1;30:1;31:1;32:1;
33:1;34:1;35:1;36:1;
37:1,2;38:1;39:1;40:1;
41:1;42:1;43:1;44:1;
45:1;46:1;47:1;48:1;
49:1;50:1;51:1;52:1;
53:1;54:1;55:1;56:1;
57:1;58:1;59:1;60:1;
61:1;62:1;63:1;64:1;
65:1;66:1;67:1;68:1;
69:1;70:1;71:1;72:1;
73:1;74:1;75:1;76:1;
77:1;78:1;79:1;80:1;
81:1;82:1;83:1;84:1;
85:1;86:1;87:1;88:1;
89:1;90:1;91:1;92:1;
93:1;94:1;95:1;96:1;
97:1;98:1;99:1;100:1;
101:1;102:1;103:1;
104:1;105:1;106:1;
107:1;108:1;109:1;
110:1;111:1;112:1;
113:1;114:1;115:1;
116:1;117:1;118:1;
119:1;120:1;121:1;
122:1;123:1;124:1;
125:1
**direction (1)**
93:19
**directly (3)**
16:10;59:25;92:25
**disclosure (2)**
46:7;62:20
**discovery (1)**
71:5
**discuss (2)**
28:20;109:10
**discussed (8)**
32:7;57:9;69:9,12;
76:25;94:8;103:20;
104:2
**discussing (5)**
91:11;104:8;105:24;
106:8,9
**disease (7)**
33:21;98:18,19;
103:12,18,24;104:6
**diseases (5)**
33:2,6,9,16;98:12

**dishwasher (1)**
16:14
**dismiss (1)**
102:18
**dismissed (2)**
23:19;53:21
**Disorders (1)**
42:15
**dispute (2)**
21:6;22:22
**disputing (1)**
22:15
**distance (9)**
48:2;62:10;83:2;90:7,
20;91:2,4;94:16;107:5
**distances (2)**
22:23;71:12
**distraction (5)**
47:25;48:15;49:21,
24;51:7,9,22;52:10,24;
54:2
**disturbance (1)**
83:6
**diverge (1)**
54:23
**division (1)**
44:11
**Doctor (33)**
3:7,8;4:11;5:11;7:8;
20:7;21:2,13;23:4;
29:10;30:15;46:13;
52:7;56:8,24;57:12;
59:6;72:7;74:9,14;76:7;
80:23;81:23;86:21;
87:3;91:9;98:11;
104:10;105:15;106:25;
108:2;114:25;115:9
**Doctorate (1)**
5:19
**Document (15)**
30:12;46:2,18,25;
62:17;63:2,3,6,8;71:25;
74:6,11;75:13;80:20;
107:23
**Documents (9)**
28:23;31:20;39:13;
70:15,17;71:6;72:19;
73:4;77:21
**domestically (1)**
6:17
**done (16)**
17:10;26:22;27:11;
33:18;34:3,4;38:2,4,21,
24;45:17;46:23;47:3;
76:23;81:8;108:7
**door (1)**
102:21
**DOT (1)**
71:3
**down (8)**
12:8;27:17;34:17;
66:11,13;94:2;96:10;
117:2

**download (1)**
108:6
**downloads (1)**
108:10
**dozen (2)**
69:2,18
**Dr (129)**
4:1;5:1;6:1;7:1;8:1;
9:1;10:1;11:1;12:1;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1,2,5;30:1;31:1;
32:1;33:1;34:1;35:1;
36:1;37:1;38:1;39:1;
40:1;41:1;42:1;43:1;
44:1;45:1;46:1,5;47:1;
48:1;49:1;50:1;51:1;
52:1;53:1;54:1;55:1;
56:1;57:1;58:1;59:1;
60:1;61:1;62:1;22;63:1;
64:1;65:1;66:1;67:1;
68:1;69:1;70:1;71:1;
72:1;73:1;74:1;75:1,16;
76:1;77:1;78:1,20;79:1;
80:1;81:1;82:1;83:1;
84:1;85:1;86:1;87:1;
88:1;89:1;90:1;91:1;
92:1;93:1;94:1;95:1;
96:1;97:1;98:1;99:1;
100:1;101:1;102:1;
103:1;104:1;105:1;
106:1;107:1;108:1;
109:1;110:1;111:1;
112:1;113:1;114:1;
115:1;116:1;117:1;
118:1;119:1;120:1;
121:1;122:1,6;123:1;
124:1;125:1
**drafting (2)**
63:5,6
**dresser (5)**
100:10,22;102:5,11,
15
**drift (2)**
117:10;118:19
**drifting (1)**
116:18
**drive (1)**
87:22
**driver (44)**
28:17;35:16,16,17;
36:21,22,24;47:25;
49:4;50:9;51:19;55:21;
58:6;63:19;71:7;87:14,
22;88:3,5,12,13,22;
89:20,21;90:14,24;
93:13;108:24;111:3,17;
112:24;113:2;114:5,13;
115:11,15;116:20;
117:16,21;118:8;120:8;
121:2;124:10,15

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 41 of 52   PageID 3231

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

**drivers (14)**
10:18;34:16,23;
35:21;36:10;37:2,10;
48:18;84:10;90:4,6,8;
106:18;115:4
**driver's (4)**
37:7;87:5;114:15;
115:7
**Drives (1)**
60:20
**driving (52)**
10:20,23,23;15:19;
27:18,20,22,24;28:2;
32:4,12,21,22;33:3,7;
34:9,11,15;35:12;37:19,
24;38:3,8,20;41:10,12;
56:20,20;60:23,25,25;
61:15;87:23;88:7,8;
91:12,13;92:21;94:7;
96:15;98:15;105:2,5,10,
12,16;118:2,21,23,24;
119:3;123:12
**drop (1)**
36:11
**drowsiness (9)**
48:16,23;49:22,24;
51:8,10;53:21;120:17;
123:11
**drowsing (1)**
117:7
**drowsy (4)**
116:15;117:17;118:2;
123:21
**drug (1)**
71:4
**drug/alcohol (1)**
71:3
**dually-diagnosed (1)**
40:22
**due (1)**
36:17
**DUI (1)**
53:20
**duly (1)**
3:3
**dumb (2)**
113:13,14
**Dump (10)**
61:5,7,9,22;63:18;
66:11;70:18;78:10;
92:5,7
**during (4)**
21:25;47:5;70:24;
114:14
**dynamics (1)**
21:24

**E**

**earlier (4)**
32:22;44:3;70:2;85:4
**early (9)**
50:6;51:14,16;53:5;

54:7;77:3;119:19,25;
124:9
**Earth (1)**
71:10
**ease (1)**
9:20
**easier (2)**
3:23;103:9
**easiest (1)**
96:12
**easy (1)**
9:10
**Eckhardt (1)**
38:25
**EDR (5)**
108:5;109:4,5;
112:13,22
**education (1)**
17:8
**educational (2)**
5:12;8:11
**effect (2)**
33:20;99:11
**effects (1)**
38:4
**eight (1)**
114:10
**Eighty-plus (1)**
60:19
**either (7)**
11:2;19:15;32:2;
68:4;85:20;89:16;
124:16
**elderly (2)**
34:15;114:2
**electrical (2)**
16:15;20:3
**electrocuted (1)**
45:22
**else (5)**
37:9;71:9;95:23,24;
102:20
**E-M (1)**
4:14
**email (1)**
59:22
**emergency (1)**
123:19
**employed (2)**
29:16;31:15
**employees (3)**
6:19,20;7:5
**employment (1)**
47:5
**EMT (4)**
79:3,4;121:20;122:20
**EMTs (1)**
61:14
**encompass (1)**
38:11
**end (4)**
54:22;100:21,23;
113:19

**engagement (1)**
112:14
**engages (1)**
113:6
**engineer (10)**
15:14;16:15;20:8,9,
11,13,16,17,19;44:12
**Engineering (12)**
7:25;14:9;19:10,16;
20:3,3,4,22,25;42:24;
45:7;84:23
**engineers (2)**
6:21;8:4
**enough (3)**
55:20;90:20;113:10
**ensure (1)**
83:5
**entire (2)**
31:4,8
**entitled (2)**
76:8;77:6
**environment (14)**
27:20,24;28:16;
32:21,24;33:13;34:9,
12;38:8;41:12;56:20;
88:7,9;96:16
**environmental (1)**
45:20
**environments (1)**
88:20
**equate (1)**
12:25
**ERD (1)**
70:25
**Ergonomic (4)**
7:24;19:6,7,9
**Ergonomics (29)**
5:19;7:17,20;8:6,8,
13,15;13:22,23;14:5,18;
15:23;16:6,13,23;18:13,
14,16;19:3,13,15,23;
20:21;23:12,16;27:16,
23;28:9;41:5
**ergonomics-related (1)**
5:2
**Eric (2)**
53:24;55:10
**essentially (4)**
39:17;42:18;43:12;
45:9
**established (2)**
83:12,18;84:12;
85:23;91:5
**Estate (1)**
3:14
**estimate (3)**
6:23;24:2,21
**estimation (1)**
58:21
**et (6)**
17:11;43:2;55:6;
91:8;97:6,13
**even (7)**

37:21,22;73:11;
99:23;103:16;116:11;
119:5
**evening (2)**
119:25;124:14
**event (7)**
66:13;92:3;96:9;
98:16;99:24;107:17;
109:13,18,20;110:19,
25;111:23;117:12;
121:23;123:23;124:12,
18
**events (3)**
87:6;88:20;116:12
**eventually (1)**
62:6
**evidence (11)**
17:7;79:21;105:4,6,7,
17,19;116:10;117:14;
123:4,5
**exactly (1)**
113:8
**exam (2)**
16:25;17:2,3,4;71:3
**EXAMINATION- (1)**
3:5
**examined (1)**
3:3
**example (14)**
8:19;10:18;14:8;
20:18;50:20;88:24;
91:25;92:19;93:17;
94:12;97:12;99:12;
100:4;111:12
**examples (3)**
35:20;37:11;100:5
**excuse (4)**
8:3;61:19;100:21;
110:23
**excused (1)**
125:7
**Exhibit (7)**
46:14;62:25;72:3,8;
74:10;80:23;108:3
**Exhibits (5)**
29:3;71:17,19;78:24;
79:5
**exist (2)**
34:25;115:16
**existence (1)**
5:5
**exists (1)**
25:22
**exit (2)**
54:17;55:9
**ex-law (1)**
15:15
**expect (5)**
89:3;94:13;101:19;
103:7;117:11
**expectancies (16)**
28:2,5,11;32:20;
87:14;91:18,19,20,23;

92:23;93:18;94:7;
97:16,19,23;101:9
**Expectancy (39)**
47:24;62:8;77:8;
82:20;85:3;87:3,4,22;
88:4,5,22,23,25;89:6,8,
13,17,19,20,21;90:2;
91:7;92:3,10,19;94:19;
95:4,18,21;96:7,21;
98:7,9,21;99:21,22;
102:22;103:22;109:16
**expectation (1)**
90:12
**expectations (2)**
88:17;106:6
**expected (4)**
10:14;94:10;95:25;
103:15
**expecting (10)**
92:13;93:23;94:16;
95:23;99:25;100:16;
101:16,24,25;102:5
**expects (1)**
103:9
**experience (15)**
7:9;8:11,11,12,12;
15:15;16:10,16;40:11,
12,17;41:20;42:10;
43:8;88:18
**experiences (1)**
89:10
**experiencing (1)**
88:14
**experiment (1)**
41:3
**expert (17)**
8:9,10;13:20;15:4,8,
20,24;17:17,20;23:7,12,
16;24:17;26:7;31:10;
61:21;84:3
**expertise (4)**
21:6;22:17;32:11,13
**experts (4)**
6:21,24;19:9;23:2
**explain (7)**
27:17;28:21;31:7;
89:24;94:11;109:3,8
**explanation (1)**
121:14
**expletive (1)**
101:3
**expressed (4)**
59:20;74:14;121:12;
122:5
**expression (1)**
116:16
**extended (3)**
118:21;119:2,15
**extending (1)**
84:18
**extent (1)**
98:24
**extra (1)**

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 42 of 52   PageID 3232

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

30:6
**eye (16)**
33:12,21;36:3,17;
92:11;95:15;98:13,19;
102:25;103:12,18,24;
104:6,12,15;111:7
**eyeballs (1)**
95:16
**eyes (6)**
32:15;33:2,6;34:2;
101:6,14

**F**

**facilities (1)**
42:19
**fact (7)**
53:11;84:19;93:2;
116:4;118:16,17;
120:24
**factor (1)**
16:22
**factored (1)**
58:25
**factors (56)**
5:2;6:10;7:17,19,20,
24;8:8,9,13,14,16:9:8;
10:12;13:20,22;15:19,
20,25;16:13;17:16,19;
18:13,14,16;19:3,9,23;
20:2,19,21,24;22:4;
23:11,16;24:17;26:7;
27:16,17,23;28:9;35:2,
5,8;39:2;41:4,7;42:5,20,
23;44:12;45:10;53:10;
87:5;91:10;116:2;
120:21
**factors/ (2)**
15:22;19:14
**factors/ergonomic (1)**
16:11
**factors/ergonomics (5)**
14:12;15:4,8;19:20;
20:5
**facts (7)**
53:2;54:4;59:18;
70:16;83:20,25;84:6
**fair (13)**
9:17,21;12:5;15:2;
27:7;38:12;39:22;
86:10;87:4;94:5;107:8;
110:22;111:7
**fairly (2)**
50:6;52:13
**fall (8)**
13:7;20:17;25:21;
115:15;116:3;118:13,
19;121:2
**fall- (2)**
115:21;116:11
**fall-asleep-at-the-wheel (3)**
117:12;120:18;123:6
**fall-asleep-at-the-wheel-crashes (1)**

119:22
**fallen (4)**
48:18;61:12;82:13;
122:16
**falling (20)**
48:23;49:4;62:13;
114:9,13;115:3,11,25;
116:6,16,20;117:4,17;
118:7;119:18;120:9,10,
22;123:8,22
**familiar (7)**
3:21;33:4,5,24;34:6,
10;101:8
**far (6)**
32:23;55:2;90:11,16;
97:18;102:5
**farms (2)**
45:3,3
**farther (1)**
94:2
**faster (1)**
108:22
**fatigue (9)**
48:16,23;49:21,24;
51:8,9;52:11;116:15;
120:17
**fatigue/ (1)**
53:20
**fatigue/drowsiness (7)**
49:3,6;50:8;51:23;
52:25;53:9;54:3
**fatigued (2)**
117:7;123:21
**February (2)**
77:24;78:2
**federal (7)**
14:13,19;23:18;24:6,
7,15;56:3
**feel (3)**
21:5;22:14;100:13
**feet (7)**
36:22;75:2;79:14;
108:17;111:18,19,21
**fell (7)**
82:10;121:9,11,13,
16;122:8,9
**few (3)**
3:22;32:4;119:7
**field (14)**
8:14;9:14;12:20,24;
14:10;15:11;16:10;
20:21,21;27:15;28:8;
32:25;35:15;40:16
**fields (1)**
8:12
**fifth (1)**
11:2
**figure (1)**
112:5
**file (8)**
31:5,9,9,10,16,22;
63:4;70:3
**filed (2)**

5:6;23:25
**fill (1)**
60:2
**find (4)**
12:18;19:25;20:2;
95:25
**fine (2)**
60:18;114:23
**finish (2)**
3:25;7:22
**finished (1)**
45:12
**fire (2)**
103:2,3
**firm (7)**
4:25;6:14,15,25;7:2;
45:7;57:7
**first (18)**
3:24,24;11:3;29:24;
32:2;43:10;47:11,11;
59:6;77:6,10,12,13;
82:18;109:7,7;111:17;
122:15
**five (3)**
16:12;38:25;40:4
**Florida (4)**
47:13;50:21;60:20;
105:11
**flow (1)**
83:6
**flowed (1)**
77:14
**focus (7)**
27:23;34:22;35:12;
40:17;49:7;52:23;53:24
**focused (6)**
11:21;19:21;35:8;
92:14;93:5,6
**focusing (1)**
5:15
**fog (1)**
95:13
**folks (2)**
10:24;12:22
**follows (1)**
3:4
**foot (5)**
36:23;100:25;112:21,
24;113:9
**Forensic (29)**
4:20;5:7;6:3,12,14,
20,20:14;29:6,16,17,19;
30:23;31:2,13,14;32:3;
45:7,10,16,18;48:7:3,
5;56:5;57:4;72:4,12,24;
73:20
**Forensics (2)**
30:21;31:23
**forewarning (3)**
92:9;124:12,17
**forgot (2)**
24:23;75:16
**form (1)**

59:24
**formal (5)**
7:13;28:13;35:6;
56:13,14
**formalities (1)**
29:5
**formalized (1)**
88:8
**formulate (1)**
31:21
**forth (7)**
9:7;10:23;32:20;
60:20;105:13;110:11;
117:4
**forward (2)**
93:9,22
**found (2)**
23:18;58:22
**four (7)**
24:22;25:12;55:3;
61:2;96:24,24;107:19
**four- (2)**
11:19;113:16
**four-and-a-half (2)**
113:18;114:6
**fourth (2)**
25:21,23
**four-week (1)**
15:17
**four-year (1)**
25:5
**frame (1)**
24:4
**friend (2)**
60:24,24
**front (3)**
58:6,7;61:8
**Frye (1)**
24:9
**full (1)**
4:11
**full-time (1)**
6:23
**fully (2)**
83:12;85:23
**further (3)**
28:22;32:16;124:24
**future (3)**
89:4,14,15

**G**

**Gardner (2)**
3:15;68:15
**gas (2)**
112:25;117:3
**gather (1)**
12:13
**gave (4)**
59:17;77:20;91:14;
107:19
**geared (2)**
11:11,20

**general (14)**
9:22;10:16,17;11:9;
12:2;22:9;35:14;40:20;
41:11,12;45:23;89:8;
91:19;107:11
**Generally (22)**
6:8;24:11;26:8,16;
27:18;32:9,9,9;33:10,
25;34:25;39:12;40:23;
43:24;51:11,16;55:20;
56:14;91:10;96:23;
109:2;110:23
**gentleman (3)**
21:19;55:18;58:18
**gentlemen (1)**
121:8
**genuineness (1)**
70:17
**gets (5)**
12:14;28:4;94:25;
95:7;113:23
**given (2)**
35:11;37:18
**giving (8)**
18:19;95:3,8,9;103:6;
112:25;117:6,9
**Glad (36)**
3:13;59:7;62:9,13;
63:12;71:2;78:23;79:8,
25;80:9,11;82:8,9;83:2;
85:5;86:3;99:4;104:12;
107:5;109:23;110:3;
111:24;114:9;115:3;
118:22;119:9;120:12,
14;121:8,10,12,24;
122:18;123:7,14;124:2
**gladly (1)**
4:9
**Glad's (13)**
62:7;63:15;70:18;
77:8;78:21;82:12,19;
85:3,10;89:19;104:22;
106:12;122:22
**glare (1)**
36:18
**glaucoma (1)**
33:21;99:9
**Glen (13)**
63:21;64:4,24;66:9;
70:24;75:5;79:17,23;
84:17;86:8,12,16,21
**Glen's (4)**
78:16;79:15;80:7;
108:15
**goal (1)**
9:8
**goes (2)**
21:22;117:2
**Good (4)**
3:7;75:23;117:23;
118:9
**Google (3)**
44:25;71:10,10

Case 2:17-cv-02101-SHL-cgc Document 124-6 Filed 09/14/18 Page 43 of 52 PageID 3233

Estate of Robert J. Glad vs. Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

**Gotcha (32)**
17:23,23;19:4;24:5;
26:23;31:19;38:7;39:4,
4,10,14,22;41:8,14;
45:25;46:11,22;48:10;
50:12,23;51:25;53:16;
57:12;66:19;68:3,18;
75:7;80:14;89:24;96:5;
113:13;114:7
**governing (3)**
14:2;16:4;18:8
**government (2)**
14:21,23
**graduate (5)**
5:13;7:13;15:23;
35:7;43:14
**great (2)**
37:21;60:11
**greater (1)**
94:16
**group (9)**
6:10,10;10:14;11:7;
12:17;35:2;44:13,19,21
**growth (1)**
30:24
**guess (13)**
6:22;12:5;46:21;64:8,
21;68:24;76:11;78:20;
82:18;111:9;115:5;
125:3,4
**guidance (3)**
28:12,13,15
**guidelines (3)**
88:15;90:14;91:8

**H**

**half (2)**
17:2;25:11
**handful (2)**
39:23,23
**hang (1)**
15:6
**happen (2)**
116:13;117:13
**happened (20)**
48:7;50:4;51:14;54:7,
11;60:7,9;61:19;83:9;
117:15;120:7;122:3,10,
10,11,13,25;123:2,20,
23
**happening (1)**
101:5
**happens (5)**
57:16;58:16;100:4;
101:15;117:5
**happy (1)**
60:16
**hard (3)**
37:3;57:18;103:8
**hardening (1)**
36:4
**hard-pressed (1)**

19:25
**hardware (1)**
44:11
**havoc (1)**
121:21
**hazard (18)**
6:22;46:21;64:8;
68:24;92:2;93:19,20,
21;97:6,6,21,22;99:24;
104:4;107:17;108:25;
111:23;112:8
**hazardous (2)**
89:9;92:2
**hazards (1)**
110:8
**head (5)**
4:5;24:3;37:4;99:13;
120:15
**heading (3)**
42:9;54:24;82:6
**head's (1)**
93:16
**heavily (1)**
56:23
**heck (1)**
122:3
**help (2)**
10:10;101:10
**helping (2)**
42:7;63:7
**hey (1)**
118:13
**hidden (1)**
111:6
**hiding (1)**
111:13
**high (2)**
42:20;45:21
**higher (1)**
36:10
**high-speed (1)**
54:10
**highway (2)**
54:10,11
**himself (3)**
83:18;85:23;121:9
**hinders (1)**
37:7
**historical (1)**
20:23
**history (5)**
46:6,16;72:16,24;
124:2
**hit (5)**
57:23;97:12;100:25;
101:2,11
**hits (2)**
61:7;102:25
**hoc (7)**
87:19;88:23,24;89:3,
6,7,13
**hold (1)**
17:6

**holding (1)**
20:15
**home (1)**
50:10
**hopped (1)**
117:19
**hotel (1)**
100:19
**hour (6)**
15:19;61:16;91:9;
98:12;105:24;108:16
**hours (4)**
53:5;54:8;119:12,25
**huge (1)**
45:2
**human (60)**
5:2,16;6:10;7:17,19,
19,24;8:7,8,13,14,16;
9:8;10:12;13:20,22;
14:12;15:3,7,19,20,22,
25;16:11,13,22;17:16,
19;18:13,14,16;19:2,9,
14,20,21,22,20:2,5,19,
21,24;22:4;23:11,16;
24:17;26:7;27:16,17,
23;28:3,8;32:13;35:2,4;
41:4;44:11;45:9;87:5;
91:10
**Hypothetically (1)**
124:10

**I**

**IBM (19)**
20:18;39:12,16,19,
25;40:3,5,6,8;43:23,25;
44:3,4,8,11,13,20;45:4,
11
**idea (3)**
13:16;56:7;121:4
**ideal (1)**
95:13
**identification (16)**
28:23;30:12;46:2;
62:17;71:25;74:6;
80:20;96:4;97:3;98:6,9;
101:10,17;103:19;
107:20,23
**identified (3)**
42:23;97:7,8
**identify (12)**
37:20;42:19;55:22;
95:20;97:4,19,20,24;
102:19;107:15;110:6,6
**illnesses (1)**
33:16
**Illuminating (1)**
7:25
**immediately (1)**
119:11
**Imoh (1)**
3:10
**impact (15)**

61:17,17,20,23;67:7;
71:13,14;79:18;84:16;
91:18;99:15;103:24;
108:19,22;110:16
**impacts (1)**
109:3
**implement (1)**
105:16
**implementation (1)**
97:14
**implicates (1)**
94:9
**importantly (1)**
95:5
**improper (10)**
62:7;77:8;82:19,21;
83:10,14;85:2;86:6;
89:18,25
**inattention (9)**
48:15;49:21,24;51:7,
9,22;52:10,24;54:2
**Inc (1)**
45:6
**incidences (1)**
123:13
**incident (5)**
22:7;42:21;60:6,23;
121:14
**include (4)**
38:15;82:12,14;
116:17
**included (3)**
52:24;53:25;71:9
**including (1)**
71:6
**inconsistencies (1)**
122:24
**inconsistent (1)**
119:17;123:14
**incorporated (1)**
5:9
**incorrect (6)**
12:4;40:8;86:23;
96:3;98:2,3
**incorrectly (1)**
97:8
**independent (4)**
6:24;7:3;64:17,20
**independently (1)**
23:10
**indicate (3)**
84:11;115:23;117:25
**Indicating (2)**
37:4;69:7
**indication (4)**
90:23;105:15;120:17;
123:21
**individual (2)**
9:23;12:9
**individuals (2)**
12:12;13:13
**industrial (2)**
19:16;42:19

**industries (1)**
42:17
**industry (2)**
9:7;14:24
**influenced (1)**
41:6
**informal (1)**
28:14
**information (24)**
5:16;28:3,11,13;
30:20;32:14,15,23;
33:12,15;34:2;36:6,8;
38:6;40:8;58:25;60:3;
74:21;75:10;87:7;
96:16,20;98:3,4
**information- (1)**
35:24
**information-processing (1)**
32:19
**initial (1)**
76:23
**initiate (3)**
107:16;110:11;
113:11
**initiation (4)**
109:18,19;112:9,12
**injured (1)**
45:19
**injury (3)**
42:21;121:18;122:5
**inpatients (1)**
40:22
**input (5)**
101:7;117:6,8,9;
118:18
**inquiry (1)**
60:2
**inspection (2)**
70:11,24
**instances (1)**
23:6
**instantaneous (2)**
112:20;116:14
**instructed (1)**
90:8
**insufficient (2)**
98:2,3
**intake (1)**
56:15
**intended (1)**
54:16
**intention (1)**
90:5
**intentions (2)**
90:25;92:9
**interact (2)**
8:17;118:10
**interaction (2)**
19:21;99:20
**interchange (1)**
54:12
**interest (3)**
27:20,25;28:8

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 44 of 52   PageID
3234

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

**interested (11)**
8:20;10:14,22;11:5,
10,12,14,16,19;28:6;
76:20
**intermix (1)**
32:19
**intern (1)**
44:8
**internal (1)**
44:20
**International (1)**
43:23
**internationally (1)**
6:18
**interrogatories (2)**
70:13,14
**Interruption (1)**
51:12
**intersection (3)**
58:19;67:5,7
**into (45)**
12:15;13:13;20:17;
21:8;28:4,14;32:18;
33:15;37:12;43:6;
55:11,18;61:8;78:6;
82:23,25;84:19;85:13,
18,23,24,25;86:2,20;
90:9,10,16,17,18;91:3;
92:8,16;94:25;95:7;
100:3,10;107:7;109:20,
22;110:2;111:24,25;
117:9;121:25;123:24
**Introduction (1)**
76:8
**investigate (1)**
76:12
**investigated (1)**
45:18
**investigation (8)**
58:3;66:6;77:4;83:23,
25;84:3,20,21
**investigations (2)**
45:10;108:7
**invoice (3)**
72:23;73:20,23
**invoiced (1)**
72:20
**invoices (6)**
31:12,19;65:11,12;
72:4,11
**involved (12)**
22:6;25:15;27:18;
32:6;49:12,25;51:10;
59:18;84:11;101:4;
115:24;118:6
**involves (2)**
114:13;118:8
**involving (3)**
25:17;58:18;115:4
**irregularity (1)**
116:19
**issue (10)**
15:24;35:9;48:21,22;

52:10;77:10;94:19;
99:4;117:19;123:8
**issues (11)**
5:3;21:9;33:17;34:9;
36:8;49:23;51:9;53:3,
11;54:4;81:22
**item (1)**
38:13
**items (2)**
34:14;39:11

**J**

**January (3)**
29:15;51:4;52:8
**J-channel (1)**
90:15
**Jennifer (1)**
9:25
**jet (1)**
25:16
**job (5)**
16:12,12;43:2;45:14;
71:6
**John (1)**
4:13
**JR (2)**
3:2;4:13
**J-turn (11)**
61:6;66:12;67:8,10;
75:2;78:11;80:5;82:23;
83:12;84:13;90:15
**July (3)**
6:5;40:9;44:5
**June (1)**
52:21
**jury (4)**
48:6;51:2;52:13;
53:19
**Justin (1)**
69:25

**K**

**keep (12)**
25:6;26:13,16;27:9,
12;30:8;46:25;56:8,13;
57:16;118:11,12
**keeping (1)**
92:11
**keeps (1)**
118:20
**Kelly (2)**
67:12,14
**Kent (1)**
61:25
**kept (1)**
56:14
**kill (1)**
35:13
**killed (1)**
58:10
**kind (11)**

12:2;37:11;43:11;
45:4;47:23;49:5,8;
56:19;59:17;60:6;73:13
**knew (2)**
48:8;59:19
**knowing (1)**
122:3
**knowledge (3)**
9:3;24:13;38:5
**known (2)**
20:22;35:8
**KOZLOWSKI (4)**
46:10;62:23;72:5;
106:23

**L**

**lab (1)**
42:7
**labels (2)**
38:6;42:3
**lag (1)**
112:20
**lane (60)**
55:2,23;61:15;62:7;
77:7;79:20,22,24;80:12,
17,24;82:19,21,24,25;
83:10,13,13,14,18,19;
84:12;85:2,8,12,12,18,
18,24,24;86:2,3,6,20;
89:18,25;90:5,10,11,16,
17,19,22;91:3;92:6,8,
13,16;108:18,19,22;
109:21,23;110:2;
111:24,25;116:18,19;
118:19;123:24
**lanes (11)**
55:3,3;61:2;62:11;
78:10;80:4;85:12,17,
24;97:13;110:10
**laptops (1)**
44:15
**large (1)**
44:24
**largest (1)**
18:15
**last (11)**
48:14;53:22;57:17;
64:11;69:3,5;72:23;
73:20;112:5;114:7;
117:22
**late (5)**
19:18;114:14;115:6;
119:20;124:8
**later (8)**
43:19;44:18;51:16;
77:17,18;112:9;119:20;
120:4
**laterally (2)**
81:2;108:18
**Laura (1)**
57:6
**law (1)**

57:6
**lawsuit (1)**
3:12
**lay (1)**
111:9
**lead (3)**
14:15,16;115:23
**leader (1)**
6:10
**leading (3)**
76:25;120:18;123:5
**leads (2)**
107:7;116:16
**learning (1)**
8:23
**least (13)**
16:12;23:14,17;55:3;
59:19;64:23;80:9;83:8;
86:8;92:8;104:16;
113:16;119:14
**leaves (3)**
114:16;115:8;118:16
**leaving (2)**
80:2;123:11
**left (24)**
6:22;29:23;30:23;
37:4;40:9;44:5;52:7;
61:8;82:24;83:13,19;
86:3;90:17,19;92:5,13;
104:15;108:18,21;
119:3,3,6,10,12
**legitimate (1)**
16:22
**lens (1)**
36:3
**lenses (1)**
36:14
**Less (3)**
69:18;117:8;118:9
**lets (1)**
113:2
**letter (1)**
75:19
**letterhead (2)**
29:17,20
**level (2)**
14:13;122:2
**licensed (2)**
14:10;21:3
**licensing (1)**
13:19
**light (12)**
55:5,5;100:15,17;
101:6,11,13,18,19;
102:6,14,16
**lights (2)**
55:4,4
**likelihood (3)**
92:2;95:4,5
**likely (13)**
19:24;36:15;50:13,
18;55:25;56:3;93:24;
97:5,17;101:2;110:7;

116:3;121:24
**limitations (4)**
8:21,24;9:2;11:22
**limited (1)**
36:23
**limits (1)**
115:13
**line (3)**
61:3;96:10;125:3
**list (9)**
24:25;25:2,3,5;37:14;
38:13;47:12;77:20;
91:24
**listed (4)**
38:24;47:2;72:18;
123:11
**listing (3)**
43:4
**litigation (3)**
23:7,12;26:14
**little (14)**
28:21;34:3;40:11;
44:2;51:16;84:14;96:6;
106:18,19;107:9;
109:11,19;112:20;
119:13
**LLC (3)**
3:11;4:19;5:6
**loaded (2)**
32:8;33:8
**located (1)**
60:5
**location (3)**
80:3,4,7
**lolling (1)**
120:16
**long (10)**
5:4;6:4;23:24;40:3;
49:9;60:17;65:7;
117:22,24;119:5
**longer (7)**
99:16;103:13,16;
109:15;110:22;112:6;
114:3
**longitudinally (1)**
81:3
**long-term (9)**
87:14,18,21,21;88:3,
5;89:20,23;91:19
**look (17)**
28:10;29:10;30:4;
31:25;37:14;40:7;
46:14;49:15;51:3;
52:20;72:9;76:7;81:24;
86:11;87:2;117:16;
118:3
**looked (16)**
34:10;53:10,11;
70:12,17,23,25;71:2,5,
10,12,14;73:5;108:10;
116:8;117:24
**looking (19)**
9:20,21;12:6;22:4;

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 45 of 52   PageID
3235
Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

37:3,23;41:5;46:5;
59:21;84:9;92:4,6;93:8,
19,22,24;99:25;119:11;
120:15
**looks (16)**
16:21;42:11;46:16;
47:12,17;48:21;49:16,
19;59:10;66:21;70:9;
72:15;75:15,19;78:25;
116:2
**lose (2)**
36:24;37:5
**loss (1)**
71:8
**lot (7)**
28:8;37:10;72:18;
73:18;101:7;116:23;
122:24
**low (2)**
75:6;79:16

## M

**Machine (1)**
43:23
**machines (2)**
8:18;9:9
**macular (5)**
33:22;99:3,8;104:15,
22
**Madam (1)**
75:21
**maintaining (1)**
9:12
**major (1)**
119:24
**makes (1)**
88:5
**making (2)**
78:11;81:18
**manager (1)**
6:11
**maneuvering (1)**
67:10
**maneuvers (1)**
66:12
**manner (2)**
62:8;77:9
**manuals (1)**
88:13
**many (15)**
3:19;6:19;7:5;23:10;
24:16;25:7;37:18;56:9,
24;57:5,12;64:7;68:18,
22;69:14
**map (1)**
118:23
**Maps (1)**
71:10
**Marianne (2)**
3:15;68:14
**Mark (9)**
29:4;30:8,10;46:4;

62:19;72:3;74:4;
114:18;125:5
**marked (15)**
28:23;29:3;30:12;
46:2,13;62:17,25;
71:25;72:7;74:6,10;
80:20;81:23;107:23;
108:2
**Markeith (3)**
3:11;63:18;85:12
**Mark's (1)**
125:3
**Mary (1)**
4:15
**Maryland (13)**
23:13,15,18,23;24:6,
8,22,24;25:12;26:20,24;
50:21;82:3
**Massey-Galena (2)**
61:24;105:11
**Master's (1)**
5:18
**materials (1)**
77:18
**math (1)**
113:14
**mathematical (1)**
22:19
**mathematically (1)**
22:21
**matriculate (2)**
43:14,16
**matter (9)**
74:13;113:10;116:5;
124:8,13,15,18,19,22
**matters (2)**
23:7;26:15
**may (24)**
10:4;14:15;18:24,25;
36:21,22;48:11,11;50:2,
7;65:4,8;66:3,7;70:20;
74:12,21;102:18,19;
114:5;121:12,13;
122:15,16
**maybe (24)**
5:7;6:24;7:15;21:25;
24:2,19;39:23;43:6;
44:25;50:9;55:3;64:10;
91:13;94:15;99:13,13;
100:9,22;102:20,20;
109:18;114:20;118:14;
119:7
**mean (26)**
6:21;13:3;14:20,21;
21:9;32:11;34:7;46:23;
48:8,19;58:17;65:12;
68:9;69:16;81:2,2,15;
82:20;101:23;106:5;
109:2;112:14;113:21;
121:7,16;123:16
**meaning (4)**
95:3;103:7,8,10
**means (1)**

93:7
**meant (1)**
109:8
**measurements (4)**
22:24;23:2;65:21,24
**mechanical (1)**
20:3
**median (3)**
82:23;90:15;113:21
**medical (10)**
14:9;21:7;49:13;
78:21,23;79:7;104:11;
105:8;123:19;124:11
**medically (1)**
98:24
**medication- (1)**
117:18
**meet (1)**
64:24
**meeting (1)**
66:9
**melds (1)**
43:6
**member (3)**
7:23;8:5;54:15
**members (2)**
19:8;42:8
**memory (7)**
8:23;32:20;49:10;
121:21,22,23;122:18
**mention (1)**
75:16
**mentioned (6)**
9:15;16:4;32:22;
77:23;78:8;85:4
**mentioning (1)**
17:23
**met (4)**
67:19;68:2,3;69:25
**methodology (5)**
48:14;49:20;51:6;
52:24;53:25
**methods (2)**
7:12;41:18
**Miami (1)**
47:13
**mid-afternoon (1)**
120:4
**middle (3)**
34:18;100:6;118:3
**mid-summer (1)**
50:6
**might (4)**
28:21;46:7;65:12;
113:13
**miles (3)**
61:16;108:16;118:25
**military (1)**
54:15
**Miller (3)**
57:6;69:15,25
**mind (3)**
37:12;58:12;100:17

**mine (1)**
84:18
**minors (1)**
10:20
**minutes (1)**
119:2
**mirror (1)**
93:10
**misidentified (1)**
104:4
**misidentify (2)**
95:22;97:25
**mistake (1)**
44:2
**mistaken (1)**
123:7
**mitigation (1)**
42:25
**model (1)**
78:9
**module (3)**
108:5,9;112:23
**moment (5)**
70:22,22;75:11;
111:14;112:7
**Montgomery (1)**
25:19
**months (1)**
69:5
**moonlighting (1)**
45:9
**more (27)**
11:7;12:20;21:10;
29:25;34:4;36:7,15,18;
37:10;39:23;40:24;
41:4,11,12;46:8;48:22;
50:13,18;58:4;92:17;
95:5;98:11;99:23;
100:2;103:21;107:13;
117:3
**morning (14)**
3:7;51:15,17;53:5,6,
7;54:7;69:25;99:12;
100:20;119:3,25;124:9,
14
**most (12)**
15:11;19:23;20:15;
36:13;37:17;55:25;
56:3;69:19;96:16;
115:19;116:17,18
**Mostly (1)**
41:24
**motion (4)**
23:17,19,25;37:6
**motions (1)**
23:22
**Motor (1)**
82:3
**motorcycles (1)**
58:18
**motorcyclist (1)**
58:20
**move (7)**

90:7,20,21,23;92:8;
108:18,21
**moved (4)**
44:10;82:24;123:24
**movement (7)**
21:24,25;92:16;94:3;
109:20,22;111:25
**moves (2)**
93:13;109:25
**moving (2)**
86:19;91:2
**much (3)**
50:21;94:17;100:8
**multiple (2)**
6:8;64:6
**multiple-lane (1)**
54:11
**muscle (1)**
117:8
**muscles (2)**
116:24;118:17
**must (2)**
61:11;82:13
**myself (4)**
7:7;45:14;46:24;
76:17

## N

**name (4)**
3:10;4:11;14:2,4
**names (1)**
24:14;60:4
**narrow (1)**
27:16
**national (1)**
6:15
**natural (2)**
13:2;119:23
**nature (1)**
25:13
**near (4)**
54:22;67:6,7;113:19
**necessarily (4)**
9:23;35:25;37:19;
73:5
**neck (2)**
36:25;37:6
**need (7)**
4:7,8;36:14,15;99:17;
105:15;114:5
**needed (4)**
43:14;83:2;107:6;
113:16
**needs (1)**
110:13
**negligence (1)**
61:10
**Neida (1)**
47:12
**networking (1)**
44:11
**neurology (1)**

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 46 of 52   PageID
3236

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

21:10
**neurons (1)**
103:2
**New (3)**
60:20;74:20;75:10
**next (13)**
4:3;23:4;30:16;
37:13;39:14;41:20;
43:4;49:15;51:3;52:20;
54:25;77:5;123:17
**night (17)**
36:6,9,18,22;53:5;
94:13;100:4,6;111:15;
114:14;115:6;119:17,
20;120:2;123:12,13;
124:8
**nighttime (1)**
95:13
**Ninety (1)**
27:21
**Nods (1)**
24:3
**noes (1)**
4:4
**noise (2)**
101:22;102:19
**none (2)**
89:21;115:15
**normal (8)**
13:5,8;106:9,12,15;
113:21;117:21;120:3
**North (16)**
5:20,21;18:20;41:21;
43:5,10;61:2,6;67:6,9;
75:2;83:13,16,17,18;
119:4
**Northwestern (1)**
15:17
**Nos (1)**
29:3
**note (3)**
80:16;81:6;82:7
**noted (1)**
88:13
**notes (2)**
66:23;81:6
**notice (2)**
65:12;74:23
**number (7)**
16:9;17:4;24:24;
25:10;27:6;91:15;107:2

**O**

**object (9)**
36:20,21;99:24;
100:3;103:8;104:3;
111:13,14,19
**objection (1)**
98:23
**objects (1)**
100:12
**occasion (1)**

108:8
**occasions (2)**
64:23;105:13
**occupant (1)**
21:25
**occupation (1)**
4:24
**occupy (1)**
45:14
**occur (2)**
123:23;124:12
**occurred (16)**
22:5,5,6;1:19;74:25;
79:20,22;80:25;84:24;
115:6;116:13;118:4,5,
5;119:18;121:22;124:8
**occurring (4)**
79:14;80:17;120:5;
121:5
**occurs (5)**
109:16;114:14;
116:14;119:13;121:15
**o'clock (2)**
54:8;100:20
**October (2)**
5:8;30:21
**off (9)**
36:11;43:20;52:7;
54:17;60:25;113:2,5;
114:21;117:2
**off-duty (1)**
79:4;121:19
**offering (1)**
14:25
**offhand (7)**
23:10;25:7,13;56:24;
67:13;70:20;71:20
**office (1)**
6:12
**officer (6)**
121:12;122:8,14,17,
21,23
**officer's (1)**
122:17
**officially (3)**
5:8;30:22;57:11
**off-ramp (4)**
54:12,21,21,23
**oftentimes (3)**
13:10;15:9;49:3
**old (4)**
9:24;10:25;48:20;
60:19
**older (19)**
34:23,23,24;35:9,10,
16,21;36:7,12,16,16,22,
24;37:2,7,10;58:18,19;
114:5
**once (8)**
58:25;62:11;94:25;
97:3,7;101:11;110:15;
111:10
**One (52)**

15:11,18,18;20:5;
23:17;24:23;25:15,21,
24;26:3;37:2;38:13,24;
40:21;47:11,12;48:17;
53:22,23;57:9,17;
58:17;66:21;69:24;
70:15;75:3,19;77:6,22;
83:13,18;84:12;85:12,
18,24;86:18;87:12,14,
17,18,22;99:12;100:5;
107:13;108:17,20;
109:17;110:15;115:23;
119:24;120:4;121:4
**one- (1)**
112:5
**one-and-a-half (6)**
109:14;110:14,21,25;
112:4,8
**ones (1)**
78:12
**one's (1)**
98:20
**only (17)**
15:25;24:15;25:5;
38:12,13,14,23;57:3;
65:14;78:23;95:7;
109:17;110:15;113:3;
115:10;118:25;123:4
**onward (1)**
19:19
**oops (1)**
78:24
**operation (2)**
38:23,24
**opine (1)**
76:19
**opining (2)**
76:18,20
**opinion (3)**
59:2;84:4;86:15
**opinions (16)**
31:21;53:12;57:14;
69:12;71:22;74:14,15,
18;75:9;80:3;84:18,21,
25;86:6,24;105:20
**opposed (5)**
9:25;22:9;35:16;
48:23;81:11
**order (2)**
77:12,13
**organization (2)**
14:4;18:16
**original (1)**
38:18
**originally (1)**
3:13
**otherwise (1)**
54:19
**ours (1)**
21:18
**out (26)**
7:15;20:16;21:22;
22:25;42:18;45:8;

58:12,19,22;60:2,22;
83:5;90:11;102:17;
111:10;113:11;121:19,
25;122:22;123:9,10,14,
17;124:4,7,10
**outcome (4)**
48:4;50:24;52:11;
53:16
**outdated (3)**
29:18,21,22
**outer (1)**
115:13
**outreach (1)**
42:16
**outside (2)**
34:6;93:15
**over (20)**
3:22;12:24;44:10;
56:19;58:8;59:25;
60:12;69:2;85:25;88:2,
16,18;90:7;91:2;92:8;
93:14,24;106:5;116:14;
119:10
**overall (3)**
31:16;56:17;90:13
**Overhead (1)**
55:5
**overlay (1)**
70:10
**own (5)**
42:6;49:6;81:8;
84:20;100:8
**owner (1)**
4:21
**owner/operator (1)**
4:25

**P**

**page (12)**
29:24;32:2;34:18;
38:25;47:11;74:25;
79:13;82:5;86:11;
108:13;109:10;114:10
**pages (1)**
109:10
**paragraph (2)**
48:14;60:17
**part (18)**
9:13,16;22:3;31:15;
35:6;41:16;42:24;46:6;
63:6;66:5;80:6;83:14;
86:14;94:20;96:22;
98:6,10;102:8
**participate (1)**
63:5
**participating (1)**
12:12
**particular (21)**
9:20;11:8;12:7,8,13,
18;13:11,12;14:6,11;
30:22;50:16;53:22;
62:15;81:9;89:4;98:18;

104:24;107:10;108:13;
115:18
**particularly (6)**
34:15;37:19;47:6;
83:10;114:2
**part-time (2)**
6:24;45:14
**party (3)**
47:18;57:13;68:10
**party's (1)**
60:4
**pass (1)**
17:3
**Passenger (7)**
61:12;63:15;70:5;
82:12;85:15;118:10;
121:2
**passengers (1)**
84:11
**patents (1)**
39:24
**path (5)**
83:3;84:16;85:13;
86:9,23
**Patricia (1)**
49:16
**pattern (13)**
53:11;84:19;95:8,9,
19;100:17;101:13,17,
21;102:10,18,23;103:6
**Paul (5)**
4:14;56:25;59:12;
67:12,14;68:23
**Pauls (2)**
3:11;71:6
**Paul's (1)**
71:7
**paying (1)**
57:25
**PC-based (1)**
44:16
**PC-related (1)**
44:15
**pedestrian (6)**
51:19;57:23,25;58:4;
94:14;111:17
**peer (1)**
16:20
**Pembrooke (1)**
4:14
**Penn (2)**
42:11,14
**Pennsylvania (9)**
4:15;5:9,17;42:17;
45:8;49:20;52:21;
57:20,21
**people (14)**
8:17;9:11;11:7;
12:25;13:7;15:9;22:6;
32:14;36:13;42:2,4;
45:19;122:24,25
**people's (1)**
8:20

Case 2:17-cv-02101-SHL-cgc Document 124-6 Filed 09/14/18 Page 47 of 52 PageID 3237

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

**per (2)**
61:16;108:16
**perceive (4)**
42:2,4;95:24;106:13
**perceives (1)**
102:9
**perceiving (2)**
95:6,7
**percent (6)**
27:21;32:23;73:17;
91:14,15;94:15
**percentage (1)**
17:4
**percentile (4)**
11:2,3;106:17;113:24
**percentiles (1)**
113:22
**perception (29)**
8:22;27:21;28:18;
32:17,18;33:3,6,20;
35:22;36:2;41:8;91:24;
94:21;95:3;96:9,18,22;
98:16,22,25;103:13,19,
25;104:8;106:13,14,16;
111:6;112:5
**perception- (1)**
28:6
**perception-reaction (21)**
8:22;41:3,6;47:25;
96:15,19,23;107:11,14,
18;108:11,12,23;
109:12;110:13,20,24;
111:5,20,22;113:20
**perception-response (1)**
110:4
**perceptions (1)**
42:5
**perceptual (2)**
102:8;103:5
**perceptual-reaction (1)**
28:18
**perfectly (2)**
83:16,17
**perform (1)**
66:12
**performance (14)**
12:18,24;13:17;
28:17;33:11;34:15;
35:4,9,11;41:13;91:24;
92:20;93:18;99:10
**performed (2)**
34:8;42:22
**period (5)**
41:19;112:11;118:21;
119:2,15
**periodically (1)**
93:12
**peripheral (8)**
12:20,23;92:16,23;
93:7,14,16;94:4
**peripherals (1)**
44:16
**person (9)**

**personal (3)**
3:14;30:24;44:13
**personally (2)**
34:8;57:3
**perspective (2)**
10:13,13
**PhD (3)**
5:21;19:4;45:12
**Philadelphia (3)**
6:11;57:20,22
**Phoenixville (1)**
4:15
**phone (4)**
29:4;70:2;106:23;
114:17
**photographs (5)**
65:25;66:22,24;67:3;
78:6
**photos (4)**
70:11,17,18,19
**phrasing (1)**
35:14
**Physical (3)**
8:24;12:8;65:23
**physician (1)**
21:3
**physicians (1)**
21:11
**physician's (1)**
21:6
**physics (1)**
21:23
**pick (2)**
100:14;103:14
**Plaintiff (23)**
48:3,12;50:3,9;51:2,
20;52:18;55:10;56:10,
19,23;58:10;59:4;60:4,
24;61:7,11,13,15,18,21;
62:20;70:4
**plaintiff/defendant (2)**
56:16,18
**please (1)**
4:11
**pm (2)**
61:4;125:9
**point (21)**
22:6;38:18;62:5;
63:12;67:7,16;71:13,
13;74:18;79:6,18;
83:19;84:16;108:19,22;
109:25;110:3,16;
111:10,16,21
**pointers (1)**
3:22
**Police (9)**
61:11;70:7;71:2;
80:17;82:8;122:8,14,17,
21
**policies (3)**

**policy (1)**
71:8
**popping (1)**
37:12
**population (13)**
10:16,17,25;11:10,12,
14,17;12:14,16;13:7,14;
106:5;114:2
**portfolio (2)**
16:17,21
**position (3)**
6:6;43:9;57:15
**positions (1)**
6:8
**possess (2)**
31:4,22
**possible (3)**
68:12;114:4;115:17
**Possibly (1)**
105:22
**potential (4)**
34:14;99:4;110:8;
116:6
**potentially (2)**
46:23;99:10
**practice (7)**
6:9,10;12:10;14:11;
20:14;40:25;105:16
**preceded (2)**
89:2,5
**pre-collision (1)**
116:5
**precursor (1)**
49:5
**predict (4)**
13:6;94:18;116:3;
117:16
**predictable (2)**
87:7,7
**predicting (1)**
40:21
**predictors (1)**
120:7
**pre-event (1)**
116:5
**premises (1)**
25:20
**preparation (2)**
73:6;76:25
**prepare (4)**
26:14;56:2;69:23;
72:19
**prepared (2)**
73:23;76:3
**prepped (1)**
73:2
**presentation (1)**
38:14
**presentations (9)**
27:12,13;37:15,18,
25;38:2,10,16;39:8
**pretty (3)**

**prevalent (1)**
115:20
**prior (10)**
55:13;66:16;73:15;
105:13;109:22;111:18;
116:13;120:7,18;
123:21
**private (1)**
14:23
**probably (14)**
12:20;25:3;30:19;
48:8;50:14;64:16;91:9,
11;96:11;98:11;105:25;
113:4,19;114:10
**problem (5)**
87:17,17;99:19;
105:14,18
**problems (4)**
36:18;104:12;105:10,
12
**procedures (2)**
88:16;91:5
**proceed (1)**
16:24
**process (8)**
3:21,23;13:20,21;
16:4;102:8;103:5,25
**processed (2)**
32:16,17
**processes (1)**
96:24
**processing (4)**
5:16;28:3,12;35:25
**produce (2)**
26:8;55:24
**produced (2)**
50:14,18
**product (6)**
11:4,8,11;12:7;38:6;
56:22
**production (1)**
70:14
**products (8)**
8:18;9:6,9;11:9;35:3;
39:21;44:15;45:20
**professional (16)**
7:9,21;8:6;13:23;
14:5,13,18;16:5;18:15;
19:13;20:9,11,16,25;
30:24;42:10
**professionals (2)**
18:17;20:24
**professors (1)**
7:15
**program (5)**
18:24;20:2,4;42:17;
43:12
**programs (3)**
19:15,20;20:6
**progression (1)**
45:4
**project (2)**

**11:4,24**
**projects (3)**
16:18,19,23
**prone (1)**
103:19
**proper (1)**
88:12
**protocol (1)**
103:20
**prove (1)**
22:21
**provide (7)**
16:17;17:7;42:24;
60:17;74:17;90:6,22
**provided (2)**
24:25;73:10
**providing (2)**
43:2;82:25
**psychiatric (1)**
40:22
**psychology (9)**
5:15,19;19:4,6,7,10,
15;20:22;40:14
**publication (5)**
38:14;39:5,7
**publications (9)**
27:5;37:14;38:3,11,
16,19,21,22;39:8
**publicly (2)**
39:8,12
**published (2)**
39:24;42:6
**pull (5)**
90:9,9,16,17,18
**pulled (4)**
54:25;58:19;111:13,
14
**pulling (1)**
83:5
**push (1)**
114:22
**put (10)**
46:19;70:2;72:16;
78:6;95:19;96:14;
101:21;102:10,18,23
**puts (2)**
100:17;101:13
**putting (4)**
46:17;103:6,8,10

**Q**

**qualification (1)**
16:2
**qualifications (1)**
20:14
**qualified (4)**
23:6,11;24:12;76:19
**qualify (1)**
20:10
**quickly (2)**
37:12;122:11

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 48 of 52   PageID 3238

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

# R

**race (1)**
25:15
**rain (1)**
95:13
**ran (2)**
55:11,18
**Ranade (3)**
75:16,22;78:20
**R-A-N-A-D-E (1)**
75:22
**range (5)**
10:14;18:9;19:10;
21:15;37:6
**ranges (1)**
9:2
**rate (1)**
58:23
**rates (2)**
40:22;42:21
**react (4)**
96:10;97:14;98:7;
113:17
**reaction (17)**
28:7;35:22,25;41:8;
55:12;97:10,14;98:22;
104:7;106:7;107:21;
110:12;112:6,10,12,25;
113:3
**read (5)**
38:5;60:10;85:21;
109:9;125:4
**readiness (1)**
87:6
**Ready (1)**
52:4
**realize (2)**
95:18;117:3
**realized (1)**
73:8
**realizing (1)**
95:8
**really (3)**
101:9;113:10;116:21
**rear (1)**
61:8
**reason (15)**
14:6;25:24;26:10;
30:22;81:9;82:11,14,
15;104:24;109:24;
115:18;118:9;119:20;
123:18;124:11
**reasonable (8)**
15:21;62:8;77:8;
82:20;84:22;85:3;
89:19;109:12
**reasonably (6)**
55:21;93:13;94:10;
108:23;111:2;114:5
**recall (33)**
17:2;18:6,11;19:13;

23:22;26:4;46:24;48:9,
13,19,20;49:10,14;50:2,
11;57:17,17;62:5;63:3;
64:3,15;65:11;68:12,
13;69:21;70:22;71:18,
20;73:16;78:22;79:6;
82:15;85:14
**recalled (1)**
85:20
**receipt (1)**
71:7
**receive (1)**
75:13
**received (2)**
28:8;75:10
**receiving (1)**
101:14
**recent (3)**
29:25;37:17;69:19
**recertification (1)**
17:24
**recess (2)**
52:3;106:22
**recitation (1)**
86:12
**recognize (7)**
29:11,13;46:15;72:9;
74:11;81:25;108:3
**recognized (1)**
19:2
**recognizes (1)**
34:14
**recollection (5)**
63:7;64:18;80:9;
85:16,22
**reconstruction (7)**
15:13,13,16;21:17;
22:3,9,10
**reconstructionist (3)**
21:14;22:11,16
**reconstructionist's (1)**
22:23
**record (6)**
29:12;43:20;56:13,
14;72:15;116:10
**recorded (1)**
78:13
**records (6)**
49:13;56:8;78:21,23;
79:7;105:8
**recover (1)**
118:19
**redesigning (2)**
42:25;43:2
**reference (10)**
3:12;24:10;25:9;
34:18;48:15;82:8,14;
83:10;84:2;114:12
**referenced (6)**
76:10;77:6;107:12;
108:15;115:3,6
**references (5)**
49:20;51:7;70:8;

87:12;104:21
**referencing (1)**
89:17
**refers (2)**
21:17,18
**refrigerator- (1)**
44:24
**regard (3)**
38:22;48:22;80:3
**regards (2)**
81:22;86:13
**regional (1)**
6:14
**relapse (1)**
40:21
**relate (3)**
92:25
**related (21)**
12:21;16:10;18:12;
28:5;33:11;34:11;38:3;
39:20,24;41:4;48:24;
49:5;51:21;53:2;54:4;
72:13;92:20,23;116:21;
117:19,21
**relates (5)**
46:9;87:5;93:2;
96:19;98:10
**relation (1)**
89:20
**relative (2)**
80:4;99:19
**relax (4)**
116:24,25;117:8;
118:18
**relied (3)**
75:5;79:17;84:20
**rely (4)**
81:12,13;84:17;123:4
**relying (9)**
79:15,21,23;80:7;
81:5,10;83:20,22;
106:11
**remember (35)**
17:12;18:4;23:24;
25:13,25;46:17;47:8,18,
21;48:4,16;49:11,23;
50:5,8,24;51:8;52:11,
25;53:5,16,18;54:3;
55:14,17;58:13,17;
64:11;67:3;91:15;
101:12;102:24;106:8,9;
122:4
**repetition (1)**
88:19
**rephrase (2)**
4:8;114:25
**report (57)**
26:8,24;50:14,19,22;
55:24;56:2,6;61:11;
62:15;70:3,6,7,8,10;
71:2,22;74:2,13,15,20;
75:8,16,18;76:3;77:2,
14,24,25;78:7,20;79:9,

15;80:7,17;81:7,21;
82:3,6,8,12;84:3,5;86:7;
87:13;90:4;91:25;
104:18,21,25;105:3;
106:11;107:4;112:13;
113:16;116:9;122:5
**reporter (3)**
3:24;75:21,24
**reports (8)**
26:14,17,19,22;34:5;
39:11,15,18
**represent (1)**
3:10
**representative (2)**
3:15;13:14
**request (3)**
60:13;70:14,16
**requested (1)**
26:11
**require (7)**
14:15;16:6,6,9;20:15;
26:24;50:21
**required (6)**
26:12;90:4,5;93:12;
108:23
**requirement (3)**
14:12,19;18:7
**requirements (6)**
14:9,14;15:3;18:11;
19:14;43:13
**research (30)**
7:12;8:2,12;10:12;
12:13;16:18;17:10;
27:8,24;33:2,18;34:5,
11;35:8,21;37:10;38:4;
40:11,17;41:9;71:20,22,
25;42:7,7;43:8;49:12;
109:11;116:2
**research-based (1)**
9:15
**researcher (1)**
14:16
**resolve (1)**
121:7
**resources (1)**
100:2
**respect (7)**
8:21;20:23;28:18;
64:25;85:15;97:10;
101:24
**respectfully (1)**
108:18
**respond (8)**
42:2;87:6;91:2;97:3;
98:5;108:24;109:18;
110:17
**response (5)**
52:5;55:12;107:16;
114:19;125:6
**responses (2)**
33:15;70:13
**responsibility (1)**
83:4

**restroom (1)**
100:7
**result (2)**
92:10;120:23
**results (3)**
37:2;49:3;71:3
**retained (13)**
26:7;47:18;52:16;
53:13;55:15;56:9,25;
57:6,8,11,13;58:15;
76:24
**retina (2)**
95:16;102:7
**retrieved (1)**
70:25
**Reuschling (17)**
63:21;64:4,19,24;
66:9,10;70:7,21,24;
71:16;75:5;78:9;79:18,
23;80:5;81:5;86:12
**Reuschling's (12)**
71:17;79:25;81:10,
16;83:22,24;84:3,17,21;
86:8,16,22
**reverse (1)**
89:11
**review (5)**
16:20;77:19,23;
85:10;108:8
**reviewed (14)**
70:3,4,6,7,8,10,11;
71:22;73:10,11;74:21;
77:21,25;78:20
**reviewing (2)**
49:12;78:22
**Revolving (1)**
55:5
**rhythm (3)**
119:23,24;120:3
**Ricarda (1)**
122:6
**Richmond (3)**
71:14;119:4,10
**right (32)**
37:5;54:21;55:2,23;
61:7,8,15;79:20,22;
80:12,24;82:25;85:8;
86:2,20;90:16,21,22;
91:3;92:8;93:4,10;94:2;
105:25;108:19;109:20,
22;110:2;111:24,25;
123:15;125:3
**rises (1)**
51:16
**risk (5)**
42:5,20,23;116:16;
118:2
**risks (1)**
42:4
**road (14)**
61:5,7,25;88:11,25;
89:10,12,15,15;94:3,13;
105:12;118:16;119:5

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 49 of 52   PageID
3239
Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

**roadway (19)**
8:19;9:5;28:13;14;
38:23;54:24;56:20;
89:5,9;92:14;94:14;
96:17;107:16;108:25;
110:19;114:16;115:8,
12;123:12
**Robau (1)**
47:12
**Robert (4)**
3:13;59:7;63:12;
104:12
**Robson (22)**
6:2,12,14,20;29:6,16,
17;30:23;31:2,13,14;
45:17;46:19;47:3,5;
56:5,14;57:4;72:4,12,
24;73:20
**rods (3)**
94:23;95:17;103:2
**role (1)**
7:13
**room (6)**
100:8,13,19;101:8;
102:6,12
**Route (3)**
61:2,3;105:11
**rubric (3)**
98:20;103:25;104:8
**Rule (2)**
46:7;62:19
**rules (6)**
88:11,15;90:13,13;
91:5,7
**running (1)**
12:13
**Rural (1)**
61:5

**S**

**safe (1)**
9:11
**safely (4)**
83:3;90:20;100:11;
107:6
**Safety (2)**
8:3,4
**same (10)**
4:2;30:20;43:16;
68:10,11;88:19;100:3;
101:15;102:13;117:5
**sample (2)**
12:17,25
**sampling (1)**
12:15
**saying (6)**
20:10;31:19;79:15;
114:14;122:24,25
**scale (1)**
112:3
**scene (6)**
22:24;61:14;65:5,15,

16;66:3
**scheduled (1)**
73:7
**scheduling (1)**
69:11
**school (5)**
5:13;7:13;16:8;18:20,
24
**Science (10)**
5:14,18;8:16;9:16,18;
12:23;18:9;19:19;
33:19;45:16
**Scientific (1)**
27:8
**scope (2)**
47:21,24
**Scranton (5)**
5:17,17;40:13;41:9,
16
**screws (1)**
120:3
**S-E-A (1)**
61:20
**S-E-A's (1)**
77:23
**seat (1)**
10:23
**second (5)**
57:10;66:15,21;
75:19;123:17
**seconds (16)**
61:21;108:17,21;
109:14,17;110:14,15,
21,21;111:2;112:4,9;
113:17,19,23;114:6
**secretary (1)**
51:12
**seeing (6)**
63:3;79:5,7;85:14,20;
92:7
**seems (1)**
122:23
**segment (1)**
113:25
**send (3)**
16:20;59:22;94:24
**senior (1)**
11:22
**seniors (1)**
35:10
**sensation (2)**
94:22,22
**sense (2)**
32:15;95:2
**senses (2)**
36:9;95:15
**sensitivity (2)**
12:19;36:10
**sent (4)**
31:13,14;32:16;60:12
**sentence (1)**
109:9
**sentences (1)**

4:5
**separate (1)**
43:9
**SEPTA (1)**
57:19
**September (2)**
5:6;30:3
**server (1)**
45:3
**servers (1)**
44:16
**set (5)**
15:3;23:4;30:16;
34:24;35:13
**seven (4)**
9:24;108:13;110:19;
114:11
**several (3)**
27:11;114:12;119:14
**severity (3)**
103:17,23;104:7
**sexist (1)**
21:20
**shakes (1)**
4:5
**Sherman (1)**
3:12
**shift (2)**
100:2;120:2
**shingle (1)**
15:7
**Shore (2)**
51:4;52:8
**shortcut (1)**
56:17
**shorter (1)**
96:6
**shortly (3)**
89:15;121:19,20
**short-term (6)**
87:19;88:21,22;
89:21;91:19;121:21
**shoulder (2)**
86:2;90:16
**show (2)**
56:8;80:23
**showed (1)**
58:3
**showing (9)**
29:2;46:5,13;62:19,
22;72:7;74:9;81:23;
108:2
**shown (1)**
116:9
**shows (3)**
109:11;116:11;
122:20
**side (2)**
54:21;102:5
**sign (2)**
89:2;125:4
**signal (6)**
86:19;90:4,23;92:6,

12;94:24
**signalling (1)**
91:3
**signals (5)**
103:3,4,6,7,10
**signed (2)**
89:9,13,16
**significance (1)**
98:18
**significant (1)**
27:23
**significantly (1)**
54:23
**signs (1)**
42:4
**Similar (2)**
45:17;88:19
**simply (2)**
110:17;123:14
**simulation (1)**
78:3
**single (4)**
25:18;114:16;115:7;
118:16
**single-vehicle (3)**
53:4;54:5;124:20
**sit (3)**
16:25;37:12;74:16
**site (17)**
65:6,7,8,17,18,19,22,
25;66:5,11,15,20;70:19;
71:11;78:13;79:10;82:7
**sites (1)**
44:10
**site-specific (1)**
88:24
**sitting (1)**
104:10
**situation (4)**
87:6;90:9;107:17;
113:18
**six (4)**
69:5;86:11;109:10;
110:18
**six-foot (1)**
9:25
**Sixty-three (1)**
61:16
**six-year-old (1)**
11:20
**sized (1)**
44:25
**sketch (1)**
59:17
**skewed (2)**
56:23;122:16
**ski (1)**
25:16
**sleep (4)**
117:21,23;120:2,9
**Sleepiness (1)**
116:13
**slept (1)**

12;94:24
**slight (1)**
104:14
**slips (1)**
71:4
**slower (1)**
35:21
**small (2)**
18:24;39:2
**Smith (2)**
49:16;50:23
**Society (5)**
7:24,25;8:3,4;18:15
**software (2)**
44:19,19
**somebody (1)**
15:24
**someone (8)**
9:24;24:11;33:20;
46:19;69:15,16;103:11;
123:9
**sometimes (2)**
11:3;26:9
**somewhat (1)**
93:8
**somewhere (4)**
13:8;34:17,17;79:16
**Sorry (13)**
32:9;40:5;43:17;
54:6;59:3;65:18;66:6;
68:20;69:8;87:16,17;
105:4;114:25
**sort (32)**
6:21;9:15,22;10:2;
12:9;17:24;18:9;27:15;
31:19;33:23;34:21;
35:14;39:15;41:10;
43:24;76:11,24;86:5,7;
88:3,4;89:18;91:11;
98:16;103:19;104:11;
105:20;106:2,4,5;
107:19;120:21
**sorts (2)**
19:11;106:7
**Sounds (1)**
87:11
**south (9)**
61:2,3,5,24;67:6,9;
83:13,16,17
**Southeast (3)**
57:20,21,21
**speak (4)**
57:4;63:12,18;64:4
**speaking (2)**
24:11;68:21
**specific (10)**
9:23;11:15;18:11;
25:10;34:4,4;41:11;
49:7;121:23;122:18
**specifically (6)**
21:16;28:17;66:8;
75:9;79:3;80:2
**speed (7)**

117:22

Case 2:17-cv-02101-SHL-cgc Document 124-6 Filed 09/14/18 Page 50 of 52 PageID 3240

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

21:23;58:21;83:3;
116:19,23;117:2;
123:12
**spends (1)**
15:18
**spoke (5)**
64:11,19;69:3;
122:14,23
**spoken (6)**
63:9;67:14,20;68:4,
22;69:15
**spring (2)**
17:13,15
**square (1)**
55:11
**staff (1)**
16:21
**stages (1)**
96:25
**stand (1)**
23:3
**stand- (1)**
22:5
**standard (5)**
13:3,17;106:9,12;
113:20
**standardization (4)**
88:10,11,12;90:13
**standardized (1)**
15:3
**standing (1)**
58:7
**standpoint (5)**
9:3;12:23;13:10;
20:25;35:3
**start (10)**
4:2;40:12;59:5;92:6;
111:8,20,25;116:25;
117:4,7
**started (9)**
5:7;6:5;30:21,25;
40:6,8;44:4;54:23;
113:4
**starting (1)**
118:13
**starts (11)**
95:2;111:9,10,22;
112:7;114:10,11;
116:24;117:8,10
**state (28)**
4:11;5:22;14:8,9,11,
13,18;15:14;18:20;
23:12,15,17,23;24:6,8,
22;26:25;27:3;41:21;
42:11,14;43:5,10;
54:12;60:22;67:17;
82:2;122:12
**stated (7)**
58:24;61:11,12;82:9,
9,13;96:7
**statement (4)**
12:4;71:8;79:19;87:4
**statements (3)**

12:2;31:13;84:10
**states (2)**
20:15;54:15
**state-sponsored (1)**
42:16
**statistical (2)**
12:15;13:16
**statistics (3)**
7:12,18;41:17
**status (2)**
104:11,11
**stay (3)**
90:19;92:13;93:3
**steer (1)**
97:13
**steering (6)**
112:17,19;117:5,6,
10;118:18
**step (1)**
84:4
**steps (1)**
16:25
**sticks (1)**
58:12
**still (5)**
7:2;17:16;56:5;
66:24;73:13
**stimulus (16)**
94:23;95:15;100:15,
18;101:6,11,13,18,19;
102:9,17,24,25;103:14;
104:3;118:10
**stop (2)**
105:16;117:9
**stopped (5)**
54:20;55:9,22;119:7,
14
**storage (3)**
44:21,22;45:3
**store (1)**
45:2
**straight (2)**
54:24;120:15
**straightforward (1)**
110:25
**strategies (1)**
42:25
**strength (1)**
8:25
**stretch (1)**
89:5
**strictly (1)**
19:21;38:10
**struck (2)**
25:16;51:19
**stub (1)**
100:20
**students (2)**
41:17;43:13
**studies (6)**
8:17;34:8;39:19,20;
40:20;106:3
**studio (1)**

44:9
**study (14)**
9:14;12:6,9,13;13:13;
32:25;34:21,22;35:6,6;
40:17,20;41:2;43:12
**studying (1)**
41:5
**stuff (2)**
31:20;43:7
**subfield (1)**
19:22
**subgroup (1)**
12:17
**subpoena (1)**
60:13
**subsection (3)**
76:8;79:9;82:16
**subset (2)**
10:17;19:22
**subspecialty (1)**
21:11
**successful (1)**
87:8
**successfully (1)**
100:11
**Sudafed (2)**
99:14;117:19
**sudden (2)**
123:16,19
**suffered (1)**
121:18
**suffering (2)**
103:12;104:13
**sufficient (3)**
62:10;90:6;91:4
**suggest (1)**
105:18
**suggested (1)**
123:6
**suggests (3)**
89:10;105:2,5
**suitcase (1)**
100:22
**sum (1)**
96:5
**summarize (1)**
87:21
**summation (2)**
86:22;120:20
**summer (1)**
44:6
**summertime (1)**
51:17
**Sun (1)**
51:16
**sunrise (2)**
50:4,6;51:14
**supplemental (3)**
76:3;77:24,25
**support (4)**
15:9;17:8;59:2;83:21
**Sure (23)**
3:9;4:13;5:14;7:22;

10:9,11;24:8;25:23;
27:9;30:5,9;35:18;
38:17;53:18;60:12;
64:9;68:25;70:20;
73:17;87:9;98:14;
106:20,21
**swapped (2)**
118:22,24
**swerve (2)**
97:13;110:11
**swing (1)**
61:6
**switching (1)**
60:24
**sworn (1)**
3:3
**symptoms (2)**
116:6,18
**synonyms (1)**
7:20
**system (5)**
8:20;10:15;11:9;
13:11;41:10
**systems (3)**
8:19;9:5,5,9,12,20;
10:15;11:6;35:4;44:13,
21,23;106:3

**T**

**TA (2)**
7:11;41:16
**Taillights (1)**
55:6
**tailored (1)**
11:15
**talk (9)**
63:9,15;69:22,24;
87:3;99:2;106:25;
107:12;118:11
**talked (8)**
32:5;43:7;64:18,22;
68:16;70:2;98:12;
118:17
**talking (20)**
15:12;52:7;59:5;
61:13;76:9;78:12;84:6;
87:5;91:10,15;98:21;
105:7,9;107:8;111:4,5,
15;115:2;120:13;124:6
**talks (1)**
87:13
**tall (1)**
9:25
**task (10)**
27:22;28:2;35:11,12;
43:2;87:23;91:13;
92:21;94:7;98:15
**tasks (1)**
42:22
**TBI's (1)**
121:20
**teach (1)**

7:14
**teaching (3)**
7:9,11,14
**team (1)**
42:24
**technical (4)**
34:5;39:11,15,18
**technically (1)**
22:3
**techniques (1)**
13:16
**Telephonic (1)**
125:8
**telling (1)**
122:19
**tend (2)**
35:21;36:16
**tends (1)**
36:11
**Terence (1)**
49:16
**term (6)**
13:2;20:23;21:17;
22:8,10;28:12
**terms (13)**
6:15;9:19;19:7;
28:20;31:20;32:11;
33:5;51:7;53:25;83:8;
96:14;105:23;115:12
**test (3)**
12:23,24;71:3
**testified (26)**
3:3;23:14;24:17,23;
25:4,8;26:20;46:17;
47:15;48:12;80:10,11;
85:11,14,17,19,23,25;
86:3,19;104:14;119:9;
120:13,14;122:7,14
**testify (5)**
24:13;47:14;50:12
**testifying (1)**
24:21
**testimony (17)**
25:13;26:13,16;46:6;
80:2,15;84:9;85:5,7,11,
22;105:10;117:25;
120:11,24;121:8,11
**testing (3)**
13:18;24:13;71:4
**Thanks (1)**
75:24
**theory (3)**
48:17;57:15;58:14
**therefore (5)**
27:22;91:6;102:18;
111:19;116:25
**thing's (1)**
3:24
**thinking (2)**
26:3;122:17
**third (2)**
25:20;118:21
**Thomas (2)**

Case 2:17-cv-02101-SHL-cgc   Document 124-6   Filed 09/14/18   Page 51 of 52   PageID 3241

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

**3:11;71:6**
**though (2)**
64:21;74:23
**thought (3)**
48:17;77:14;87:16
**threat (5)**
109:23,24;110:2,5,16
**three (23)**
18:4,6;19:23;23:15;
24:22;25:12;27:3;
30:11;34:13;43:10;
55:3;58:23;62:15;
64:10,19;70:23;76:10,
21;82:5;115:19,19;
116:8;119:12
**three- (1)**
114:5
**throughout (1)**
86:7
**thru (1)**
55:3
**thumbnail (1)**
59:17
**tickets (1)**
71:7
**till (1)**
6:12
**timeline (1)**
18:3
**times (27)**
3:19;23:6,10,15;
24:16,19;25:4,7,8;
35:22;56:9,24;57:5,12;
58:13,16,23;64:6,7,10,
19;68:18,22;69:14,18;
119:7,14
**title (2)**
16:12;20:19
**Tobolski (2)**
67:18;71:16
**Tobolski's (1)**
71:20
**today (9)**
15:12;63:2;69:20,23;
72:20;74:16;76:6,7;
104:10
**today's (2)**
69:22;73:3
**toe (2)**
100:21;101:11
**together (4)**
46:18,20;70:3;72:16
**told (8)**
38:9;59:16;66:14;
75:12;76:2;122:8,9,15
**took (8)**
6:16,17;22:25;65:23;
66:22,23;67:4;70:20;
99:14;108:21
**topic (5)**
18:9;32:4,6;39:15;
76:21
**topics (10)**

9:4;27:19;28:21;
34:11;41:25;47:24;
48:25;62:16;76:11,13
**tower (1)**
45:21
**toy (2)**
11:18,20
**track (1)**
57:16
**tracking (1)**
92:10
**tractor (3)**
48:2;61:20,22
**trade (1)**
12:19
**traditionally (1)**
19:14
**traffic (5)**
54:13,22;83:6;88:9;
93:11
**tragic (1)**
58:9
**trailer (4)**
48:2;61:7,20,22
**trainer/supervisor (1)**
58:7
**training (2)**
8:23;21:10
**transferred (1)**
59:25
**Transit (1)**
57:21
**translates (1)**
32:18
**translation (2)**
32:17;33:14
**Transportation (1)**
8:2
**Trauma (1)**
42:15
**traumatic (2)**
121:18;122:4
**travel (7)**
55:23;79:20,22,24;
80:24;82:24,25
**traveling (10)**
58:22,24,24;67:6,9;
80:12;83:18;85:8;
88:25;119:17
**trial (14)**
23:14;24:18,18;
26:13,17;46:6;47:11,
14;50:13,17;53:19,19;
72:16,24
**trials (1)**
46:16
**trigger (1)**
94:23
**trip (2)**
25:20;119:11
**trooper (4)**
15:14;67:17;71:16;
120:25

**trough (1)**
120:6
**troughs (1)**
119:24
**truck (19)**
55:2,4,19;61:5,9,22;
63:19;66:11;70:18;
78:10;92:5,7;93:3,7,11,
13;94:2,3;110:15
**try (4)**
10:10;13:14;15:19;
16:15
**trying (5)**
22:21;23:21;35:3;
96:5;111:9
**turn (6)**
79:9;82:5,16;90:22;
92:6,12
**turned (1)**
93:16
**turning (3)**
37:4;78:10,11
**twice (3)**
23:14;65:17,19
**two (25)**
7:23;18:3,6;29:6;
40:19;48:24;58:18,23;
61:2,2;73:15;74:25;
79:14;80:17;85:13,18,
24;87:13;107:2;108:17,
20;109:17;110:15;
116:18;119:24
**two- (1)**
113:22
**two-and-a-half (7)**
109:14;110:14,21;
111:2;112:4,6,9
**two-car (1)**
124:20
**two-vehicle (1)**
54:6
**two-week (1)**
15:16
**type (3)**
11:4;22:2;124:22
**types (6)**
8:18;33:16;36:19;
45:23;87:13;88:19
**typically (20)**
11:10;12:11;21:8,17,
18;26:18,24;27:19;
33:11;35:24;36:7;37:5;
46:25;60:2;90:8;
112:19,21;114:15;
118:7;120:2
**typo (2)**
74:23;75:4

**U**

**ultimate (2)**
58:13;84:5
**umbrella (1)**

94:6
**unconscious (1)**
61:14
**under (13)**
31:5,22;39:7,11;
41:18,20;73:20,23;
82:6;94:6;98:20;
108:11,13
**undergraduate (4)**
5:12;7:12;35:7;43:13
**underlying (2)**
84:6;120:21
**understandings (1)**
35:14
**Understood (29)**
4:21;11:23;13:9;
14:20;16:3;21:2,21;
23:4,24;24:10,10,16;
26:2,6,23;27:4;38:17;
45:15;55:14,14;58:11,
11;68:14;69:14;73:19;
94:5;95:11;103:17;
105:19
**unexpected (5)**
108:25;109:13;
110:19,23,24
**unfamiliar (1)**
102:12
**unfortunately (1)**
58:3
**unh-unhs (1)**
4:6
**United (1)**
54:15
**units (1)**
44:25
**universities (2)**
18:19;19:17
**University (14)**
5:16,20,22;15:17;
16:8;18:21;40:13;41:9,
15,21;42:14,16;43:5,10
**unknown (1)**
124:11
**unless (1)**
120:2
**unlit (1)**
94:13
**up (27)**
10:24;47:16,17;
54:25;61:7;76:14,25;
96:5,22;99:12;100:6,8,
14,20;102:13;103:14;
105:11;109:19;113:23;
116:25;117:19;119:8,9;
121:25;122:20;123:5,
16
**upon (27)**
11:4;12:11;13:6;
21:11;35:20;61:15;
75:5;79:23;81:5,12,13;
83:22;84:17,20;88:7,
18;89:7;90:12;91:7;

96:3;97:24;98:6,7,8,9;
112:21;123:4
**upper (2)**
36:25;113:19
**up-to-date (1)**
46:8
**usability (1)**
44:20
**use (12)**
8:17;9:10,10,11,20;
11:13;20:23;22:8;
30:15;35:14;37:17;
100:7
**used (1)**
44:25
**user (3)**
9:22,22;10:14
**user-based (1)**
39:19
**users (4)**
12:14;13:15;34:24;
35:2
**uses (1)**
84:24
**using (3)**
9:12;10:15;109:3
**usually (1)**
101:3

**V**

**V-1 (3)**
28:24;29:11,15
**V-2 (6)**
28:24;29:11,18,21;
30:17;46:9
**V-3 (2)**
30:13,20
**V-4 (3)**
46:3,5,14
**V-5 (2)**
62:18;63:2
**V-6 (2)**
72:2,8
**V-7 (3)**
74:5,7,10
**V-8 (2)**
80:21;81:24
**V-9 (3)**
107:24;108:3,4
**varies (1)**
56:19
**vehicle (23)**
13:12;21:24,25;
25:18;38:24;54:20;
55:22;71:2;82:3;83:12;
85:13,17;86:9,23;
114:15,16;115:7;
117:10;118:8,16;121:5;
123:11;124:16
**vehicles (3)**
8:19;9:6;83:7
**venture (1)**

Estate of Robert J. Glad vs.
Demby, et al

William J. Vigilante, Jr., Ph.D.
March 10, 2017

64:21
**verbal (1)**
4:4
**verdict (2)**
51:2;52:14
**Vernetta (1)**
3:11
**version (2)**
29:18;86:8
**versus (1)**
56:10
**video (3)**
78:3,5,16
**videos (7)**
66:22,25;67:4;70:11,
23;78:9,15
**VIGILANTE (143)**
3:2;4:1,13,19,20;5:1,
4,7,24;6:1;7:1,5;8:1;
9:1;10:1;11:1;12:1;
13:1;14:1;15:1;16:1;
17:1;18:1;19:1;20:1;
21:1;22:1;23:1;24:1;
25:1;26:1;27:1;28:1;
29:1,2,7,19;30:1,21;
31:1,3,5,23;32:1,2;33:1;
34:1;35:1;36:1;37:1;
38:1,25;39:1;40:1;41:1;
42:1;43:1;44:1;45:1,18;
46:1,5;47:1;48:1;49:1;
50:1;51:1;52:1;53:1;
54:1;55:1;56:1;57:1;
58:1;59:1;60:1;61:1;
62:1,22;63:1;64:1;65:1;
66:1;67:1;68:1;69:1;
70:1;71:1;72:1;73:1,24;
74:1;75:1;76:1;77:1;
78:1;79:1;80:1;81:1;
82:1;83:1;84:1;85:1;
86:1;87:1;88:1;89:1;
90:1;91:1;92:1;93:1;
94:1;95:1;96:1;97:1;
98:1;99:1;100:1;101:1;
102:1;103:1;104:1;
105:1;106:1;107:1;
108:1;109:1;110:1;
111:1;112:1;113:1;
114:1;115:1;116:1;
117:1;118:1;119:1;
120:1;121:1;122:1;
123:1;124:1;125:1
**Vigilante's (1)**
29:6
**violate (1)**
92:3
**violated (5)**
62:7;77:8;85:3;
89:25;99:23
**violation (6)**
47:24;82:19;89:19;
91:6;103:22;109:16
**visibility (2)**
39:2;48:2

**Vision (35)**
32:4,12,13;33:3,20;
37:18,24;38:20,22,23;
91:12,18;92:16,18,20,
24,24;93:8,15,16,25;
94:4,9,21;98:25;99:4,
12,19;100:14;101:16,
20,25,25;102:4,13
**visual (28)**
8:22;12:20,24;27:21,
22;28:18;32:14,23;
33:10,14;36:9,11;
55:20;91:14,23,24;
92:20;93:18;94:20;
95:12;96:8,17,18,20;
98:16;99:10;106:13,15
**voltage (1)**
45:21
**voluntary (3)**
13:21,24;14:7

**W**

**wage (1)**
71:8
**wake (3)**
99:12;100:20;102:13
**walked (1)**
58:5
**walking (1)**
100:23
**warn (1)**
118:12
**warned (1)**
89:9
**warning (3)**
42:3,4;124:22
**warnings (4)**
42:2,3;56:22;89:6
**waved (1)**
58:8
**way (18)**
43:11;48:21;50:9,10;
77:13,15;88:6;94:6;
95:25;96:6,8,11,12;
100:9,10;101:4;111:9;
113:3
**ways (2)**
15:10;87:8
**weave (1)**
100:10
**Web (2)**
44:8,10
**week (1)**
70:2
**weeks (1)**
73:15
**welcome (1)**
30:7
**weren't (1)**
81:19
**what's (3)**
47:23;100:16;101:5

**whatsoever (1)**
117:14
**wheel (18)**
62:13;115:5,25;
116:4,7,17,21;117:6,6,
10;118:8,14;119:18;
120:9,10,23;121:3;
123:22
**whichever (1)**
30:15
**whoever's (1)**
14:24
**who's (2)**
8:10;116:20
**WILLIAM (2)**
3:2;4:13
**windy (2)**
88:25;89:12
**wintertime (1)**
51:15
**within (8)**
10:25;13:8;19:22;
20:2,5;21:25;69:5;
106:17
**without (3)**
82:25;91:3,3
**WITNESS (11)**
43:19;49:18;51:5,13;
52:22;74:3;79:12;
82:17;99:2;125:5,7
**woke (1)**
121:25
**woman (2)**
21:19;58:19
**work (40)**
5:25;6:4;8:11;16:16,
17,17;22:2;23:3;30:25;
34:5;39:24;40:5,12,23;
41:24;42:13,24;43:12,
24;45:4,6,15,16,23;
47:22;50:9,10;54:20;
55:4;56:18,20,22;
57:11;64:15;69:12;
72:12,21,25;73:16;
120:3
**worked (10)**
6:2;16:18,19;41:17;
42:14;44:3,14;52:15;
57:8;63:23
**worker (1)**
42:21
**working (8)**
40:20;44:8,21;45:11;
50:3;51:18;68:10;86:14
**workshops (1)**
17:9
**worldwide (2)**
11:13,14
**worried (1)**
93:4
**wreak (1)**
121:21
**wrestle (1)**

120:23
**writing (2)**
109:9;113:15
**written (6)**
26:8;27:6;38:22;
47:23;48:21;50:18
**wrong (2)**
48:11;91:13
**wrote (4)**
77:14;87:11;104:17;
108:20

**Y**

**year (3)**
50:5;58:16;77:24
**years (11)**
9:24;10:25;16:9,12;
18:4,4,6;24:24;40:4;
43:11;60:19
**yellow (1)**
55:5
**yellowing (1)**
36:4
**Yep (3)**
52:22;78:2;96:13
**Yeses (1)**
4:4
**York (1)**
60:20
**young (2)**
10:20;11:20
**younger (7)**
35:2,17,22,23;36:9,
14,21

**Z**

**zero (4)**
111:6,10;112:3,4
**Zois (5)**
57:6,6,8;69:15,25
**ZUBER (8)**
43:18;47:9;75:23;
98:23;106:21;114:20,
23;125:2